1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF OHIO

3    WESTERN DIVISION

4    CASE NO.: 1:08-CV-00737

5

6    SAMUEL A. CAMPBELL                    PLAINTIFF

7        vs.

8    THE CITY OF SPRINGBORO, OHIO,         DEFENDANTS
     ET AL.
9

10             * * * * * * * * *

11   DEPONENT:        OFFICER NICK CLARK

12   DATE:            FEBRUARY 4, 2010

13             * * * * * * * * *

14
                                    **COPY**
15

16

17   Mindy Davis

18   Certified Court Reporter

19

20

21
              ***Barlow***
22
              Raising the Bar
23   **Reporting & Video Services, LLC**
              **620 Washington Street**
24            **Covington, Kentucky 41011**
              **(859) 261-8440**
25

2

1                                INDEX

2                                                          Page

3    Cross-Examination By Mr. Brannon                        4

4                              EXHIBITS

5                                                          Page

6    Deposition Exhibit S17                                  42
     Deposition Exhibit S2                                   56
7    Deposition Exhibit S5                                   87
     Deposition Exhibit S1                                  104
8    Deposition Exhibit S3                                  109
     Deposition Exhibit 1                                   175
9    Deposition Exhibit S5B                                 176
     Deposition Exhibit S5C                                 187
10   Deposition Exhibit S15                                 214
     Deposition Exhibit S14                                 222
11   Deposition Exhibit S9                                  239

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          The deposition of OFFICER NICK CLARK, taken for

2     the purpose of discovery and/or use as evidence in

3     the within action, pursuant to notice, heretofore

4     taken at the office of Rendigs, Fry, Kiely & Dennis,

5     900 Fourth & Vine Tower, 1 West Fourth Street,

6     Cincinnati, Ohio, on January 4, 2010, at 9:00 a.m.,

7     upon oral examination, and to be used in accordance

8     with the Ohio Rules of Federal Procedure.

9                    * * * * * * * *

10                     APPEARANCES

11    REPRESENTING THE PLAINTIFF:

12    Douglas D. Brannon, Esq
      Brannon & Associates
13    130 West Second Street
      Suite 900
14    Dayton, Ohio  45402

15    REPRESENTING THE DEFENDANTS:

16    Wilson G. Weisenfelder, Esq.
      Rendigs, Fry, Kiely & Dennis
17    900 Fourth & Vine Tower
      1 West Fourth Street
18    Cincinnati, Ohio  45202-3688
      (513)381-9200
19
      ALSO PRESENT:          Michael Stine, Glatfelter Ins.
20

21                    * * * * * * * *

22

23

24

25

4

1              OFFICER NICK CLARK,

2  called on behalf of the Plaintiff, after having been

3  first duly sworn, was examined and deposed as

4  follows:

5              CROSS-EXAMINATION

6  BY MR. BRANNON:

7      Q.   Mr. Clark, my name is Doug Brannon, as we

8  just got introduced to each other here. I'm here

9  today for the purposes of taking your deposition, as

10 I'm sure your attorney's already explained to you.

11     A.   Yes.

12     Q.   You most likely testified under oath

13 before and this is no different than that as far as

14 the answers. I'm going to ask you various

15 questions. I'm going to assume that you understand

16 those questions before giving me an answer. If you

17 don't, please say so and I'll be more than happy to

18 restate the question so that we get a clear record

19 of what's transpired here in this case.

20         If you ever need to take a break or

21 anything like that, all I ask is that you finish

22 answering the question that's on the table and then

23 we can break after that. Fair enough?

24     A.   Yes.

25     Q.   Could you please state your full name for

1    the record?

2         A.    Steven Nicholas Clark.

3         Q.    And what is your current address?

4         A.    My home address?

5              MR. WEISENFELDER:  I'm not sure we can

6         claim -- can we skip the home address?

7              MR. BRANNON:  If you agree to -- if I ask

8         for it privately, that you'll provide it to

9         me; is that fair, if you'll stipulate to that?

10             MR. WEISENFELDER:  With certain

11        conditions that it's not disclosed beyond

12        what's reasonably necessary.

13             MR. BRANNON:  For the case.  And I

14        understand that officers are often hesitant to

15        give out their home address.

16             MR. WEISENFELDER:  And to the extent that

17        he would need to be served with anything, I

18        will accept service on his behalf.

19             MR. BRANNON:  Okay.  Fair enough.

20   BY MR. BRANNON:

21        Q.    Your date of birth, Mr. Clark?

22        A.         REDACTED        1979.

23             MR. BRANNON:  And off the record, your

24        Social Security number?

25                   (OFF THE RECORD)

Barlow Reporting & Video Services, LLC
(859) 261-8440

6

```
 1  BY MR. BRANNON:
 2       Q.   Are you married?
 3       A.   No.
 4       Q.   Have you ever been married?
 5       A.   Yes.
 6       Q.   To whom?
 7       A.   Steven Warner.
 8       Q.   Steven?
 9       A.   Warner, Steven Nicole Warner.
10       Q.   I take it Steven is a female?
11       A.   Yes, she is.  As far as I know, that's not
12  legal in the State of Ohio.
13       Q.   Okay.  And when were you married to her,
14  from what period of time?
15       A.   '06 to '07, June to June.
16       Q.   Lasted for about one year?
17       A.   Yeah.
18       Q.   Did that end in divorce, dissolution?
19       A.   Divorce.
20       Q.   Any children?
21       A.   Yes.
22       Q.   How many?
23       A.   One.
24       Q.   How old?
25       A.   Three weeks.
```

7

1     Q.   Congratulations.

2     A.   Thank you.

3     Q.   And who is the mother of that child?

4     A.   Jennifer Dean.

5     Q.   D-E-E?

6     A.   D-E-A-N.

7     Q.   And do you have anybody currently residing

8 with you?

9     A.   Brian Hawk.

10     Q.   How long have you and Brian Hawk lived

11 together?

12     A.   He's stayed with me for about four years,

13 since he lost his apartment.

14     Q.   And it's my understanding that Brian Hawk

15 is a Springboro police officer; is that correct?

16     A.   Correct.

17     Q.   Have you ever lived with any other

18 Springboro police officers?

19     A.   No, I have not.

20     Q.   The residence that you live in, is that

21 your residence and he rents from you or how does

22 that work?

23     A.   Correct. I own it, he rents from me.

24     Q.   Is it a single-family house or do you own

25 a multi-family?

8

1      A.   It's a single-family house.

2      Q.   Can you give me some idea of your

3  educational background?

4      A.   I graduated high school in 1998 from the

5  City of Lebanon.  I attended the Great Oaks Police

6  Academy.  I don't know the exact month, sometime in

7  2000, I believe.  After graduating that, I did

8  attend some on-line classes.  I believe I have about

9  60 credit -- close to 60 credit hours.

10     Q.   And which academy did you say that was, I

11  didn't catch the name?

12     A.   Great Oaks in Sharonville.

13     Q.   Great Oaks Academy.  And at Great Oaks,

14  did you receive any awards or distinguishments --

15     A.   I --

16         MR. WEISENFELDER:  Let him finish the

17     question.

18     A.   I'm sorry, I thought that was the end of

19  the question.

20     Q.   Go ahead.

21     A.   I was the sergeant-at-arms of the class

22  and I placed second in the shooting competition.

23     Q.   And what does sergeant-at-arms of the

24  class mean?

25     A.   Basically there's the president, the

1 vice-president, and the sergeant-at-arms, and

2 anything that came up as to a discussion in terms of

3 a vote, I was there for the vote.

4     Q. Was that an elected position?

5     A. Yes.

6     Q. So you were elected by your classmates?

7     A. Correct.

8     Q. And you also stated that you had 60 hours

9 of additional schooling that you took on-line?

10     A. Yes.

11     Q. Where did you take that on-line at?

12     A. University of Phoenix.

13     Q. And in what areas were you studying or

14 were you looking to get a degree in?

15     A. Business.

16     Q. So would I be correct in stating that

17 before you became a Springboro police officer, that

18 the Great Oaks Academy, where you graduated in 2000,

19 was the extent of your training?

20     A. Yes.

21     Q. I'm sorry, training in law enforcement?

22     A. Yes.

23     Q. And you received no other training besides

24 that, pertaining to law enforcement, before becoming

25 a Springboro police officer?

10

1    A.    Well, I was a dispatcher for the police
2    department for a period of about a year before I
3    went to the academy.
4    Q.    Okay.  Let's go into your employment
5    history then.  We'll start from when did you become
6    a Springboro police officer?
7    A.    I was appointed to the position of police
8    officer at the age of 20-and-a-half.
9    Q.    And when you say appointed, what do you
10   mean by that?
11   A.    I was a cadet.  I was hired from being a
12   cadet dispatcher to a police officer.  You could not
13   attend the police academy until you were
14   20-and-a-half years old, which meant that you would
15   graduate when you were 21.
16   Q.    Okay.  And in what year was that
17   appointment then?
18   A.    2000.
19   Q.    Now, let's go ahead and take me back.  I
20   take it your job previous to that was a dispatcher
21   for the Springboro Police Department?
22   A.    Correct.  Yes.
23   Q.    How long did you do that?
24   A.    Since June of 1999.  I believe the date
25   was June the 10th.

11

1  Q.  And what were your duties as a dispatcher

2  then?

3  A.  Handle emergency calls, 911, answer the

4  non-emergency line, put calls into the computerated

5  dispatch system, dispatch officers to calls, and I

6  dispatched the fire department to calls.

7  Q.  And what type of job have you held prior

8  to being a dispatcher?

9  A.  I'm sorry?

10  Q.  We're going backwards in time.

11  A.  Okay.

12  Q.  You were a police officer dispatcher.

13  What before then?

14  A.  Before that, I worked with my mother.  She

15  owns a landscaping supply company and I delivered

16  mulch for her.

17  Q.  Was that mostly in high school then?

18  A.  Yes.

19  Q.  Did you have any other prior exposure to

20  law enforcement growing up before you became a

21  dispatcher with Springboro?

22  A.  Before I became a dispatcher, I rode as a

23  ride-along with the Clearcreek officers in the

24  township where I lived at the time.

25  Q.  Was that during high school or was that

12

1   after you graduated high school?

2       A.   Both.

3       Q.   And how many ride-alongs did you do,

4   approximately?

5       A.   More than 20.  I don't know the exact

6   number.

7       Q.   I take it you never served in the

8   military?

9       A.   No, sir.

10      Q.   Do you belong to any organizations, clubs,

11  anything like that?

12      A.   No.

13      Q.   I know that the incidents that we're here

14  about today happened in 2007 and 2008.  Did you at

15  that time belong to any clubs, memberships,

16  organizations?

17      A.   Yes.

18      Q.   Which ones?

19      A.   The North American Police Work Dog

20  Association.

21      Q.   Any other ones?

22      A.   Miami Valley Police Canine Association,

23  Ohio Law Enforcement Canine Association, and the

24  International Police Mountain Bike Association.

25      Q.   Tell me what the North American Police

13

1  Work Dog Association is.

2      A.    North American Police Work Dog Association

3  is a group of master trainers and they go around the

4  country doing seminars, helping teams work on

5  different things with dogs.  They hold the national

6  workshops.  They also provide additional

7  certifications for handlers if they want them.

8      Q.    And was this an association that you were

9  actively involved in or was this sort of an

10  association that put on training that you'd

11  participate in from time to time?

12     A.    Somewhat of both.  You had to maintain

13  yearly dues to be in the organization.  And those

14  had to come out of my pocket, not the city's.  The

15  certification you didn't have to have, but there was

16  a period of time where I did do it.  Other than

17  that, I did go to one of the seminars.

18     Q.    Okay.  And by certification, what do you

19  mean that you did do it, but you didn't have to do

20  it?

21     A.    It's not required by state law, it's just

22  their certification that you can take.

23     Q.    Okay.  For what period of time were you

24  certified, then, with the North American Police Work

25  Dog Association?

14

1     A.   From the time I graduated -- or, I'm

2  sorry, completed dog school, that would have been a

3  one-year period from the date of that certificate,

4  and I believe that was 2005 to 2006.  And then I've

5  re-upped just the narcotics portion of the

6  certificate because I was unable to, with the wrist

7  surgery, do the patrol portion.

8     Q.   Okay.  So if I'm correct in understanding,

9  your certification with them ended in 2006?

10     A.   One of them.

11     Q.   One of them.  When did the other one end?

12     A.   It would have been good for another year.

13  I'd have to see the document to tell you.  I don't

14  remember when I re-upped it.

15     Q.   But around 2007?

16     A.   It could have been late 2007, early 2008.

17     Q.   Okay.  Now, you mentioned that to be a

18  member of that organization, you had to be a master

19  trainer?

20     A.   No.

21     Q.   No.

22     A.   No, that's not --

23     Q.   Go ahead and correct me.

24     A.   You may have misunderstood me.  Master

25  trainers run the training programs and the seminars.

15

1     Q.   So can anybody join this organization or

2  is it just police canine handlers?

3     A.   As far as I know, it's just police canine

4  handlers.  That's all I ever saw at the workshops.

5     Q.   Okay.  You mentioned that you took some

6  training through the North American Police Work Dog

7  Association.  What training did you take through

8  them?

9     A.   I took a national workshop in 2006 in a

10  town near Cleveland.  I took narcotics, canine first

11  aid, bulk narcotics response to aggression and

12  tracking.

13     Q.   Tell me about who the Miami Valley Police

14  Canine Association is.

15     A.   Well, Miami Valley Police Canine

16  Association is the group of dog handlers that train

17  together on a weekly basis throughout Warren and

18  Clinton County.  That consists of dog handlers from

19  multiple different departments.  They usually get

20  together every Wednesday.

21     Q.   Okay.  So that's mainly confined to Warren

22  and Clinton County officers and their canines?

23     A.   Yes.  There are some members from

24  Cincinnati that would come up on an occasional basis

25  and there are members from Dayton and Trotwood.

16

1   Q.   Approximately how many people belong to
2   that?
3   A.   That's hard for me to say.  I couldn't
4   give you an exact number.  More than 20, but
5   probably not exceeding 30.
6   Q.   Fair enough.  Who is that organized by
7   mainly?
8   A.   At the present time, I don't know who the
9   president and vice-president are at the time.
10  Q.   2007, 2008, who would have been the
11  president then?
12  A.   John Patrick.
13  Q.   And who is John Patrick?
14  A.   He was a dog handler from the Ohio
15  Department of Natural Resources.
16  Q.   And you said that this group would train
17  on a weekly basis then?
18  A.   Correct.
19  Q.   How often would you train with this group
20  in the 2007/2008 time frame, generally?
21  A.   As many times as I could.
22  Q.   Would that be detailed, then, in your
23  training logs for Spike most likely?
24  A.   Yes.
25  Q.   Did you ever hold any positions with the

17

1  Miami Valley Police Canine Association?

2      A.   No, I did not.

3      Q.   Go ahead now and tell me about the Ohio

4  Law Enforcement Canine Association.

5      A.   The Ohio Law Enforcement Canine

6  Association is a group very similar to the Miami

7  Valley Police Canine Association.  However, they are

8  more geared towards the northern portion.  I refer

9  to it as the northern portion, but it would be

10  Montgomery County.  There are a lot of Montgomery

11  County dog handlers, Montgomery County Sheriff's

12  Office and I believe the president is a Montgomery

13  County Sheriff's deputy.

14      Q.   Would that have been true at the time of

15  2007/2008?

