126

1      A.    Yes.

2      Q.    You said that his breathing also changes.

3  Does he start breathing faster the closer he gets to

4  an object, he sort of gets excited?

5      A.    Yes.

6      Q.    And a posture change, can you explain to

7  me what a posture change is?

8      A.    Instead of running, he may stop, his

9  stance will become much like that of a pointing bird

10 dog that becomes sort of statuesque sometimes.  It

11 varied depending upon what you were looking for with

12 him.

13     Q.    Okay.  On a track, for instance, what

14 would often be Spike's change in posture as he would

15 approach a subject?

16     A.    Typically he would stop, he would begin

17 looking around and then he would begin trying to

18 work the scent that he was getting.

19     Q.    During a track, would he also slow down at

20 this point, typically?

21     A.    Yes.

22     Q.    Would his tail start wagging at all?

23     A.    No, I don't think I've noticed that.

24     Q.    Okay.  He just sort of locks up more like

25 a pointing bird dog perhaps?

127

1  A. For a short time.

2  Q. How short of a time are we talking about?

3  A. Seconds.

4  Q. Any other alerts, indicators that Spike

5 would have when you're on a track?

6  A. I would always watch him to see if he were

7 going high.  Him going high, to me, would indicate

8 that someone would be up high at first glance, but

9 it was never reliable, depending on the wind.

10  Q. And by the dog going high, what do you

11 mean going high?

12  A. Leaving his front feet.  He would stand

13 straight up and sniff up into the air.

14  Q. He'd sort of jump up on his hind legs,

15 then, to get higher up in the air column?

16  A. Correct.

17  Q. How does your dog indicate to you that

18 he's found -- I know there's some debate here about

19 human odor or the scent disturbance on the ground

20 when he's doing a track.  How does he tell you that

21 he's on a track?

22  A. His head is down, he's not circling and

23 he's moving very briskly, very fast.

24  Q. Okay.  And by fast, are we talking a swift

25 walk, are we jogging, are we running?

128

1  A. I had to run with him.

2  Q. So he would go very quickly?

3  A. Very fast.

4  Q. Would that be almost all tracks, Spike

5 would be running when he's on a track?

6  A. Yes.

7  Q. When you were doing your training in

8 regards to tracking with Spike, were you trained to

9 just stay with the dog? For example, if the dog's

10 running on a track, were you just trying to stay

11 with the dog if he's running or would you slow the

12 dog up? I mean, how does that relate to your

13 training, how were you trained to track?

14  A. The general rule was not -- you didn't

15 train specifically anything, it was training per the

16 dog. Each dog tracks at a different pace. None of

17 them are the same. To slow the dog down, you may

18 create the impression upon the dog that you're

19 disciplining him. So it was to try to work at the

20 dog's pace; however, if you were not in shape enough

21 and couldn't go as fast as him, you could slow him

22 down slightly.

23  Q. How many dogs track, in your experience,

24 as fast as Spike? I imagine that would wear you out

25 pretty quick running to keep up with a dog like

129

1    this?

2        A.    There are quite a few.  I couldn't give

3    you an exact number.

4        Q.    Do most dogs track at a running pace or do

5    most dogs track at a slower pace?

6        A.    That would, again, depend on the type of

7    training that you're talking about for the tracking.

8        Q.    Out of all the training that you did with

9    your dog in the 2007/2008 time frame, how much of

10   that training was devoted to tracking?

11       A.    The majority of it.

12       Q.    And why was that?

13       A.    It was something that was easy for me to

14   do at work while I was on duty.  It was good

15   exercise not only for him but for me also.  In the

16   dead zones at work when we just had nothing to do,

17   it was a good time to get out of the car and get

18   moving around.

19       Q.    When Spike was deployed in the field, was

20   he most often deployed in a track situation, a drug

21   search situation?  Was there anything he did more

22   than anything else?

23       A.    Drug searches.

24       Q.    So when Spike was deployed, most of the

25   time it was for a drug search?

130

1  A. Absolutely.

2  Q. And most of your training was for a track,

3 correct?

4  A. Correct.

5  Q. Is Spike weak or strong in any particular

6 area, meaning drug searches, tracks, building

7 searches?

8    MR. WEISENFELDER: We're still talking

9  what time period?

10    MR. BRANNON: 2007/2008.

11  A. No, Spike was very good at most everything

12 that he did about equally.

13  Q. I know we've used a few terms, dog handler

14 and dog trainer. Is there a difference between the

15 two?

16  A. Yes.

17  Q. Tell me what that difference is.

18  A. A trainer is someone who's been through a

19 prescribed number of training hours and has

20 experience in training dogs for a certain number of

21 hours. A handler is someone who has been trained by

22 that person and then certified to be a handler.

23  Q. And a handler is who?

24  A. A handler can also be a trainer.

25  Q. Okay. And yourself, during your

131

1    employment with Springboro, were you only a handler?

2        A.   Yes.

3        Q.   Have you always only been a handler?

4        A.   Yes.

5        Q.   You've never done any work as a trainer

6    other than maintenance training with Spike, correct?

7        A.   No, at Lynnwoods you were required to work

8    two dogs, your own and assist in the training of

9    another one. So I did act in the role of a trainer,

10   although I was not certified as a trainer. It was

11   not an interest of mine.

12       Q.   Okay. So you are certified as a trainer?

13       A.   I was not certified as a trainer. It was

14   not an interest of mine.

15       Q.   I understand. But that was part of your

16   initial training, correct?

17       A.   Correct.

18       Q.   Now, when you're training a dog like

19   Spike, are there distractions that you throw in as

20   part of the training to try and throw the dog off?

21       A.   Yes.

22       Q.   Give me some examples of that in a

23   tracking situation.

24       A.   Tracking?

25       Q.   Yes.

132

1      A.    Cross tracks, animal odors, food, just
2  about anything you can think of.
3      Q.    Okay.  And in a situation where Spike is
4  on a bite and you're doing training, what types of
5  distractions are thrown in to throw off the dog when
6  he's actually on a bite?
7      A.    They use bamboo sticks that aren't
8  harmful, they just create the impression to the dog
9  that he could potentially be hit with a stick,
10  although it's not, it doesn't cause the dog any
11  pain.
12      Q.    So they actually strike the dog with a
13  bamboo stick knowing that it's not going to harm the
14  dog, but it makes a loud crack?
15      A.    It makes a loud crack, yes.  There is also
16  the decoy, wrapping the dog and a lot of yelling.
17      Q.    Okay.  When Spike is on a track and has
18  indication or alerts, are his changes in behavior
19  such that other people would recognize them as well,
20  meaning not just you as the handler with special
21  knowledge, but other people would be able to
22  recognize that Spike is changing in his behavior and
23  that something is going on?
24          MR. WEISENFELDER:  Objection.  Go ahead.
25      A.    Possibly.  If he were going high, they

Barlow Reporting & Video Services, LLC
(859) 261-8440

133

1  would definitely notice that.  But other than that,

2  unless you're trained to know your individual dog,

3  you don't know what the indicators are for that dog

4  when he's alerting.

5       Q.    And you mentioned a term how well you know

6  your dog.  During the first incident that this case

7  is about on October 21, 2007, you know, just prior

8  to that, how well would you say you knew Spike and

9  Spike's behaviors?

10      A.    Fairly well.

11      Q.    Fairly well or very well?

12      A.    Fairly well.

13      Q.    And prior to the Gemperline incident on

14  October 11, 2008, how would you say that you were

15  recognizing Spike's behavior?

16      A.    Still fairly well.

17      Q.    And by fairly well, I take it you imply

18  that you miss on occasion some clues or changes in

19  behavior; is that correct?

20      A.    Correct.

21      Q.    What types of things would you often miss

22  during that time frame?

23      A.    The direction that he's indicating to in

24  terms of the wind, the direction he may be going,

25  the object at the end of the track.  The training

134

1  track you had laid may be somewhere else, depends on

2  the change in wind. You may be five feet off the

3  track and not know it. It's all variables that only

4  a scientist could probably explain the certain

5  details of.

6      Q.  Would you attribute this to the fact that

7  Spike wasn't acting reliably or were you just not

8  picking up on clues?

9      A.  I would attribute it to the fact that he

10 is an animal and I have no way to read his mind.

11 It's virtually impossible to detect within

12 100 percent everything that your dog is displaying

13 to you.

14      Q.  Was there anything that you could have

15 done prior to the October 21, 2007 date that would

16 have helped you become at reading your dog or be a

17 better handler that you had not done?

18      A.  No, not that I'm aware of.

19      Q.  During the course of training, has your

20 dog, Spike, ever failed to locate a person?

21      A.  Yes.

22      Q.  Why would that have been?

23      A.  Cross tracks. I don't know what the

24 reasoning exactly was, I couldn't tell you.

25      Q.  There would just be situations that you

135

1  would lay out that he couldn't solve the puzzle

2  then?

3      A.   Yes.

4      Q.   And during the course of using the dog in

5  the field, has the dog ever failed to locate a

6  person?

7      A.   Yes.

8      Q.   And why would that have been?

9           MR. WEISENFELDER:  Objection.  Go ahead.

10     A.   I have no idea.

11     Q.   Would it have been simply because the

12 subject wasn't there any longer, would it have

13 been -- I've read some of your deployment reports

14 and some indicate that, you know, maybe a perimeter

15 wasn't set up and the person got out that way and

16 sometimes you've later learned that, you know, you

17 were close but the person had fled in a car?

18     A.   Certainly, of course, perimeter, vehicles,

19 and then it could be that he's a dog and he's just

20 not having a good day and he has no way to tell you

21 that.  Any number of things could come into play.

22     Q.   How would you compare the Springboro

23 Police Department's and your canine training program

24 as it compared to other agencies here locally,

25 meaning the Warren County Sheriff's, Montgomery

136

1    County Sheriff's training programs?

2         MR. WEISENFELDER:  Objection.  Go ahead.

3    Q.    If you know?

4    A.    Are you referring to maintenance training

5    or original training?

6    Q.    Maintenance training, let's start there.

7         MR. WEISENFELDER:  Same objection.  Go

8    ahead.

9    A.    Maintenance training, I would say I did

10   twice for me personally what I had to do.  I exerted

11   twice the effort.

12   Q.    Does that mean you spent twice the time

13   doing maintenance training than what you were

14   required to do?

15   A.    No, that's not what that means.

16   Q.    Tell me what that means when you say you

17   exerted twice the effort.

18   A.    Instead of laying a 300-yard track in just

19   grass, I was willing to run myself through

20   thornbushes, across creeks, hard surfaces, soft

21   surfaces, and make sure that he was familiar with

22   tracking in all different areas instead of just the

23   standard, I'll go out and lay a little track and be

24   done with it.

25   Q.    Okay.  So that is how you would say your

137

1  training differentiated from other agencies, is you

2  personally would set up harder scenarios for your

3  dog during training?

4      A.   Correct.

5      Q.   But you would not spend any additional

6  time -- would you spend more or less time than,

7  let's say, the Warren County Sheriff's or the

8  Montgomery County Sheriff's in training their dogs?

9          MR. WEISENFELDER:  Objection.  Go ahead.

10     A.   I don't know what Montgomery County

11 Sheriff's Office spends in terms of training their

12 dogs, and the Warren County Sheriff's Office does

13 not have a tracking dog.

14     Q.   Okay.  But they do have dogs, correct,

15 that you said you trained with?

16     A.   A narcotics dog.

17     Q.   How much time would they spend training

18 their tracking down -- or, I'm sorry, their

19 narcotics dog each week?

20     A.   I believe it was about four hours every

21 Wednesday.

22     Q.   Would you spend more or less time than

23 that training Spike?

24     A.   I would obviously have to spend more time

25 because I had a dual-purpose dog.  I had to train in

138

1   the patrol section and the narcotics section.

2       Q.    Okay.  And once again, all of that

3   training would be documented, then, in your canine

4   unit training log?

5       A.    Correct.

6       Q.    Can your dog indicate on command, meaning

7   if you command it to alert to something, will it

8   alert on something?

9       A.    No.

10      Q.    Have you maintained Spike's training since

11  he retired?

12      A.    To a slight degree.  I don't have access

13  to the drugs that we had before, but I do still run

14  tracks occasionally.

15      Q.    And occasionally means how often?

16      A.    Once or twice a month.

17      Q.    Back in the time period 2007/2008 when

18  these incidents took place, did you reward your dog

19  when it locates a human on a track?  For example,

20  when it locates a person, would you reward your dog?

21      A.    Yes.

22          MR. WEISENFELDER:  Are we talking about

23      training or an actual track?

24          MR. BRANNON:  Training.

25      A.    Yes.

139

1  Q. Okay. How would you reward your dog?

2  A. In training, I reward him with laying a

3 toy at the end of the track.

4  Q. What type of toy would you give him?

5  A. A plastic tube.

6  Q. Now, in service when your dog is

7 performing a track in the field, would you reward

8 him when he locates a person?

9  A. No. Well, let me stop there. It depends.

10  Q. What would it depend on?

11  A. What type of track you're referring to.

12  Q. How many different types of tracks are

13 there?

14  A. There's a missing persons track and then

15 there is a fugitive track.

16  Q. What is the difference between a missing

17 persons track and a fugitive track?

18  A. A missing persons track, there is no

19 chance of a bite. You have lights out. You're not

20 being tactical. You have a very, very short line,

21 lighting up the entire area around you and you do

22 carry a toy with you so if you do find the person,

23 you throw the toy in front of the dog.

24  Q. Okay. And that's prior to -- why would

25 you throw the toy in front of the dog at the end of

140

1  the track, is that before or after you locate the
2  person?
3      A.   After.
4      Q.   Would you throw the toy in between the
5  person and the dog?
6      A.   Yes.
7      Q.   Would that be so that the dog does not
8  become oriented on the person?
9      A.   A mixture of both; the dog is rewarded and
10 does not become oriented on the person.
11     Q.   Now, at the end of a fugitive track when
12 you find a person, what would you do?
13     A.   Praise the dog.
14     Q.   And that would be his reward?
15     A.   Yes.
16     Q.   You'd just say, good dog, something like
17 that?
18     A.   He would be very highly praised, yes.
19          MR. BRANNON:  Off the record real quick.
20              (OFF THE RECORD)
21 BY MR. BRANNON:
22     Q.   Mr. Clark, I'm going to take you back to
23 Exhibit S3 there.  At the time that your training
24 certificate with the State of Ohio lapsed, were you
25 aware it lapsed?

