

## Springboro Division of Police

**LT Jonathan D. Wheeler**
Commander of Administrative Services
320 W Central Avenue
Springboro, Ohio 45066

Phone: (937) 748-4369
Fax:    (937) 748-3214
Email: jon@cityofspringboro.com

## DEPARTMENT MEMORANDUM

To:       Chief Kruithoff

From:     LT Wheeler

Date:     December 12, 2008

Subject:  Review of Chelsie Gemperline Case
          Incident no. 0807507

Chief,

I have reviewed the basic reports, officer narratives, and in-car video of the Springboro Police Department and the reports and statements of the Warren County Sheriff's Office surrounding the complaint and subsequent arrest of Chelsie Gemperline. The following is a synopsis of those reports, my post incident review and interviews, and an analysis of department actions.

### Incident Synopsis

On October 11th, 2008 Springboro Police Officers were dispatched to the address of 128 Deer Trail to investigate a large, underage-drinking party. According to Officer Nick Clark's statement, he witnessed a number of individuals "drinking beer" and "being quite loud" outside the residence on the back deck of the house.

Officer Clark shined his light into the crowd and many of them ran back into the residence ignoring his orders to stop. He requested assistance from other units to help sort out the situation. Other officers responded including units from the Warren County Sheriff's Office.

Several subjects were found to be intoxicated inside and outside the residence. There were a number of uncooperative people at the scene. For example, Clark stated in his narrative that at one point he heard a "loud crashing sound" come from the garage area and observed a male climbing a privacy fence. Officer Hawk then came across the radio stating he was in foot pursuit (of two males). Officer Clark can be heard on his camera mic ordering one subject to stop. The subject ignored his order and ran into the woods. Hawk stated in his narrative that he also



DEPOSITION
EXHIBIT
G33

DEFENDANTS' DISCOVERY
RESPONSES 00410

shouted warnings identifying himself. He stated he "...gave chase over fences, through backyards, and into a pond".

One of the males was arrested. The other, Adam Gemperline, was charged the following day.

Officers soon discovered that the owners of the property were away on vacation and had made arrangements for a young lady to watch the house. The 18-year-old girl invited a large number of teenagers and young adults over to the residence for a party. Officers found the residence to be littered with beer cans and bottles.

Well into the investigation, Chelsie Gemperline was found intoxicated and hiding in the residence. After locating her, officers on the scene stated Miss Gemperline was belligerent and uncooperative. She was taken into custody by Sgt. Zimmaro for Underage Consumption. However, due to her behavior and the size of the party, Deputy Apking of the Warren County Sheriff's Office took custody (and criminal charges) of her to free Sgt. Zimmaro to deal with other issues.

At approximately 0256 (per Clark's video recording) Sgt. Zimmaro reported to Clark that Gemperline had escaped from a Warren County cruiser. He told Clark, "I need your dog".

According to two Warren County Deputies statements, Miss Gemperline later admitted at the hospital that she was able to get a hand out of the handcuffs and roll the back window down to get out of the car. She said she then ran into the woods.

Note: After being notified of her escape, Officer Clark can then be heard saying something to the effect of, "Jeez Louise...[unintelligible] this bitch,... I've had it."

Shortly after, a comment is made from an unknown officer about her "trying to get the cuffs in front of her". Officer Clark replied, "Probably, she's gonna get a nice rude awakening here in one second or two,.... it's not gonna feel very good".

A track was initiated with Sgt. Zimmaro and Deputy Apking assisting Officer Clark. The track proceeded through several yards in the neighborhood.

After several minutes of tracking, Officer Clark got ahead of Sgt. Zimmaro and Deputy Apking. During this part of the track Clark noted in his statement that Spike was "air Scenting" toward the back deck of a residence. In his statement and subsequent interview with me, Clark said he shortened his lead and checked the deck but found no one there. He concluded that Spike was detecting a scent from an open window of the residence. He decided to turn back and head toward the other officers to end the search. As he passed by a child's playhouse in the back yard he stated Spike darted to his right and into the house. He heard screams and looked inside the playhouse where Spike was "holding solid" on Miss Gemperline's right leg. Clark then pulled Spike off the bite. (See Clark's interview for detailed information on track and K9 engagement).