16      A.   Yes.

17      Q.   How active were you in the Ohio Law

18  Enforcement Canine Association?

19      A.   My activity was limited with them.

20  Basically those are training groups.  And so

21  whenever you train with them, that's when you would

22  be considered active with them.

23      Q.   And would every time that you trained with

24  them, would that also be detailed in your training

25  logs for your canine?

18

1     A.    I'm not sure that it would be specific to

2   that group.  It may not specifically say that I was

3   training with that group.

4     Q.    Okay.  And it's my understanding that you

5   operated a canine for Springboro from the time

6   period of about 2006 to 2008, correct?

7     A.    Correct.

8     Q.    And during that time period, how many

9   times would you estimate you trained with the Ohio

10  Law Enforcement Canine Association with that group?

11    A.    Maybe six to 10 times.

12    Q.    So a couple of times a year, two, three

13  times a year maybe?

14    A.    Yes.

15    Q.    You mentioned that the Miami Valley Police

16  Canine Association mainly consisted of officers and

17  deputies in Warren and Clinton Counties, correct?

18    A.    Correct.

19    Q.    I take it that the canine community and

20  the officers, it's a relatively small group, number

21  of officers in that region that have dogs and work

22  with dogs; am I correct?

23    A.    Correct.

24    Q.    Approximately how many officers and

25  deputies and people in Warren County handle a

19

1  canine, to your knowledge?

2      A.   Can you give me a second to think about

3  that?

4      Q.   Sure.

5      A.   Around seven to eight at any given time.

6      Q.   And how about for Clinton County?

7      A.   Wilmington and then the Clinton County

8  Sheriff's Office has a canine.

9      Q.   One dog for each one of those entities?

10     A.   Correct.

11     Q.   Okay.  So they have two?

12     A.   Two in Clinton County.

13     Q.   Two dogs there and about eight or nine in

14  Warren County?

15     A.   Correct.

16     Q.   Tell me about the International Mountain

17  Bike Association.

18     A.   Before I became a dog handler, I was a

19  bicycle officer.  And I had to take the

20  International Police Mountain Bike Association

21  course for bicycle officers.  I completed the course

22  in Centerville with the instructors and then became

23  a member.

24     Q.   Okay.  And you became a police officer in

25  what month of 2000 then with Springboro?

20

1      A.    Honestly, I don't remember.

2      Q.    I want to go through and have you detail

3  for me each position you held within the Springboro

4  Police Department until your most recent, starting

5  with when you first came on with Springboro.  What

6  was your title, what did you do?

7      A.    Like I said, I started as a dispatcher,

8  moved to cadet.  I became a police officer, then I

9  became a bicycle officer, then I was the community

10 police relations officer, basically setting up the

11 crime watches in neighborhoods.  After that, I was

12 appointed to officer in charge.  And then the last

13 position I would have held would have been the

14 canine officer.

15     Q.    Okay.  Starting with your first duty as an

16 officer, what did that entail; was that a road

17 patrol, what was that?

18     A.    Road patrol.

19     Q.    What sorts of situations, then, would you

20 deal with as a road patrol officer, typically?

21     A.    Any number, domestics, robberies, traffic

22 offenses, thefts, just about anything you could

23 think of.

24     Q.    Anything that dispatch gave you a call

25 on --

21

1    A.   Correct.

2    Q.   -- you're the guy that would handle that?

3    A.   Yes.

4    Q.   Tell me about the community makeup of

5  Springboro itself.  How would you classify it from a

6  crime standpoint?  Is it a crime area with gang

7  activity, is it middle-class families with, you

8  know, relatively a low crime rate?  How would you

9  describe the patrol limits that you had within the

10 City of Springboro in Springboro itself?

11   A.   There was a mixture of lower class, middle

12 class, upper middle class, and then upper-class

13 people within the city, families.  The crime rate

14 was not high.  There was no gang activity.

15   Q.   Was there a large amount of drug activity

16 in Springboro during the time that you were there?

17   A.   I'm not sure what you mean by large.

18   Q.   Was there, you know, frequency to

19 encounter large amounts of cocaine, heroin, crack?

20   A.   Large amounts, no.

21   Q.   Were you dealing with mostly small

22 amounts, you know, kids with marijuana, you know,

23 personal use type quantities?

24   A.   Not necessarily, no.  I did arrest several

25 people for heroin violations.  We had a lot of

22

1  heroin arrests, heroin overdoses.  I did arrest

2  several people for possession of crack cocaine, but

3  not in large quantities.  The majority of the

4  arrests -- or, I'm sorry, drug possession charges,

5  yes, would have to deal with marijuana.

6       Q.   In Springboro, the typical people that you

7  would have to deal with, would you consider them,

8  you know, the community, comprised of dangerous

9  citizens?

10      A.   No.

11           MR. WEISENFELDER:  Objection as to the

12      form.  Go ahead.

13      Q.   And as far as the makeup of the city

14  itself, is it rural farmland, is it mostly

15  residential, is there industrial, what mostly

16  comprises Springboro?

17      A.   A mix of industrial and residential.

18      Q.   Is that heavy industrial manufacturing,

19  light industrial, smaller companies or --

20      A.   Some of it's heavy.  Some of the

21  businesses are heavy industrial manufacturing

22  facilities and some of them are small.

23      Q.   Can you give me an idea of what the

24  Springboro corporation limits are, where they

25  typically run, north, south, east, west, what the

1  boundaries are?

2      A.   From about -- on 741 at the south limit

3  would be right around Red Lion Five Points Road

4  intersection or just south of the high school all

5  the way to Austin Pike at the north end.  To the

6  west would be 75 and to the east would be Red Lion

7  Five Points Road again.

8      Q.   Approximately what's the distance that

9  that would encompass?  Do you know how many square

10 miles or how large of a population you have in that

11 area?

12     A.   Approximately, I believe it's around 15

13 square miles.

14     Q.   Let's go back to your function as a

15 bicycle officer for Springboro.  How long were you

16 on bike patrol?

17     A.   I'd have to look.

18     Q.   Approximately, is this a one summer --

19     A.   Three years maybe.

20          MR. WEISENFELDER:  If you can estimate,

21     but don't guess.

22     A.   Two to three years, I would say.

23     Q.   How long were you on road patrol before

24 bicycle patrol?

25     A.   Three or four years.

24

1      Q.    Was bicycle patrol basically a summertime

2    only thing or did you do that year-round?

3      A.    It went into the fall, not during the

4    winter.

5      Q.    Did you go back to being a regular patrol

6    officer then during the winter months?

7      A.    Yes.

8      Q.    Tell me about your function as a community

9    PR officer.

10     A.    My function there, as far as the city was

11   concerned, was to address specific complaints that

12   were not of an urgent matter, such as recurring --

13   what people thought may have been suspicious

14   vehicles and things of that nature, that they

15   couldn't catch at the time or that the people were

16   not calling in at the time.  I would then go out,

17   talk to the people and see if they wanted to

18   organize a community watch program.

19     Q.    And how long did you act as a community PR

20   officer?

21     A.    The entire time I was a bicycle officer.

22     Q.    So those duties would have overlapped?

23     A.    Yes.

24     Q.    So that's about three years there, also?

25     A.    Yes.

25

1      Q.    Tell me about what an officer in charge

2   is.

3      A.    Officer in charge is the supervisor of the

4   shift in absence of a sergeant.

5      Q.    How large of a department is Springboro?

6   How many officers, sergeants is it composed of,

7   approximately?

8           MR. WEISENFELDER:  Time frame?

9      Q.    Time frame, 2007/2008.

10     A.    The number was in the 20s.  I don't have

11  the exact number.  We were back and forth with

12  people.

13     Q.    You said that you would act as an officer

14  in charge if there wasn't a sergeant on duty,

15  correct?

16     A.    If I was the highest ranking OIC, the most

17  senior OIC on the shift in absence of a sergeant,

18  yes.

19     Q.    How often would there not be a sergeant on

20  duty?  Was a sergeant only on during a day shift,

21  was a sergeant generally available 24 hours, 24/7,

22  during this 2007/2008 time frame?

23     A.    We had three shift sergeants for days,

24  seconds, midnights.  There were two OICs generally

25  placed under each sergeant on each shift.  It could

1  range from two to three days that you would not have

2  a sergeant on your shift depending upon their

3  schedule.

4      Q.   How long were you an officer in charge

5  for, that you were designated with that?

6      A.   Four years, four-and-a-half years.

7      Q.   Approximately which years were those?

8      A.   Late 2004, early 2005.  And that is just a

9  guess.  I don't have the paperwork in front of me.

10     Q.   Was when you started?

11     A.   That's an estimate.  Until the -- until I

12 stopped working at Springboro.

13     Q.   And then your last assignment was a canine

14 officer, correct?

15     A.   Yes.

16     Q.   How would you describe your duties as a

17 canine officer?

18     A.   I handled the same calls as I did as a

19 patrol officer except when there was a need for

20 canine usage in the city or for a mutual aid request

21 for an adjoining jurisdiction, I would handle or

22 respond to that call per request.

23     Q.   And when did your termination cease with

24 the City of Springboro?

25     A.   October 9, 2009.

27

1      Q.    What was the reason for your leaving

2  Springboro?

3      A.    I was discharged.

4      Q.    And why were you discharged?

5      A.    I have retained counsel.  There is a

6  future lawsuit pending.  My attorney is Eric Deters

7  and I would refer you to him for that.

8      Q.    Let's try this a different way.  Why did

9  they tell you that you were discharged, what reason

10  did they give you?  I'm understanding that that's in

11  dispute or that you dispute that.  Why did they tell

12  you they discharged you then?

13      A.    Absent without leave.

14      Q.    And what does absent without leave mean?

15      A.    Being injured, not being able to return to

16  work, and being out of approved time.

17      Q.    If I'm understanding that correctly, that

18  means that you did not get preapproved for time off.

19  Is that what that means?

20      A.    That would be a subject that I would have

21  to refer you to Mr. Deters for.  That's in dispute.

22      Q.    Okay.  But is that what they're accusing

23  you of is not getting permission to take time off

24  and taking time off; is that the reason why they're

25  saying that they discharged you, to your

28

1    understanding?

2        A.    No.

3        Q.    Okay.  Correct me then.

4        A.    I'm not sure how to answer that.  I was

5    approved for the time off.  I was discharged after

6    being approved.  I don't know why.

7        Q.    Have you ever been, during your employment

8    with the City of Springboro Police Department, have

9    you ever been disciplined in any way, shape or form?

10       A.    Yes.

11             MR. WEISENFELDER:  Objection.  Go ahead.

12       Q.    Tell me about those occurrences.

13       A.    I was involved in an incident that -- are

14   you referring to any discipline whatsoever?

15       Q.    Any discipline that you would have

16   received whatsoever after you became an officer with

17   the City of Springboro.

18             MR. WEISENFELDER:  I'm just going to note

19        the continuing objection to any reference to

20        discipline.

21             MR. BRANNON:  That's fine.

22       A.    The only written disciplines that I can

23   think of were a phone picture, cell phone picture

24   that was taken during an arrest and then an off-duty

25   incident where I was involved with a fight.

29

1     Q.   Tell me about the cell phone picture

2  incident.

3     A.   A gentleman was arrested for being

4  intoxicated and he was hiding in the trunk of a car.

5  He was arrested. I had his cell phone. It was

6  going off. I picked it up to open it. At some

7  point, I pushed the picture button instead of the

8  menu button. It took the picture. I hung it up,

9  set it down, put it in his property instead of

10  turning it off. He complained. I admitted that,

11  yes, I did mess with the cell phone. That was not

12  my intention to do anything with a picture of him.

13  I had a picture of him on the Digi-Mug and it was

14  his cell phone. I still received a written

15  reprimand for it.

16     Q.   Did you take that picture of him in the

17  trunk?

18     A.   No, in the booking room.

19     Q.   In the booking room. Did you send that

20  picture to anybody?

21     A.   Not that I'm aware of.

22     Q.   And what was your punishment for that?

23     A.   The written reprimand.

24     Q.   You also mentioned an off-duty incident?

25     A.   Correct.

1       Q.    Can you tell me about that?

2       A.    Yes.  While out with some friends, two

3   other officers, a gentleman approached me and said

4   that I was the one who had arrested his girlfriend

5   for DUI.  He then followed us when we left there,

6   because I felt uncomfortable, to another place and

7   brought more of his friends.  And at that time, they

8   followed me outside when I tried to leave again and

9   a fight occurred.

10      Q.    Okay.  And by a fight occurred, were you

11  there at that establishment by yourself?

12      A.    No, I was not.

13      Q.    Who were you there with?

14      A.    Officer Jim Burns from Lebanon and Brian

15  Hawk.

16      Q.    Another Springboro officer?

17      A.    Correct.

18      Q.    And when you say a fight occurred, what

19  happened in that fight?

20      A.    They followed me outside.  A man, as I was

21  walking away, stripped his shirt off and charged at

22  me at which time I maced him and ran.  They followed

23  me down the street, ended up tackling me and kicking

24  me in the head.

25      Q.    Was the mace discharged in the bar or was

31

1    it outside?

2         A.   Outside.

3         Q.   And how were you disciplined for that?

4         A.   I received five days off.

5         Q.   Approximately, when did that incident

6    occur?

7              MR. WEISENFELDER:  The fight?

8              MR. BRANNON:  Yes.

9         A.   I believe it was in 2004, maybe.  No.  No,

10   it wasn't, I'm mistaken.  2005.  I don't have it in

11   front of me.

12        Q.   How about the cell phone incident, when

13   did that occur?

14        A.   Maybe two years before that.  That's about

15   a rough estimate.

16        Q.   You've had no military service; am I

17   correct in that?

18        A.   Correct.

19        Q.   Ever been involved in any prior lawsuits

20   or litigation?