141

1    A.    Yes.

2    Q.    Okay.  How were you made aware of that?

3    A.    By looking at the certificate.

4    Q.    Okay.  When did you first become aware it

5    had lapsed?

6    A.    I knew that it was approaching and I

7    looked at the date.

8    Q.    Why did it take you until September to get

9    that renewed?

10   A.    I believe I've explained that.  The two

11   surgeries to Spike, also the surgery for myself, the

12   vet would not allow him to do any type of work

13   whatsoever.  He wasn't allowed out of his crate

14   other than to use the bathroom and eat for an

15   extended period of time.  And he was not allowed to

16   work at all after that for an additional amount of

17   time.

18   Q.    Okay.  You also mentioned the difference

19   between a missing persons track and a fugitive

20   track.  Can you describe for me what a fugitive

21   track is?

22   A.    A fugitive track is when a person has

23   committed an offense, most likely a felony or a

24   crime of violence, and then fled the scene and is

25   actively evading the arresting officers at which

142

1   point, if I am utilized, I would begin it as -- a

2   fugitive track is also a tactical track.  It's used

3   without leaving flashlights on to maintain your

4   cover and it's used with the dog allowed a lot more

5   line to work with.

6          Q.   In regards to Sam Campbell, on 10/21/07,

7   you deployed canine Spike, correct?

8          A.   Correct.

9          Q.   And was that on a track?

10         A.   Yes, it was.

11         Q.   Would that have been a missing persons

12  track or a fugitive track?

13         A.   A tactical fugitive track.

14         Q.   Is there a difference between a plain

15  fugitive track and a tactical fugitive track?

16         A.   They're one in the same.

17         Q.   And in regards to Chelsie Gemperline on

18  10/11/08 when you deployed Spike on a track, was

19  that a missing persons track or a fugitive track?

20         A.   Fugitive track.

21         Q.   Okay.  Have you ever permitted Spike to

22  bite a person during training when it locates a

23  human during a track?

24         A.   Yes.

25         Q.   Okay.  Under what circumstances would you

143

1   permit him to attack a person in training on a

2   track?

3       A.   Spike has never attacked anyone.  He does

4   not attack, he bites, and that is what's known as an

5   apprehension.  I don't use the term attack.  That's

6   more associated with pit bulls.  However, he would

7   do apprehension tracks.  On occasion, we would use a

8   man, but that was very rare.  Normally it was with a

9   toy at the end.

10          MR. WEISENFELDER:  Usually what?

11      A.   With a toy at the end.

12          MR. WEISENFELDER:  Okay.  Just keep your

13      voice up.

14      Q.   So understanding your terminology, and I

15  know that you speak a dog language that I'm not as

16  familiar with, an apprehension would be considered a

17  bite.  And you do not use the terminology "attack"

18  when a dog bites, but you call it a bite, correct?

19      A.   It is exactly what it is, it is a dog

20  bite.  However, it is not a mauling or an attack and

21  there's no anger associated with it for the dog.

22      Q.   Okay.  In your training sessions in which

23  you permitted Spike to bite a person during a track,

24  how many times did that occur, approximately?

25      A.   I don't know.  I could tell you it was

144

1   very rarely.

2        Q.    In Spike's entire career with you, how

3   many times would you estimate?

4        A.    Ten would be a high, at the highest number

5   I could think of.

6        Q.    At the end of a track, would the person do

7   something to provoke the bite or was it Spike's

8   natural response to bite at the end of a track in a

9   training scenario?

10       A.    Both.  We trained both.  We trained for

11  passive suspects and for nonpassive suspects.

12       Q.    Okay.  In a nonpassive suspect, would

13  Spike bite at the end of a track --

14       A.    There again --

15       Q.    -- during his training?

16       A.    There again, you would also have to lay

17  out more of the circumstances around that in order

18  for me to answer that question.

19       Q.    What additional circumstances would there

20  be that would determine whether or not Spike were to

21  bite at the end of a track during a training

22  session?

23       A.    The lighting condition, whether it's day

24  or night, whether I can physically see and make

25  contact with that person visually and verbally, and

145

1   if the person is actively, at the time they are

2   found, continuing to flee, if they run at that

3   point, if they do not comply.

4       Q.   Okay.  So let's set up a training scenario

5   where it's daylight and you send Spike on a track to

6   locate a person and he finds that person.  Would he

7   then bite or apprehend that person at the end of

8   that track in the training scenario if there the

9   person is passive?

10      A.   I'd have to ask if I've seen -- if I know

11  that the person is there or not, have I seen them?

12      Q.   Okay.  Well, let's assume that you do not

13  know the person is there.  Would Spike attack?

14      A.   He would apprehend.

15      Q.   He would bite.  I'm sorry, I used the word

16  attack again.  So he would bite if you did not see

17  that person, correct?

18      A.   Correct.

19      Q.   If you did see that person, would Spike

20  bite?

21      A.   Only if I allowed him to do so.

22      Q.   Why would he only bite if you allowed him

23  to do so?

24      A.   Because if I saw someone and knew that

25  they were there beyond a doubt, I would stop and

146

1    order them.  If they did not comply at that point or

2    they continued to resist by evading arrest, then he

3    would be allowed to apprehend them.

4         Q.    Okay.  Would it change at all if the

5    scenario was at night --

6         A.    Yes.

7         Q.    -- under these same circumstances?  Okay.

8    Let's go through this under a night scenario and you

9    saw the person, would Spike bite?

10        A.    No, I would stop him short.  Again, the

11   same thing; if I know someone is there, I stop and

12   shout warnings.

13        Q.    Okay.  If you did not see the person,

14   would Spike bite?

15        A.    If he was close enough to them to bite

16   them, yes, he would.

17        Q.    Okay.  So the only way that Spike would be

18   prevented from biting a person during a track would

19   be if you physically saw the person and restrained

20   Spike from biting them, correct?

21        A.    Correct.

22        Q.    Otherwise, Spike would bite the person on

23   the track?

24        A.    Yes.

25        Q.    So in Spike's training, if he came to a

147

1   person at the end of a track, he would bite that

2   person unless you stopped Spike from biting that

3   person?

4        A.   Yes.

5        Q.   So under every tracking scenario in

6   training or in the field, you would expect Spike to

7   bite the person at the end of the track if you did

8   not see that person and were able to restrain Spike?

9        A.   In a tactical or what some refer to as a

10  fugitive track, absolutely.

11       Q.   How would Spike know if it's a missing

12  persons track or a fugitive track?

13       A.   He doesn't.

14       Q.   So how would Spike not know to bite a

15  person in a missing persons track?

16       A.   That would be why we would take the

17  precautions that I outlined for you, a lot of light,

18  more than one back-up officer.  They also have their

19  lights on and he is not 20 feet out in front of me.

20       Q.   So if I'm understanding you correctly,

21  under a missing persons track, you can change the

22  environment to make it safer for the person that

23  you're looking for, correct?

24       A.   Correct.

25       Q.   Is there any reason why you could not do

148

1  that in a fugitive track, create those same

2  conditions?

3      A.    That you would make yourself a very large

4  target.

5      Q.    Meaning because you were fearing attack

6  from a subject, potentially?

7      A.    Yes.

8      Q.    For example, in your training Spike and

9  how Spike would react in a field, anytime you would

10  send Spike, just so we're clear on this, on a track,

11  you would expect a bite to occur unless you,

12  yourself, physically prevented Spike from getting to

13  that person, correct?

14      A.    If I stopped and posted myself up, he

15  would not be afforded the opportunity to apprehend

16  the person, no.

17      Q.    Okay.  But that's the only way a bite

18  would not occur is if either -- if he found a

19  suspect, if Spike found that person that you guys

20  were looking for on a track, the only way that a

21  bite would not occur would be if you physically

22  restrained Spike from biting that person?

23      A.    No, I could down him.  If I knew the

24  person was there, I could down him and that would

25  not be physically restraining him.  But it was often

149

1    at times better to physically restrain him because

2    he would then bark more and be more excited and the

3    person would be more apt to give up and listen to

4    me.

5        Q.    Okay.  A down command, is that a verbal

6    command?

7        A.    Yes.

8        Q.    And I take it that the dog will just lay

9    down there and await a further command if you give

10   that command?

11       A.    Yes.

12       Q.    What is the command for Spike to lay down?

13       A.    Auf, A-U-F.

14       Q.    So during the course of a track, you've

15   described for me two ways to prevent Spike from

16   biting a person that he sees on a track.  One is if

17   you physically restrain him and stop him from biting

18   the person and the other is if you order the dog in

19   a down position, correct?

20       A.    Correct.

21       Q.    Are there any other scenarios that you can

22   think of in which Spike would not bite a person on a

23   track if he found that person?

24       A.    Anytime a person verbally gave themself

25   up, they did not get bit.

150

1    Q.    Okay.  Why would a person standing up --

2    is that only because you would then restrain the dog

3    or order the dog not to -- you'd either order the

4    dog down or restrain the dog from getting to that

5    person?

6    A.    Either one of those two, yes.

7    Q.    Okay.  But any other time you could expect

8    a person to get bit?

9    A.    Correct.

10   Q.    Prior to the incident involving Sam

11   Campbell, how many hours of training had your dog

12   Spike had, do you know?

13   A.    I've never tallied them up.

14   Q.    Prior to the Gemperline incident, do you

15   have any idea how many hours of training your dog

16   had?

17   A.    Again, I've never added them up.

18   Q.    Has anybody at your department ever

19   tallied up or added your training hours, any

20   supervisor or anything like that?

21   A.    Not that I'm aware of.

22   Q.    Do you know whether or not Spike was

23   trained as a bite-and-hold dog or a bark-and-hold

24   dog?

25   A.    At the beginning he was trained as a

151

1   bark-and-hold dog, and then somewhere towards the

2   end, the last year, we were transitioning to a

3   down-en-route, which is noted in my training

4   records.

5       Q.   Okay.  What's a down-en-route, is that a

6   bite-and-hold dog instead of a bark-and-hold dog?

7       A.   The theories you would have to consult the

8   master trainer on.  For me it just seemed like an

9   easier thing to transition to.

10      Q.   Okay.  You say initially Spike was

11  supposed to be a bark-and-hold dog, correct?

12      A.   Correct.

13      Q.   What is a bark-and-hold dog versus a

14  down-en-route dog?  I've not heard of a

15  down-en-route dog.  What is a down-en-route dog?

16      A.   Well, the difference between bark-and-hold

17  and down in route, on a bark-and-hold, during the

18  evaluation, you have a subject running from the dog.

19  The dog sees the person.  You wait, you send the

20  dog, the person stops halfway between the dog

21  getting to them and decides they're going to give

22  up, they play that scenario.

23      Q.   And what does the dog do in that

24  situation?

25      A.   When the person stops, the dog will then

152

1   run up close to them and bark.  A down-en-route dog

2   is --

3       Q.   Meaning he will not bite and apprehend?

4       A.   Not to engage the person, but to bark at

5   them --

6       Q.   Okay.

7       A.   -- is what they call a bark-and-hold.  A

8   down-en-route is halfway there, if a person decides

9   to stop, you down the dog.  He lays down halfway

10  between the person, creating more distance between

11  the suspect and the dog.

12      Q.   Okay.  So a down-en-route dog is supposed

13  to lay down before he ever gets to the suspect?

14      A.   Correct.

15      Q.   And that's how Spike was trained, to lay

16  down before he got to a suspect then?

17      A.   We had begun the transition into that.

18      Q.   When did you begin that type of training?

19      A.   I believe it's in the training records if

20  someone wants to look.  I don't remember.

21      Q.   I can provide you with those training

22  records if you'd like to take a look at them?

23      A.   They're here.  I don't know the exact

24  date.  That's only one month.

25      Q.   I'm going to hand you again what has been

153

1    marked or Bates stamped as Defendants' 36 through

2    185, which we had previously identified as the

3    canine unit training logs. While you're looking

4    through that, I'm going to go to the restroom real

5    quick. Or I'll wait. So I see a date of 8/20/08;

6    is that correct?

7         A.   Yes.

8         Q.   And it's Defendants' No. 182 in the canine

9    unit training log records. And you were explaining

10   to me that a down-en-route is where the dog will

11   automatically lay down before he reaches a suspect?

12        A.   No, not automatically, on command.

13        Q.   Okay. On command. What happens if the

14   dog does not receive a command to go down-en-route?

15   And I take it that's a verbal command from the

16   handbook, correct?

17        A.   Correct.

18        Q.   Then what happens?

19        A.   The dog would be corrected.

20        Q.   What would happen to the suspect if the

21   verbal command to go down-en-route is not given?

22        A.   I'm sorry, you didn't differentiate

23   between the training and whether this was a real

24   live scenario you were referring to.

25        Q.   You train for a real life scenario,

154

1　correct, so there wouldn't be any difference between

2　whether it's training or real life if a command is

3　given?

4　　　A.　My answer to you is this was not

5　completed, it had just been started.  He was still

6　on a pinch collar and a long line at that time so he

7　would have received a correction.  It had not been

8　instituted in the field.

9　　　Q.　Okay.  So when you were in the field with

10　Spike, past 8/20/08 -- or 8/20/08 is when you began

11　this type of training, you were still using Spike as

12　a bark-and-hold dog in the field during the

13　Gemperline incident, correct?

14　　　A.　Correct.

15　　　Q.　You've not implemented down-en-route in

16　the field?

17　　　A.　No.

18　　　Q.　So let's go back to under a training

19　scenario and a hypothetical since you were not using

20　this in the field but in a training scenario.  If

21　the dog was going after a suspect and you did not

22　give a verbal command to go down, what would then

23　happen to the suspect?

24　　　A.　The dog would apprehend.

25　　　Q.　The dog would bite the suspect?

155

1      A.   Correct.

2      Q.   Would that then be what's called a

3 bite-and-hold dog?

4      A.   Yes.

5      Q.   So you were training Spike to become a

6 bite-and-hold dog as opposed to a bark-and-hold dog?

7      A.   That's up for debate among the experts and

8 I am in no sense an expert.  That's a fine line

9 right there.

10     Q.   Okay.  How so?

11     A.   The reasoning for transitioning from

12 bark-and-hold is it is not practical in the field.