Miss Gemperline sustained puncture wounds to her upper right thigh. She was carried out to the street curb where she was attended to by CCFD.

DEFENDANTS' DISCOVERY
RESPONSES 00411

Officer Clark's in-car video microphone recorded most of the incident. However, there are two periods of time when the microphone is not functioning. One of those periods covers several minutes and includes the portion of time when Miss Gemperline was actually bitten.

As a result of the incident several individuals were charged with alcohol related offenses. Chelsie Gemperline was charged with Felony Escape, Resisting Arrest, Underage Consumption, and Disorderly Conduct.

**Post-Incident Investigation**

During the last week of October I contacted John Brannon, a Master K9 trainer, to get direction and guidance on the case. Mr. Brannon reviewed portions of the case and suggested areas where I should focus my review, such as past training for the K9.

On 12/9/08 I conducted a recorded interview with Nick Clark on station regarding the Gemperline Incident.

In that interview I requested that he go back over the facts of the incident and I asked specific questions about apparent contradictions between his statement of facts and those of Sgt. Dulle (WCSO), as well as statements he made that were recorded on his in-car camera. (See attached interview narrative.)

On 12/11/08 I contacted Brian Woods, who was the trainer that certified PSD Spike for service in 2005. I asked Mr. Woods to clarify for me if Spike was trained as a "bark and hold" K9. Mr. Woods stated yes, that he was.

I asked him to explain this term "bark and hold" and how it would relate to a K9 track for a suspect who had fled. He stated to me that if Spike locates a subject on a track, he is trained to alert by barking as long as the suspect doesn't move. He said if there is movement on the part of the suspect the dog will bite to hold the suspect, to keep him from escaping or fighting. I asked how much movement would it take for a bite to occur. He stated any aggressive movement toward the dog, or any scooting or moving away from the dog could result in a bite.

Mr. Woods did not seem to believe Spike's actions were problematic. However, he did offer to review the reports and render a more comprehensive perspective of the incident, if we desired. (After consideration I did send the incident reports and narratives for his review.)

On 12/16/08 I contacted Major John Newsome of the Warren County Sheriff's Office to attempt to speak with Sgt. Dulle regarding his statement. Arrangements were made for Sgt. Dulle to meet on December 19th at SPD for an interview.

During the interview with Sgt. Dulle, I asked him to recount some of his observations from that morning. I also asked him specific questions about a perceived contradiction between his statement of facts, and Officer Clark's statement. (See attached interview narrative).

DEFENDANTS' DISCOVERY
RESPONSES 00412

As a result, I believe this issue was a misunderstanding about what was said, and not a contradiction in facts.

On 12/31/08 I Contacted Mason P.D., and requested to talk with their K9 Officers regarding County-wide training methods. I made arrangements to talk with Officer Matt Hayes on 1/3/08.

On 1/3/08 I contacted Off. Hayes by phone. We discussed the basic makeup of the group and its' training routines.

The group is somewhat formalized, in that it has an elected president (John Patrick ODNR retired). Matt told me there is no written training manual for the group, but stated they do train within NAPWDA standards and adhere to its' recommendations.

I asked Officer Hayes to give me his interpretation of a "bark and hold" vs. "bite and hold" and how the group generally trains when it comes to these concepts. He told me it varies for each officer depending on the type of dog they have and how that dog was originally trained. He said they have a mix in the group, but most of the dogs are "bite and hold" dogs. (Spike was trained as a "bark and hold" dog).