21        A.   Yes.

22        Q.   Tell me about those.

23        A.   The city was sued by the Center For

24   Bioethical Reform.

25        Q.   Why would the city be sued by the Center

32

1    For Bioethical Reform?

2              MR. WEISENFELDER:  Objection.

3         Q.   To your knowledge?

4         A.   To my knowledge why?

5         Q.   Yeah, what was the suit about?

6         A.   They were driving large box trucks.  They

7    stopped traffic and were impeding traffic.  I

8    investigated as to why they were impeding traffic.

9    They were wearing full level three threat body armor

10   and Kevlar helmets.  I notified my supervisor who

11   notified the FBI.  The FBI ordered us to stop and

12   detain them until they got there.  We were charged

13   with detaining them for too long.  That's what their

14   suit was.

15        Q.   Was the city sued or were you sued

16   personally?

17        A.   The city.

18        Q.   And were you the officer that made the

19   stop on this vehicle?

20        A.   The first time, yes.

21             MR. WEISENFELDER:  For the record, I

22        think Nick was named as a defendant in the

23        lawsuit.

24             MR. BRANNON:  Okay.

25             MR. WEISENFELDER:  Am I correct?

33

1          THE WITNESS:  Not personally.

2          MR. WEISENFELDER:  But, I mean, you were

3     named as a defendant?

4          THE WITNESS:  Yes.

5  BY MR. BRANNON:

6     Q.   And just to clarify, you weren't named in

7  your individual capacity but in your official

8  capacity as a police officer?

9          MR. WEISENFELDER:  If he knows.  I'm not

10    sure he knows.

11    Q.   If you know?

12    A.   Correct.

13         MR. WEISENFELDER:  There's a Sixth

14    Circuit -- I mean, it's all out there.

15         MR. BRANNON:  I understand.

16    Q.   Have you been involved in any other

17 lawsuits or litigation besides that one?

18    A.   Being sued or --

19    Q.   Being sued, suing somebody, anything where

20 you weren't testifying in a criminal context with

21 Springboro.

22         MR. WEISENFELDER:  Or as a witness in

23    another matter.  I believe your question is

24    where you've been a party in civil litigation.

25    A.   The only other thing than that was I sued

34

1    the drunk driver who caused me to crash my police

2    cruiser.

3         Q.    And when was that, approximately?

4         A.    The accident was in 2005.  I believe the

5    suit was completed sometime in 2007.

6         Q.    Were you injured in that incident?

7         A.    Yes.

8         Q.    And is that matter currently resolved?

9         A.    Yes, it is.

10        Q.    Was your deposition taken in that

11   incident?

12        A.    Yes.

13        Q.    And can you tell me what court that was in

14   and --

15        A.    Warren --

16        Q.    -- possibly the case number?

17        A.    Warren County Common Pleas.  I do not know

18   the case number.

19        Q.    Have you been involved in any other

20   lawsuits, litigation, as a party, that you can think

21   of besides those two incidents?

22        A.    No, other than the pending one that I have

23   now.

24             MR. WEISENFELDER:  Well, I don't want to

25        testify, but if there was a divorce, I don't

35

1      know if that was actually litigation or --

2      A.   My divorce was very simple. I sued for

3  divorce and there was no contesting to it.

4        MR. WEISENFELDER: Just so the record is

5     clear.

6        MR. BRANNON: Sure.

7      Q.   I take it you've had your deposition taken

8  before on multiple occasions; am I correct in that?

9      A.   Yes, sir.

10     Q.   Approximately how many times have you had

11  your deposition taken?

12     A.   Four.

13     Q.   Do you recall what those four incidents

14  involved?

15     A.   The Center For Bioethical Reform, the

16  automobile accident, a case where the city was sued

17  by an individual. I may have forgotten to mention

18  that. I apologize. I didn't even remember that.

19  I'm not sure I was named in the Miracle Hurston

20  suit, but I did testify for that. I did provide a

21  deposition, and then this one.

22     Q.   Let's talk about that one that you gave a

23  deposition in but you weren't named as a party in.

24  Was the City of Springboro named in a lawsuit or

25  tell me about this lawsuit.

36

1    MR. WEISENFELDER:  Objection; to the

2  extent that you know.

3    MR. BRANNON:  Sure.

4    MR. WEISENFELDER:  If you know.

5    A. I'm not sure what the suit was for.  My

6 testimony was to my involvement in the case, and

7 that was that another officer had stopped a person

8 for a traffic violation and I was there.

9    Q. Okay.  Did this lawsuit involve claims

10 about unnecessary use of force?

11    A. No.

12    Q. What was the disagreement between the

13 officer that stopped and why this person sued the

14 city, do you know what the context was?

15    A. I believe the context, and please feel

16 free to correct me if I'm wrong, that there was no

17 reason to stop and detain that person, was their

18 claim.

19    Q. That was their gripe, you stopped me and

20 had no reason to stop me?

21    A. Correct.

22    Q. Do you recall the name of the individual

23 that was stopped?

24    A. Miracle Hurston.

25    Q. Hursten, S-T-E-N?

37

1        A.    I think it's O-N.

2        Q.    And what was the name of the officer that

3   was involved with that stop?

4        A.    Terry Dunkel.

5        Q.    And is Terry Dunkel an officer with

6   Springboro then currently?

7        A.    Yes.

8        Q.    Do you know how that litigation was

9   resolved?

10       A.    I believe it went to a jury and the jury

11  found that Terry Dunkel and the police department

12  not guilty.

13       Q.    You mentioned that you received discipline

14  as a police officer on two occasions with written

15  discipline.  Were there other occasions where you

16  were disciplined as well?

17            MR. WEISENFELDER:  Objection.  Go ahead.

18       A.    Verbal counseling.

19       Q.    Tell me about what that verbal counseling

20  included and the events surrounding that; on how

21  many occasions?

22            MR. WEISENFELDER:  Continuing objection

23       to the line of questioning.

24       A.    We would be verbally counseled for any

25  number of things, not having your microphone clipped

38

on on a traffic stop where nothing unusual occurred,
if that had happened before.  If your camera was not
functioning and you weren't aware of it at the time
or it ceased to function, you could have been
verbally counseled for that.  If you recorded at any
time on accident and wasted footage, I was verbally
counseled for that.  That's about the extent of it.

Q.   Were you ever verbally counseled for
anything having to do with your use of a canine or
anything involving your canine?

MR. WEISENFELDER:  Objection.  Go ahead.

A.   I was questioned during the Kerns,
Mr. Kerns, after that pursuit, I was questioned.

MR. WEISENFELDER:  The question was, were
you --

A.   I don't believe I was counseled.  No, not
disciplined in any way, shape or form.

Q.   Which incidents were you counseled for
involving the canine then?

A.   None.

Q.   So in your function as a canine officer,
you never received any verbal counseling, discipline
or any other type of discipline, reprimand or
anything like that, concerning your use of the
canine?

39

1    A.   No.

2    Q.   You mentioned the term questioned. Were

3  you questioned regarding your use of the canine on

4  prior incidents or on incidents involving the

5  canine?

6    A.   Yes.

7    Q.   On how many occasions?

8    A.   Three.

9    Q.   Which three canine incidents were you

10  questioned about?

11    A.   Campbell, Kerns and Gemperline.

12    Q.   Who was the one that questioned you

13  regarding Mr. Campbell?

14    A.   Initially Sergeant Bentley and secondly

15  Lieutenant Parker.

16    Q.   Who was it that questioned you regarding

17  the Kerns incident?

18    A.   Lieutenant Wheeler.

19    Q.   Anybody else?

20    A.   No.

21    Q.   How about regarding the Gemperline

22  incident?

23    A.   Lieutenant Parker and Lieutenant Wheeler.

24    Q.   Did you review any documents, statements,

25  anything like that, prior to your deposition here

40

1    today?

2        A.    Yes.

3        Q.    What was it that you reviewed?

4        A.    The case file on Mr. Campbell and the case

5    file on Ms. Gemperline.

6        Q.    And please tell me about what's in a case

7    file, what would be in the case file for

8    Mr. Campbell and Ms. Gemperline?

9        A.    The initial narrative report form, my

10   usage form, the use of force --

11           MR. BRANNON:  My pen just ran out of ink.

12       I apologize. if we can go off.

13                   (OFF THE RECORD)

14   BY MR. BRANNON:

15       Q.    I apologize for that.  You were telling me

16   about the case file, what was contained in the case

17   file on Mr. Campbell and Ms. Gemperline.

18       A.    The initial report by the officer.  It's

19   referred to as NIBRS, N-I-B-R-S, the use of force

20   report, my canine usage report would be what would

21   typically be in that.

22       Q.    Okay.  Did you review any other documents,

23   besides those documents, in preparation for today?

24       A.    The policy.

25       Q.    And which policy are you referring to?

1     A.   The canine usage policy.

2     Q.   I take it that's one adopted by the City

3 of Springboro.  Did the Springboro Police Department

4 adopt a canine usage policy at any point in time

5 that you're aware of?

6     A.   Yes.

7     Q.   Was that the policy that you reviewed?

8     A.   Yes.

9     Q.   When was that policy adopted by the City

10 of Springboro, to your knowledge?

11     A.   The policy that I worked on was provided

12 to the Chief by me and accepted the first day that I

13 came back from dog training school.

14     Q.   So if I'm understanding you correctly, you

15 came back from dog training school, somebody had

16 given you a policy, you gave it to your chief, and

17 that's the policy then that Springboro adopted?

18     A.   Not exactly that way.  Before graduating

19 from dog school, before completing certifications,

20 we had had discussions that we needed to have a

21 policy and one needed to be drawn up.

22     Q.   Who is we?

23     A.   The class and the instructors.  I brought

24 it to the Chief's attention and the Chief told me to

25 prepare him something.  So I received a policy,

42

1  which was the International Association of Chiefs of

2  Police Accepted Canine Policy, presented that to the

3  Chief and that is what we used.

4      Q.   When would that policy have gone into

5  effect, then, for Springboro?

6      A.   The day that I handed it to the Chief.

7  I'm sorry, the day that he told me that this was

8  what we would work with.  I don't remember the exact

9  date.

10     Q.   But would that have been before you and

11  Spike went out on the road then?

12     A.   Yes.

13          (Deposition Exhibit S17 was marked for

14  identification.)

15     Q.   Mr. Clark, I'm going to hand you a

16  document.

17          MR. WEISENFELDER:  Do you have copies?

18          MR. BRANNON:  I don't have copies of that

19      particular one.

20          MR. WEISENFELDER:  Are you going to

21      ask -- other than identifying it?

22          MR. BRANNON:  I'm just going to have him

23      identify that document.

24          MR. WEISENFELDER:  If we get into

25      questions, I'm going to want a copy.

43

1        MR. BRANNON:  Sure.  And I have copies of
2     everything else.
3        MR. WEISENFELDER:  Okay.  But, I mean, if
4     that's all you're doing is asking him to
5     identify it, I don't want to stop.
6  BY MR. BRANNON:
7     Q.    Do you recognize that document before you
8  that's been marked as S17?
9     A.    Yes.
10     Q.    Can you tell me what that document is?
11     A.    The International Association of Chiefs of
12  Police, Law Enforcement Canine Model Policy.
13     Q.    Is that the one you took back to your
14  chief from dog training school?
15     A.    Yes, it is.
16     Q.    And is that the one that Springboro then
17  adopted for their policy?
18     A.    Yes.
19     Q.    How long was that policy in effect for at
20  Springboro, to your knowledge?
21     A.    The entire time that I worked with Spike,
22  from my first certification date until the end of
23  the canine program.
24     Q.    And I noticed on that document previously
25  that it looked like something printed off the

44

1    Internet.  Do you know where that document came from

2    originally?

3         A.    This one?

4         Q.    Correct.

5         A.    From Terry Fleck's website.

6         Q.    Can you tell me who Terry Fleck is?

7         A.    Terry Fleck is an expert witness in the

8    canine field.  He handles the canine legal updates.

9         Q.    Where is Terry Fleck located at?

10        A.    I don't know.

11        Q.    Have you ever spoken with Terry Fleck?

12        A.    No, I have not.

13        Q.    Have you ever been provided any training

14   from Terry Fleck?

15        A.    No, I have not.

16        Q.    Were you the one that pulled this document

17   off of Terry Fleck's website?

18        A.    Yes, I was.

19        Q.    How was it that you chose this particular

20   website and this policy that you found on this

21   website?

22        A.    I was advised by my trainers that Terry

23   Fleck was the foremost expert in canine case law in

24   the United States.  I didn't want to use a -- I did

25   not want to present the Chief with a policy that was

45

1    state specific.

2         Q.    Now, the International Association of

3    Chiefs of Police, did you ever check with them for

4    what their model canine policy was?

5         A.    It's right here.

6         Q.    Did you ever check with the International

7    Association of Chiefs of Police for their canine

8    policy or did you just find this off of Terry

9    Fleck's website and assume it was the same one

10   issued by the International Association of --

11        A.    Just off Terry Fleck.

12        Q.    Okay.  But you never confirmed that that

13   was the current version with the International

14   Association of Chiefs of Police?

15        A.    No, I did not.

16        Q.    Do you know how long that particular

17   version of the International Association of Chiefs

18   of Police policy has been out or when it first

19   issued?

20        A.    I do not.

21        Q.    Do you know if it's ever changed during

22   your entire career with the Springboro Police

23   Department?

24        A.    Not that I'm aware of.

25        Q.    To your knowledge, did anybody ever go

46

1    back and check and see if it ever changed?

2        A.    I had pulled it off several times and it

3    had not changed.

4        Q.    Where did you pull it off of several

5    times?

6        A.    The same time, Terry Fleck's site.

7        Q.    Okay.  So you kept going back to Terry

8    Fleck's website.  Had you ever gone to the

9    International Association of Chiefs of Police

10   website?

11       A.    No.

12       Q.    So for all you know, this same document

13   was the same one that was posted originally on Terry

14   Fleck's website?

15       A.    Yes.

16       Q.    You don't know if Terry Fleck ever updated

17   that website, correct?

18       A.    I don't know.

19       Q.    Did you review any video or audio

20   recordings or diagrams or any photos prior to today?

21       A.    Yes.

22       Q.    Which of those did you review?

23       A.    The video of the incident involving

24   Ms. Gemperline and two diagrams that were -- one was

25   a diagram, the approximate area involving the

47

1    incident with Mr. Campbell and another involving

2    Ms. Gemperline.

3        Q.    Are you aware of any video or audio

4    recordings involving the Campbell incident?

5        A.    Yes.

6        Q.    Which ones are you aware of?

7        A.    The in-car cruiser cam and audio.

8        Q.    Do you know if that cruiser cam and audio

9    still exists for the Campbell incident?

10       A.    I don't know.

11       Q.    Do you know if they still exist for the

12   Gemperline incident?

13       A.    Yes.

14           MR. BRANNON:   I'd make a request for the

15       in-car video camera of the Campbell incident

16       if that still exists and is available.