13     Q.   Why is that?

14     A.   It's not practical in the field because

15 most people do not stand as still as you can in

16 training when you're wearing a bite suit so we

17 wanted to transition away from that.  So on a

18 straight runaway when the dog has a line of sight to

19 someone, typically it's not in your mind that the

20 person is going to stand there perfectly still while

21 a dog is charging at them full speed and comes

22 within five feet.

23     Q.   Who decided to change Spike from a

24 bark-and-hold dog to a bite-and-hold dog?

25     A.   Trainer John Patrick, Steve Dunham and

156

1  Kelly Hopkins.

2      Q.    Are any of those a member of the

3  Springboro Police Department?

4      A.    No.

5      Q.    These were the guys that you just trained

6  with?

7      A.    John is a trainer, Steve is a trainer and

8  owns a -- they both operate a dog training school in

9  Warren County and they're members of Miami Valley

10 Police Canine Association.

11     Q.    So you on your own, then, as far as the

12 Springboro Police Department is concerned, made the

13 decision to transition Spike from a bark-and-hold

14 dog to a bite-and-hold dog, correct?

15     A.    Correct.

16     Q.    When the canine program was initiated at

17 Springboro, it was based upon obtaining and

18 maintaining a bark-and-hold dog, correct?

19     A.    Incorrect.

20     Q.    Okay.  Correct me, then.

21     A.    That was never specified.

22     Q.    Okay.  I thought you told me when you went

23 to go get Spike up at Lynnwoods Kennels, that you

24 were told to get a bark-and-hold dog; am I not

25 correct?

157

1      A.   If I said that, I apologize.  I was told

2  to get a dual-purpose dog.

3      Q.   Okay.  Who then made the determination to

4  get a dual-purpose, bark-and-hold dog versus a

5  bite-and-hold dog?

6      A.   No one, that's just what they trained at

7  Lynnwoods.

8      Q.   They only trained bark-and-hold dogs at

9  Lynnwoods?

10      A.   Correct.

11      Q.   Did Spike ever have problems performing as

12  a bark-and-hold dog?

13      A.   Yes.

14      Q.   How so?

15      A.   The suspect or the decoy would break a

16  little bit before.  He was very fast.  He would

17  charge the decoy, and the decoy, anticipating the

18  impact of his launch on the trial, would break,

19  move, make sudden exaggerated body movements.  That

20  alone, to a bark-and-hold dog, is enough to cause

21  him to bite and that's why we made the determination

22  it was easier to transition to the down-en-route.

23      Q.   Okay.  Were these problems that you were

24  noticing in the field with Spike or in training with

25  Spike when you decided to make this transition?

158

1      A.    I've never had in the field an instance

2  where bark-and-hold would apply to him.  It was only

3  during training.

4      Q.    Okay.  So you never had an instance when

5  Spike should have barked at a person prior to biting

6  that person, correct?

7      A.    Never.

8      Q.    So every situation that you encountered in

9  the field, Spike was trained to bite that person?

10     A.    On every situation that I encountered in

11  the field where there was a track and a bite, it did

12  not pertain to anything that would do with

13  bark-and-hold.  That was not trained at Lynnwoods.

14     Q.    Okay.  You described a bark-and-hold dog

15  for me as a dog that would approach a suspect and

16  then start to bark at that suspect, correct?

17     A.    Correct.

18     Q.    That's what they're trained to do, a

19  bark-and-hold dog.  That dog would then sit there

20  and bark at that person unless that person made an

21  affirmative movement towards the animal or tried to

22  flee; am I correct in that?

23     A.    Correct.

24     Q.    So you never encountered a situation in

25  the field in which a person did not make an

159

1   affirmative movement toward your dog or attempt to

2   flee from your dog in which someone was bit,

3   correct?

4        A.   Not the way that we train bark-and-hold,

5   no, I did not ever.

6        Q.   Okay.  Well, tell me how you train

7   bark-and-hold then.

8        A.   Bark-and-hold was trained with a subject

9   in a bite suit standing in the middle of a field

10  running away from the dog.  The orders were then

11  shouted, the dog was then sent, and the dog was

12  ordered to stand still thus giving the impression to

13  the subject that you're talking to them to stand

14  still, also giving the dog the command that it's

15  time to start breaking down, slow down, and break

16  into your bark-and-hold, stand still then, if you're

17  talking to both parties, without having to

18  differentiate your conversation or your words.

19            On a track, no commands were used

20  whatsoever except to just down the dog whenever you

21  felt like it.  I was never once trained to do

22  bark-and-hold on any tracks unless I had visual

23  contact or knew this person was there.

24       Q.   Okay.  Under those two scenarios, the only

25  way that you would prevent a bite, if I'm

160

1   understanding you correctly, even with a

2   bark-and-hold dog, was to physically restrain the

3   dog from biting or order the dog down, correct?

4        A.   No.

5        Q.   Okay.  What other way would there have

6   been?

7        A.   In the situation, you have to

8   differentiate between situations for me, a track

9   versus a straight runaway, fleeing, in-sight

10  suspect.

11       Q.   I was talking about a track.

12       A.   In a track, there is no bark-and-hold

13  trained.

14       Q.   So a bark-and-hold style does not apply to

15  a tracking situation, is that your understanding?

16       A.   That is the way I was trained, yes.

17       Q.   I understand that that's the way you were

18  trained.  What is your understanding of that?

19       A.   My understanding of that is that every dog

20  in my training group was also trained the same way

21  and that is the accepted practice.

22       Q.   So it's your belief, then, that all

23  bark-and-hold dogs are trained to bite at the end of

24  a track unless commanded verbally to go down or

25  physically prevented from biting by the handler?

161

1     A.   The dog that I have trained with and the

2   training that I received, yes.

3     Q.   The canine policy that was implemented by

4   the City of Springboro when Spike came on, do you

5   know if that specified or did not specify whether or

6   not the dog be used for the City of Springboro was a

7   bark-and-hold dog or a bite-and-hold dog?

8     A.   I don't know.

9     Q.   Do you ever know if a bite-and-hold dog

10  versus a bark-and-hold dog was discussed prior to

11  starting the canine unit at Springboro?

12     A.   No, it was not.

13     Q.   Did you not learn of a bite-and-hold dog

14  versus a bark-and-hold dog until when?

15     A.   When I went to train.  My first, probably,

16  week of training.

17     Q.   Is it true that the force of a police

18  dog's bite is between 1,200 and 2,000 pounds per

19  square inch?

20     A.   I have no idea.

21     Q.   Okay.  Do you train the dog in biting, how

22  it bites?

23     A.   We train the retention of the bite, yes.

24     Q.   Okay.  And by retention, is that

25  increasing bite pressure?

162

1      A.   Not necessarily, no.

2      Q.   How do you train a dog to maintain on a

3  bite?

4      A.   To hold on as long as possible.

5      Q.   How do you train it to do that?

6      A.   By creating a situation where the dog is

7  on the decoy, the decoy is pulling away, the dog is

8  tight-lined.  If the dog lets go, the dog no longer

9  gets to bite, it's put up for the day, that's the

10 end of it.

11     Q.   So if the dog lets go, he's done for the

12 day?

13     A.   Yes.

14     Q.   I take it with an increase in bite

15 pressure, there's also, you know, higher likelihood

16 that that dog can hold on, correct, to somebody in a

17 bite suit?

18          MR. WEISENFELDER:  Objection.  Go ahead.

19     A.   I suppose you have to ask a veterinarian

20 or scientist.  I don't know about bite pressure.  I

21 know about retention.  And that's what I wanted him

22 to do, was retain that bite.

23     Q.   Can you explain to me what a choke-off is?

24     A.   Yes, it is where you use the fur saver

25 collar that was always on the dog, it never comes

163

1   off, to cut the dog's airway off so that he, at that

2   point, has to open his mouth.

3       Q.   It's called a fur saver collar?

4       A.   Yes.

5            MR. WEISENFELDER:  What kind of collar?

6       A.   Fur saver.

7       Q.   And when a dog is deployed in the field,

8   did Spike wear a fur saver collar?

9       A.   Every day.

10      Q.   What is the purpose in making Spike wear a

11  fur saver collar in the field?

12      A.   If the harness were to fall off, if his

13  correction collar were to fall off, if on that

14  particular night he were in an electric collar, if

15  that were to fail, there's always something to grab

16  ahold of the dog by to control his head.

17      Q.   So the fur saver collar was just in case

18  everything else fell off and you needed another

19  collar to grab onto?

20      A.   The fur saver collar was also just his

21  standard collar that he would use while I was out

22  breaking him, during work, to let him out of the car

23  and so on and so forth.

24      Q.   And that was the collar he wore every day?

25      A.   Every day.

164

1      Q.    Even around the house?

2      A.    Yes.

3      Q.    When you deployed Spike in the field, what

4 other collars would he wear?

5      A.    Occasionally he would wear an electronic

6 collar and occasionally he would wear what's known

7 as a pinch collar.  And he almost always, in

8 addition to the fur saver, had a correction collar,

9 what some people believed to be called a choke

10 chain, which does not.

11      Q.    Tell me what is the purpose of a pinch

12 collar.

13      A.    Correction.

14      Q.    I take it it pinches the dog's neck in

15 some way, shape or form to make it think twice about

16 what it's doing?

17      A.    Correct.

18      Q.    Is that the same for a corrective collar?

19      A.    No, a corrective collar creates a

20 different type of sensation.

21      Q.    What does a corrective collar do?

22      A.    A correction collar is for a quick, sharp

23 snap of the lead across the back of the neck of the

24 dog, is where you want the correction to end up at.

25 With a pinch collar, you're elevating the level of

165

1    correction.

2         Q.    And how about an E-collar, is that an

3    electronic shock collar?

4         A.    Yes.

5         Q.    And what is the purpose in that collar?

6         A.    The E-collar has two purposes; number one,

7    it can create a vibrating sound that you can use for

8    very, very minor discipline, such as you want the

9    dog to respond to you faster, or it can also be used

10   as a means of long-term correction if you don't have

11   a long enough line.

12        Q.    Now, Spike would only wear the E-collar

13   occasionaly in the field, correct?

14        A.    Actually, from the time we stopped dog

15   school and he graduated until the time that the

16   E-collar stopped working and I requested a new one,

17   he wore it.

18        Q.    Okay.  When did it quit working,

19   approximately?

20        A.    I don't know the exact date.  There was a

21   memo from me to Lieutenant Parker describing I

22   needed a new one.

23        Q.    Approximately?

24        A.    Late in 2007 maybe.  I think it was

25   sometime around summertime.

166

1      Q.    Was it prior to or after the Campbell bite
2  incident?
3      A.    I believe it was prior to.
4      Q.    Were you provided with a new E-collar?
5      A.    No, I was not.
6      Q.    Were you ever provided with a new
7  E-collar?
8      A.    No, I was not.
9      Q.    Would an E-collar be something that you
10  would deem necessary to maintain your dog in proper
11  working condition?
12      A.    No, but it helped with distance.
13      Q.    Would that be something that you would
14  have wanted your dog to wear in the field?
15      A.    I preferred it.
16      Q.    And is that due to the fact that you could
17  immediately cause a correction in your dog's
18  behavior if he was improperly performing?
19      A.    It was due to the fact that I could cause
20  a correction off line.
21      Q.    Meaning without a lead attached to the dog
22  physically?
23      A.    Correct. Yes.
24      Q.    How about the corrective collar, was that
25  worn all the time in the field or not?

167

1    A.   Yes.  Well, let me rephrase.  It was not

2   used in tactical situations because it did have his

3   small badge on it and it clanged and made a lot of

4   noise, so I would take it off before all tracks.

5    Q.   Okay.  And a tactical situation would be a

6   track.  So he would not be wearing his corrective

7   collar with his badge on it during a track, correct?

8    A.   Correct.

9    Q.   Any other time he wouldn't be wearing it?

10    A.   Building searches, area searches.

11    Q.   Basically anything but a drug search?

12    A.   Yes.

13    Q.   How about a pinch collar, did he always

14   where that in the field?

15    A.   No.

16    Q.   Did he ever wear it in the field?

17    A.   No.

18    Q.   That was a training purpose only collar?

19    A.   Training aid.

20    Q.   So it was important for you to have these

21   things, these different types of collars on Spike in

22   the field so that you could maintain control over

23   Spike, correct?

24    MR. WEISENFELDER:  Objection.

25    A.   I don't think I could fit all of them on

168

1   him at the same time.

2       Q.   Okay.  You just told me he wears a

3   corrective collar, an E-collar, and what was the

4   first kind of collar we talked about, the --

5       A.   Pinch?

6       Q.   Not the pinch, before that.

7       A.   The fur saver?

8       Q.   The fur saver, yeah.

9       A.   But never all at the same time.  He's not

10  big enough.

11          MR. WEISENFELDER:  Wait until there's a

12      question.

13      Q.   Okay.  When Spike was deployed on a track,

14  what would he be wearing?

15      A.   A fur saver and a tracking harness.

16      Q.   Would he have been wearing an E-collar if

17  you would have had one past this time in 2007 when

18  it quit working?

19      A.   Yes.

20      Q.   So on all tracks prior to this '07 date

21  when it quit working, you had an E-collar on Spike?

22      A.   He had an E-collar on every night, yes.

23      Q.   How important is it that a handler has

24  complete control over his canine in the field?

25      A.   Important.

169

1   Q. Why is it important?

2   A. To reduce the risk of injury to anyone but

3 the suspect, or if the suspect gives up and

4 complies, and to prevent accidental bites of any

5 kind.

6   Q. Okay.  So you'd agree with me, then, that

7 the severity of an apprehended suspect's injuries,

8 they could be reduced or eliminated if the handler

9 has complete control over the actions of his animal?

10     MR. WEISENFELDER:  Objection.  Go ahead.

11   A. That would vary.

12   Q. How would that vary?

13   A. It depends on the noncompliance of the

14 suspect and his actions at the time of the initial

15 apprehension.

16   Q. But you'd agree with me that if a handler

17 has complete control over the actions of his dog, so

18 long as the subject is complying, that the injuries

19 to that suspect can be minimized, correct?

20     MR. WEISENFELDER:  Objection.

21   A. As long as the suspect is complying, yes.

22   Q. Now, typically, when you're with a dog in

23 the field, a handler should be able to recall his

24 dog at any given time with a verbal command,

25 correct?

170

1      A.    It depends on the training.

2      Q.    What about with the training that Spike

3    had?