Officer Hayes said a "bark and hold" dog should not bite a passive/still subject, but will bite if that subject moves. I asked him how much movement. He said it depends on the dog but it doesn't take much movement for a bark and hold dog to engage a subject.

On the other hand officer Hayes stated a "bite and hold" dog will bite and hold a subject when he finds them, unless the handler calls him off before he reaches the subject.

I asked Matt about certification testing and two important functions that I understood a dog must be able to demonstrate. First, that the dog can recall on command (which is to say that the dog will come back after being deployed if commanded to do so by the handler before reaching the designated decoy). Further, that the dog demonstrates that he will disengage from a bite quickly when commanded by the handler. He confirmed that these are necessary functions that the dog must demonstrate to pass certification.

During our conversation I asked Matt what type of dog he had. He said his is a "bite and hold" dog. I asked if that has bearing on the kind of searches he is willing to perform; i.e., searching for lost elderly subjects or children. He said that he has performed these types of searches but uses extreme caution. He said he will shorten the lead to five feet so the dog is almost beside him to prevent a bite in these situations. He said has performed approximately thirty tracks with his current dog in last several years and had two bites.

I asked Matt how many dogs in the group are certified for drug searches only. He stated two; the Warren County S.O. canine, and U.S. Customs canine from the DHL facility.

On 1/7/09, In light of the information I received from Officer Hayes, I conducted a short follow-up interview with Officer Clark to question him as to why it was necessary to physically pull Spike offof the bite (as he stated in the interview on 12/9/08) instead of calling him off.

DEFENDANTS' DISCOVERY
RESPONSES 00413

Clark stated that Spike was in an awkward position with his head in a confined space. He said he was not sure where Spike had bit Miss Gemperline so he grabbed his collar and performed a "choke off". He stated he did this to prevent further injury because Miss Gemperline was screaming and moving.

**Analysis of Police Actions**

The Decision to Search

The decision to use the canine to search for Chelsie Gemperline was a correct decision. Chelsie Gemperline was intoxicated and had been placed under arrest. Not only did she commit a felony by escaping from the police car, but also put her own safety at risk because of her condition. She was in an unfamiliar area in the middle of the night, and also in proximately to a pond that one subject had already jumped into while running from an officer. She needed to be found quickly.

Deployment of the Canine

Based on Officer Clark's statement and the audio recordings, it seems that he was conducting the search in a reasonable manner. Furthermore, when he entered the area where the dog was "air scenting", he increased control of Spike by shortening the lead. However, he also stated that Spike "...lunged to the right" and into the playhouse before Clark could react. This raises the question: was the dog under sufficient control? If he was, can an incident such as this ever be completely prevented?

Nick stated in his interview with me that Spike is trained to bite on a track. In talking with experts in the police canine field I confirmed that even "bark and hold" dogs will bite individuals considered to be passive subjects, if they exhibit movement that is perceived by the dog to be aggressive or evasive. This type of training produced an unfortunate result in this case.

The department should carefully consider this point to determine if our current K9 program fits the needs of our city. Does the type of dog we use, along with the existing philosophy of training and deployment of the dog present risks that out-way the benefits.

Inappropriate Comments

Officer Clark made two inappropriate comments which are referenced in my report. Although they were not made in the presence of the public, at least one comment was likely heard by another officer, and both were captured in his in-car camera. In light of the situation that occurred later that morning, the comments are reason for concern.

During an interview with Off. Clark he expressed to me that he would never intentionally allow Spike to bite someone out of frustration or to punish them. I believe Nick was truthful with that statement. However, these type comments made by a police officer cast an unprofessional light

DEFENDANTS' DISCOVERY
RESPONSES 00414

to say the least. Additionally, in the case of the second comment where Officer Clark stated "She's gonna get a nice rude awakening...it's not gonna feel very good", the statement could easily raise questions as to his intentions and "clear-headedness" while performing his duties that evening.

DEFENDANTS' DISCOVERY
RESPONSES 00415