17           MR. WEISENFELDER:   That's fine.  And all

18       I ask is that when we're finished, just put it

19       in writing to me.

20           MR. BRANNON:   Sure.  And if I could, have

21       the court reporter start running me a separate

22       page for discovery requests, and if we could

23       put on that separate page the request for the

24       in-car video camera concerning the Campbell

25       incident.

48

BY MR. BRANNON:

Q.   When was the last time that you were aware
of the existence of the in-car video camera
regarding the Campbell incident?

A.   I listened to it the next day.

Q.   Do you know if anybody else has listened
to it since then?

A.   At the time Officer Anderkin listened to
it during that time period going up to the hearing
in Warren County Court.  So between the time of the
incident and the initial hearing in Warren County
Court, it would have been that time period.  I'm not
sure if anyone's listened to it after that.

Q.   Do you know where that tape or CD may be
located now?

A.   No, sir, that's not my responsibility.

Q.   Would the prosecutor have been given a
copy of this tape or CD, to your knowledge?

A.   That would be a question better posed to
Officer Anderkin.

Q.   Did you make the audio/video recording of
that incident or did Officer Anderkin?

A.   Both of our mics and cameras were on.

Q.   So there were actually two recordings of
that incident?

1      A.    I believe so, yes.

2      Q.    Are you familiar with any use of force

3  model continuum, are you familiar with that term?

4      A.    Yes.

5      Q.    To your knowledge, what is that term

6  defined?

7      A.    Defined?

8      Q.    Yeah, what does that mean?

9      A.    It's the use of force policy, the

10 continuum, the level of force in situations.

11     Q.    Okay.  Does Springboro have one, to your

12 knowledge, have they adopted a use of force policy?

13     A.    At that time I was employed there they

14 did, yes.

15     Q.    Do you know if that policy that was

16 adopted by Springboro ever included anything having

17 to do with canine use of force?

18     A.    Not to my knowledge.

19     Q.    So is it your belief, on the use of force

20 policy adopted by Springboro, that a canine use of

21 force is not included in that policy?

22     A.    Not that I can remember.

23     Q.    Can you give me some examples of what is

24 included on that use of force policy?

25          MR. WEISENFELDER:  Objection.  You're

50

1    referring to?

2        MR. BRANNON:  The one adopted by

3    Springboro during the 2007/2008 time frame.

4        A.   Verbal, chemical irritants, physical

5    restraints, key locks, holds, asp baton, and then I

6    believe it graduates to firearms, but that was

7    before the implementation of Taser and things of

8    that nature that I don't know if it was changed or

9    not.

10       Q.   So is it your understanding, then, that

11   the use of firearms would be the highest level of

12   force and that the lowest level would be a verbal

13   command?

14       A.   Yes.

15       Q.   Okay.  And then everything else falls

16   somewhere in between, meaning a Taser, a chemical

17   irritant, an asp, things of that nature, correct?

18       A.   Correct.

19       Q.   Did anybody at the City of Springboro ever

20   talk to you or discuss with you where a canine fell

21   within that use of force model somewhere between

22   firearm and verbal, did they tell you what a canine

23   use of force would approximate to?

24       MR. WEISENFELDER:  I'm going to object to

25       the form of the question.  Go ahead and

51

1    answer, if you can.

2    A.    I was not told where the canine would be

3    in the use of force.  I was asked on several

4    occasions where I thought it should be, and that was

5    the extent of my asking about the canine and the use

6    of force.

7    Q.    Okay.  Who asked you where you thought it

8    should be?

9    A.    Lieutenant Wheeler.

10    Q.    Okay.  And who is Lieutenant Wheeler, is

11    he the operational's commander?  Who is he in the

12    hierarchy of the Springboro Police Department?

13        MR. WEISENFELDER:  Then or now?

14        MR. BRANNON:  During the 2007/2008 time

15    frame.

16    A.    I don't remember what date he was --

17    Q.    Let's try it a different way.  When he

18    asked you those questions, where was he in the --

19    A.    He was the operations commander.

20    Q.    And approximately when was it that he

21    asked you these questions?

22    A.    Early 2006.

23    Q.    Was there any event that occurred that

24    caused him to ask you these questions?

25    A.    He was re-evaluating the use of force

52

1 policy.  I remember him asking me -- or telling me

2 that he was going through the policies.  That was

3 apparently something that he was doing, some

4 project, and he asked my opinion on where I thought

5 the canine should lie in the use of force policy.

6     Q.    And what opinion did you give Lieutenant

7 Wheeler about where the canine falls in the use of

8 force policy?

9     A.    That it should not be in there at all.

10     Q.    And why is that?

11     A.    The canine does not dictate the use of

12 force, the suspect does.

13     Q.    Can you explain that to me?

14     A.    The suspect is the deciding factor in

15 their behavior and their actions as to whether the

16 use of force occurs, unlike a typical use of force

17 weapon such as mace, a baton, a gun, or a Taser that

18 is activated by the officer and used as a weapon.  A

19 dog is an animal, a detecting tool, not a weapon.

20     Q.    Okay.  So if I'm understanding you

21 correctly, you believe that the canine is not --

22 when a canine is utilized, that that is not a use of

23 force?

24     A.    A use of force report should be made, but

25 it should not be placed in the use of force

53

1    continuum, is my opinion.

2        Q.   Okay.  So it's your opinion that the

3    deployment of a canine or the use of a canine -- is

4    there any difference in the term use and deployment

5    of canine, to your knowledge, or are those one in

6    the same?

7        A.   If you're getting specific, a deployment

8    could be anytime he steps out of the car, whether

9    he's used or not.  A deployment would be actually

10   referred to as being utilized in his function, his

11   capacity.

12       Q.   Okay.  Whether or not a canine is used or

13   deployed, either way, in your opinion, that does not

14   constitute a use of form; am I correct?

15       A.   The difference being that if the dog is

16   deployed, it is not always a use of force.  Whereas

17   if an asp baton is used on a person, it's always a

18   use of force.  If someone is sprayed with OC, it is

19   always a use of force.  The dog can be deployed and

20   there may or may not be a use of force dependent

21   upon the suspect's actions.

22       Q.   Okay.  You sort of qualified that,

23   depending on a suspect's actions?

24       A.   Correct.

25       Q.   Does a suspect's actions always determine

54

1    what use of force may be necessary in a given

2    situation?

3         A.   Can you say that again?

4         Q.   You mentioned the suspect's actions

5    determine whether or not there's a use of force for

6    a canine; am I correct in that?

7         A.   Correct.

8         Q.   How is a suspect's actions -- I'm trying

9    to understand how that's different with a canine,

10   deploying a canine, as opposed to a suspect's

11   actions in utilizing pepper spray, for example?

12        A.   Once pepper spray is sprayed, it's

13   sprayed.  A dog does not have to, once it has been

14   deployed, actually make physical apprehension of

15   someone.

16        Q.   Okay.

17        A.   If pepper spray's deployed, it's deployed.

18        Q.   And is there a difference if the dog is

19   utilized as opposed to deployed under the same

20   question?

21        A.   There would be no difference unless

22   there's a physical apprehension.

23        Q.   Either way, though, it's your

24   understanding that a canine does not constitute a

25   use of force, correct?

55

1     A.    That is not what I said.

2     Q.    Okay.  Correct me, then.

3     A.    A simple deployment of the dog and usage

4  of the dog does not constitute use of force.  The

5  use of force comes when the suspect fails to comply

6  or resist and is actually physically apprehended by

7  the canine.

8     Q.    So unless there's -- it's your

9  understanding, then, there's no use of force with a

10 canine unless the canine physically apprehends or

11 attacks or bites somebody, correct?

12    A.    That is what I was trained, yes, physical

13 apprehension.

14    Q.    But until then, any use of the canine,

15 until it makes physical contact, does not constitute

16 a use of force?

17    A.    Correct.

18    Q.    And it was your recommendation, then, to

19 Lieutenant Wheeler that a canine not be placed on

20 the use of force continuum adopted by the City of

21 Springboro, correct?

22    A.    Correct.

23    Q.    And it was also your opinion to Lieutenant

24 Wheeler in your recommendation not to include the

25 canine in the use of force policy for the City of

56

1    Springboro, correct?

2        A.    In the use of force continuum that the

3    city used, yes.

4        Q.    Okay.  Did you recommend that they place

5    the canine in the use of force policy that he was

6    reviewing at that time that you had this

7    conversation with Lieutenant Wheeler?

8        A.    He asked where I thought it lay -- where I

9    thought it lied within that, and I said that I

10   believe it did not belong anywhere in there.

11           (Deposition Exhibit S2 was marked for

12   identification.)

13       Q.    I'm going to go ahead and hand you a

14   document that we have marked as S2.  Are you ready?

15       A.    Yes.

16       Q.    Do you recognize that document?

17       A.    Yes.

18       Q.    Can you tell me what that document is?

19       A.    It's a use of force policy.  It looks like

20   it's out of the policy book for the Springboro

21   Division of Police.

22       Q.    So it looks like a copy of the use of

23   force policy for Springboro, correct?

24       A.    Correct.

25       Q.    Do you know whether or not this was a use

57

1    of force policy that was in effect at the time of

2    the Campbell and Gemperline bite incidents?

3         A.   I do not.

4         Q.   Do you know if it's ever been changed from

5    the time period of 2006 to current?

6         A.   I do not.

7         Q.   Do you know if this was the use of force

8    policy in effect at the time that you were operating

9    with your canine Spike?

10        A.   I do not.

11        Q.   Have you ever reviewed this use of force

12   policy prior to today?

13        A.   I have no way to tell.  I can tell you

14   that I reviewed the use of force policy when I was

15   in field training.

16        Q.   Okay.  And would that have been the last

17   time that you would have reviewed the Springboro use

18   of force policy?

19        A.   Yes.

20        Q.   And when you were in training, is that

21   when you just became an officer with Springboro?

22        A.   Yes.

23        Q.   Back in the year 2000, approximately?

24        A.   Yes.

25        Q.   Were you provided with a copy of the

58

1   policy at that point in time?

2       A.   It was in the policy book, but I had not

3   had my individual own policy, no.

4       Q.   Were you ever provided with your own

5   individual policy book?

6       A.   No.

7       Q.   Did any supervisor at Springboro ever

8   discuss with you the use of force policy for

9   Springboro besides Lieutenant Wheeler?

10      A.   When I was in field training.

11      Q.   And who would that have been?

12      A.   At the time, Sergeant Hughes.

13      Q.   And what did you discuss with Sergeant

14  Hughes?

15      A.   During field training, we discussed the

16  majority of the policies.

17      Q.   He just sort of reviewed them with you, is

18  that safe to say?

19      A.   Yes.

20      Q.   Do you have an opinion, as we sit here

21  today, whether or not a canine belongs on a use of

22  force policy for the Springboro Police Department?

23           MR. WEISENFELDER:  Objection.  Go ahead

24      and answer.

25      A.   In my opinion, no, it does not for the

59

1    City of Springboro.

2       Q.   And would that be for the same reasons

3    that we discussed earlier?

4       A.   Yes.

5       Q.   I'd like to talk to you now about how you

6    became a canine officer for the City of Springboro?

7           MR. WEISENFELDER:  Are you sort of

8       switching topics here for a minute?

9           MR. BRANNON:  A little bit.

10          MR. WEISENFELDER:  Good time to take a

11      break?

12          MR. BRANNON:  I think so.

13                (OFF THE RECORD)

14   BY MR. BRANNON:

15      Q.   You ready, Officer, Mr. Clark?

16      A.   Yeah.

17      Q.   Before we took a break, I was wanting to

18   know your background with dogs and canines.  Can you

19   tell me prior to joining the Springboro Police

20   Department what your experience was with dogs,

21   canines, animals?

22      A.   Just owned dogs all my life since being

23   little.

24      Q.   What type of dogs have you owned?

25      A.   I've owned Dobermans, Golden Retrievers,

60

1   German Shepherds and various mutts.  That's about

2   it.

3        Q.   Have you always had a dog growing up?

4        A.   Yes.

5        Q.   And as an adult, have you always had a

6   dog?

7        A.   Yes.

8        Q.   The dogs that you've had prior to getting

9   police canine Spike, have they all been family

10   household pets?

11        A.   Yes.

12        Q.   Have any of them ever been trained to do

13   anything, such as hunting, teach them to do tricks,

14   anything like that?

15        A.   My Golden Retriever would roll over and

16   play dead.

17        Q.   Okay.  I take it you taught him that?

18        A.   Yes, I did.

19        Q.   Did you ever do any other training,

20   teaching, anything like that, with any of your dogs?

21        A.   Just puppy camp I'd been to a couple of

22   times and then they closed that down.

23        Q.   What's puppy camp, basic obedience school

24   where you teach them to sit, hand you their paw,

25   something like that?

61

1     A.   Correct.

2     Q.   Tell me about how the Springboro Police

3 Department decided to start a canine department.

4 Whose idea was this?

5     A.   Originally it was Officer Bob Marchiny's

6 idea.  He had approached the previous chief who did

7 not support it, budgetary at the time.  I then

8 reasked to implement the program and the Chief

9 agreed to it.

10    Q.   And this would be Chief Kruithoff?

11    A.   Kruithoff.

12    Q.   You may have to correct me on that a few

13 times.  Hopefully I'll get it straight before I take

14 his deposition.  Approximately during what period of

15 time, then, did you -- you were the first one to

16 approach Chief Kruithoff about a canine program?

17    A.   As far as I'm aware.

18    Q.   To your knowledge, had Springboro ever had

19 a canine unit or program prior to this one?

20    A.   No.

21    Q.   Had any of the other officers or

22 lieutenants or the Chief, had they ever had any

23 prior experience with a canine program prior to this

24 one?

25    A.   Yes.

62

```
 1          Q.    Okay.  Who?

 2          A.    Lieutenant Parker.

 3          Q.    To your knowledge, what was Lieutenant

 4   Parker's canine experience prior to this one?

 5          A.    He was a handler, I believe, at Clearcreek

 6   Township.

 7                MR. WEISENFELDER:  Where?

 8          A.    Clearcreek Township.

 9          Q.    Do you know how long he was a handler at

10   Clearcreek Township with a canine?

11          A.    No, sir.

12          Q.    When did Lieutenant Parker, to your

13   knowledge, come on board with the Springboro Police

14   Department?

15          A.    Honestly, I don't know.

16          Q.    Was he there when you got there?

17          A.    Yes, he was.

18          Q.    Did you ever know Lieutenant Parker to

19   ever have a dog?

20          A.    No.

21          Q.    Did he get to keep his canine that he

22   handled for Clearcreek Township?

23          A.    I don't know.

24          Q.    Did Lieutenant Parker ever assist you with

25   any training, or anything like that, with your
```

63

1  canine Spike?