4      A.    The training with Spike, we never did

5    recalls, it was either a down and you approached the

6    position of the dog.  You never bring the dog away

7    from the decoy.

8      Q.    Okay.  So the training that you had with

9    Spike, for example, if he was on a bite and actively

10   biting a subject, he could not be recalled verbally?

11     A.    He would down and you would ask the

12   suspect to step away or move away from the dog.  The

13   dog always stood his ground.

14     Q.    Okay.  So a verbal command could be used

15   to get the dog off the bite if the dog is properly

16   responding to that verbal command, correct?

17     A.    Correct.

18     Q.    And that's how Spike was trained?

19     A.    Yes.

20     Q.    And with that same notion, with a verbal

21   command, if the dog is properly responding, you

22   should be able to prevent a bite from occurring with

23   a verbal command as well, correct?

24     A.    No, the dogs were trained that if a person

25   is still resisting, no matter what you said, the

1  extent to which they were resisting, the dog would
2  always bite.
3      Q.   Okay.  Maybe you misunderstood my
4  question.  Maybe I should have done a better job of
5  setting up the example, meaning if a bite has not
6  occurred yet.  And I think you just described a
7  situation in which the bite was already occurring,
8  correct?
9      A.   Yes.
10     Q.   Okay.  Let's say that the bite has not
11 occurred yet.  A handler should be able to prevent a
12 bite from occurring with a verbal command, correct?
13 Meaning if he sees the suspect out in front and the
14 dog is headed towards the suspect, with a verbal
15 command and a properly-performing dog, you should be
16 able to prevent that bite from occurring by ordering
17 the dog, like Spike, down?
18     A.   Correct.
19     Q.   And with that being said, a dog that's
20 properly performing that is on a bite should be able
21 to be ordered off that bite with a down command,
22 correct, verbally?
23     A.   Correct, as long as there's not excessive
24 movement or fighting from the suspect.
25     Q.   Okay.  If there's excessive movement or

172

1   fighting from the suspect, would you order the dog

2   down?

3       A.   Never.

4       Q.   So if the suspect was not fighting or

5   moving, you could give a verbal command to get the

6   dog down and if it was properly performing, it would

7   comply, correct?

8       A.   Correct.

9       Q.   Now, an oral command is different than a

10  leash command, correct?

11      A.   Correct.

12      Q.   Oral command is something you say to the

13  dog and the dog is supposed to respond, right?

14      A.   Yes.

15      Q.   What's a leash command?

16      A.   A leash correction?  I've never heard of a

17  leash command.

18      Q.   Okay.  Tell me what a leash correction

19  would be.

20      A.   It's manual correction where you would

21  have the dog attached on line to your choice of

22  collar, whatever is on, and you would physically

23  correct the dog by generally a popping of the

24  collar.

25      Q.   And what is the preference in the field,

173

1   using oral commands or leash corrections, in

2   handling your canine?

3         A.   The preference would be oral.

4         Q.   Is that the standard in law enforcement,

5   oral commands?

6         A.   Yes.

7         Q.   But a dog can also be controlled with the

8   leash, if I'm understanding you correctly?

9         A.   Yes.

10        Q.   And I think one of the examples that we

11  talked about is where you physically prevent the dog

12  from reaching a suspect?

13        A.   Yes.

14        Q.   Now, with a leash -- is there any

15  difference between a leash or a lead?

16        A.   Not in my mind.

17        Q.   It's basically a piece of rope attached to

18  the dog that keeps you in contact with the dog?

19        A.   Yes.

20        Q.   Or in my case, keeps my dog running away

21  from me.

22        A.   Yes.

23        Q.   If a handler is using a leash or a lead,

24  he should be able to control where that dogs goes;

25  is that a fair statement?

174

1      A.   To a certain degree.

2      Q.   How so to a certain degree?

3      A.   You're never going to be able to have

4  complete control of left and right movements.  You

5  will have control over forward movements.  And by

6  left and right movements, I would say that it would

7  vary depending upon how much lead you have out and

8  what type of line you're working with.

9      Q.   Okay.  So if I'm understanding you

10  correctly, with a leash you could never control

11  Spike's left or right movement, correct?

12      A.   You could by stepping to the opposite

13  direction, you could cut it off.  But as a general

14  rule, I would have to draw it to show you what I'm

15  talking about.

16      Q.   Let me hand you a piece of paper and a

17  pen.

18      A.   If the position in the center is the

19  handler and he's posted and the line's out, or are

20  the lead, the dog can swivel back and forth

21  depending upon how much line you have out, so this

22  would vary.  If you wanted to cut this distance off,

23  you would have to immediately make steps to move

24  opposite the direction that you want the dog to stop

25  unless you downed him; otherwise, he has this area

175

1    free to search around the pivot point.

2         MR. BRANNON:   Okay.   And I'm going to

3       have the court reporter mark that as an

4       exhibit.  Let's call this just plain 1.

5         (Deposition Exhibit 1 was marked for

6    identification.)

7       Q.   Would you give me your initials on that

8    exhibit?

9       A.   (Witness complies).

10      Q.   Thank you.   So am I correct in stating

11   that you would have more control over your dog, as

12   handler, the shorter your lead was?

13      A.   Correct.

14      Q.   And with a short enough lead, you should

15   be able to prevent a dog from coming into contact

16   with any person?

17         MR. WEISENFELDER:   Objection.   Go ahead.

18      A.   That would depend on the location of the

19   person, how close you are to the person.   Obviously,

20   if you're walking over top of the person or in very

21   close vicinity, the dog is going to have some reach.

22      Q.   Okay.   Assuming that you aren't walking

23   over top of the person or the person isn't coming

24   towards you, you should be able to prevent that dog

25   from coming into contact with that person if the dog

176

1   is on the lead, correct?

2       A.   Generally, yes.

3            MR. WEISENFELDER:  Is this a good spot

4       for a break?

5            MR. BRANNON:  Sure.

6                    (OFF THE RECORD)

7            (Deposition Exhibit S5B was marked for

8   identification.)

9   BY MR. BRANNON:

10      Q.   Mr. Clark, I'm going to hand you what I've

11  had marked as S5B.  And these are another portion of

12  the training logs or the canine unit training logs;

13  does that sound correct to you?

14      A.   Yes.

15      Q.   And these have various Bates stamps at the

16  bottom of them, and these are selected ones that I

17  pulled out.  And I still have the book in front of

18  you that had them all, but in the interest of saving

19  a few trees, I didn't copy the whole thing to mark

20  as an exhibit.  I have in relation to what's marked

21  down at the bottom, Defendants' 75.  I believe that

22  this training session took place on 5/3/06.  And you

23  have a training note in there of, need to work on

24  door closed alerts?

25           MR. WEISENFELDER:  What's the Bates

1    number?

2         MR. BRANNON:  75.

3    Q.    It says need, to work on door closed

4    alerts, not barking enough.  Can you describe that

5    training scenario for me and why Spike wasn't

6    barking enough?

7    A.    I can't explain to you why he wasn't

8    barking enough, but I can explain to you that that

9    was a building search.  And a door closed alert is

10   when someone's in a room and you're doing a building

11   search, the objective is for the dog to go to the

12   door where the person is located and bark at that

13   door inside the building.

14   Q.    Okay.  Would that be the same thing as --

15   would that fall under a bark-and-hold type

16   training --

17   A.    That would be --

18   Q.    -- that we talked about earlier?

19   A.    That would be an alert.

20   Q.    Okay.  The barking at that point would be

21   an alert?

22   A.    Yes.

23   Q.    Is that because the dog cannot physically

24   see the person, is that the difference?

25   A.    Yes.

1      Q.   So if the dog was able to see the person,

2  a bark-and-hold dog should sit there and bark,

3  right?

4      A.   Correct.

5      Q.   I'm going to have you flip to Bates number

6  93 in this exhibit.  And I believe this was some

7  training that occurred on 6/13/2006; does that sound

8  right?

9      A.   Yes.

10      Q.   And in there there's a note, three

11  sessions with choke-offs.  Extremely impressive.

12  Most fight Spike has encountered and then it has

13  strong underlined.  Can you explain that to me, what

14  was done there and what you meant by your note?

15      A.   Yes, Franco Angelini is a world renowned

16  decoy trainer and he also holds many classes on

17  decoy work.  He's known as one of the best decoys.

18  He was decoying my dog that day, doing the

19  aggression.  And part of what he was doing was

20  putting the dog into the drive known as fight.  Dogs

21  have character traits and drives.  Without them, you

22  can't work the dog.  Those dogs are washed.  You

23  engage the fight drive in the dog to see what limit

24  the dog is willing to stand, and that is what I

25  refer to there.

179

1     Q.   Okay.  When you say those dogs are washed,

2 that means they don't make it to an assignment with

3 an officer, correct?

4     A.   Correct.

5     Q.   So Spike displayed these characteristics

6 where he would continue to fight and fight

7 aggressively?

8     A.   He stayed on the bite even though Franco

9 was in here.  I don't know if I put it, but he had

10 rolled him completely over onto his back and wrapped

11 him up to where he couldn't see and he still stayed

12 there.

13    Q.   All right.  Where does that say that?

14    A.   I didn't think I put it, but that's what

15 happened.  Those were the pictures that ended up at

16 Ace Canine.

17    Q.   Okay.  And Frank's the guy in the bite

18 suit during these training exercises, correct?

19    A.   Yes.

20    Q.   And was it his opinion or your opinion

21 that Spike was extremely impressive and that that

22 was the most fight Spike has encountered so far?

23    A.   It was my opinion that was the most fight

24 he's encountered.  It was his opinion that he was

25 the most impressive dog in the aggression phase.

1     Q.   Okay.  Meaning that once Spike got on a

2  bite, he was extremely impressed with how Spike

3  stayed on the bite?

4     A.   Yes.

5     Q.   And that's out of -- how many dogs were

6  there?

7     A.   Hundreds.

8     Q.   And this guy trains how many dogs,

9  approximately, in a year; are we talking thousands?

10     A.   I don't know.

11     Q.   At least a hundred at this event, though?

12     A.   Yes.

13     Q.   And Spike was one of the top dogs in that

14  regard?

15     A.   Yes, he was.

16     Q.   And there's also another note at the

17  bottom, Rob Hickman outing issues, three sessions,

18  needs work?

19     A.   Yes.

20     Q.   Want to explain that one?

21     A.   Sticks.  Mr. Hickman likes his decoys to

22  use what are called sticks, and known in the dog

23  world as sticking the dog.  This stick is quite the

24  issue with Spike.  He does not care for the sticks.

25  And I wanted to move away from the sticks.  He

181

1    wanted to stay with the sticks.  It was just a

2    difference of opinion and we were going to need to

3    work with the sticks a lot more.

4        Q.    Are these sticks these bamboo sticks that

5    you described?

6        A.    No, they're not.

7        Q.    What is a stick?

8        A.    The sticks are maybe, if you want to

9    guesstimate that's three feet, I guess, they're

10   about that long.  They're made out of fiberglass and

11   they're used mostly by German trainers, but

12   Mr. Hickman likes to use them as well.  And that is,

13   they stick the front of the dog's paws where your

14   shin might be or your forearm and they whack them

15   pretty hard and it is very painful.

16       Q.    Okay.  So they actually hit the dog with

17   these sticks and the purpose is to make sure the dog

18   stays on the bite?

19       A.    Off.

20       Q.    Off the bite?

21       A.    Yes, to keep them at bay, keep them away.

22   It's very painful to the dog.

23       Q.    Why would you train a dog like that?

24       A.    I don't know.

25       Q.    What's the purpose in hitting the dog with

182

1    a fiberglass stick to keep them at bay?

2        A.   In that issue, what they were doing is

3    trying to invoke a bark-and-hold so that the dog, in

4    his mind, believed that he didn't want to encounter

5    that type of pain anymore, therefore, he would stay

6    at a certain distance.

7        Q.   Meaning he'd stay back and bark even

8    though he was being hit on the shin with these

9    sticks, correct?

10       A.   He would stay back and bark when the

11   sticking stopped.

12       Q.   Okay.  What would he do when he was being

13   sticked?

14       A.   A lot of times Spike, in that instance

15   there, would continue the bite.  He would continue

16   to try to bite.

17       Q.   Okay.  So Spike had some issues back then

18   with staying back and just doing barking, correct?

19       A.   When being sticked, yes.

20       Q.   Okay.  Did he ever have any other issues

21   about staying back and barking at any other time?

22       A.   It varied sometimes.

23       Q.   Okay.  Sometimes, like when?

24       A.   If the decoy -- different decoys invoked

25   different responses.  Sometimes they would not stop

183

1    right when they were supposed to stop.  Sometimes

2    they would yell.  Sometimes they would do different

3    things.  It just depended on the training and who

4    was doing the decoy work really.

5         Q.   Okay.  Is that to say that Spike would

6    most often end up biting a decoy as opposed to

7    barking at a decoy?

8         A.   No.

9         Q.   Had Spike ever bitten a decoy when he was

10   supposed to bark at a decoy?

11        A.   Yes.

12        Q.   When did that occur?

13        A.   That happened at a training session here

14   when he was being sticked.  The sticks and the

15   movement of the arms of the sticks caused him to

16   engage.  He didn't like the pain and it brought out

17   more fight drive in him.

18        Q.   Did you ever do any remedial training past

19   this point to correct this behavior in Spike?

20        A.   Yes.

21        Q.   When would that have been?

22        A.   Every time -- almost every Wednesday that

23   I had someone to help me within the group who would

24   decoy that I trusted as a decoy.

25        Q.   Okay.  And what did you do in this

184

1  training every week to correct this behavior?  What

2  specific scenario did you set up for Spike?

3      A.   To enforce the bark-and-hold, what we

4  would do is put him on a long line with a pinch.

5      Q.   And how would that be detailed in your

6  training records if I were to look through these

7  training records; would it say bark-and-hold work,

8  how would you notation that?

9      A.   Specifically, I don't know.  You might

10  find long-line work, something to that effect, pinch

11  work.  Occasionally, I would also use an E-collar.

12      Q.   But all that should be detailed in these

13  reports, correct?

14      A.   Yes.

15      Q.   I'm going to have you flip to Defendants'

16  No. 137.  This is training that occurred on

17  December 13, 2006, is what it says on the form.  It

18  says, three sessions bite and out.  What does that

19  indicate?