2      A.   No.

3      Q.   Let's get back to how the Springboro

4  Police Department started this canine unit with

5  Spike.  My understanding, you approached Chief

6  Kruithoff about starting the unit?

7      A.   Yes.

8      Q.   Tell me about that conversation with the

9  Chief.

10      A.   I approached the Chief, talked to him

11  about it, my interest in doing it.  The Chief told

12  me he would approach city council and ask them.

13      Q.   And why did you have an interest in

14  starting a canine unit for Springboro?

15      A.   I had utilized the City of Franklin

16  several times and our department had utilized

17  outside agency's canines multiple times, and I felt

18  that it was something that we used enough that we

19  could use our own.

20      Q.   What was Springboro utilizing other

21  departments' canines for, both in your personal

22  experience with Franklin and the other ones you know

23  about?

24      A.   Tracking and narcotics work.

25      Q.   And give me a time frame here of when this

64

1    conversation would have taken place with your chief.

2    A.    Sometime in 2004.

3    Q.    I take it at some point your chief

4    approached city council?

5    A.    Yes.

6    Q.    Or the city manager?

7    A.    Council.

8    Q.    Okay. Tell me about how the canine

9    program came to be from there then, who was involved

10   in that?

11   A.    The Chief told me that council had

12   approved it; however, they would not approve the

13   funding, they would only -- I'm sorry, they would

14   only approve a portion of the funding. They would

15   not pay for, I believe it -- it was either the dog

16   or the training, one or the other, I couldn't tell

17   you which one, but they would approve the rest of

18   it. And that he would post the position. Everyone

19   had the opportunity to apply for it. Whoever was

20   awarded it, they would have to then raise the money

21   throughout the community and the funds to fund the

22   remainder of what city council would not fund.

23   Q.    Okay. And how many officers, to your

24   knowledge, applied for the position?

25   A.    I have no idea.

1   Q.   But you got it?

2   A.   Yes, I did.

3   Q.   Do you know what, if anything, the Chief

4   would have done to get this approved by city

5   council?  Did he just say, hey, I think a canine

6   unit is a good idea, are you guys on board with it,

7   is it a pretty informal thing or were there votes

8   and public hearings or anything like that, to your

9   knowledge?

10   A.   I don't know.

11   Q.   After you were told that you would be the

12   canine officer, what did you do to start the program

13   then?

14   A.   I raised money through certain businesses

15   and also received a grant from -- a grant donation

16   from Milk-Bone Corporation.

17   Q.   The dog biscuit people?

18   A.   Correct.

19   Q.   And by donations, were these from

20   individuals, private businesses?

21   A.   Both.

22   Q.   Do you recall approximately how much money

23   you had to raise to start this program?

24   A.   I don't remember how much I had to raise.

25   I believe it was in the neighborhood of 8,000.  I

66

1    raised 12,500.

2        Q.    Do you know what types of budgetary

3    allotments were made for the additional training

4    past the initial training at this point in time?

5    Was there any projected costs of keeping this dog

6    and what additional training would cost and those

7    sorts of things?

8        A.    Not that was made to me, not that I knew

9    of.

10       Q.    Were you in charge of any of the budgets

11   regarding the canine program or not?

12       A.    Just the initial 12,500 that I raised.

13       Q.    Okay.  Do you have any additional

14   knowledge about the budgeting for the dog?

15       A.    I do not.

16       Q.    After you raised the money, what happened

17   next?

18       A.    The Chief told me to pick out a dog

19   training school, a place to get the dog.

20       Q.    And you said a dog training school, a

21   place to get the dog.  Where did you choose to get

22   the dog from?

23       A.    Lynnwoods Kennels.

24       Q.    How did you choose Lynnwoods Kennels?

25       A.    I was told by a trainer and an officer

1    from Franklin and several members of the Miami

2    Valley Police Canine Association that that was the

3    place to go.

4        Q.    Okay.   And who did you deal with at

5    Lynnwoods Kennels?

6        A.    Master Trainer Brian Woods and Rob, Robert

7    Hickman.

8        Q.    And what did Lynnwoods Kennels do for you?

9        A.    They provided the imported dog and the

10    training.

11        Q.    You mentioned that Brian Woods held a

12    classification as a master trainer?

13        A.    Correct.

14        Q.    How do you get that status as a master

15    trainer?

16        A.    You have to be approved by North American

17    Police Work Dog Association, and I believe it's in

18    terms of the number of hours you have training.

19        Q.    So they were a one-stop shop thing, you

20    buy your dog there and they train you there?

21        A.    Correct.

22        Q.    Tell me about the dog that was selected.

23    Who was responsible for selecting the dog?

24        A.    Brian Woods.

25        Q.    And how would Brian Woods determine what

68

1    dog would fit your needs?

2        A.    I'm not sure how he selected who got what

3    dog.  There were six people in my class and he chose

4    the dogs for each individual person before they made

5    it to class.

6        Q.    Okay.  When you were sent to Lynnwoods

7    Kennels by the Springboro Police Department, or sent

8    up there, did they give you any instructions on what

9    type of dog to get?

10       A.    No, they did not.

11       Q.    Was there any criteria for the kind of dog

12   that they wanted for their department?

13       A.    No, there was not.

14       Q.    So what type of dog were you going to get

15   or were you told to get, a narcotics dog, a tracking

16   dog, a public relations dog?  I don't know how many

17   types of dogs there are, but I think you understand

18   my question.

19       A.    I'm sorry, I thought you were referring to

20   the breed of dog.  No, I was instructed to get a

21   dual-purpose dog, narcotics and patrol work.

22       Q.    And what would a dual-purpose dog be

23   trained to do?

24       A.    Detect the four major odors of narcotics

25   and patrol, also patrol work, which entails

69

1    tracking, building searches, area searches, criminal
2    apprehension and articles.
3        Q.    Okay.  Did you have that discussion with
4    your chief before you went up to get the dog?
5        A.    Yes, I did.
6        Q.    So the Chief says, if we're going to do
7    this, I want a dual-purpose dog?
8        A.    Yes, sir.
9        Q.    Was the dog to be trained in any type of
10   specific manner for Springboro or not?
11       A.    No.
12       Q.    You were told a dual-purpose canine?
13       A.    Yes.
14       Q.    What was the breed of the dog that Brian
15   Woods gave to you?
16       A.    A Belgian Malinois.
17       Q.    And is that like a German Shepherd?
18       A.    It's similar.
19       Q.    Okay.  How would you describe a Belgian
20   Malinois?
21       A.    Shorter, actually smaller in stature than
22   your typical German Shepherd, a little faster, a
23   higher -- typically higher drive rate and more of a
24   herding animal.
25       Q.    Okay.  And by a higher drive rate, what do

70

1  you mean by that?

2      A.    More desire to work, to herd.

3      Q.    And is this dog known for anything in

4  particular, being good at anything in particular,

5  such as is this a better tracking dog than, say, a

6  Bloodhound, is it a better drug dog than a Labrador

7  Retriever?

8      A.    No.

9      Q.    Was this dog particularly good at any one

10  area?

11      A.    The breed?

12      Q.    This breed, yes.  Are they known for being

13  particularly good at any one thing?

14      A.    No.

15      Q.    Are they known for being aggressive?

16      A.    No.

17      Q.    Are they known for being obedient?

18      A.    Yes.

19      Q.    Are they known for anything else?

20      A.    Yes.

21      Q.    What else are they known for?

22      A.    Lower instance in rate of allergies and

23  cancers and hip dysplasia than the German Shepherd.

24      Q.    A healthier dog than a German Shepherd?

25      A.    Correct.

1          Q.    Who named this particular dog?

2          A.    I have no idea.

3          Q.    The dog that we're here talking about

4    today, its name is Spike, correct?

5          A.    Yes, it is.

6          Q.    So Brian Woods said, here's Spike, this is

7    your dog?

8          A.    Correct.

9          Q.    Did you know anything about Spike before

10   you were given him by Brian Woods?

11         A.    Just that he had a little book and x-ray

12   that came with him.  The book was written in Dutch

13   and it was his vaccine record and it had the name

14   Spike on it.

15         Q.    Was this dog imported then?

16         A.    Yes.

17         Q.    Where was he imported from?

18         A.    I don't know.

19         Q.    Someplace where they speak Dutch, I take

20   it?

21         A.    Correct.

22         Q.    Tell me about what type of training

23   program Brian Woods provided to you.

24         A.    It was five days a week, just all phases

25   of the dog training.  It was two weeks longer in

72

1   duration than the single-purpose narcotic dog.

2      Q.   Okay.  So he sold two kinds of dogs, one

3   was a narcotics-only dog and then the other was a

4   dual-purpose dog; am I correct?

5      A.   Three kinds.

6      Q.   Three kinds.  What was the third kind he

7   sold?

8      A.   Patrol only.

9      Q.   Okay.  So you have narcotics, dual-purpose

10   and patrol?

11      A.   Correct.

12      Q.   You said that the training was five days a

13   week.  For how many weeks?

14      A.   I believe it was six weeks.

15      Q.   And in those six weeks, can you tell me,

16   was Spike with you 24 hours a day, seven days a

17   week?

18      A.   No, he slept in the kennels.  I slept in

19   the bunkhouse.

20      Q.   And what did you guys do for six weeks

21   then?

22      A.   Obedience, drug work was -- obedience and

23   drug work were the first month, first four weeks.

24   That is all that we did.  The last two weeks

25   consisted of patrol work.

73

1    Q.    During the first four weeks during the
2  obedience and drug work weeks, did you have any
3  problems or issues with Spike?
4    A.    No, I did not.
5    Q.    How about during the second week, during
6  the patrol work, did you have any problems or issues
7  with Spike?
8    A.    The last two weeks?
9    Q.    Yes.
10    A.    No.
11    Q.    What did this training course provide you,
12  did they give you a certificate at the end?  What do
13  you get out of this?
14    A.    A certificate.
15    Q.    Okay.  And what type of certificate?
16    A.    A certificate that stated that you had
17  completed the number of hours of training described
18  by the State of Ohio, and that was particular to
19  whether you were dual purpose or just the narcotics.
20    Q.    Okay.  And were there any grades given in
21  this course?
22    A.    No.
23    Q.    It was just a pass/fail?
24    A.    I don't know that anyone failed you.  No,
25  it was neither.

74

1      Q.     Were you just there the number of hours

2 required and then that allowed you to get your

3 certificate?

4      A.     Yes.

5      Q.     Do you know what the requirements are for,

6 or were at that time, for a canine unit to be in

7 compliance with the rules under the State of Ohio?

8      A.     There was a number of hours that had to be

9 completed of initial training and then you had to

10 pass the state certification.

11      Q.     And was the work at Lynnwoods Kennels just

12 to get the number of hours that you needed then?

13      A.     Yes.

14      Q.     And tell me about the certification

15 process to that.

16      A.     The state certification?

17      Q.     Correct.

18      A.     The state certification is administered by

19 a state examiner, someone who is recognized by the

20 state, to do that, administer that. They oversee

21 it, that is a pass/fail, and then they report that

22 back to the head of whoever that was at the time,

23 that office.

24      Q.     Okay. And is the certification, is this a

25 written examination, an examination on oral

1  questions, a practical examination, what type of

2  examination did they conduct?

3       A.   Practical.

4       Q.   Were you ever required to take any tests,

5  any written work, anything like that, as part of

6  this training for Spike?

7       A.   For Lynnwoods I had to complete a final

8  test, yes.

9       Q.   And was that final test, was that a

10 written test?

11      A.   Yes.

12      Q.   And what was your score on that test?

13      A.   I do not know.

14      Q.   Did they grade the test?

15      A.   Yes.

16      Q.   Did they ever tell you your grade on that

17 test?

18      A.   No, they did not.

19      Q.   They just said, you're okay, you're not

20 okay?

21      A.   You either passed or failed.

22      Q.   How many dogs had there been in that

23 Springboro canine unit?

24      A.   Just one.

25      Q.   Just one.  And that's you and Spike.  You

76

1  were the only canine unit that Springboro has ever

2  had now or currently has?

3       A.   To my knowledge, yes.

4       Q.   How old was Spike when you got Spike?

5       A.   Thirteen months.

6       Q.   How old was Spike when Spike first went

7  into the field?

8       A.   Would have been six weeks older than 13

9  months, so...

10      Q.   So if I'm understanding you correctly,

11 right after you went up to Lynnwoods Kennels for

12 about six weeks, would you have immediately then

13 taken the state certification?

14      A.   After the six weeks.

15      Q.   After the six weeks.  And then right after

16 that, you and Spike were deployed in the field?

17      A.   Correct.

18      Q.   There was no delay between your

19 certification and deployment in the field?

20      A.   No.

21      Q.   Were you ever asked by any superior to

22 demonstrate Spike prior to deployment in the field?

23      A.   Yes.

24      Q.   Who were you asked to demonstrate Spike

25 for prior to deployment in the field?

77

1      A.   Lieutenant Wheeler, the chief of police

2  and the city manager.

3      Q.   And what did you do?  What were you asked

4  to demonstrate for them?

5      A.   On separate dates, the first time I

6  demonstrated drug work, detection of all four

7  narcotics, major narcotics, and the second date I

8  did an apprehension and call off.

9      Q.   You mentioned that you demonstrated the

10  dog for the city manager at that point in time.

11  Prior to that, had you known of the city manager's

12  involvement at all with the canine unit?

13      A.   I did not know.

14      Q.   And what was her purpose in being there

15  for the canine demonstrations at that point in time?

16            MR. WEISENFELDER:  Objection.

17      Q.   If you know?

18      A.   I don't know.

19      Q.   Did you ever demonstrate any other

20  functions of the dog prior to deployment in the

21  field?

22      A.   No.

23      Q.   Can you describe for me what an

24  apprehension and call off is?

25      A.   An apprehension and call off in that case

78

1    was a decoy, which is a person in a bite suit.  The

2    decoy is running away.  The dog is sent on what's

3    called, or determined to be a straight runaway bite.

4    The dog apprehends the person, stops.  The dog at

5    that point, after the person stops running, is

6    called off.

7         Q.    I take it at Lynnwoods Kennels you were

8    trained to give certain commands to the dog that the

9    dog was supposed to follow, correct?

10        A.    Correct.

11        Q.    What are the commands, for example, doing

12   a track?  How would you command the dog to do a

13   track?

14        A.    The word?

15        Q.    Sure.  You tell me what you do to make

16   this dog track.

17        A.    To make that particular dog track, I would

18   get him excited and I would hook him up in his

19   harness and I would tell him to sook it.