20      A.   Afterwards it says, passive decoy,

21  straight decoy or straight runaway so I would

22  imagine that would have been sending the dog on a

23  bite, you're looking at the person.  All this

24  training was held during the daytime.  So the dog is

25  sent to apprehend a person and bite them and then

185

1    the dog is called off and out.

2        Q.    Did you ever train with Spike at night?

3        A.    Yes.

4        Q.    Is there a place in these reports where

5    that would be noted, what days the training was at

6    night?

7        A.    Somewhere in there.  This particular

8    section you're looking at is the N.A.P.W.D.A.

9    National Workshop from 2006, and I know that those

10   were all during the day.

11       Q.    Okay.  Let me have you go ahead and flip

12   then to Bates No. 171.  There's a notation on the

13   last line there.  It says, second bite apprehension

14   was not so clean, had to flank him?

15       A.    Uh-huh.

16       Q.    What did you mean by that?

17       A.    There was issues, and there is with a lot

18   of dogs in confined spaces in building searches, and

19   that one happened to be in the area of a closet

20   where it was dark in a confined space such as about

21   the size of a walk-in closet.  And by flanking him,

22   I mean walking up and grabbing the flank of his skin

23   and squeezing it.

24       Q.    Okay.  Was that to get him off a bite?

25       A.    Yes.

186

1     Q.   So he would not release with verbal

2  commands?

3     A.   No.

4     Q.   And how was flanking him different than

5  choking him off somebody?

6     A.   It's one or the other.

7     Q.   It is the same term?

8     A.   No, it's not.  By doing a choke-off, you

9  have complete control over the head of a dog.  This

10  is more discipline.  Flanking is more of a

11  disciplinary tactic.  Choking off is not.

12     Q.   Okay.  You would use both.  Under both a

13  choke-off and a flank situation, you would use both

14  of those when a dog would not be responding to a

15  verbal command to release a bite, correct?

16          MR. WEISENFELDER:  Could you read that

17     back, please?

18             (RECORD READ)

19          MR. WEISENFELDER:  Object as to the form.

20     Go ahead.

21     A.   I wouldn't use them both, no.

22     Q.   Not at the same time.  I'm saying you

23  could use one or the other, correct?  When a dog is

24  not responding to a verbal command to come off of a

25  bite, you could either use a choke-off or a flank as

187

1    you've described?

2         A.    In training.  On the street, I would never

3    attempt to flank him.

4         Q.    Why would you not attempt to flank him on

5    the street?

6         A.    I would not have control of his head, and

7    it would not be on a suit, it would be on a person.

8              (Deposition Exhibit S5C was marked for

9    identification.)

10        Q.    And I've handed you some more canine unit

11   training logs; does that sound correct?

12        A.    Yes.

13        Q.    That we've marked as Exhibit S5C, these

14   being Bates Nos. 160, 161 and 185, Defendants' Bates

15   numbers from discovery.  I show that the date on the

16   first one, 160, was September 19th of 2007; does

17   that sound correct?

18        A.    Correct.

19        Q.    And this was the last training record I

20   found before the Campbell bite that occurred on

21   October 21, 2007.  Are you aware of any other

22   training logs that exist between this one here dated

23   September 19, 2007 and the bite that occurred on

24   October 21, 2007 with Mr. Campbell?

25        A.    If it's not in there, I'm not aware of it,

188

1    no.

2        Q.    And I have before you the whole book of

3    the training logs and records that I've been

4    provided, correct?  And feel free to look through

5    those at any time, but I did not find one in there

6    with the date.  And that's the last one before the

7    bite; is that fair?

8        A.    Yes.

9        Q.    Based upon that, there was no training

10   that was performed with Spike between September 19,

11   2007 and when the bite occurred on October 21, 2007,

12   correct?

13       A.    That's highly possible.

14       Q.    In fact, it's probable, correct?

15           MR. WEISENFELDER:  Objection.

16       A.    Yes.

17       Q.    And there would be nothing on the CATS, or

18   anything like that, during this training time?

19       A.    No, it would not be on the CATS.

20       Q.    So the last training that you had with

21   Spike prior to the bite with Campbell would have

22   been over 30 days, correct, based upon this record?

23       A.    Yes.

24       Q.    Then I'm going to now reference you to

25   Defendants' 185 in that exhibit.  That has a canine

189

1    unit training log date of 9/3/2008; does that sound
2    correct, September 3, 2008?
3        A.    Yes.
4        Q.    That is the last training log I found on
5    the documents provided to me prior to the Chelsie
6    Gemperline bite that occurred on October 11, 2008.
7    Are you aware of any other training that occurred
8    between that date and the bite on Ms. Gemperline?
9        A.    No.
10       Q.    So is that to say that that was the last
11   training that Spike had prior to the bite on
12   Ms. Gemperline?
13       A.    I believe so, yes.
14       Q.    And that also was -- over 30 days had
15   lapsed between that training and when the bite
16   occurred, correct?
17       A.    Correct.
18       Q.    And I believe that you testified earlier
19   that Spike was required to train eight hours every
20   other week; is that correct?
21       A.    That's correct.
22       Q.    So Spike would not have been current with
23   his training prior to the Campbell or Gemperline
24   bites, correct?
25       A.    Correct.

1      Q.     Was anybody at the Springboro Police

2  Department aware that Spike wasn't current in his

3  training when he was out on the streets prior to the

4  Gemperline and Campbell bites?

5      A.     Very aware.

6      Q.     Who was aware?

7      A.     Sergeant Turpin, Sergeant Zimmaro,

8  Lieutenant Parker and Lieutenant Wheeler.

9      Q.     How were they made aware of this?

10     A.     I made them aware.

11     Q.     Tell me when and where you made them

12  aware.

13     A.     Through e-mail form and memo I dictated

14  that I was not receiving from my sergeants the

15  appropriate time to train and that there were also

16  workshops that I would like to go to and that I was

17  being denied my training time to avoid overtime,

18  which was put into memo form and e-mail form.  I do

19  not have the exact dates, but it was submitted to

20  both lieutenants and my sergeant.

21     Q.     Okay.  You rattled off here a lot of

22  people and a lot of things that occurred.  If I can

23  start with the people again just so I can write and

24  go through each one of these people.

25     A.     The first request was made through

191

1   Sergeant Turpin.

2       Q.    We have Sergeant Turpin?

3       A.    Yes.

4       Q.    Who else?

5       A.    Sergeant Zimmaro.

6       Q.    Who else?

7       A.    Lieutenant Parker.

8       Q.    Who else?

9       A.    Lieutenant Wheeler.

10      Q.    So you complained to all of these people

11  that you were not getting enough training with

12  Spike, correct?

13      A.    Correct.

14      Q.    Go ahead and take me chronologically

15  through who you made these complaints to and when

16  and what the complaints were.

17      A.    On a weekly basis I spoke to Sergeant

18  Turpin, asking him to check the schedule to see if I

19  could go to training on certain Wednesdays.  He

20  never responded to me.  I then took that to

21  Lieutenant Parker and then was taken, after still

22  receiving no response, to Lieutenant Wheeler.

23  Lieutenant Wheeler responded to me that I would soon

24  be afforded every possible time available to train

25  no matter what and that I would get the minimum

192

1 number of hours.

2     Q.   When did you first start making these

3 complaints to Sergeant Turpin, Sergeant Zimmaro,

4 Lieutenant Parker and Lieutenant Wheeler?

5     A.   It was over the course of probably the

6 last year and a half to two years that Spike was in

7 service.

8     Q.   Was that prior to the bite incident

9 involving Mr. Campbell?

10     A.   Yes.

11     Q.   How long before the bite incident

12 involving Mr. Campbell did you make complaints about

13 not getting enough training with Spike?

14     A.   It would have been somewhere around the

15 summertime because I had also indicated in there

16 that I would like to go to the 40-hour training for

17 the state -- I'm sorry, the N.A.P.W.D.A workshop.

18 And I indicated to Lieutenant Wheeler that I had not

19 been receiving enough training time and this would

20 be very helpful to me to attend that seminar.

21     Q.   Would that have been the same seminar that

22 you took when you initially got Spike?

23     A.   It's a yearly seminar, yes.

24     Q.   And you had not been to any other seminar

25 since that one?

193

1     A.   I had not.

2     Q.   Approximately how long before the Campbell

3 bite, time-wise, did you first voice your complaints

4 about not getting enough training with Spike?

5     A.   I know that it was during the summer.

6 That's all I can tell you.  I don't know the exact

7 date.

8     Q.   Approximately July, August, June, July

9 August?

10     A.   It was hot, I know that.  Honestly, I

11 can't tell you the date.

12     Q.   And that was the first complaint that you

13 made, correct?

14     A.   Correct.

15     Q.   You made that verbally to Sergeant Turpin?

16     A.   Yes, I did.

17     Q.   Did you make that initial complaint to

18 anybody else?

19     A.   When we switched shifts -- when the

20 sergeants switched shifts, I never changed my shift.

21 I talked to Sergeant Zimmaro about it.

22     Q.   Okay.  Was this right at about the same

23 time?

24     A.   Same time period over the course of about

25 a year, yes.

194

1    Q.   Okay.  Did you only make one complaint or
2   did you make multiple complaints to your sergeants?
3    A.   I don't know that you could say that those
4   were complaints.  They were references that I would
5   like them to check the schedule to see if I could go
6   to that training that day.
7    Q.   Okay.  Did you also tell them at that time
8   that you were not getting enough training with your
9   canine?
10    A.   Yes, I did.
11    Q.   Do you know if they reported -- I know you
12   don't want me to call them complaints, but I don't
13   know what else to call them.  Were you aware if
14   those issues were then reported up through the chain
15   of command by Sergeant Turpin and Sergeant Zimmaro
16   to either Lieutenant Parker or Lieutenant Wheeler?
17    A.   I don't know if they did or not.  I did.
18    Q.   Okay.  So when you did not get a response
19   from your sergeants, you went to whom then?
20    A.   Lieutenant Parker and Lieutenant Wheeler
21   were both issued an e-mail at the same time, which
22   was around the same time I requested an E-collar,
23   too, and I don't remember the exact date of any of
24   that.
25    Q.   During the time period of first complaints

195

1    before the Campbell bite, how many verbal -- or how
2    many times did you verbally complain to Sergeant
3    Turpin and Sergeant Zimmaro that you needed
4    additional training and that you weren't getting
5    enough training?
6        A.   I mentioned it to Sergeant Turpin at least
7    once a week.  I was not on Sergeant Zimmaro's shift
8    for as long as Sergeant Turpin's.  And at that
9    point, I believe it was Sergeant Zimmaro I mentioned
10   it to at first and then Sergeant Turpin over the
11   course of a fairly long period that frustrated me
12   enough to support sending the e-mail to Lieutenant
13   Parker and Lieutenant Wheeler.
14       Q.   So you felt it was a bad enough situation
15   to where you needed to go around your sergeant and
16   get it up the chain of command to Lieutenant Wheeler
17   then or Lieutenant Parker?
18       A.   I just felt I wasn't being listened to.
19       Q.   Okay.  And Sergeant Zimmaro, approximately
20   how many times did you make that complaint to him
21   that you weren't getting -- I know that you weren't
22   with him as long --
23       A.   Maybe two or three.
24       Q.   Would that be on a weekly basis, also?
25       A.   Yes.

196

1      Q.    Were these concerns or complaints voiced
2  by you at a weekly staff meeting, just in passing,
3  under what circumstances did you make these concerns
4  known?
5      A.    It could have been anytime during the
6  shift that we were both in the building at the same
7  time.  I would just say, hey, can you check the
8  schedule to see if I could go to training next
9  Wednesday.
10     Q.    Why was it important to you to do this
11  training?
12     A.    As indicated in my e-mail, I became
13  concerned that I was falling below the standards.
14     Q.    Was Spike's performance suffering because
15  he wasn't getting this training?
16     A.    His drug work was definitely starting to
17  go downhill a little bit.
18     Q.    Knowing that if you would have gotten this
19  training, did you feel like you'd have a better dog
20  and be a better unit in the field?
21     A.    That would depend on the situation.
22     Q.    Would you feel that with this additional
23  training you would have had better control of your
24  canine in the field?
25     A.    You would have to be specific to the exact

197

1   situation.

2       Q.   Just generally speaking, I mean, if you

3   didn't think that this training would make you any

4   better, you know, you wouldn't need it, right?  The

5   training is designed to make you a better handler

6   and the dog a better dog, right?

7       A.   That, and to conform with the state's

8   standards.

9       Q.   Okay.  And it's your feeling now, looking

10  back, that you probably could have been a better

11  handler and Spike could have been a better dog had

12  you got him this training?

13          MR. WEISENFELDER:  Objection.

14      A.   I did not say that.

15      Q.   Okay.  Would that be true?

16          MR. WEISENFELDER:  Objection.

17      A.   Again, that would be specific to the

18  individual thing that you're referring to,

19  situation.

20      Q.   Do you think Spike would have been better

21  at tracking if he would have gotten this additional

22  training that you were requesting?

23      A.   Not at tracking, no.  I tracked on a

24  regular basis while at work.

25      Q.   Do you think he would have been a better

198

1  bark-and-hold dog had he gotten this additional

2  training?

3      A.   Yes.

4      Q.   I think when we talked about some of his

5  training earlier, he had some problems with

6  bark-and-hold when we were talking about using the

7  sticks or you described them as sticks, the

8  fiberglass sticks that they would hit him on the

9  front of the shins with?

10      A.   Correct.

11      Q.   Would that be one of the things that this

12  training would have worked on?

13      A.   No.

14      Q.   Okay.  But it would have included

15  bark-and-hold training as training that you were

16  requesting?

17      A.   Yes.

18      Q.   You mentioned that, getting back to this

19  chain of complaints and going up the chain of

20  command here, that you sent an e-mail to Lieutenant

21  Parker and Lieutenant Wheeler.  Was that before or

22  after the Campbell bite?

23      A.   I don't know.

24      Q.   Did you ever get a response to that

25  complaint?

199

1     A.   Yes.

2     Q.   What was the response?

3     A.   That I would not be allowed to go to the

4 national workshop and that they would be -- there

5 would be more attempts to get me to weekly training,

6 more emphasis.

7     Q.   Did they tell you why you were denied

8 access to the national workshop?

9     A.   No, they did not.

10    Q.   Did you get more access to weekly

11 training?

12    A.   Yes.

13    Q.   How much more?

14    A.   A few of the days on the schedule were

15 marked off where there were enough officers.  There

16 was more, yes.