20        Q.    And I take it sook it is a term in another

21   language that's used?

22        A.    Correct.

23        Q.    What language is that?

24        A.    I believe that's German.

25        Q.    And how would you get the dog excited?

79

1      A.    Speaking to him in high, happy tones, like
2    a baby.
3      Q.    And, for example, how would you then
4    command a dog to do an apprehension, what would you
5    do in that circumstance?
6      A.    The word?
7      Q.    Just the same process that you described
8    for a track.  Would you get him excited first, would
9    you just give him a word and he'd go, what would he
10   do?
11     A.    That would depend on the circumstance.
12   You have to give me an example.
13     Q.    For example, when you were demonstrating
14   the dog for Lieutenant Wheeler, the Chief and the
15   city manager?
16     A.    That was a straight runaway bite where
17   you're presenting the scenario of a suspect that is
18   actively running away from you.  You have visual
19   contact with the suspect.  At that point, I shout
20   three warnings, police, stop or I'll send the dog,
21   again three times, and then the dog is released with
22   the word fourdan.
23     Q.    What's the word?
24     A.    Fourdan.
25     Q.    Can you spell that for us?

80

1      A.    F-O-U-R-D-A-N.

2      Q.    And you mentioned that you give three

3 warnings prior to sending the dog. How did you come

4 up with three warnings?

5      A.    On a straight runaway bite where you had

6 visualize sight of the suspect, that is what is the

7 common practice.

8      Q.    Okay. How did you know that that was a

9 common practice?

10     A.    That's what we were taught.

11     Q.    Okay. Meaning that that's what they

12 taught you, Brian Woods and Robert Hickman, out at

13 Lynnwoods Kennels, and that's what they taught you?

14     A.    Correct.

15     Q.    Have you been Spike's only handler?

16     A.    Yes.

17     Q.    Has anybody trained Spike besides the

18 folks up at Lynnwoods Kennels and yourself?

19     A.    That's a broad question. In terms of core

20 training or further maintenance training?

21     Q.    Tell me what you understand core training

22 to be.

23     A.    The core training was the training that

24 was completed at Lynnwoods Kennels teaching me to be

25 a handler.

81

1    Q.   Okay.  And then maintenance training would

2  be anything after that?

3    A.   Correct.

4    Q.   Nobody else participated in the dog's core

5  training besides yourself and the folks at Lynnwoods

6  Kennels, correct?

7    A.   Correct.

8    Q.   Who were the folks that participated in

9  Spike's training, maintenance training after

10 Lynnwoods Kennels?

11   A.   The Miami Valley Police Canine

12 Association.

13   Q.   Okay.  And would they actually train Spike

14 or would you be there working with Spike at the same

15 time?

16   A.   They would be there, while we were

17 working, assisting.

18   Q.   Okay.  So you actually were doing the

19 training, but they were just sort of providing

20 support, recommendations, that sort of thing?

21   A.   They would decoy, they would hide drugs in

22 places where I didn't know about them, things of

23 that nature.

24   Q.   Okay.  But they did not actually train

25 Spike at those, they just provided training

82

1    scenarios?

2        A.    Correct.

3        Q.    Who was responsible for keeping the dog

4    current in its training?

5        A.    Me.

6        Q.    Okay.  What is your understanding of the

7    training requirements for the dog as it gets into

8    service and moving forward, what do you have to do

9    to keep this dog current?

10        A.    A minimum number of hours a month.

11        Q.    How many hours were required per month,

12    then, to keep Spike current in his training?

13        A.    Sixteen in patrol, I believe, and I'm not

14    sure if it's been changed, I can't remember, the

15    narcotics, certain hours close to the same as the

16    patrol.

17        Q.    Okay.  And to stay current, you had to

18    actually be on patrol for 16 hours per month?

19        A.    The minimum --

20        Q.    And let me clarify.  I want this for

21    during the 2007/2008 time frame, during the times of

22    the Gemperline bite and the Campbell bite, the

23    incidents that we're here today about?

24        A.    I don't know the exact number separated,

25    but I can tell you together the minimum was eight

83

1    hours every other week.

2        Q.   Eight hours every other week of what?

3        A.   Maintenance training.

4        Q.   Now, is that a state requirement, is that

5    a recommendation?

6        A.   State.

7        Q.   Okay. What did that eight hours every

8    other week consist of?

9        A.   Patrol and narcotics training.

10       Q.   Would that be strictly training then,

11   training with the dog?

12       A.   Yes.

13       Q.   During the time that you were with

14   Springboro and Spike was assigned to you, how did

15   you keep track of the training of Spike or the

16   maintenance training of Spike, this eight hours that

17   we talked about?

18       A.   Originally, I kept it on computer format

19   in the CATS program, which became way too tedious

20   for me and it was easier to create a written log.

21       Q.   Okay. What is the CATS program?

22       A.   Canine Activity Tracking Software.

23       Q.   Where is this CATS program kept, all this

24   data that you entered into this program?

25       A.   On the Springboro Police Department's

84

1    server.

2         Q.    To your knowledge, is it still there, as

3    we sit here today?

4         A.    I have no idea.

5         Q.    When did you last notice it there?

6         A.    September of 2009.

7              MR. BRANNON:  I'd, again, make a document

8         request for this CATS program and any

9         information pertaining to the training of

10        Spike in that program.  I'm not sure what sort

11        of format it can be gotten in, but if we could

12        add that to my request that the court reporter

13        is running for me as well.

14        Q.    You said that the CATS program was a

15   little bit tedious for you and that you started

16   keeping records manually, correct?

17        A.    Yes.

18        Q.    Tell me about those records.

19        A.    It's essentially the same thing except I

20   don't have to input the things into the computer.  I

21   write them down in the boxes on the pieces of paper

22   in the training logs.

23        Q.    Was it your responsibility, then, to fill

24   out one of these training logs or to document the

25   training of Spike every time you trained Spike?

85

1          A.   Yes.

2          Q.   And if I'm understanding how you kept

3    these records correctly then, there should be a

4    piece of paper for every training session that

5    you've had with Spike?

6          A.   Yes.

7          Q.   Would I then be correct in stating that

8    there's no training session that you had with Spike

9    that wasn't documented?

10         A.   There were certain tracks that I did on

11   duty by myself that were short that I wouldn't

12   document sometimes.

13         Q.   Would this just be something when you were

14   out on duty, no other calls going on, something to

15   keep you and Spike occupied?

16         A.   Yes, sir.

17         Q.   So you're running through a short, little

18   routine, correct?

19         A.   Yes.

20         Q.   But you wouldn't necessarily qualify this

21   as your training time with Spike?

22         A.   No.

23         Q.   So all of your training time with Spike

24   should be documented in those training records?

25         A.   Yes.

86

1      Q.    Where were these training records kept?

2      A.    In my locked file cabinet.

3      Q.    And where was your locked file cabinet at?

4      A.    In the squad room at the police

5 department.

6      Q.    And who had access to this locked file

7 cabinet?

8      A.    Me.

9      Q.    At the time that you left the Springboro

10 Police Department, were all of Spike's training

11 records in that file cabinet?

12      A.    Yes.

13      Q.    And to your knowledge, are they still

14 there today?

15      A.    I don't know where the file cabinet is.

16      Q.    When's the last time you've seen all of

17 these records?

18      A.    I don't know.

19      Q.    Presumably the last time you would have

20 trained Spike, you would have filled out one of

21 these and stuck it in the file cabinet?

22      A.    Yes.

23      Q.    Do you recall seeing all of these records

24 there in that file cabinet?

25      A.    The last time actually that I saw them,

87

1  they were given to Lieutenant Wheeler to make

2  copies.  The originals that were in my filing

3  cabinet, I don't remember the last time I've seen

4  those.

5      Q.   Do you recall on what date that was,

6  approximately?

7      A.   No, I do not.

8           (Deposition Exhibit S5 was marked for

9  identification.)

10      Q.   I've handed you a document that we've

11  marked as S5.  Does that look familiar to you?

12      A.   Yes.

13      Q.   Can you tell me what that is?

14      A.   That is a written booklet for training

15  records.

16      Q.   Okay.  Are these the same training logs

17  that we've been talking about here most recently,

18  the records that you would have kept on Spike, his

19  training records?

20      A.   These are the paper ones.

21      Q.   Okay.  Do you know, approximately, at what

22  point in time you would have started keeping the

23  paper records?

24      A.   Somewhere around the time of the first

25  national workshop, which would have been 2006.

88

1          Q.    And you mentioned the first national

2    workshop.  What was the first national workshop that

3    you went to in 2006; was that part of your

4    certification for the state or this was additional

5    training after you completed your certification for

6    the state?

7          A.    Additional training.

8          Q.    Okay.  Where was that conducted at?

9          A.    Right outside of Cleveland, Ohio.  The

10   town's name is Beech something.  I don't remember

11   the full name of the town, but it was the North

12   American Police Work Dog 2006 workshop.

13         Q.    Okay.  And how many days was that?

14         A.    Five.

15         Q.    And approximately how long after your

16   certification did you do that?

17         A.    It was the summer of 2006.

18         Q.    And have you completed any additional

19   workshops like that since that time?

20         A.    Just in-service workshops.

21         Q.    Meaning the ones here locally that you did

22   with the Warren County and Clinton County, other

23   canine units?

24         A.    No.

25         Q.    Tell me what other workshops you've done

89

1   then.

2       A.   Forty-hour in-service workshop at

3   Lynnwoods Kennels.

4       Q.   When was that completed?

5       A.   I'd have to see the certificate.  I'm sure

6   someone has it.

7       Q.   Are we talking back in 2006, more

8   recently, or was that just after -- you've had the

9   dog in service for 40 hours, they --

10      A.   2006/2007 sounds right.

11      Q.   And how long was that training up in

12  Lynnwoods Kennels when you went back for that?

13      A.   Forty hours.

14      Q.   One week, five days?

15      A.   Yes.

16      Q.   And what did you do with the dog at that

17  point in time?

18      A.   I believe we did night tactics, night

19  building searches, just patrol and narcotic

20  training.

21      Q.   Okay.  Was it more of a refresher course

22  or was this more advanced training than what you

23  received from Lynnwoods initially?

24      A.   More advanced.

25      Q.   Any other additional training besides what

90

1  happened up at Lynnwoods and this one up in Beech,

2  wherever it was?

3      A.  No.

4      Q.  And would that have been in 2007 or before

5  all of this training?

6      A.  I believe so.

7      Q.  Was this training documented in your

8  canine unit training logs?

9      A.  The national workshop, I believe, may have

10 been put onto the computer, the CATS version.  I'm

11 not positive about that.  It may be in the paper.

12 Honestly, I don't remember.

13     Q.  I know that this exhibit -- I'm going to

14 direct you back to the exhibit that I marked as S5.

15 These are a portion of the canine unit training logs

16 that have been provided to me.  They have dates on

17 them but no other information.  Can you explain to

18 me why they only have the dates on them and no other

19 information?

20     A.  Which ones are you looking at?

21     Q.  All of those that have been marked as S5,

22 all of these training logs.

23     A.  What I would do is I would set them up for

24 an entire month and write the dates in the top

25 right-hand corner.  That's daily.  Every page is a

91

1  day -- every other page would be one day.  And we

2  did not train every single day.

3      Q.   Okay.  So you wrote up canine unit

4  training logs in advance in anticipation of doing

5  training?

6      A.   Correct.

7      Q.   But you did not do any training, so you do

8  not fill out these forms, correct?

9      A.   On certain days.

10     Q.   Okay.  Would I be correct in

11  understanding, then, that if you did do training on

12  certain days, that those forms would have been

13  filled out the rest of the way.

14     A.   Yes.

15     Q.   And that any one that is blank like these

16  that have been marked as S5, no training was

17  conducted on those days?

18     A.   Correct.

19     Q.   During Spike's career at Springboro, was

20  he ever taken out of service for any reason?

21        MR. WEISENFELDER:  Objection.  Go ahead.

22     A.   In October he was taken out of service for

23  a review of the policy and procedures regarding the

24  canine program.  And then there was a point in time

25  where he was taken out of service due to an injury.

92

1    He tore his patellar tendon and had to have surgery

2    and it was a very lengthy time.

3        Q.    October of what year for the review of

4    policies and procedures?

5        A.    2008.

6        Q.    And who took Spike off duty?  Is that how

7    you say it?  You tell me how you say it when you

8    take a dog out of service.

9        A.    That's about it.

10       Q.    When Spike went off duty in October of

11   2008, who took him off duty?

12       A.    Chief Kruithoff.

13       Q.    And you said that that was for a review of

14   policies and procedures?

15       A.    Correct.

16       Q.    What type of a review of policies and

17   procedures was done at that point?

18       A.    A review of policies and procedures.

19       Q.    Okay.  Who conducted the review?

20       A.    Lieutenant Wheeler.

21       Q.    And what did Lieutenant Wheeler do as part

22   of this review?

23       A.    He reviewed the policies and procedures.

24       Q.    Why were they reviewed at this time, to

25   your knowledge?

93

1    A.    A complaint, I believe.

2    Q.    What type of complaint?

3    A.    A complaint about the bite, or the

4  physical apprehension of Ms. Gemperline.

5    Q.    So, to your understanding, somebody made a

6  complaint to the Springboro Police Department in

7  2008 regarding the bite that Ms. Gemperline received

8  and at that point the Chief said, we need to do a

9  review of our policies and procedures?

10    A.    Yes.

11    Q.    Prior to that point in time, had there

12  ever been another review of policies and procedures

13  concerning the canine?

14    A.    There was a review done into the entire

15  event of Mr. Kerns's pursuit.

16    Q.    Was that a review of policies and

17  procedures or just an investigation into that event?

18    A.    I believe it was an investigation into

19  that event.

20    Q.    Okay.  So to your knowledge, I know that

21  when you initially -- you had one other discussion

22  with Lieutenant Wheeler way back when you started

23  the program about policies and procedures concerning

24  the canine that we previously discussed, correct?

25    A.    Correct.

94

1      Q.   And that the only other discussion that

2 you've had with anybody at Springboro about that has

3 been in this October of 2008 following the

4 Gemperline bite, correct?

5      A.   The only other -- can you say that again.

6      Q.   The only other discussions that you've had

7 concerning the policies and procedures of Springboro

8 occurred in October of 2008 after the Gemperline

9 incident?

10     A.   For policies and procedures, yes.

11     Q.   Okay.  And you said that Lieutenant

12 Wheeler conducted the review, correct --

13     A.   Yes.

14     Q.   -- in 2008?  And what was determined as a

15 result of the review, did anything change?

16     A.   As a result of his review?  Are you asking

17 his findings or the end result of all the findings?