17    Q.   Okay.  Was there enough to get current

18 with the state minimum standards?

19    A.   I'd have to go and look through all of

20 those.  I don't know.  I don't recall.

21    Q.   Did you ever notify them that you weren't

22 getting enough training time to comply with the

23 state minimum standards meaning --

24    A.   Yes, I've already told you that.

25    Q.   And that was in the e-mail to Lieutenant

200

1    Parker and Lieutenant Wheeler?

2        A.    Yes.

3        Q.    As well as to Sergeant Turpin and Sergeant

4    Zimmaro?

5        A.    I did not e-mail them.

6        Q.    Yeah, but you told them that you weren't

7    keeping up with the state minimum standards?

8        A.    Correct.

9        Q.    So all four of those individuals were

10   aware that the canine unit would require more

11   training every 30 days to maintain the unit to

12   professionally performing standards and state

13   standards, correct?

14            MR. WEISENFELDER:  Objection.  Go ahead.

15       A.    I believe you said more training every 30

16   days or did you mean more than every 30 days?  I

17   didn't understand.

18       Q.    You made them aware that you would require

19   more training than, let's say, once every 30 days,

20   which appears what you were getting at the time, or

21   a little bit more than 30 days, before the bite

22   periods of Gemperline and Campbell, that prior to

23   the bite involving Mr. Campbell, you made them aware

24   that that was not sufficient to -- not sufficient

25   training to maintain the canine unit, you and Spike,

201

1  to professionally performing levels at state minimum

2  standards, correct?

3         MR. WEISENFELDER: Objection.

4    A.   Correct.

5    Q.   That was a yes?

6    A.   That's correct.

7    Q.   You stated that you voiced complaints to

8  the sergeants and the lieutenants concerning the

9  training prior to the bite incident involving

10  Mr. Campbell, correct?

11    A.   I believe I said I didn't know the exact

12  time period.

13    Q.   Okay. You at least notified your

14  sergeants then. You weren't sure, though, if you

15  sent the e-mail to your lieutenants yet?

16    A.   Yes.

17    Q.   After the bite occurred with Mr. Campbell,

18  did anything change in regards to the training?

19         MR. WEISENFELDER: Objection. Go ahead.

20    A.   No.

21    Q.   Were you still voicing complaints to your

22  sergeants and your lieutenants prior to the

23  Gemperline bite incident regarding training?

24    A.   Yes.

25    Q.   And I think we covered up and to the

202

1    e-mail.  What's the next step that you took after

2    that?  What other complaints did you make past that

3    point?

4         A.    After the e-mail?

5         Q.    Yeah, after the e-mail.

6         A.    Just verbal statements to the sergeant.

7         Q.    Which sergeant?

8         A.    At that point, Sergeant Bentley.

9         Q.    Was he, then, your sergeant at that time?

10        A.    Yes.

11        Q.    How many times did you complain to

12   Sergeant Bentley and during what periods of time?

13        A.    I only had to complain to Sergeant Bentley

14   once, and that would have been during the first

15   period of time that he was on my shift.  He was very

16   good about getting me my training time.

17        Q.    Okay.  So what time period would that have

18   been, approximately?

19        A.    I don't know.  I'd have to pull the

20   schedule.

21        Q.    Okay.  The Campbell and Gemperline --

22        A.    It would have been --

23        Q.    -- they occurred about a year apart.  What

24   time period in there from --

25        A.    Probably right after the Mr. Campbell

203

1    incident, somewhere after that.

2        Q.    Okay.  Would that be a month, two months

3    after the Campbell incident, then, that you had

4    Sergeant Bentley come in and he sort of made sure

5    that you got more training?

6        A.    Yes.

7        Q.    And then prior to the Gemperline bite, who

8    was your sergeant at that time?

9        A.    Sergeant prior to the Gemperline?

10       Q.    The Gemperline, correct.

11       A.    That would have been Sergeant Bentley

12   still.

13       Q.    Okay.  Sergeant Bentley still.  And did

14   you voice any more --

15       A.    I'm sorry, Sergeant Zimmaro.

16       Q.    Okay.  I apologize.  When would Sergeant

17   Zimmaro have been your sergeant then after Bentley,

18   and we're still before the Gemperline bite,

19   approximately how many months before that bite

20   occurred?

21       A.    They went on three-month rotations so I

22   don't know the exact time period, how long Sergeant

23   Zimmaro was there, but he was my sergeant during the

24   Gemperline incident.

25       Q.    For approximately a month, two months,

204

1  three months prior to the bite?

2      A.   I can't answer that question.  I don't

3  remember.

4      Q.   Okay.  Did you ever complain to Sergeant

5  Zimmaro about not getting enough training?

6      A.   Yes.

7      Q.   On how many occasions, approximately,

8  prior to the Gemperline bite?

9      A.   Mind you, I'm saying yes to what you're

10  referring to as a complaint by not knowing what else

11  to call it.  I made him aware that I was not -- or

12  that I needed to go to training on certain days,

13  yes.

14      Q.   Okay.  Approximately how many times, prior

15  to the Gemperline bite, did you make him aware that

16  you needed additional training?

17      A.   A couple, probably less than five.

18      Q.   Did that do any good?

19      A.   Yes.

20      Q.   Was there any particular reason Spike had

21  not been to any training over 30 days before the

22  Gemperline bite then?

23      A.   Manpower.

24      Q.   Explain that to me, why manpower?

25      A.   Training was eight hours.  For me to go to

205

1   training and go to work, I would have had to have

2   been paid eight hours of overtime. Instead, I

3   worked the shift. If there were not enough people

4   and it was minimum manpower, I was not allowed to go

5   to training.

6       Q.   Okay. So you were not permitted to go to

7   training in this 30-day period because of manpower

8   budgetary problems?

9       A.   I don't know that I would say it's -- can

10  even begin to speculate whether it's budgetary

11  problems. It was an issue of manpower in terms of

12  OIC, has to be an OIC working, and there has to be a

13  minimum number of people working on the shift that

14  night.

15      Q.   Okay. So there were staffing issues with

16  the department at that time to make sure that there

17  were enough people out on the street or doing their

18  jobs, correct?

19      A.   Correct.

20      Q.   Would that have been true as well prior to

21  the Campbell bite? Was that the reason that you

22  didn't get any training with Spike during that over

23  30-day time frame, was that -- why was that? Was

24  that because of manpower issues again or was this

25  just because your sergeants weren't letting you

206

1    or --

2         A.   Manpower.

3         Q.   Manpower.  What type of system did the

4    City of Springboro Police Department have in place

5    to monitor the canine unit?

6         A.   I don't know.

7         Q.   Was there none?

8         A.   No, not that I'm aware of.

9         Q.   Nobody at Springboro ever went through

10   your training records, your training logs?

11        A.   No.

12        Q.   Did anybody ever request to go through

13   your training logs prior to this lawsuit?

14        A.   No.

15        Q.   So there was nobody monitoring the

16   performance of the canine unit; am I correct in

17   stating that?

18        A.   I don't know.

19        Q.   Let me ask it this way:  Your sergeant

20   monitors you while you're on duty, correct?

21        A.   Correct.

22        Q.   Is their anybody else that monitors you

23   while you're on duty?

24        A.   No.

25        Q.   But there was nobody at Springboro that

207

1   monitored the canine unit's success rate with bites,

2   with drug searches, nothing like that?

3      A.   No.

4      Q.   Wouldn't you agree with me that it's

5   necessary for a police department to monitor the

6   performance of their canine unit?

7         MR. WEISENFELDER:  Objection.  Go ahead.

8      A.   Yes.

9      Q.   But nobody at Springboro was doing that?

10      A.   No.

11      Q.   Who was responsible for making sure that

12   the canine unit was getting everything that they

13   needed to operate in the field safely?

14      A.   The operations lieutenant.

15      Q.   And we've already talked about the

16   training that you didn't receive even though you

17   requested it, correct?

18      A.   Yes, we have.

19      Q.   And we've already talked about the

20   E-collar that you didn't receive when you requested

21   it, correct?

22      A.   Correct.

23      Q.   And all of that should have been provided

24   by the lieutenant operations commander?

25      A.   Yes.

208

1     Q.   Or he should have saw to it that you were
2  provided those things that you needed?
3     A.   Yes.
4     Q.   And was that Lieutenant Wheeler during
5  this 2007/2008 time frame?
6     A.   At that time, I believe it was Lieutenant
7  Parker.
8     Q.   Okay.  When did it become Lieutenant
9  Wheeler?
10    A.   It would have been Lieutenant Wheeler
11  before Lieutenant Parker.
12    Q.   Okay.  But you don't know when that change
13  occurred, approximately?
14    A.   I don't remember.
15    Q.   Was there anything else that you requested
16  from the City of Springboro for your canine unit
17  that you did not receive?
18    A.   No.
19    Q.   So you were denied a request to go to the
20  annual training put on by -- is it N.A.P.W.D.A.?
21    A.   North American Police Work Dog
22  Association, yes.
23    Q.   Okay.  You're also denied training to go
24  with the -- is it the Miami Valley Canine?
25    A.   Police Canine.

209

1     Q.   Police Canine?

2     A.   Yes.

3     Q.   Okay.  And that is one that you were

4 denied on a continuous basis?

5     A.   Yes.

6     Q.   Were you also denied the ability to go to

7 any other canine training functions besides the

8 N.A.P.W.D.A. and Miami Valley?

9     A.   I didn't ask to go to any others.

10    Q.   Did Springboro Police Department ever

11 require you to keep any training records or logs on

12 the dog or anything like that?

13    A.   Once yearly I submitted an activity log

14 detailing, in different districts, the number of

15 calls of the different districts and differentiating

16 the types of calls that were handled in those

17 districts.  And it also numbered the number of calls

18 handled for outside agencies, but that was once a

19 year to the Chief.

20    Q.   Was that something specific to the canine

21 unit or did every officer have to do that?

22    A.   Specific to the canine unit.

23       MR. BRANNON:  I'm going to, again, make

24    an additional document request for that

25    document.

210

1          MR. WEISENFELDER:   I think you have it.

2          MR. BRANNON:   And I may.   I think I know

3      what he may be referencing to.   I'm just going

4      to have to go back and take a look at it.

5          Q.   What type of information would the Chief

6   be able to gather from that type of a report?   Would

7   he even be able to tell if a bite occurred or

8   anything like that?

9          A.   Yes.

10          Q.   What other information would the Chief be

11   able to garner from that annual report that you

12   would give him?

13          A.   How many calls were in -- how many

14   dog-related calls, how many times Spike was deployed

15   in each individual district, the average time of day

16   for those deployments, how many times I was called

17   out from home while not at work during the day, and

18   how many physical and non-physical apprehensions

19   there were, how many building searches there were,

20   how many tracks, how many successful tracks,

21   non-successful tracks, how many area searches, how

22   many drug searches.   Basically every single function

23   of the dog, he would have a complete and total

24   number as to how many usages, broken up, for the

25   year.

211

1      Q.    Did the Springboro Police Department
2  require you to keep any records, any other records
3  concerning the dog, besides this annual report and
4  that was the only thing you were really required to
5  keep and provide to them?
6      A.    Yes.
7      Q.    So the canine unit training logs, that's
8  something that you did on your own?
9      A.    That is something that I was trained to
10  keep by Lynnwoods Kennels.
11      Q.    Okay.  Was there a special kind of record
12  that you would have to prepare when you deployed
13  your canine in the field?
14      A.    Yes.
15      Q.    Tell me what that would be.
16      A.    That would be a deployment form.
17      Q.    Did the Springboro Police Department
18  require that or was that just something that you did
19  as your practice?
20      A.    That was required.
21      Q.    Okay.  So anytime you deployed Spike in
22  the field, you had to fill out a report?
23      A.    Yes.
24      Q.    And that would detail the reason why you
25  deployed Spike and what happened, presumably?

212

1     A.   Yes.

2     Q.   And was there any other type of record

3 required when a bite occurred in the field or was

4 this all encompassed in the canine deployment

5 report?

6     A.   That was all in the canine deployment

7 report.

8     Q.   Have you heard the term bite to

9 apprehension ratio?

10    A.   Yes.

11    Q.   A bite ratio, as it's more commonly known?

12    A.   Yes.

13    Q.   What's your understanding of a bite ratio?

14    A.   In terms of the number of complete

15 apprehensions that is physical versus non-physical.

16    Q.   Meaning where the dog bites and apprehends

17 versus where the dog doesn't bite and an

18 apprehension is made?

19    A.   Correct.

20    Q.   Was there any system at Springboro for

21 monitoring the bite ratio for you and Spike?

22    A.   No.

23    Q.   So really, there were no internal

24 procedures for monitoring you and Spike or the

25 canine unit besides your annual report, correct?

213

1          MR. WEISENFELDER:  Objection.

2      A.    Anytime there was a bite or anything -- I

3  should say this, I was required anything above and

4  beyond a drug search that the deployment report was

5  to be printed off and turned in to the lieutenant.

6      Q.    Okay.  So anytime Spike was deployed not

7  for drugs, you gave the report to the lieutenant?

8      A.    Yes.

9      Q.    So the lieutenant presumably would have

10 been aware of when a bite apprehension was made

11 versus a building search was done?

12     A.    Yes.

13     Q.    Do you know if the lieutenant did anything

14 to keep track of these or monitor these?

15     A.    I have no idea.

16     Q.    Do you even know if he read the reports?

17          MR. WEISENFELDER:  Objection.  Go ahead.

18     A.    I don't know.

19     Q.    Did any of your supervisors at Springboro

20 have any experience with canines or canine units?

21     A.    Lieutenant Parker.

22     Q.    And that was where he was a handler for a

23 dog previously, correct?

24     A.    Correct.

25     Q.    Would you agree with the fact that because

214

1 a dog's responsiveness to its handler's commands may

2 erode over time, that police dogs need continual

3 training to assure that they will perform

4 consistently in the field?

5    MR. WEISENFELDER:  Objection.  Go ahead.

6  A. I'm an advocate of maintenance training.

7 I believe it is necessary, yes.

8  Q. Prior to the bite incident involving

9 Mr. Campbell, how many bites in field deployment did

10 Spike have?

11    MR. WEISENFELDER:  Objection as to the

12  form.  Go ahead.

13  A. I'd have to see the paperwork, I don't

14 know.