18     Q.   Tell me what his findings were.

19     A.   His findings were that neither I nor the

20 dog had done anything wrong and that there did need

21 to be a review of the policy to see if anything

22 should be input additionally to it.

23     Q.   Okay.  Do you know what they were talking

24 about, about inputting anything additionally into

25 the policies and procedures?

95

1      A.    I do not.

2      Q.    What was the result of that review?

3      A.    The chief discontinued the dog program.

4      Q.    Spike took an early retirement then?

5      A.    Correct.

6      Q.    Were you given any reason for why the

7   Chief discontinued the dog program?

8           MR. WEISENFELDER:  Objection.  Go ahead.

9      A.    The Chief told me that I had done nothing

10   wrong, the program had done nothing wrong, but the

11   council did not want to pay out any more money in

12   lawsuits.

13     Q.    Had money been paid out previously in

14   lawsuits?

15     A.    Not to my knowledge.

16     Q.    What happened to Spike?

17     A.    He lives with me.

18     Q.    Who initially acquired Spike?  Who had

19   ownership of Spike when you guys got him from

20   Lynnwoods Kennels?

21     A.    The City of Springboro.

22     Q.    And did the City of Springboro maintain

23   ownership of Spike up until when?

24     A.    I believe it was February 6, 2009.

25     Q.    Okay.  Who acquired Spike, then,

1  February 6th of 2009?

2      A.    Myself.

3      Q.    Did you purchase Spike directly from

4  Springboro, did they give him to you, how did that

5  happen?

6      A.    He was retired to me.

7      Q.    So basically they gave you the dog?

8      A.    Correct.

9      Q.    How old was Spike at that time?

10     A.    Six.

11     Q.    Can you tell me what the expected career

12 of a police canine is?  How many years did you

13 expect to get out of Spike or how old was Spike

14 going to be when he would have normally retired?

15     A.    You asked me two different questions.  I

16 can answer both of them.

17     Q.    I don't mean to ask you two separate

18 questions at different times.  Tell me which one you

19 want to answer and we'll start there.

20     A.    The expected career of a police canine, in

21 general, depends on the breed.

22     Q.    And for a breed of a Belgian Malinois is

23 what?

24     A.    Depends on the individual dog.  I've seen

25 them work, working up to 14 years old.

97

1     Q.   And what would the average be then?

2     A.   I don't know the average.

3     Q.   How long were you expecting to get out of

4  Spike?

5        MR. WEISENFELDER:  Objection.  If you can

6     answer, go ahead.

7     A.   The minimum I expected to get out of him

8  was until he was at least nine.

9     Q.   So his retirement had nothing to do with

10  his physical abilities?

11     A.   No, it did not.

12     Q.   Did we cover both questions there or are

13  there --

14     A.   Yes, we did.

15     Q.   You also mentioned previously that Spike

16  had an injury leave sometime during his career

17  because of a torn --

18     A.   Patellar tendon.

19     Q.   Okay.  How did Spike suffer a torn

20  patellar tendon?

21     A.   Stepped in a mole hole.

22     Q.   Did he undergo surgery for that?

23     A.   Yes, he did.

24     Q.   Did he make a full recovery from that?

25     A.   Yes, he did.

98

1    Q.   And what period of time did that occur?

2    A.   I don't remember.  I could estimate for

3 you.

4    Q.   Give me a year, month.

5    A.   2007.  I don't know the month.  I know it

6 was winter.  It was cold outside.

7    Q.   Okay.  Winter of 2007?

8    A.   Winter into spring.  It was just starting

9 to warm up.

10    Q.   Okay.  So early 2007?

11    A.   Yes.

12    Q.   How long was Spike out of service for?

13    A.   A little over six weeks.

14    Q.   Was there anything that was done after

15 Spike came back, training-wise, with him to get him

16 back up to speed besides whatever normal training

17 you provided?

18    A.   No.

19    Q.   Did he do any training during the six

20 weeks that he was off?

21    A.   He did nothing.

22    Q.   Laid around the house and watched TV?

23    A.   He wasn't allowed out of his crate.

24    Q.   The incident involving Mr. Campbell

25 occurred, according to records that I've been

99

1    provided with, on October 21, 2007; is that correct?

2         A.    It sounds correct.

3         Q.    What type of training were you doing with

4    Spike around that period of time prior to that date?

5         A.    The same as I had always done.

6         Q.    And tell me what the same is that you've

7    always done.

8         A.    I would request from the shift sergeant to

9    go to weekly training.

10        Q.    Okay.  And would all that training be

11   documented, then, in the canine unit training logs?

12        A.    What was approved would be, yes.

13        Q.    I think we've already discussed previously

14   that there wouldn't have been any additional

15   training besides what's in those training logs,

16   correct?

17        A.    Correct.

18        Q.    And I'm going to represent to you also

19   that the Gemperline incident occurred on October 11,

20   2008; does that sound correct to you?

21        A.    Yes.

22        Q.    And do you recall what type of training

23   you would have been doing with Spike in the two,

24   three months prior to that date?

25        A.    The same as my normal training.

100

1       Q.   Okay.  And that would have also been

2   documented in your canine unit training logs?

3       A.   Yes.

4       Q.   At both of those times, you believe that

5   you needed to complete approximately eight hours of

6   training every other week to stay current, correct?

7       A.   Correct.

8       Q.   Have you ever received any training in how

9   to testify?

10      A.   Yes.

11      Q.   Tell me about what training you've

12  received in how to testify.

13      A.   In the academy, we were trained a brief

14  period of how to testify.

15      Q.   Okay.  And what sorts of things did they

16  teach you about how to testify?

17      A.   To answer clearly and concisely, to try to

18  maintain eye contact back and forth with the jury,

19  and to speak so that everyone can hear you.

20      Q.   Okay.  Did you ever receive any additional

21  training in how to testify after that?

22      A.   No.

23      Q.   How about writing reports, have you ever

24  received any training on how to write reports?

25      A.   In the academy.

101

1    Q.   Okay.  And what did they teach you to do?

2    A.   To document the incident.

3    Q.   Okay.  Were you supposed to document the

4    incident in a statement of facts?

5    A.   Correct.

6    Q.   Is that statement of facts supposed to be

7    in a chronological order?

8    A.   Yes.

9    Q.   And you're supposed to write complete and

10   accurate reports about each incident?

11   A.   Yes.

12   Q.   And you're supposed to put all the

13   important details of that report or that incident in

14   that report, correct?

15   A.   Yes.

16   Q.   And it's your understanding that when you

17   make a report like that, it's an official report?

18   A.   Yes.

19   Q.   And that you're required to tell the truth

20   in those reports?

21   A.   Yes.

22   Q.   Did you complete any reports after

23   arresting Mr. Campbell?

24   A.   After he was arrested, I completed a

25   report.  I did not arrest him.

102

1      Q.    Okay.  Who was the individual that

2  arrested Mr. Campbell?

3      A.    Officer Anderkin.

4      Q.    And what type of reports did you complete

5  after Mr. Campbell was arrested?

6      A.    A canine usage report.

7      Q.    And did you create any other reports

8  besides the canine usage report?

9      A.    No, I did not.

10     Q.    How long after the incident was that

11  report created?

12     A.    It would have been later in the morning.

13     Q.    And how about for Ms. Gemperline, what

14  type of report would you have created after her

15  arrest?

16     A.    In that incident, I created a canine usage

17  report along with a NIBRS report.

18     Q.    How long after the incident did you create

19  the use of force report?

20     A.    I did not create a use of force report.

21     Q.    I'm sorry, the canine usage report.

22     A.    The morning, within hours.

23     Q.    And you always mentioned a NIBRS report?

24     A.    A NIBRS report.

25     Q.    Can you tell me what a NIBRS report is?

103

1      A.    An incident report, a standard that would

2   be used with any other event not related specific to

3   canine.

4      Q.    Okay.  When did you complete the NIBRS

5   report?

6      A.    The same day.

7      Q.    At the same time that you did the canine

8   usage report?

9      A.    The same time period, not the exact same

10  time.

11     Q.    I understand, but one after the other or

12  one before the other sometime?

13     A.    Yes.

14     Q.    And why were you required to create a

15  NIBRS report or why did you create a NIBRS report?

16     A.    Because I arrested several individuals at

17  that residence where the initial call took place and

18  they were charged separately.  They were not

19  involved with the usage of the dog.

20     Q.    So am I correct in believing then or

21  understanding that the NIBRS report did not involve

22  Ms. Gemperline?

23     A.    Correct.

24     Q.    I know that you stated that you reviewed

25  these reports prior to today, correct?

104

1      A.   Yes.

2      Q.   The files on both Mr. Campbell and

3  Ms. Gemperline.  How long before today did you

4  review those?

5      A.   Yesterday.

6      Q.   As part of your training with the dog, did

7  you ever receive a manual or written materials or

8  anything like that?

9      A.   No.

10      Q.   I'm going to hand you what I would like

11  marked S1.

12          (Deposition Exhibit S1 was marked for

13  identification.)

14      Q.   Do you recognize that document?

15      A.   Yes.

16      Q.   Can you tell me what that document is?

17      A.   It's the Springboro Police Department's

18  use of canine policy as of December 10, 2008.

19      Q.   So my understanding, then, that the

20  Springboro Police Department did not adopt this

21  particular policy until December 10, 2008?

22      A.   Correct.

23      Q.   Do you know why this document came about

24  December 10, 2008?

25      A.   It was following the review conducted by

105

1   Lieutenant Wheeler that I informed you of.

2       Q.   Okay.  That's the October 2008 review

3   following the Gemperline incident?

4       A.   Correct.

5       Q.   What date did they decide to terminate the

6   canine program at Springboro?

7       A.   February -- I believe I gave you that

8   date.  I think it's February 6th of 2009.

9       Q.   After the Gemperline incident, was Spike

10  ever put back on the road after that October 11,

11  2008 --

12          MR. WEISENFELDER:  Objection.  Go ahead.

13      Q.   -- date?

14      A.   No.

15      Q.   Did you at all participate in developing

16  this use of canine force policy for Springboro that

17  they did not adopt until December 2008?

18      A.   I had nothing to do with that.

19      Q.   It states that this policy became

20  effective December 10, 2008 and was then again

21  revised on December 19, 2008.  Are you with me there

22  on the last page?

23      A.   Yeah.

24      Q.   Can you tell me what was revised in those

25  nine days?

106

1      A.    I have no idea.

2      Q.    When did they make the determination to

3  terminate the canine program in Springboro?

4      A.    February 2009.

5      Q.    Okay.  So if I'm understanding the events

6  chronologically and if I'm understanding you

7  correctly, to your understanding, Spike was taken

8  out of service after the bite, concerning

9  Gemperline, on or about the October 11, 2008?

10      A.    Yes.

11      Q.    Springboro then adopted a new use of force

12  policy for the canine October 10th, 2008 and then

13  terminated the program in February of 2009 before a

14  dog was ever put back on duty?

15      A.    Correct.

16      Q.    If you could hand me the bottom page

17  there?

18      A.    This one?

19      Q.    Yeah.  I know previously we talked about

20  Exhibit S17.  S17, I think, was your understanding

21  that that was the canine policy in effect for

22  Springboro prior to the most recent one that's been

23  marked as Springboro Exhibit 1; is that correct?

24      A.    Correct.

25      Q.    And do you know of any difference between

107

1   those two policies?

2       A.   I have not compared them.

3       Q.   Have you ever looked at those, or read the

4   Springboro policy marked as Springboro Exhibit 1?

5       A.   I've glanced through it.  I've not read

6   the entire thing word for word, no.

7       Q.   Okay.  Both --

8           MR. BRANNON:  You need a break, Wil?

9           MR. WEISENFELDER:  No.  I'm trying to

10          keep track of things.  The first one was

11          marked.  All we have is the original.  I don't

12          have a copy of it.

13          MR. BRANNON:  And I don't have any

14          additional copies to give.  If you'd like, we

15          can take a break and make copies.

16          MR. WEISENFELDER:  As I said before, it

17          was really merely marked for identification.

18          If we get into questioning about the specific

19          document, I will want a copy.

20          MR. BRANNON:  Let's go ahead and take a

21          break and make some copies then.

22                  (OFF THE RECORD)

23   BY MR. BRANNON:

24       Q.   I am going to show you a binder here and

25   represent to you that certain documents have been

108

1  provided to me in discovery.  Included within some

2  of those documents were the canine unit training

3  logs that we talked about.  These are Bates stamped

4  numbered by, I believe, your counsel, Bates numbers

5  36 through 185 right there.  I'll give you an

6  opportunity to look through those.

7       A.  Do I need to look through all of them or

8  just stipulate they're mine?

9            MR. BRANNON:  Off the record.

10                (OFF THE RECORD)

11  BY MR. BRANNON:

12       Q.  Mr. Clark, we were talking about your

13  canine unit training logs.  There's a number of them

14  there in front of you.  Are those the complete and

15  accurate copies of the records and logs that you

16  kept on Spike?

17       A.  Yes.  After the computer records, those

18  were the paper ones that I kept.

19       Q.  Okay.  Knowing that those are not included

20  in any computer ones that you kept under the CATS

21  program, does that look like a complete set of the

22  records that you kept a copy of those, meaning

23  that's going to have all the canine unit training

24  logs, to your knowledge, that you would have filled

25  out and kept on Spike?

1      A.   Yes.

2      Q.   And I know we talked about the records

3  that you kept in your file cabinet on that.  Does

4  that appear to be copies of those records?

5      A.   Yes.

6      Q.   And does that look like the proper amount,

7  we aren't missing any?  That's most likely all of

8  them that exist, correct?

9      A.   Correct.

10      Q.   I'll go ahead and take that back from you.

11  Prior to lunch, we also talked about your

12  certification through the State of Ohio that you

13  would have completed with your canine Spike.  How

14  long was that certification good for?

15      A.   A period of two years.

16           MR. BRANNON:  I'm going to have you mark

17      that as S3.

18           (Deposition Exhibit S3 was marked for

19  identification.)

20      Q.   Are you ready?

21      A.   Yes.

22      Q.   You've had an opportunity to look through

23  S3 which is a series of, I believe, four

24  certificates.  Do you recognize those documents?

25      A.   I do.

110

1       Q.    Can you tell me what those are?

2       A.    They're certificates for the certification

3    from the Office of the Attorney General for the

4    certification of a police working dog.

5       Q.    Okay.  And it's my understanding that

6    that's the Ohio certification that you need to be

7    compliant in the State of Ohio; is that correct?

8       A.    Correct.

9       Q.    And it appears that you were first awarded

10   this certificate on May 12, 2005; does that sound

11   right?

12      A.    Yes.

13      Q.    And then immediately thereafter that's

14   when you and Spike went into service for Springboro?