15    MR. BRANNON:  Please mark that as S15.

16    (Deposition Exhibit S15 was marked for

17 identification.)

18  Q. Mr. Clark, I've handed you what we marked

19 as S15.  Do you recognize that document?

20  A. Yes, I do.

21  Q. Have you seen that prior to today?

22  A. Yes.

23  Q. And can you tell me what that document is?

24  A. It is a letter that I wrote to Lieutenant

25 Wheeler at the request of Chief Kruithoff.

215

1      Q.    Okay.  And this references a Shane Menz.
2   It's my understanding that he was bitten by Spike
3   when he was deployed?
4      A.    Yes.
5      Q.    And how did this letter come about or this
6   memo or whatever you want to call it?
7      A.    The Chief came to me and asked me to
8   explain to Lieutenant Wheeler, because he was new to
9   the dog deployment and biting issue at the time, if
10  I could please explain to him when it is appropriate
11  to deploy the dog.
12     Q.    Okay.  Was the Chief not able to explain
13  when you should deploy a dog to Lieutenant Wheeler?
14     A.    I don't know.
15     Q.    What was your conversation with Chief
16  Kruithoff?
17     A.    Kruithoff.
18     Q.    Kruithoff.
19     A.    He just, I believe, sent me an e-mail
20  asking me to just very briefly, could you please
21  explain to Lieutenant Wheeler, he had asked me some
22  questions, that you would be better to answer.
23     Q.    Did that imply that the Chief did not know
24  the answers to the questions about when to deploy
25  the dog, is that the sense that you got in the

216

1  e-mail?

2     A.   No.

3     Q.   Was it just your sense that Lieutenant

4  Wheeler did not know about use and deployment of a

5  canine dog?

6     A.   Led me to believe that Lieutenant Wheeler

7  had less knowledge than I did at the time and that

8  he also was not as knowledgeable since he was not

9  there at the scene as I was about this particular

10  case.

11     Q.   Okay.  So you had to teach your

12  supervisor, presumably, about when a canine should

13  and should not be deployed in the field?

14         MR. WEISENFELDER:  Objection.

15     Q.   Is that a fair statement?

16         MR. WEISENFELDER:  Objection.

17     A.   Yes.

18     Q.   And during that time, this is dated

19  8/22/06, what was Lieutenant Wheeler's position, was

20  he the operational commander, was he --

21     A.   I believe he was the operations commander,

22  yes.

23     Q.   And as the operations commander, he would

24  be the person right below the Chief in charge of all

25  the officers on the road, correct?

217

1     A.   Correct.

2     Q.   And in this letter it references, second

3 sentence, without having a written policy of our own

4 for the use of canine, I have utilized the

5 International Association of Chiefs of Police canine

6 policy, see attached for guidance and deployment of

7 police service dog Spike, correct?

8     A.   Correct.

9     Q.   Is that to say that Springboro, at that

10 point in time, never had or did not have a policy

11 for a police canine in place?

12     A.   I requested from the Chief that we needed

13 to have our own policy. He did not want to do that.

14 I showed him the International Association of Chiefs

15 of Police policy. He said, that was fine, we'll

16 utilize that.

17     Q.   Okay. Let me take you back to Exhibit

18 S17. S17, is that the document you're referring

19 to --

20     A.   Yes.

21     Q.   -- the policy you printed off the Internet

22 at Terry Fleck's website?

23     A.   Yes.

24     Q.   There was never any formal adoption of

25 that policy by your chief; am I correct in that?

218

1          MR. WEISENFELDER:  Objection.

2      Q.   To your knowledge?

3      A.   I don't know what formal is.  It was not

4  in the book, he just told me yes, to go by that.

5      Q.   Okay.  Let's say if somebody was presented

6  with a copy of the policies and procedures and

7  everything -- which book is the use of force

8  contained in, what would you call that, the policies

9  and procedures handbook?

10      A.   Yes.

11      Q.   Is just about everything contained in that

12  policies and procedures handbook?

13          MR. WEISENFELDER:  Now or then?

14          MR. BRANNON:  Back then.

15      A.   Yes.

16      Q.   If Springboro had a canine policy in place

17  prior to the Chelsie Gemperline bite, would you

18  expect to find that canine policy in that policies

19  and procedures handbook --

20          MR. WEISENFELDER:  Objection.

21      Q.   -- as an officer with Springboro?

22      A.   No.

23      Q.   Why not?

24      A.   Because I know that it wasn't in there.

25      Q.   Okay.  But as a new officer coming on the

219

1   force, you were presented with a copy of that

2   policies and procedures handbook, correct?

3          A.   I was shown it.  I never had my own, no.

4          Q.   Okay.  Did Springboro ever issue a copy of

5   the policies and procedures handbook to any officer,

6   to your knowledge?

7          A.   Not to my knowledge.

8          Q.   It's just something that they kept,

9   correct?

10         A.   Correct.

11         Q.   And if you looked in that book on the date

12  of the Gemperline bite or prior to that, would you

13  have found that policies and procedures in that

14  book?

15         A.   No.

16         Q.   Where was this policies and procedures

17  kept, meaning S17?

18         A.   The Chief had a copy and I had a copy.

19         Q.   And where did you keep your copy?

20         A.   In my locked file cabinet.

21         Q.   You just have basically a file cabinet

22  that you kept everything about the dog in?

23         A.   Yes.

24         Q.   And do you know where the Chief kept his

25  copy?

220

1          A.    I have no idea.

2          Q.    But you do know that if somebody would

3      have made a public records request for the policies

4      and procedures of Springboro prior to the Gemperline

5      bite, you would not have found a canine policy in

6      that book, correct?

7          A.    Correct.

8          Q.    So to your knowledge, there was never an

9      official adoption of that canine policy for

10     Springboro?

11              MR. WEISENFELDER:    Objection.

12         A.    I don't know the answer to that.  That is

13     what the Chief told me to utilize.  I don't know

14     what you mean by adoption.

15         Q.    Okay.  Any formal incorporation of that

16     into the Springboro policies and procedures

17     handbook.  Because it wasn't located in there, I'm

18     assuming there was never any adoption of that into

19     that material, correct?

20         A.    Correct.

21         Q.    He just said, go with it, you know.  He

22     hands it -- or you hand it to him, he says, this

23     looks okay, go by this?

24         A.    No, he had it for a period of time and

25     then I re-approached him about it and he informed me

221

1  that it would be okay to use this.  He did not use

2  the exact words that you used.

3      Q.  Okay.  Fair enough.  In regards to the

4  letter that you -- or the memorandum that you sent

5  to Lieutenant Wheeler, did you just send him a

6  letter or did you ever sit down and talk with him

7  about the dog and explain the use of force of the

8  dog regarding the Shane Menz bite?

9      A.  This was the only conversation I had with

10  Lieutenant Wheeler about the Shane Menz bite.

11      Q.  Okay.  Do you know how many total bites

12  Spike had in his career with the City of Springboro?

13      A.  I don't know the exact number.

14      Q.  Does 13 sound about right?

15      A.  Yeah.

16          MR. WEISENFELDER:  Objection.  Go ahead.

17      A.  Probably.

18      Q.  Do you know how many apprehensions Spike

19  had without a bite in his career with the City of

20  Springboro?

21      A.  No, I don't.

22      Q.  Does six sound about right?

23          MR. WEISENFELDER:  Objection.  Go ahead.

24      A.  No.  I could be wrong, but I don't think

25  so.

222

1          MR. BRANNON:  I'd like to have that

2     marked as S14.

3          (Deposition Exhibit S14 was marked for

4     identification.)

5     Q.    You've had an opportunity to flip through

6     those documents, correct?

7     A.    Correct.

8     Q.    And do you recognize those?

9     A.    Yes.

10    Q.    And can you tell me what those are?

11    A.    Use of force forms on top of my usage

12    reports and narratives.

13    Q.    And I'm going to represent to you that

14    those are the bite reports for Spike in every

15    deployment case in which a bite occurred.  Does

16    those look to be like those reports to you?

17    A.    Yes.

18    Q.    And I've been provided with all of the use

19    of force reports, or what have been represented to

20    me as all of the use of force reports for yourself

21    and Spike in the field.  I'm going to hand these to

22    you and identify them as Defendants' discovery

23    responses, Bates Nos. 983 through 1274.  I'm going

24    to give you an opportunity to go ahead and look

25    through those.  As you're flipping through those,

223

1  one of the questions I'm going to have for you, I

2  know that this is large stack of documents, I've

3  been through all of those, I was only able to find

4  six apprehensions without bites.  If you find more

5  than six apprehensions without bites, please let me

6  know that.

7       A.   That would be contained in the CATS

8  software.

9       Q.   Okay.  Meaning the CATS software that you

10  kept back at Springboro, correct?

11       A.   Correct.  It appears here, all I see is

12  bites and shooting a deer which has nothing to do

13  with Spike.

14       Q.   Yeah.  I believe that those were all the

15  use of force reports for you?

16       A.   Yes, the use of force would not have been

17  completed on a non-bite.

18       Q.   If an apprehension was made without a

19  bite?

20       A.   Correct.

21       Q.   Does that also contain your deployment

22  reports as well for Spike in that series of

23  documents?

24       A.   There's no use of force at all or no dog

25  usage even -- this is from 2003.  I don't even know

224

1    what this is for.  There was no use of force

2    attached to it.  It's just a NIBRS report for a

3    domestic.

4        Q.   How would you classify that group of

5    documents then that have been provided there?

6        A.   This?

7        Q.   The only thing total, that whole set from

8    Bates numbers, whatever I started with there and

9    ended with.  I can be more specific.  Let me be more

10   specific for the record here, meaning Bates Nos. 983

11   through 1274.

12       A.   I'm not really sure how you want me to

13   describe them.  They start with --

14       Q.   Does that --

15       A.   -- the incident involving Mr. Campbell and

16   then revert back to 2003, a domestic that I was just

17   a simple witness to and then revert back to 2005.

18       Q.   And, Mr. Clark, I cannot explain to you

19   why the documents are in that order.  Those are the

20   order in which they were provided to me in.  All I

21   know is that it contains some canine deployment

22   reports.  I presume all of your canine deployment

23   reports are encompassed within that set of

24   documents.  Does that seem true or not true?

25       A.   I don't know.  I'd have to sit here and go

225

1  through every page.

2      Q.    And, Mr. Clark, I want to give you every

3  opportunity to do that and I want to make sure that

4  our answers here are accurate, so you take as much

5  time as you would like to go through that because my

6  question to you is, I've been through all of those.

7  I believe that they contain all of your deployment

8  reports, possibly all of your use of force reports

9  or supervisor's use of force reports for every

10 incident in which Spike was deployed, with you as

11 the handler.  In that, I've counted 13 total bites

12 that occurred during the course of yours and Spike's

13 career as a canine team, and I was only able to find

14 six apprehensions that were made without bites and I

15 just want to know if that's true.  Does that sound

16 true?

17     A.    The number doesn't sound right to me.  I

18 would have to pull up the program.  And you can

19 actually have the program separate the numbers for

20 you instead of -- honestly, I don't know why Officer

21 Stewart's domestic report is in here from 2003 and

22 then a driving under suspension that I was not a

23 part of nor my dog.  So making much sense of that is

24 going to be a little difficult for me.

25     Q.    Let me give you another number that I

226

1   counted up in there.  I counted 72 total deployments

2   of Spike which included drug searches, building

3   searches, article searches and all other types of

4   reasons why you would have deployed Spike as a

5   canine handler during your career.  Does that sound

6   correct to you?

7        A.   That sounds absolutely wrong.

8        Q.   Okay.  How can we get me some accurate

9   numbers then?

10       A.   Have to pull from the CATS program, but

11   there were over 100 usages within one year that I'm

12   aware of.  So 65 total in a career is definitely the

13   wrong number.

14       Q.   Okay.  How would these be able to be

15   compiled in this CATS program?

16       A.   They're all listed in this form, the exact

17   same form.

18       Q.   And you pointed to a canine deployment

19   report, correct?

20       A.   Correct.  They're all listed in that form

21   but separated by the type of usage that it is.

22       Q.   Okay.  So in the program, you have

23   itemized each canine deployment report, correct?

24       A.   Correct.

25       Q.   Within each one of those reports, there

227

1 should also be a corresponding written report

2 somewhere, correct, that you would have written?

3   A. Narrative such as this here?

4   Q. Yes.

5   A. Yes.

6   Q. And you're pointing to Bates number --

7 read me the Bates number.

8   A. 104701047, narrative along the

9 company's -- the deployment report, not a separate

10 report.

11   Q. Okay.  Sure.  It's all contained in the

12 same document, correct?

13   A. Correct.

14   Q. And are all those on the CATS system like

15 that?

16   A. Yes, they were.

17   Q. In that deployment report form?

18   A. Exact form.

19   Q. Okay.  So that's the computer form on the

20 CATS program, that canine deployment report,

21 correct?

22   A. Correct.

23   Q. You just go in there, you fill in the

24 blanks, and it prints you out that report, correct?

25   A. Fill out the narrative along with filling

228

1    out the blanks, yes.

2        Q.   Okay.  Would there be any reason why they

3    wouldn't have been printed out from that program and

4    kept in a file or something like that?

5        A.   The only reason that I could think of is

6    that I was only required to turn in anything over a

7    drug search.

8        Q.   So is it your understanding and your

9    belief, in looking through those documents, that

10   those are not all of the canine deployment reports

11   for you and Spike?

12       A.   It's my understanding that if you say

13   there's only 65 in here, then there is absolutely no

14   way whatsoever they're all in here.

15       Q.   I believe 72 deployments is what I counted

16   in there.

17       A.   Seventy-two, that is incorrect.

18       Q.   And 13 total bites sounds about right to

19   you?

20       A.   That number does, yes.

21       Q.   And six apprehensions without bites?

22           MR. WEISENFELDER:  I'm going to object.

23   He's answered that at least twice.

24       A.   That sounds low to me.

25       Q.   That sounds low to you.  What number would

Barlow Reporting & Video Services, LLC
(859) 261-8440

229

1    you say that would be then?

2            MR. WEISENFELDER:  Object.  If you can

3        answer, go ahead.

4        A.    I believe it's over 10, around 10 or more.

5        Q.    Okay.  But you think approximately 10 is

6    where your apprehensions without bites would be?

7        A.    Ten or more.

8            MR. BRANNON:  And, again, we're just

9        going to make a document request for this CATS

10       program.  I'm sure we'll facilitate it in some

11       way, shape or form.