15      A.    Correct.

16      Q.    And you had a renewal date on that

17   certificate of, it looks like, April 28, 2007 on one

18   and May 12, 2007 on the other one, meaning the first

19   one being for tracking article search, marijuana,

20   cocaine, and the second one being for criminal

21   apprehension canine control and canine searches,

22   correct?

23      A.    Correct.

24      Q.    Do you know why there's two different

25   renewal dates on those certificates?

111

1     A.   I have no idea.

2     Q.   Okay. But it was your understanding that

3 both of these needed to be renewed every two years?

4     A.   My understanding is that's the only time

5 that you can. You can't have it renewed before that

6 date.

7     Q.   Okay. Meaning you can't do the work to

8 have it renewed before that date or how does that

9 work when you go to renew?

10     A.   You have to contact the state evaluator.

11 The state evaluator comes to renew your

12 certification and review you, but they will not do

13 it before that date.

14     Q.   It is your understanding, then, that the

15 dog cannot be in service if these -- if you're not

16 renewed?

17     A.   Yes.

18     Q.   Okay. And it's also, judging by the last

19 two certificates, it looks like there was a lapse in

20 time for the renewal on Spike; is that correct?

21     A.   That's correct.

22     Q.   And we already talked about the renewal

23 dates, but it looks like Spike wasn't renewed again

24 until September 26th of 2007; is that correct?

25     A.   That's correct.

112

1     Q.   Was Spike deployed in the field at all

2   from the March 28th date, 2007 until September 26,

3   2007?

4     A.   I'd have to look at the records, but I

5   don't believe so.

6     Q.   Okay.  Which records would you need to

7   look at to confirm that?

8     A.   My canine activity tracking software to

9   show the dates of each deployment.

10     Q.   Where is the canine tracking software,

11   where is this?

12          MR. WEISENFELDER:  That's what he

13          mentioned earlier, the CATS, I think.

14     A.   The Springboro server.

15     Q.   Okay.  So the CATS server would show every

16   date that your dog is in service?

17     A.   Every day that he's been deployed.  Every

18   deployment was listed on that, yes.

19     Q.   Okay.  But it wouldn't necessarily show

20   you if Spike was in service then, correct --

21     A.   Correct.

22     Q.   -- meaning out on patrol?  That software

23   would only tell you if Spike was deployed during his

24   service?

25     A.   Yes.

113

1      Q.   Were you working between that April 28,

2   2007 date and September 26, 2007 date?

3      A.   A large majority of that time was spent on

4   light duty working in the office because I had had

5   two wrist surgeries that required me to be

6   incapacitated in my left hand in a brace where I

7   could not move it at all.

8      Q.   Okay.  Were you on patrol at all during

9   those times?

10     A.   At some point but I don't remember the

11  date that I came back from the surgery.

12     Q.   Would Spike have been with you if you

13  would have been on patrol during those dates?

14     A.   Yes.

15     Q.   Was Spike with you every day that you were

16  on patrol --

17     A.   No.

18     Q.   -- during that time frame?

19     A.   No.

20     Q.   Why would Spike not have been on patrol

21  with you?

22     A.   He had a broken tooth at one point that

23  had to have a root canal and he was off duty for

24  that.  He also had a split paw pad and I was unable

25  to do any training with him at one point.  And he

114

1    also had the patellar tendon tear.

2        Q.    Okay.  We've talked previously about the

3    patellar tendon tear.  Let's talk about the tooth

4    now.  When did the tooth incident occur?

5        A.    I'd have to see the vet records.

6        Q.    Who was Spike's vet?

7        A.    The initial referring vet was Dr. Beall.

8    The doctor that did the root canal was not

9    Dr. Beall, it was a specialist in Cincinnati.

10       Q.    Where are the vet records on Spike kept?

11       A.    At the vet's office.

12       Q.    Does Springboro keep any of his health

13   records, anything like that?

14       A.    Not that I'm aware of.

15            MR. BRANNON:  And I'm not exactly sure if

16        we need a release for vet records.

17            MR. WEISENFELDER:  My experience is you

18        do.

19       Q.    And who would execute that for Springboro

20   for Spike?  I guess you're technically the owner of

21   Spike?

22            MR. WEISENFELDER:  Let's try it through

23        the city.  Send me a release and we'll go

24        through the city.  And if the vet balks at the

25        city and wants the owner, we can do that.

115

1        MR. BRANNON:  Let's go ahead and add that

2     to my request of the records sheet that you

3     have been keeping.

4   BY MR. BRANNON:

5        Q.    So am I correct then in my understanding

6   that there is no way to show what day Spike was on

7   duty with you and not on duty with you during this

8   time frame?

9        A.    The only way to do that would be through

10  the CATS system.

11       Q.    Okay.  But the CATS system only shows if

12  Spike was actually deployed during that, correct?

13       A.    Correct.

14       Q.    It does not show if he was on duty?

15       A.    Correct.

16       Q.    And it's my understanding from your

17  previous testimony that the CATS system, you were

18  not using the CATS system in 2007, that you ceased

19  using the CATS system when you started the canine

20  unit training logs on 5/3/06?

21       A.    That's incorrect.

22       Q.    That's incorrect.  Go ahead and correct me

23  then.

24       A.    The correction that I would make is just

25  for the purposes of training.  The CATS system is a

116

dual-purpose machine. It records your usages and your training. I used it to report my usages, not my -- I discontinued doing it for training, so my usages were on there.

Q. So training went to a manual system but the usages --

A. Correct.

Q. -- were still using the CATS?

A. Yes.

Q. Would the most recent bite incident involving Chelsie Gemperline be on the CATS system then?

A. Yes.

Q. Would that have been the last incident entered into the CATS system most likely?

A. Yes.

Q. So you cannot tell me whether or not Spike was ever on duty during the lapse in his training certificates, correct?

A. Correct.

Q. And is this somebody from the State of Ohio that issues these training certificates or is this a master trainer?

A. As far as I know, these certificates come mailed from the State of Ohio Attorney General's

117

1  Office.  The evaluator is a state certified trainer

2  and they don't issue a certificate.

3      Q.    Do they fill something out, send it up to

4  the state, the state sends you your certificate?

5      A.    Correct.

6      Q.    I noticed that there are two different

7  areas on these training certificates; one is for

8  tracking article search, marijuana, cocaine, heroin,

9  the other is for criminal apprehension, canine

10  control and canine searches.  Did Spike ever obtain

11  any other certifications besides those two?

12      A.    No.

13      Q.    Are there any additional ones that are

14  issued by the state besides those two?

15      A.    Cadaver and bomb.

16      Q.    As a dual-purpose dog, was Spike ever

17  trained in cadaver and bomb searches?

18      A.    No.

19      Q.    Is a cadaver searching dog, is that what's

20  known as a human detector?

21      A.    I've never trained cadaver dogs, but

22  the -- I've worked with them and the training aids

23  that they use are real decaying human tissue.

24      Q.    Okay.  What is a human detector as the

25  term is used in canine terminology?

118

1   A. As far as patrol or cadaver?

2   Q. Not cadaver related.  As you understand it

3 in your dog with your employment with the City of

4 Springboro.  If you heard the term human detector in

5 reference to a dog, what does that mean, what's your

6 understanding of that term?

7   A. I've never heard that used that way.

8   Q. Okay.  How have you heard it used?

9   A. It's either tracking, building search or

10 area search, if you're talking about finding a

11 human.

12   Q. Okay.  Was Spike trained as a human

13 detector in that manner then?

14   A. Yes.

15   Q. So for tracking, building searches, things

16 of that nature?

17   A. Yes.

18   Q. Is an odor the same thing as a scent when

19 a dog is tracking?

20   A. I believe you'd have to refer to the

21 scientists for that one.  I think they're still up

22 in debate about that.  There's a conflict of

23 interest between the two ideas.

24   Q. What's your understanding of what a scent

25 is?

119

1      A.   A scent can be anything cologne, anything

2  of that nature that gives off an odor.

3      Q.   Okay.  Is that in relation to the dog as

4  well when you're training with the dog?  Are you

5  trained to understand a scent any differently?

6      A.   In terms of narcotics, they've trained in

7  odor detection.

8      Q.   So is odor something different than a

9  scent then, to your understanding?

10      A.   I don't know.  I'm not a scientist.

11      Q.   Okay.  What's your understanding of the

12  term scent, then, in relation to dogs and dog

13  training?

14      A.   In relation to dogs, what I've always been

15  told the term scent refers to is more of the lines

16  of a trailing dog, such as a Bloodhound that would

17  use skin cells to trail someone, not to actually

18  track them.

19      Q.   Okay.  What does a dog look for, then,

20  when doing a tracking if they don't use scent or

21  odor?  For example, if Spike was performing a track,

22  would he be using scent, would he be looking for

23  scent and odor, what would he be doing?

24      A.   Ground disturbance odor.

25      Q.   Okay.  Can you tell me what ground

120

1   disturbance odor is?

2        A.   Ground disturbance odor is the disturbance

3   of the ground, in particular, grass, dirt, concrete,

4   asphalt, any type of ground surface.  The way the

5   dogs are trained is when that surface is stepped on,

6   the area around it and where the area has been

7   stepped on has been disturbed.  It's going to have a

8   different odor than the area that is not disturbed,

9   such as model spores breaking up, grass blades

10  breaking and bleeding.  It gives off a much

11  different odor to the dog than the non-disturbed

12  area.

13       Q.   Okay.  So if I'm understanding you

14  correctly, when you would send Spike on a track,

15  Spike would be sniffing not for human odor but for

16  disturbances in the ground?

17       A.   That, again, I would have to refer you to

18  some sort of scientist because even when I was going

19  through dog school, there was a large debate if any

20  human odor actually played into the actual track

21  itself or not, and no one could ever give me an

22  answer.

23       Q.   Okay.  So my understanding is there's some

24  dispute amongst the canine community, then, when a

25  dog is tracking somebody, whether or not they're

121

1  smelling human odor residue or ground disturbance,

2  as you described it?

3      A.   Correct.

4      Q.   Tell me, then, the difference with air

5  scenting.  What is air scenting?

6      A.   Air scenting to me and the handlers that I

7  worked with was when a dog became closer towards the

8  end of the track and closer towards finding the toy

9  or whatever you had placed out there, he caught an

10  odor of that toy, would pick his head up and begin

11  to use his eyes instead of his nose.

12      Q.   Okay.  If I'm understanding you correctly,

13  then, when a dog is air scenting, it's probably

14  because he's very close to whatever it is he's

15  searching for, generally?

16      A.   I don't know that you can use the term

17  very close.  They would depend on variables

18  determined by the weather, humidity, wind direction,

19  the area.

20      Q.   Okay.  And I'm not giving a specific

21  distance necessarily, but when I say close, would a

22  dog begin air scenting an object within -- are we

23  talking 10 yards, 100 yards?

24      A.   It could be either depending on the wind

25  and the area that you're in.

122

1     Q.    But as a handler, when your dog starts air

2   scenting, what is that telling you about your dog?

3     A.    It could be that you are close to someone

4   or the end goal and that the dog is looking at that

5   point, and that sometimes you are close and

6   sometimes you're not and the dog puts his head back

7   down and continues to track.

8     Q.    So if I'm understanding you, and I sort of

9   have some hunting dogs and that so I think I'm

10   understanding a little bit what air scenting is,

11   it's where a dog gets in an area and the scent

12   becomes so strong that the dog starts looking up

13   visually trying to find whatever it is because the

14   scent odor gets so strong?

15     A.    Not necessarily.  The strength is strong,

16   but the direction that the dog is getting it from

17   then turns -- he begins working what they call a

18   cone, a scent cone.  And the dog will work the

19   direction that the odor is coming from, and that

20   could be any number of distances.

21     Q.    And when it's air scenting, it has its

22   head up, though, and it's looking forward in that

23   scent cone, correct?

24     A.    Correct.

25     Q.    So in reading your dog, when your dog

123

1   picks its head up, there's a higher likelihood, when

2   it begins air scenting, whatever the search object

3   is is closer, correct?

4        A.    Correct.

5             MR. WEISENFELDER:  Objection.  Go ahead.

6        Q.    And as a handler, part of your duties is

7   being able to read your dog, correct?

8        A.    Correct.

9        Q.    And you're trained in how to read your dog

10  in what his reactions are, correct?

11       A.    In how to read your dog, yes.

12       Q.    And you respond a lot of times according

13  to how your dog is reacting to a particular

14  situation or stimulus?

15       A.    Yes.

16       Q.    So how would you describe it when a dog

17  begins air scenting; is that a sign, is that an

18  alert, what would you term that in --

19       A.    I would term it as an alert in some

20  circumstances.

21       Q.    Okay.  What does it mean when a dog

22  alerts?

23       A.    Change in body posture, change in

24  breathing.

25       Q.    Is that, say, any change in behavior then?

124

1      A.   Yes.

2      Q.   So when a dog begins air scenting, that

3  alerts you that something is going on, correct,

4  whether it be, you know -- most likely you're

5  nearing whatever it is you're tracking?

6           MR. WEISENFELDER:  Objection.  Go ahead.

7      A.   Correct.

8      Q.   And that air scenting means when the dog

9  is doing that, it's most likely that the dog is

10  detecting a strong odor of whatever it's searching

11  for in that area to the point where he believes that

12  he's close enough to where he picks his head up and

13  starts looking for it; am I understanding that

14  right?

15      A.   Generally speaking, but not always the

16  case.

17      Q.   Okay.  What's the exception?  You sort of

18  gave me a yes and no, yes, most of the time.

19  What's, no, not most of the time?

20      A.   Again, dealing with an animal and

21  scientific things that I can't explain, but wind

22  directions change, humidity levels, barometric

23  pressure, the dog may detect it earlier than other

24  times.  It's a never for sure circumstance of how

25  close you are.

125

1    Q.   Am I correct in also understanding that a

2  dog alerting is equated to a change in behavior and

3  the change of behavior is the same as an alert?

4    A.   Yes.

5    Q.   Those are two interchangeable items?

6    A.   Yes.

7    Q.   Would a response also fall into that

8  category or that definition?  All three of those,

9  would a response be any different than an alert or a

10  change in behavior?

11    A.   I never use the term response.  I was

12  never trained to use the word response.  I don't

13  know.  I never used that word.

14    Q.   So the term final response, in regards to

15  dog training, has no meaning to you?

16    A.   None.

17    Q.   What are some of the responses or alerts

18  or changes in behaviors or indications that Spike

19  gives?

20    A.   He will slow down what he's doing.  He

21  will begin to look around a little more.  His

22  breathing will become accelerated and his posture

23  will change.

24    Q.   He slows down sometimes.  Does that mean

25  that he's working more meticulously?