12           MR. WEISENFELDER:  Make the request.

13       Q.    I'm going to refer you back to what was

14   marked as Springboro Exhibit 15.  You had looked

15   through the S14 prior, correct?

16       A.    Yes.

17       Q.    And do you believe that that contains all

18   of the bite reports except for the -- or use of

19   force or deployment reports for all the incidents in

20   which you and Spike were involved where a bite

21   occurred except for the Kerns incident, the Campbell

22   incident and the Gemperline incident; does that look

23   like a complete set of those records?

24       A.    The Campbell incident is right on top.

25       Q.    Or, I'm sorry, Campbell is there.

230

1        A.    Yes, I'll agree to that.

2        Q.    Those appear to be true and accurate

3    copies of the deployment reports, supervisors'

4    reports that detail each of those incidents?

5        A.    Yes.

6        Q.    And you believe those records to be true

7    and accurate?

8        A.    Yes.

9            MR. WEISENFELDER:  Let me make a

10           suggestion.  We're not going to finish today.

11           Why don't we plan on quitting about 5:00,

12           because I have a feeling the documents you

13           request, depending on what's there and what's

14           available may necessitate another trip back

15           anyway.  And given the hour, we're not going

16           to finish today anyway.

17           MR. BRANNON:  I agree.

18           MR. WEISENFELDER:  My suggestion is,

19           let's just stop at 5:00 and we'll have to pick

20           another day.  Is that agreeable?

21           MR. BRANNON:  That's fair.

22           MR. WEISENFELDER:  Let's take a break.

23                   (OFF THE RECORD)

24   BY MR. BRANNON:

25       Q.    Getting back to -- I believe it's S17, the

Barlow Reporting & Video Services, LLC
(859) 261-8440

231

1    Springboro policy that was, I'll say, quasi adopted?

2         MR. WEISENFELDER:  I'm going to object to

3    the form.

4         Q.   We'll just call it S17, which was the use

5    of canine force policy that you and the Chief

6    discussed and the policy that you proposed to him.

7    Under that policy, would you agree that that policy

8    requires an officer to keep a canine on a leash and

9    under complete control at all times?

10        A.   Would you tell me where you're looking?

11        Q.   Let's strike that question and try this a

12   different way so we don't end up looking through

13   this document all afternoon.  Do you believe that it

14   was your responsibility as a canine officer at the

15   time of both the Campbell and Gemperline bite

16   incidents to keep your canine on a leash and under

17   complete control at all times?

18        MR. WEISENFELDER:  Object to the form.

19   Go ahead.

20        A.   He was not required to be on a leash at

21   all times, no.

22        Q.   Okay.  But you were required to keep him

23   under physical control at all times?

24        A.   Yes.

25        Q.   When could you use or deploy your canine

232

1  for assisting in the arrest or prevention of the

2  escape of a person?  When could you deploy your

3  canine, to your understanding, during the times of

4  both of these bite incidents?

5       A.   If the person was suspected of committing

6  a felony or a crime of violence and then was

7  fleeing, arrest of officers or fleeing from the

8  officers and if the person posed a threat to

9  themselves, public or other officers, and if the

10 person was actively resisting arrest by the means of

11 evading arrest.

12      Q.   Would you agree that a canine should not

13 be deployed in situations of minor complaint

14 situations?

15      A.   Yes.

16      Q.   Misdemeanor incidences mainly?

17      A.   Yes.

18      Q.   Do you believe that a canine can be

19 deployed in any felony situation?

20           MR. WEISENFELDER:  Objection.  Go ahead.

21      A.   No.

22      Q.   So your understanding is just because it

23 may be a felony situation does not mean that you

24 should deploy a canine, correct?

25      A.   Correct.

233

1     Q.    Can you give me some examples of that?

2     A.    A felony theft where a loss prevention

3  officer at a store somewhere has the person stopped

4  would not be an ideal time to deploy a canine.

5     Q.    Meaning when the suspect is under control,

6  correct?

7     A.    Or is not fleeing, correct.

8     Q.    Okay.  Is there any situation, felony

9  situation, where there's a suspect who's not under

10  the care, custody and control of another where the

11  canine should not be deployed?

12     A.    That could be numerous.  Anytime the

13  person does not flee the scene after committing a

14  felony and evade police, that would apply.

15     Q.    Okay.  And what I'm trying to understand

16  here is when it is okay, or what's your

17  understanding of when it was okay to deploy a canine

18  as an officer of the City of Springboro in a felony

19  situation, how would you determine whether or not

20  you could deploy that canine or not?

21     A.    If that person committing a felony, or

22  suspected of committing a felony, had fled the scene

23  and was actively evading the police by means -- I'm

24  sorry, resisting arrest by means of flight or

25  evasion.

234

1    Q.    Is there any situation where the canine

2    should be deployed where it's involving a

3    misdemeanor offense and the person's evading the

4    police or resisting capture?

5    A.    After the commission of a crime of

6    violence.

7    Q.    Okay.  Would a crime of violence be

8    domestic violence?

9    A.    Yes.

10   Q.    Would it also be assault?

11   A.    Yes.

12   Q.    So in a misdemeanor assault, you believe

13   that it was okay, with what you were told from

14   Springboro, to go ahead and deploy the canine,

15   correct?

16   A.    If the other factors were involved, yes.

17   Q.    Meaning if the person, for example, fled

18   the scene and was trying to hide?

19   A.    Correct.

20   Q.    Would you agree with me that a canine

21   should not be used to apprehend anyone suspected to

22   be merely under the influence of drugs or alcohol if

23   no other crime's involved?

24   MR. WEISENFELDER:  Objection.  Go ahead.

25   A.    If no other crime is involved, yes.

235

1    Q.    And is it your understanding -- back to

2  your use of force reports, just so we're clear on

3  this -- that every time a use of force report -- or

4  every time the canine is deployed, you have to file

5  a use of force report or not, or just a deployment

6  report?

7    A.    Can you give me the first half of the

8  question again?

9    Q.    Okay.  Was it your understanding with the

10  City of Springboro that every time the canine was

11  deployed in the field, that you had to file a use of

12  force report or just a deployment report?

13    A.    Just the deployment unless there was a

14  physical apprehension.

15    Q.    Okay.  And we are talking about two

16  different reports, correct?

17    A.    Correct.

18    Q.    They are not interchangeable terms?

19    A.    No.

20    Q.    Before deploying your canine for

21  Springboro, were you required to get any supervisory

22  approval to deploy your canine or was that decision

23  in your discretion?

24    A.    The ultimate decision to deploy the canine

25  was left to the handler.

236

1      Q.    Okay. Did they require you prior to that,

2 though, to get supervisor approval?

3      A.    No.

4      Q.    Knowing that you could overrule the

5 supervisor's decision?

6      A.    If there was a supervisor on duty.

7      Q.    Okay. But you were not required to get a

8 supervisor's approval prior to deploying your

9 canine?

10      A.    No.

11      Q.    And that's true in a track situation,

12 correct?

13      A.    Correct.

14      Q.    Did you get approval from any supervisor

15 prior to deploying Spike in the Campbell incident,

16 or prior to deploying Spike in the Campbell

17 situation?

18      A.    No.

19      Q.    Did you get any supervisor's approval

20 prior to deploying Spike in the Gemperline

21 situation?

22      A.    Yes.

23      Q.    Who did you get that approval from?

24      A.    Sergeant Zimmaro.

25        MR. WEISENFELDER:   Sergeant who?

237

1           THE WITNESS:  Zimmaro.

2      Q.    In that situation with Ms. Gemperline, did

3  Sergeant Zimmaro tell you to go get your dog or did

4  you ask if you could deploy your dog?

5      A.    He told me that he needed my dog.

6      Q.    And what did you understand that to mean?

7  Was that an order for you to go deploy your dog?

8      A.    It was not an order, no.  It was that he

9  merely needed the use of the dog.

10      Q.    So was it your decision then to deploy the

11  dog in that situation with Ms. Gemperline?

12      A.    After understanding why he needed the dog,

13  yes.

14      Q.    Tell me about the importance of creating a

15  perimeter prior to deploying a dog in a tracking

16  situation.

17      A.    The perimeter is important to keep

18  basically -- I'll try to explain this as simply as

19  possible, but what you want to do is make the person

20  go to the ground and stop.  In other words, if

21  someone has a 10-minute jump on you, they run, it

22  takes you 10 minutes to get there, get the dog out,

23  you will never catch them if they don't ever stop.

24  The key is to get them to stop with the use of the

25  perimeter.

238

1      Q.    Okay.  How important is it in doing a

2  track that a perimeter is created?

3      A.    Fairly important.

4      Q.    Are tracks most successful when a

5  perimeter is created?

6      A.    Yes.

7      Q.    And in both of the Campbell and Gemperline

8  incidents, would you deem both of those a track

9  scenario?

10      A.    Yes.

11      Q.    And in both of those incidents, Spike was

12  released for a track, correct?

13          MR. WEISENFELDER:  Objection as to --

14      Q.    Is that correct, to perform a track?

15          MR. WEISENFELDER:  I'll object to the

16      earlier form.  Go ahead and answer the

17      question.

18      A.    The dog was never released, he was always

19  on line.

20      Q.    Okay.  But he was -- perhaps my poor

21  choice of wording late in the day, the dog was

22  deployed to perform a track in both the Gemperline

23  and Campbell situations; is that correct?

24      A.    That is correct.

25      Q.    Do you know if the use of force reports

239

1  that were created when Spike did a bite, if they

2  were ever forwarded on to anybody when Spike

3  apprehended by way of a bite?

4      A.   To anyone?

5      Q.   Correct, at Springboro, at the Springboro

6  Police Department.

7      A.   Yes, they had to be.  A supervisor over me

8  had to first complete the use of force.  I've never

9  completed a use of force.  Then that supervisor

10 passed it on to the operations lieutenant who then

11 passed it to either the administrative lieutenant or

12 the Chief.

13     Q.   Okay.  Do you believe that that was done

14 in each of these 13 bite incidents where Spike bit

15 somebody?

16     A.   Yes.

17         MR. WEISENFELDER:  Is this a good place

18     to stop?

19         MR. BRANNON:  Let me try to find a

20     specific document, but I think we're pretty

21     close to a good place to stop.

22         (Deposition Exhibit S9 was marked for

23 identification.)

24     Q.   Let me hand you what I have marked as S9.

25 I'm going to represent to you that this is an

240

1    article from the Springboro Sun that was in that

2    newspaper on October 16, 2008. Are you familiar at

3    all with this article that was printed in the paper,

4    have you ever seen it before?

5          A.   Yes.

6               MR. WEISENFELDER:  Note an objection to

7          the article and to the fact that the -- at

8          least according to the article, it's

9          incomplete.  It's not the complete article.

10              MR. BRANNON:  Yeah, and I just have a

11         question.

12         Q.   Apparently in this article, the reporter

13   had questioned the Chief, Kruithoff, and Kruithoff

14   responded that both you and Spike have eight hours

15   of team training once a week with other police dogs

16   from Warren County. Was that a true statement, to

17   your understanding, knowing that prior to both the

18   Campbell and Gemperline bites that there was no

19   training within that 30-day time period?

20              MR. WEISENFELDER:  Objection as to the

21         characterization.  Go ahead and answer.

22         A.   I don't know if the Chief was aware of the

23   truth or not, but the statement is inaccurate.

24         Q.   Okay.  Were you ever present when the

25   Chief spoke to this reporter or this newspaper or

241

1  anybody from this newspaper regarding this incident?

2      A.   No, I was not.

3      Q.   But you do believe that that statement is

4  incorrect, correct?

5      A.   Correct.

6      Q.   On the dates of the October 21, 2007 and

7  October 11, 2008 dates, was Spike in good health?

8      A.   Yes.

9      Q.   Okay.  He wasn't having any physical

10  problems or anything that would have prohibited him

11  from performing his duties, correct?

12     A.   Correct.

13         MR. BRANNON:  Tell you what, we're

14     reaching a stopping point, or what would be a

15     good stopping point.  Let me just take two

16     minutes and talk with Sam real quick.

17              (OFF THE RECORD)

18         MR. BRANNON:  Let's go ahead and break

19     for the day, knowing that we're going to

20     continue these depositions.

21         MR. WEISENFELDER:  What we'll do is show

22     that the deposition has been continued in

23     progress.  We'll turn the original exhibits to

24     the custody of the court reporter.

25         MR. BRANNON:  And what I've requested is

Barlow Reporting & Video Services, LLC
(859) 261-8440

1        that I'm going to continue to use the exhibits

2        hopefully for all the witnesses, that she just

3        keeps bringing them back for each one.

4            MR. WEISENFELDER:  That's fine.

5            (DEPOSITION CONTINUED IN PROGRESS)

6            (Deposition concluded at 4:49 p.m.)

7

8

9      _____       _____

10    OFFICER NICK CLARK            DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Errata Sheet

SAMUEL A. CAMPBELL                                    PLAINTIFF

    vs.

THE CITY OF SPRINGBORO, OHIO,                DEFENDANTS
ET AL.


DEPONENT: OFFICER NICK CLARK
DATE: FEBRUARY 4, 2010

| CORRECTION | LINE | PAGE |
|------------|------|------|
|            |      |      |
|            |      |      |
|            |      |      |
|            |      |      |
|            |      |      |
|            |      |      |
|            |      |      |
|            |      |      |
|            |      |      |
|            |      |      |
|            |      |      |

_____                    3/4/10
    Signature                                        Date

243

1                                    )

2     STATE OF OHIO                  )

3                                    )

4         I, Mindy Davis, Notary Public for the State of

5     Ohio, do hereby certify:

6         That the witness named in the deposition, prior

7     to being examined, was by me duly sworn;

8         That said deposition was taken before me at the

9     time and place therein set forth and was taken down

10    by me in shorthand and thereafter transcribed into

11    typewriting under my direction and supervision;

12        That said deposition is a true record of the

13    testimony given by the witness and of all objections

14    made at the time of the examination.

15        I further certify that I am neither counsel for

16    nor related to any party to said action, nor in any

17    way interested in the outcome thereof.

18        IN WITNESS WHEREOF I have subscribed my name

19    and affixed my seal this 18th day of February, 2010.

20                    _____

21                    MINDY DAVIS

22                    Notary Public

23                    My Commission expires: 04/03/11

24

25