IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SAMUEL A. CAMPBELL and          :      Case No. 1:08-cv-737
CHELSIE GEMPERLINE,             :
                                :      Chief Judge Susan J. Dlott
                Plaintiffs,     :
                                :      ORDER GRANTING IN PART AND
        v.                      :      DENYING IN PART DEFENDANTS'
                                :      MOTIONS FOR SUMMARY
                                :      JUDGMENT AS TO THE CLAIMS OF
THE CITY OF SPRINGBORO, OHIO,   :      SAMUEL CAMPBELL AND CHELSIE
et al.,                         :      GEMPERLINE; DENYING AS MOOT
                                :      DEFENDANTS' MOTION TO STRIKE
                Defendants.     :      THE AFFIDAVIT OF PLAINTIFFS'
                                :      EXPERT, MICHAEL D'AMICO; and
                                :      GRANTING IN PART AND
                                :      DENYING IN PART DEFENDANTS'
                                :      MOTION TO STRIKE THE
                                :      AFFIDAVIT OF PLAINTIFFS'
                                :      EXPERT, KYLE K. HEYEN


        In this civil rights action against the City of Springboro, Ohio, City Manager Christine

Thompson, Chief of Police Jeffrey Kruithoff, Police Officer Nick Clark, and Jane or John Does,

Plaintiffs Samuel A. Campbell and Chelsie Gemperline seek relief for injuries they sustained

when they were mauled by the same police dog during the course of their arrests in unrelated

incidents.  In their Second Amended Complaint, Plaintiffs assert fourteen causes of action under

federal and Ohio law.  Before the Court are the Motion for Summary Judgment on Behalf of

Defendants as to the Claims of Plaintiff, Samuel A. Campbell (Doc. 58) and the Motion for

Summary Judgment on Behalf of Defendants as to the Claims of Plaintiff, Chelsie Gemperline

(Doc. 59).  The Court also considers, to the extent they relate to Defendants' Motions for

Summary Judgment, Defendants motions to strike the affidavits of two expert witnesses upon who opinions Plaintiffs rely.

For the reasons stated below, the Court **DENIES as moot** Defendants' Motion to Strike the Affidavit of Plaintiffs' Expert, Michael D'Amico (Doc. 74), and the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Strike the Affidavit of Plaintiffs' Expert, Kyle K. Heyen (Doc. 75).  Finally, the Court **GRANTS in part** and **DENIES in part** Defendants' Motions for Summary Judgment.  (Docs. 58, 59.)  The Court **DENIES** summary judgment as to Plaintiffs' claims against Officer Clark for excessive force in violation of the Fourth Amendment, brought under 42 U.S.C. § 1983, and for assault and battery under Ohio law.  The Court also **DENIES** summary judgment as to Plaintiffs' § 1983 claims for failure to train and/or supervise against the City of Springboro and Chief Kruithoff.  The Court **GRANTS** summary judgment to Defendants as to all remaining claims.

I.      **BACKGROUND**

A.      **The City of Springboro Police Department Canine Unit**

Springboro is a somewhat affluent city with a rather low crime rate.  (Kruithoff Dep. 12:2-9.)  The Springboro Police Department (SPD) sees only a few violent crimes a year.  (Kruithoff Dep. 12:15-19.)  Defendant Kruithoff has been Springboro's Chief of Police since April 2002.[1]  (Kruithoff Dep. 4:21-5:1.)  In keeping with the size of the town, the SPD is a small police department made up of a staff of approximately thirty people.  (*Id.*)  The SPD command staff consists of the Chief of Police, a Lieutenant in charge of Operations, a Lieutenant in charge

_____

[1] Prior to that time, he served as the Chief of Police and Director of Police and Fire Services for the City of Battle Creek, Michigan.  (Kruithoff Dep. 5:2-13.)  He has worked in law enforcement in various capacities since 1972.  (*Id.* at 5:13-25.)

2

of Administrative Services, and four Sergeants.[2]  During most of the time period at issue in this case, those positions were filled by Chief Kruithoff, Lieutenant Timothy Parker, Lieutenant Jonathan Wheeler, Sergeant Aaron Zimmaro, Sergeant Dan Bentley, and two other sergeants.

In 2002, when Kruithoff became the SPD Chief of Police, the SPD did not have a canine unit.  (Clark I Dep. 61:18-20.)  Instead, the SPD relied on assistance from other agencies when police dogs were needed for narcotics investigations and tracking purposes.  (Kruithoff Dep. 14:22-15:13; Clark Dep. I 63:15-24.)  Believing that a canine program could be a useful public relations tool, Kruithoff sent out a department memorandum to see if any officers were interested.  (Kruithoff Dep. 13:4-14:21.)  The SPD ultimately selected Officer Nick Clark to form the department's first canine unit.  (Kruithoff Dep. 15:14-20; Clark I Dep. 63:3-64:22.)  Chief Kruithoff placed Officer Clark in charge of selecting a dog and a training program.  (Clark I Dep. 66:18-19.)  The only instruction Officer Clark was given as far as choosing a dog was to get a dual purpose dog, meaning a dog that could be trained in both narcotics detection and patrol work.  (*Id.* at 68:14-69:13.)   Based on recommendations from another officer and several members of the Miami Valley Police Canine Association, Officer Clark chose a dog named Spike[3] from Lynwood Kennels, a company that specializes in training canines and their handlers for law enforcement purposes.  (*Id.* at 66:20-67:2; Woods Dep. 10:20-23.)  The canine unit consisting of Officer Clark and Spike was established in 2005 and operated until the fall of 2008 when it was suspended and subsequently decommissioned.

---

[2] *See* Springboro: Police Command Staff,
http://www.ci.springboro.oh.us/police-command-staff.html (last visited Mar. 18, 2011).

[3] Spike is a Belgian Malinois, which is similar to a German Shepherd, but smaller in stature and a little faster.  (Clark I Dep. 69:14-24.)

1.      **Training and Certification**

Lynwood Kennels provided the initial core training – a 300-hour canine handling course that Officer Clark and Spike completed in May, 2005.  (Clark I Dep. 67:4-10, 72:12-74:13; Wheeler Aff. ¶ 3, Ex. A.)  After completing that training, Spike and Officer Clark sought state certification.  (Clark I Dep. 74:5-75:3.)  According to Officer Clark, the State of Ohio requires that canine units be regularly certified by the Ohio Peace Officer Training Commission and the Office of the Attorney General ("Ohio Training Commission") in order to remain in compliance. (*Id*. at 110:2-23.)

On May 12, 2005, Officer Clark and Spike received two certificates from the Ohio Training Commission.  The first signified completion of evaluations for criminal apprehension, canine control, and canine searches.  (Wheeler Aff. ¶ 7, Ex. C.)  The second certification signified completion of evaluations for tracking, article search, and the detection of marijuana, cocaine, heroin, methamphetamines, and their derivatives.  (*Id*. ¶ 9, Ex. D.)  Both certifications were good for approximately two years.  On the same date that they received their initial state certification, Officer Clark and Spike also received accreditation from the North American Police Work Dog Association[4] for narcotics detection and for other skills referred to as "Utility Phases," including obedience, article search, area search, tracking, building search, and aggression control.[5]  (*Id*. ¶ 5, Ex. B.)

--------------------------------------------------

[4] The North American Police Work Dog Association is a group of master trainers that conducts seminars around the United States and provides additional certifications for handlers. (Clark I Dep. 13:2-7.)

[5] On August 23, 2006, Officer Clark and Spike were awarded another certificate of accreditation from the North American Police Work Dog Association for tracking, building search, article search, area search, obedience, aggression control, and narcotics detection.  (Wheeler Aff.

The SPD deployed Spike in the field immediately after he became state certified.  (Clark I Dep. 76:10-20.)  Officer Clark was responsible for making sure that Spike fulfilled training requirements.  (*Id.* at 82:3-5.)  Officer Clark believed that he and Spike were supposed to complete eight hours of maintenance training every other week to make sure Spike stayed sharp and did not develop bad habits.  (*Id.* at 82:6-83:12; Woods Dep. 35:20-39:12.)  Brian Woods, the operator of Lynwood Kennels and a master trainer, testified that the monthly maintenance training should encompass all disciplines, including narcotics detection, tracking, obedience, bite training, and reasonable force training with a particular focus on any problem areas.  (Woods Dep. 36:15-37:12.)  Without such training, the dog's level of obedience may erode overtime and the dog may not respond as well to the handler's commands.  (*Id.* at 38:7-17.)  While Woods recommends that handlers take their dogs through sixteen hours of maintenance training per month, he noted that the amount of monthly training necessary to maintain compliance may vary from dog to dog.  (*Id.* at 38:19-39:15.)

The evidence shows that Officer Clark and Spike attended three training programs in 2006 and 2007.  During the summer of 2006, they attended a five-day North American Police Work Dog Convention in northern Ohio.  (Clark I Dep. 88:1-17.)  On November 17, 2006, they received a certificate of completion of forty hours of advanced canine law enforcement training at the Miami Valley Police Canine Association.  (Wheeler Aff. ¶ 11, Ex. E.)  They also attended a forty-hour training workshop at Lynwood Kennels sometime in 2006 or 2007.  (Clark I Dep. 89:2-20.)

---

¶ 13, Ex. F.)

Nonetheless, Officer Clark admitted that he and Spike did not always engage in maintenance training on a regular basis.  For example, Spike received no training between September 19, 2007 and October 21, 2007, the date of the Campbell incident.  (Clark I Dep. 188:2-23.)  Spike also received no training for over thirty days prior to the Gemperline incident, which occurred on October 11, 2008.  (*Id*. at 188:24-189:25.)  Officer Clark testified that his supervisors did not allot sufficient time for training although they were aware that Spike's training was not current.  (*Id*. at 190-193.)  Prior to both of the bite incidents at issue in this case, Officer Clark notified his supervisors that he was unable to keep up with the maintenance training and repeatedly requested that they allow him time to attend training sessions, but his requests were denied.  (*Id*. at 190:1-194:10.)  At some point, Officer Clark sent a memo to Lieutenant Parker and Lieutenant Wheeler to notify them that his sergeants were not authorizing appropriate training time for him and that they had denied his requests to attend training workshops because they did not want him to work overtime.  (*Id*. at 190:1-20, 199:21-200:8.)  After the Campbell incident occurred, Officer Clark continued to complain about his inability to complete the maintenance training.  (*Id*. at 201:17-24.)  He gave inconsistent testimony regarding the responses he received.  At one point during his deposition, he stated that his supervising sergeants sometimes designated more time for him to train after he complained.  (*Id*. at 199:10-16.)  However, when asked if anything in regard to training changed after the Campbell incident, Officer Clark responded "no."  (*Id*. at 201:17-20.)  He also testified that he continued to voice complaints about lack of training time up to the Gemperline incident.  (*Id*. at 201:17-24.)

6

In addition to failing to keep up with maintenance training, Spike's state certifications lapsed for several months during the summer of 2007. The renewal deadlines for those certifications were April 28 and May 12, 2007. (*See* Wheeler Aff. Exs, C, D, H, I; Clark Dep. I 111:18-25.) Spike was not actually re-certified until September 26, 2007.[6] (Wheeler Aff. ¶¶ 17-19, Exs. H, I.) During his deposition, Officer Clark testified that a police dog cannot be in service in Ohio unless the certifications are renewed. (Clark I Dep. 111:14-17.) However, he interpreted the "renewal due date" posted on the certification forms not as a deadline, but rather as the earliest date upon which renewal can occur:

> Q.    Do you know why there's two different renewal dates on those certificates?
> A.    I have no idea.
> Q.    Okay. But it was your understanding that both of these needed to be renewed every two years?
> A.    My understanding is that's the only time that you can. You can't have it renewed before that date.
> Q.    Okay. Meaning you can't do the work to have it renewed before that date or how does that work when you go to renew?
> A.    You have to contact the state evaluator. The state evaluator comes to renew your certification and review you, but they will not do it before that date.

(*Id*. at 110:24-111:13.)

During the lapse in Ohio certification, Spike was deployed in the field approximately ten times. (Clark II Dep. 104:1-11.) Officer Clark testified that within that time period, he notified Chief Kruithoff and Lieutenant Parker that the certifications had expired. (*Id*. at 104:12-22.)

_____

[6] On September 26, 2007, Officer Clark and Spike received two certificates from the Ohio Training Commission signifying their re-certification in (i) criminal apprehension, canine control, and canine searches, and (ii) tracking, article search, and detection of marijuana, cocaine, heroin, methamphetamines, and their derivatives. (Wheeler Aff. ¶¶ 17-19, Exs. H, I.) Also on September 26, 2007, Officer Clark and Spike received a third certificate of accreditation from the North American Police Work Dog Association for narcotics detection. (Wheeler Aff. ¶ 15, Ex. G.)

Nonetheless, they decided to continue to deploy Spike.  (*Id*. at 104:23-25.)  Spike's re-certification occurred prior to the dates of the two bite incidences at issue in this case.

2.    **SPD's Canine Policy**

Defendants produced two separate documents that they claim represent the canine policies that were in effect during the period when the SPD was operating a canine unit.  The first document is titled "Canine Legal Update and Opinions for Supervisors and Administrators[:] International Association of Chiefs of Police (IACP), Law Enforcement Canine Model Policy" (hereinafter "IACP Policy").  (Brannon Aff. Ex. S17.)  Defendants claim that document served as the SPD's canine policy from the establishment of the canine unit until December 10, 2008, when the SPD adopted a slightly modified version of the IACP Policy as its official canine policy (herinafter the "2008 SPD Canine Policy").[7]  (*See* Brannon Aff. Ex. S1 at 10; Clark I Dep. 104:10-105:4.)  The SPD had already suspended the canine program prior to adopting the 2008 SPD Canine Policy.  Accordingly, to the extent that any policy was in place during the operation of SPD's canine program, it was the IACP Policy.

Officer Clark testified that during his initial training at Lynwood Kennels, he talked to Chief Kruithoff about the fact that the SPD needed to adopt a canine policy.  (Clark I Dep. 41:18-25.)  Chief Kruithoff instructed Officer Clark to prepare a policy, and Officer Clark gave Chief Kruithoff the IACP policy.  (*Id*. at 41:23-43:15.)  Officer Clark obtained the IACP policy document from the website of an individual who often served as an expert witness in the law enforcement canine field.  (*Id*. at 44:1-18.)  He chose that policy because it was not state-specific

---

[7] That official policy states that its "Effective Date" was December 10, 2008.  (Brannon Aff. Ex. S1 at 10.)

8

and because his trainers had recommended the website.  (*Id*. at 44:19-45:1.)  He never did any

further research to verify that the policy represented the IACP's current model policy.  (*Id*. at

45:6-46:18.)  Nor did he know whether the expert regularly updated his website.  (*Id*.)

It is somewhat unclear whether the IACP Policy was ever actually adopted as the SPD's

official canine policy prior to December 2008.  Chief Kruithoff testified that the final step in the

SPD's general procedure for formally adopting a policy is for him to sign the draft policy.

(Kruithoff Dep. 54:14-25.)  However, that procedure does not appear to have been followed

when he initially approved the IACP Policy.  Rather, Kruithoff claims that during the

establishment of the canine unit, when Officer Clark presented the IACP Policy to him, he and

Officer Clark simply agreed that it would be the SPD's canine policy.  (*Id*. at 55:15-57:5.)

Another factor calling into question the status of the IACP Policy is that the document was never

actually included in all of the SPD's policies and procedures handbooks; a copy was placed in

the chief's manual, but not in the sergeants' or patrol officers' manuals.  (Clark I Dep. 218:3-24;

Zimmaro Dep. 17:1-18:8; Wheeler Dep. 63:13-65:24.)  According to Officer Clark, those

handbooks would have contained just about all of SPD's policies with the exception of the

canine policy.  (Clark I Dep. 218:5-219:15.)  Nonetheless, Chief Kruithoff testified that the

IACP Policy was in effect at the time of both of the bite incidents that form the basis of this case.

(Kruithoff Dep. 57:14-18.)  The SPD did not officially adopt the 2008 SPD Canine Policy until

after both of those bite incidents occurred and the canine unit was suspended.  (Clark I Dep.

104:23-105:4, 106:2-10.)

### 3.  SPD's Supervision of Canine Unit and Adherence to Policy

9

Although Defendants maintain that the IACP Policy was considered the policy of the department prior to 2008, the SPD's actual procedures, particularly with regard to the supervision and training of the canine unit, did not always match up with the standards set in the IACP Policy.  For example, the IACP Policy refers both to a "canine team," which consists of the "canine handler" and the canine, and a "canine supervisor," suggesting that the SPD's own policy required the assignment of someone other than Officer Clark to supervise the canine team.[8]  (*See* Brannon Aff. Ex. S17.)  However, Chief Kruithoff never specifically designated any member of his command staff to supervise the canine unit or to ensure that Spike was suitable for duty.  (Kruithoff Dep. 22:6-9; Parker Dep. 47:12-19.)  Instead, oversight of the canine unit fell to whoever was serving as Officer Clark's supervising lieutenant and sergeant at any given time.  (Kruithoff Dep. 21:17-22:15, 57:22-58:12; Parker Dep. 70:16-71:12.)  From the formation of the canine unit until approximately April 2007, Jonathan Wheeler was Officer Clark's supervising lieutenant.  (Wheeler Dep. 25:1-9.)  Thereafter, the duty fell to Lieutenant Timothy Parker.  The sergeants in charge of Officer Clark during the Campbell and Gemperline incidents were, respectively, Sergeant Dan Bentley and Sergeant Aaron Zimmaro.  (Parker Dep. 20:8-18.)

With regard to the canine unit's general performance, Lieutenant Parker and Chief Kruithoff both testified that there was no formal monitoring system in place.  (Parker Dep. 47:12-19, Kruithoff Dep. 28:24-30:25.)  However, every time Spike was deployed, Officer Clark had to complete a canine deployment form, which was then reviewed by the SPD sergeants and

---

[8] For example, in the section on team qualifications and training, the IACP Policy states that "Canine handlers are required to demonstrate acquired abilities to the canine supervisor on a periodic basis as prescribed in departmental regulations."  (Brannon Aff. Ex. S17 at 2.)

10

either Lieutenant Parker or Lieutenant Wheeler.  (Parker Dep. 50:2-20; Wheeler Dep. 26:11-27:13.)  Officer Clark's supervisors did not as a matter of course keep track of incidents in which bites occurred and no efforts were made to calculate the percentage of deployments during which Spike bit someone.  (Kruithoff Dep. 28:24-30:25; Parker Dep. 50:21-25.)  Instead, they looked into performance issues in the context of particular incidents when problems arose.  (Kruithoff Dep. 30:1-5; Parker Dep. 52:5-20.)

With regard to the canine unit's training and certification, the testimony of Officer Clark and his supervisors, particularly Chief Kruithoff and Lieutenants Wheeler and Parker, reveals that Officer Clark was essentially supervising himself.  The IACP Policy states that "[i]t is the duty of the canine supervisor to ensure that basic and in-service training and certification is conducted on a regular basis."  (Brannon Aff. Ex. Ex. S17 at 2.)  Despite that language, it does not appear that anyone, aside from Officer Clark, was actually assigned the responsibility to ensure that the canine unit remained in compliance with training and certification requirements.  Chief Kruithoff gave conflicting testimony.  First, he stated that it was Officer Clark's responsibility to make sure that Spike received the necessary training.  (Kruithoff Dep. 23:21-24:16.)  Later, when referred to the IACP Policy language quoted above, he testified that Lieutenants Parker and Wheeler were responsible for ensuring that Spike's certifications and training remained current.  (Kruithoff Dep. 57:22-58:12.)  Lieutenant Parker testified that he did not take any independent steps, other than trusting his own memory, to monitor Spike's certifications or verify that Spike was meeting training requirements.  (Parker Dep. 36:4-37:7, 64:19-65:10.)  Rather, he relied on Officer Clark to obtain the necessary certifications and training.  (*Id*. at 35:25-36:20; 64:19-65:10.)  Similarly, Lieutenant Wheeler testified that Officer

11

Clark oversaw his own training. (Wheeler Dep. 31:2-11.) Lieutenant Wheeler claimed that he

did not need to monitor Spike's certifications because during the time period when he was

supervising Officer Clark, the original state certification was still in effect. (*Id*. at 29:15-30:2.)

The testimony of Officer Clark's supervisors also reveals that there was little consensus

as to whether any regular training and certification was actually required, and if so, what type

was required. The IACP Policy contains an entire section dealing with "Team Qualifications

and Training" that sets forth general standards for monitoring training activity and certification,

such as:

> All departmental canines must meet established department certification
> requirements. Untrained canines may not be used for canine duty. . . .
> Failure to participate in or qualify under established training standards will result
> in de-certification of the team. The team may not be deployed until re-certified.

(Brannon Aff. Ex. S17 at 2.) That section does not set forth specific training or certification

requirements,[9] but it implies that such requirements do exist. When asked about their

understanding of the training requirements, the common theme expressed by all of Officer

Clark's supervisors was that they were not sure what the requirements were. For example, Chief

Kruithoff testified that he did not know if there were specific training requirements for the

operation of a canine unit in Ohio. (Kruithoff Dep. 24:17-25.) He stated that he thought there

was a recommendation that Spike complete eight hours of training per week, but that he was not

sure where the recommendation originated and he did not view it as a requirement. (*Id*. at 26:1-

23.) Lieutenant Wheeler testified that although Officer Clark told him that he needed to attend

two eight-hour training sessions each month, he was not aware that any monthly training was

---

[9] For example, the policy does not state that Spike must receive sixteen hours of maintenance training per month or that Spike's certification from the State of Ohio must be kept current.

actually required.  (Wheeler Dep. 32:12-33:23.)  Lieutenant Parker similarly testified that he was not aware of any ongoing training requirements that Officer Clark and Spike were supposed to meet.  (Parker Dep. 38:10-12, 40:21-41:19.)

The testimony reveals similar confusion over certification requirements.  During Spike's career as a police canine, he received certifications from the State of Ohio and from the North American Police Work Dog Association.  It is not clear whether those certifications were requirements for operation or merely voluntary.   Officer Clark testified that state certification was required.  (Clark I Dep. 74:5-75:3.)  Chief Kruithoff testified that he believed there was a certification requirement, but did not elaborate on what he thought that requirement was. (Kruithoff Dep. 24:17-24.)  Lieutenant Parker testified that he thought state certification was required, while Lieutenant Wheeler characterized state certification as voluntary.  (Parker Dep. 37:12-25; Wheeler Dep. 30:7-20.)

As discussed above, there was a several-months long period in 2007 during which Spike's state certification had lapsed.  Officer Clark maintains that he notified Chief Kruithoff and Lieutenant Parker about the lapse in certification and that they knowingly allowed Spike to be deployed during that period.  Chief Kruithoff, on the other hand, testified that he was not aware of the lapse and that, had he known, he would have had concerns about deploying Spike. (Kruithoff Dep. 25:1-9, 49:6-16.)  Lieutenant Parker testified, as seen in the following excerpt, that he was not sure whether Spike should have been deployed during a lapse in certification:

> Q.    Should the Clark/Spike team have been deployed in the field if their certifications had lapsed?
> A.    I don't know the restraints on that.  I don't know.
> Q.    Okay.  So even though their State of Ohio certificates may have expired, you're not sure if you could deploy them in the field or not; is that correct?

> A.     I don't know if there's a leave time, if it's definite. No, sir, I don't.
>
> Q.     Do you know if there's any limitation on whether or not you can deploy the Clark/Spike team in the field if their training requirements are not being met?
>
> A.     I don't know.
>
> Q.     As the lieutenant operations commander, would you think that those are both important things to know?
>
> A.     Officer Clark would know all of that and would let us know if he needed certification or training.

(Parker Dep. 38:23-39:21 (objections omitted).)  Lieutenant Parker also testified that despite the statement in the IACP Policy that "[t]he team may not be deployed until re-certified," he was not aware of whether the IACP Policy would allow for the deployment of a canine team during periods when it was not certified.  (*Id*. at 67:17-68:17.)

### 4.     Spike's Behavior in the Field

Spike was initially trained to function as a bark-and-hold dog rather than a bite-and-hold dog.[10]  (Woods Dep. 35:16-19; Clark I Dep. 150:22-151:12.)  Woods, the operator of Lynwood Kennels, described the major difference between bark-and-hold and bite-and-hold dogs as follows:

> A.     The major difference is is[sic] the bark and hold dog is trained that if a person gets up and surrenders, the dog will not engage you.  He will literally detain him or bark and hold him until such time as the person either attacks, flees, or is called up back by the handler.
>
> Q.     Whereas a bite and hold dog would always engage the person?
>
> A.     He would always engage the person.

(Woods Dep. 10:18-23, 17:22-8, 25:3-5; Clark I Dep. 67:6-7.)

---

[10] The IACP Policy provides that "[t]raining and deployment of police canines shall employ the guard and bark rather than the guard and hold method."  (Brannon Aff. Ex. S17 at 2.)  The policy uses different terminology than has been used in this case, and the Court is unsure of whether the "guard and bark" method is equivalent to bark-and-hold or whether it refers to an entirely different method.

14

Officer Clark's general understanding of how a bark-and-hold dog should operate appears to be in line with the explanation given by Woods.  (Clark I Dep. 151:16-152:7.)  However, Officer Clark also testified that while Spike may have been trained in the bark-and-hold approach, he "never had in the field an instance where bark-and-hold would apply to [Spike]."  (*Id*. at 158:1-3.)  Officer Clark differentiated training operations from field operations when it came to apprehending suspects.  During training scenarios, Spike was released to chase after a fleeing suspect and was trained to stop and bark at the suspect when the handler gave certain verbal commands.  (*Id*. at 159:6-23.)  Such scenarios did not actually occur in the field.  Instead, if Spike was deployed to locate someone in the field, Officer Clark performed what is known as a "track."  (*Id*. at 160:5-16.)

According to Officer Clark, there are two different types of tracks, a "missing persons" track, which is done to locate a non-criminal missing person, and a "tactical" or "fugitive" track, which is done to locate a person who has committed a criminal offense.  (Clark I Dep. 141:18-142:5.)  Spike was not trained to respond differently based on the type of track.  (*Id*. at 147:11-19.)  However, Officer Clark used different equipment for a missing persons track than he did for a fugitive track.  When doing a fugitive track, Spike wore a harness and a twenty-foot lead.  (Clark II Dep. 22:10-23:10.)  During a missing persons track, Spike wore a much shorter four-foot leash, which gave Officer Clark more control over Spike's movement and decreased the likelihood of Spike biting the subject of the search.[11]  (*Id*. at 22:20-23:10, 141:9-142:1.)

---

[11] Other precautions taken during a missing persons search include using of flashlights to light up the area of the track and carrying a toy to throw to Spike when the person was found so that Spike would engage on the toy rather than on the person.  (Clark I Dep. 139:16-140:10.)  In contrast, during a fugitive track, officers turn their flashlights off in order to maintain cover, and do not give the dog a toy when the subject is located.  (*Id*. at 140:11-18, 142:2-4.)

15

When asked how he believed a bark-and-hold dog should perform when doing a track, Woods stated that the behavior of the dog would depend entirely on the behavior of the individual being tracked.  (Woods Dep. 53:5-21.)  If upon being located by the dog, the subject acts or moves in such a way that could be interpreted as a threat or an attempt to flee, the dog will apprehend the subject by biting.  (*Id*. at 53:10-21.)  However, if the subject is compliant, gives himself up, and refrains from making any assertive motions, a bark-and-hold dog should just bark and move around the subject to prevent him from fleeing.  (*Id*. at 55:17-57:16, 63:15-65:7, 90:3-91:17.)  In contrast, a bite-and-hold dog would be expected to bite the subject of the track regardless of whether the subject is passive or aggressive when located.  (*Id*. at 91:21-92:3.)

Officer Clark's beliefs about how a bark-and-hold dog should perform on a track differ somewhat from Woods' explanation.  Officer Clark appears to view bark-and-hold more as a method to be applied in certain circumstances than as an overall training approach.  He testified that the bark-and-hold method simply does not apply in a tracking situation, and he claims he was never trained to use that method during a tracking situation.  (Clark I Dep. 160:7-161:2.)  In fact, Officer Clark stated that anytime he deployed Spike to perform a fugitive track, there was a likelihood that someone would be bitten.  (Clark II Dep. 129:20-130:22.)  Officer Clark expected that when doing a fugitive track, even where the subject was passive rather than actively attempting to resist or flee, Spike would bite the subject unless Officer Clark saw the subject and stopped Spike through a verbal command or physical restraint.  (Clark I Dep. 144:6-149:20.)  Officer Clark claimed that if he saw the subject before Spike got within biting distance, he would

16

shout warnings and would not let Spike engage unless the subject further attempted to resist or evade arrest.  (*Id*. at 145:22-146:3.)

Officer Clark's supervisors provided inconsistent descriptions of what the bark-and-hold method means and how a bark-and-hold canine is supposed to behave in the field.  In line with Woods' description of how a bark-and-hold dog should react during a track, Chief Kruithoff testified that he believed that Spike was not supposed to bite the subject of the track if the subject remained still.  (Kruithoff Dep. 40:23-41:17.)  Rather, he expected Spike to stop and bark unless the subject moved.  (*Id*.)  Mirroring Officer Clark's definition of bark-and-hold, Lieutenant Parker described it as an approach to be applied in specific situations rather than a type of dog or an overall training method.  He also stated that the approach would never apply in a tracking situation because it was only used when a dog is deployed off-leash and Spike was always on a leash during tracks.  (Parker Dep. 23:2-26:19.)  He also testified that he expected a tracking canine to always bite upon encountering a subject, even when the subject is passive, unless the handler sees the subject and orders the canine to back down before he engages.  (*Id*. at 29:20-30:12.)  Lieutenant Wheeler testified that based on what Officer Clark told him, he thought that a bark-and-hold dog is supposed to first bark at a subject to indicate the subject's presence.  (Wheeler Dep. 18:17-20:18.)  Then if the subject makes any movement, a bark-and-hold dog is expected to bite and hold the subject until the officer can apprehend him.  (*Id*. at 18:17-20:18, 22:1-25.)

Regardless of whether he was trained and maintained as a bark-and-hold or a bite-and-hold dog, the evidence shows that during the course of his time as an SPD canine, Spike bit thirteen people, including Plaintiffs Campbell and Gemperline.  (Clark I Dep. 221:11-15.)  Based

on the annual canine usage reports prepared by Officer Clark, it appears that in 2005, Spike went on ten tracks and had three successful apprehensions, none of which involved a bite.  (Brannon Aff. Ex. S18.)  In 2006, Spike completed 28 tracks, resulting in either the  apprehension of a criminal suspect or the location of evidence.  (*Id*. Ex. S19.)  Spike apprehended a total of fourteen suspects, five of whom were bitten during apprehension.  (*Id*.)  In 2007, the year during which the Campbell incident occurred, Spike apprehended a total of six individuals.  (*Id*. Ex. S20.)  All but one of those apprehensions involved a bite.  (*Id*.)  As stated above, this case primarily concerns two of the incidents in which Spike apprehended suspects with force, both of which are described below.

### B.  Campbell Incident

The events leading up to the incident in which Spike bit Campbell took place over the course of the evening of October 20, 2007 and the early morning hours of October 21, 2007.[12] Prior to his encounter with Officer Clark and Spike, Campbell had gone to dinner with his girlfriend, Lisa Parker, and another couple.  (Campbell Dep. 30:7-31:6.)  After dinner, the couples went to the Springboro Eagles Club to have a few drinks.  (*Id*. at 31:19-32:12.)  At approximately 12:30 a.m. on October 21, 2007, Parker decided to leave the club and walk home because she was intoxicated.  (*Id*. at 34:13-35:25.)  Parker lived in a small duplex at 145 E. North Street, Springboro, Ohio, which was approximately 200 yards from the Eagles Club.  (*Id*. at 33:18-34:21.)  Campbell stayed at the club until sometime between 1:00 and 1:30 a.m.  (*Id*. at

---

[12] Plaintiffs and Defendants all describe the events as occurring on the evening of October 21, 2007.  However, documentary evidence such as an SPD dispatch report (Brannon Aff. Ex. C2) and a "K9 Deployment Report" (Brannon Aff. Ex. C3) shows that the events actually took place over the course of the evening of October 20, 2007 and the early morning of October 21, 2007.

33:16-15.)  Campbell lived about a mile from the club and he had planned on walking back to his residence.  (*Id*. at 36:7-37:13.)  However, upon leaving the club, he realized he still had Parker's car keys from earlier in the evening and needed to return them to her.  (*Id*. at 36:7-37:13.)  When he got to Parker's house, he could see her lying on the couch through the window in the front door.  (*Id*. at 37:14-19.)  He pounded loudly on the front door for about five or ten minutes, but was unable to rouse her.  (*Id*. at 37:22-23, 38:22-40:24.)  Still undeterred, Campbell walked around to the back and pounded on the back door for another two to three minutes, and then returned to the front of the house.  (*Id*. at 41:22-42:24.)

Meanwhile, the tenant in the other half of the duplex, Ken Simpson, had heard all of the pounding and called the Springboro police department about the noise.  Officer Clark and Spike were working the midnight shift that night; their shift began at 11:00 p.m. on October 20 and ended at 7:00 a.m. on October 21.  At approximately 2:22 a.m., Officer Clark was dispatched to Parker's residence to respond to a report of a possible domestic situation involving a male subject beating on Parker's front door.  (Clark II Dep. 5:11-6:12; Brannon Aff. Ex. C2.)  Officer Clark and another SPD Officer, Nate Anderkin, arrived at the address at approximately 2:26 a.m. (Clark II Dep. 7:23-24; Brannon Aff. Ex. C2.)

By the time the officers got to the scene, Campbell had already left Parker's residence and had begun to head toward his house on foot through Parker's back yard.  (Campbell Dep. 46:4-8.)  Campbell heard the approaching sirens and suspected that a neighbor may have called the police because he was pounding loudly on Parker's door.  (*Id*.)  Shortly after leaving Parker's back porch, Campbell came upon an outbuilding that was approximately 200 yards from Parker's residence.  (*Id*. at 50:5-9, 53:11-13.)  He lay down on the ground near the outbuilding in

19

an attempt to avoid a confrontation with the police.  (*Id*. at 50:17-52:17.)  Campbell heard the officers arrive but he could not see them from where he was lying.

While Campbell hid, Officer Anderkin spoke with Parker's neighbor.  (Clark II Dep. 9:3-5; Anderkin Dep. 14:2-11.)  The neighbor told Anderkin that Parker's residence had recently been broken into and that at some point she had received death threats from someone.  (Anderkin Dep. 14:3-7; Clark II Dep. 8:20-9:3.)  The neighbor also stated that he had seen a white male, later determined to be Campbell, kick the front door and then run around the side of the house as the officers were approaching.  (Anderkin Dep. 14:10-11; Clark II Dep. 9:3-5.)  By the time Officer Clark and Anderkin arrived all was quiet.  They peered through the windows of Parker's residence and saw that she was sleeping.  (Anderkin Dep. 18:11-23; Clark II Dep. 14:2-5.)  They attempted unsuccessfully to rouse her by pounding on the back and front doors to the residence, just as Campbell had done.  (Anderkin Dep. 20:24-11; Clark II Dep. 14:2-5.)  They noticed that the doors appeared damaged,[13] but they were unable to gain entrance to the residence because

---

[13]  According to Officer Clark, the front screen door was broken, a footprint and scuff marks were visible on the interior door, and the interior door was loose.  (Clark II Dep. 10:2-5.)  Officer Clark described the back door as being in a similar state, stating that the lock was broken and that there were scuff marks on the door.  (*Id*. at 10:9-14.)  Officer Anderkin gave a consistent description of the front door, stating that there were marks on the main door that were consistent with someone kicking the door and that the door was loose and shook back and forth in the frame.  (Anderkin Dep. 17:10-15.)  He also stated that the door knob twisted back and forth and the lock appeared to be broken.  (*Id*. at 16:12-15.)  Campbell disputes the officers' descriptions of the doors.  It appears that the front storm door was somewhat damaged; Campbell testified that the storm door in the front of the house had been broken for a while and that when he arrived at Parker's residence, the storm door was standing open.  (Campbell Dep. 38:9-21.)  However, Parker testified that both the front and the back doors were in fair shape and that she had never noticed any damage to the doors prior to or after the event in question.  (Lisa Parker Dep. 38:13-40:13.)  Additionally, as noted above, despite the appearance of the doors, Parker was evidently able to lock them, and they remained locked at the time Officers Clark and Anderkin were investigating the domestic disturbance call.  (Clark II Dep. 17:16-18:6.)

both of the doors were securely locked.[14]  (Clark II Dep. 10:2-5, 17:5-18:6; Anderkin Dep. 16:12-17:15.)

When asked whether he feared Parker was in danger at that time, Officer Clark responded that he did not think that she was in immediate danger, but he thought Campbell could still be in the area.  (Clark II Dep. 15:6:19.)  Accordingly, after several unsuccessful attempts to wake Parker, Officers Anderkin and Clark decided to deploy Spike to track Campbell.  At that time, the officers still did not know who they were looking for.  They knew only that the neighbor had heard someone pounding on the doors.  When questioned as to why they decided to track the individual, Officer Clark testified that the facts they had before them, including the neighbor's statement, the condition of the doors to Parker's residence, and their belief that the suspect had fled upon hearing police sirens, led the officers to conclude that they were dealing with an attempted burglary and that the suspect was likely still in the area.[15]  (*Id*. at 43:3-44:6.)  Officer Clark admitted that their conclusion conflicted with the dispatchers description of the call as a domestic situation, and explained that "that sort of information gets confused quite often."  (*Id*. at 44:7-11.)  Officer Clark also admitted that the officers were not aware of a specific threat to anyone on the scene at that time; however, they perceived a general threat to safety based on the fact that the suspect still was at large and possibly remained close by.  (*Id*. at 43:3-17.)

---

[14] At some point while Officers Anderkin and Clark were inspecting the area around the residence, a third officer, Larry Bush, arrived on the scene. (Clark II Dep. 16:10-14.) Officer Bush called the landlord to request a key for Parker's residence.  (*Id*. at 17:5-9.)

[15] Officer Anderkin provided a consistent explanation for their decision to track Campbell. (Anderkin Dep. 23:1-20.)

After outfitting Spike in a harness and twenty-foot tracking line, Officer Clark deployed him near the side of the house.  (Clark II Dep. 18:7-20:17, 22:10-19.)  Spike pulled fairly hard in the direction of the back porch, and he led Officer Clark through Parker's backyard.  (*Id*. at 20:19-24.)  Officer Clark was responsible for maintaining physical control over Spike during the track.  (Clark I Dep. 231:13-24.)  While Spike was tracking, Officer Anderkin followed behind Officer Clark to provide cover.  (Clark II Dep. 20:25-21:9.)  Spike eventually led to officers to an adjoining yard where there was a fence leading up to the outbuilding near where Campbell had laid down on the ground.  (*Id*. at 21:15.)

Campbell and the Defendants offer different descriptions of what happened at that point.  During his deposition, Officer Clark testified as follows:

> [Spike] began to air scent.  He put his head up in the air and he actually jumped up and attempted to jump over the fence.  And when I saw the fence, I knew that I wouldn't be able to cross it and I didn't want him attempting to cross it because if he would injure himself.  I pulled him off the fence and I stopped and I told Officer Anderkin that I thought possibly the person was on the other side of the fence somewhere.  And I also told Officer Anderkin that I was going to try to find an entry point, such as a gate, to go in and shout warnings at the person.  At that time Spike went back up on the fence and tried to jump over the fence again.  And when I was getting ready to go find the gate, he came down off the fence and that's when he engaged Mr. Campbell on the leg.

(Clark II Dep. 21:18-22:9.)  According to Officer Clark, he and Spike had actually walked right past Campbell as Spike was tracking near the fence and that when he was standing near the fence as Spike was air scenting and jumping up on the fence, he was so close to Campbell that Campbell could have reached out and kicked him.  (*Id*. at 28:11-19.)  When asked to elaborate on what Spike's act of air scenting signified, Officer Clark explained that air scenting could mean that the canine believes that a particular suspect or odor that he is tracking is nearby.  (*Id*. at 25:20-23.)  Officer Clark cautioned, however, that "[y]ou could be close or you could be fairly

22

far away, but actually what it really translates into is that he's in the cone, the scent cone." (*Id*. at 26:2-6.)  In this situation, Officer Clark maintains that he had no idea Campbell was that close and that he did not actually see Campbell until after Spike bit Campbell.  (*Id*. at 28:14-32:16.)  In fact, Officer Clark testified that he believed based on Spike's interest in jumping over the fence that Campbell was somewhere on the other side of the fence.  (*Id*. at 32:1-5.)  As a result, Officer Clark claims, he was not looking at Spike at the exact moment that Spike retreated from the fence and bit Campbell; rather, at that moment Officer Clark was turned toward Officer Anderkin and was talking to him about finding a way to get around to the other side of the fence. (*Id*. at 29:6-18, 31:18-32:23; *see also* Anderkin Dep. 27:18-28:6, 30:7-12.)

Officer Anderkin similarly testified that Spike led the officers through the backyard to a fence, where they stopped because Officer Clark thought the suspect might have been on the other side of the fence.  (Anderkin Dep. 27:10-22.)  While the officers were talking and looking over the fence, Spike bit Campbell, who was lying on the ground between a tree and the fence. (*Id*. at 29:5-31:19.)  Officer Anderkin estimated that he was approximately five feet from Campbell when Spike bit him.  (*Id*. at 31:20-32:4.)

Campbell's description of the events that took place in the moments before Spike bit him differs from Officer Clark's and Officer Anderkin's descriptions.  First, Campbell disputes Officer Clark's testimony that he did not see Campbell until after Spike engaged.  Campbell testified that he was sure Officer Clark saw him lying on the ground because when Officer Clark and Spike were approximately twenty-five feet from him and approaching, Campbell raised his head, looked right at Officer Clark, and their eyes met.  (Campbell Dep. 56:15-57:1.)  Campbell also stated that the area in which he lay was somewhat illuminated by a nearby light.  (*Id*. at

57:2-23.)  Campbell also denies that Spike walked past him and jumped up onto the fence prior to biting him.  Instead, Campbell maintains that Officer Clark and Spike walked directly toward him and that as soon as Officer Clark and Spike reached his location, Spike immediately attacked him.  (*Id*. at 60:19-61:6.)  According to Campbell, when Officer Clark approached him, Clark was holding Spike on a short lead and Spike was only one or two feet in front of the officer.  (*Id*. at 59:10-12.)

Both parties agree that neither Campbell nor Officer Clark said anything prior to Spike biting Campbell.  Officer Clark issued no warnings to Campbell, and Campbell said nothing to the officers.  Campbell contends and Officer Anderkin's incident report reflects that when Spike engaged Campbell, Campbell was lying face down on the ground with his hands out to the side.  (Campbell Dep. 58:4-11; Brannon Aff. Ex. C1.)  Spike bit Campbell on the left leg and continued to bite Campbell at different places on his leg for some period of time, possibly thirty to forty-five seconds.  (Clark II Dep. 32:17-34:22, 36:21-37:2.)

Officer Clark testified that after Spike engaged, he shouted at Campbell multiple times to put his hands up.  (Clark II Dep. at 33:2-23.)  According to Officer Clark, Campbell turned over at some point during the scuffle.  (*Id*.)  Officer Clark stated he could not see Campbell's left hand and continued to order Campbell to raise his hands, but Campbell did not comply.  (*Id*.)  Instead, Officer Clark testified, Campbell kicked Spike in the face with his right foot.[16]  (*Id*. at 33:25-34:1.)  Officer Clark then allowed Spike to continue to bite Campbell in different places

---

[16]  *See also* Anderkin Dep. 32:19-21 (stating that Campbell was "screaming, yelling, [and] kicking").

24

on Campbell's left leg until finally calling him off.  (*Id*. at 34:1-17.)  During his deposition,

Officer Clark described the interaction as follows:

> A.   . . . He was stomping him with his right foot on the head repeatedly.  And Officer Anderkin then started yelling at him, get your hands up, get your hands up, and became more heated.  Our verbalizations became much louder.  I was telling him to stop fighting with the dog.  And Officer Anderkin continued with, get your hands up, and I transitioned into, stop fighting the dog.  And at that point, Spike apparently did not enjoy being kicked in the face, let go and engaged him higher in the thigh where he could not kick him in the face any longer.  That is when he put both hands straight up in the air and said okay.
>
> Q.   Okay.  What did you do after that?
> A.   I did a call-off, pulled Spike back.
> Q.   And by call-off, did you give a verbal command to the dog?
> A.   Yes, I did.
> Q.   What did the dog do in response to the verbal command?
> A.   Released.
> Q.   Immediately?
> A.   Yes.

(*Id*. at 34:1-23.)  There is no indication that Officer Clark made any earlier attempt to command

Spike to back down or to pull Spike away from Campbell.  Campbell's depiction of the

interaction is somewhat similar to Officer Clark's version, although Campbell maintains that he

never kicked Spike in the face.  (Campbell Dep. 63:18-24.)  Campbell also testified that Officer

Clark never said anything to him while Spike was biting him.  (*Id*. at 67:11-16.)

After Spike released his grip on Campbell, Officer Clark ordered Campbell to stand up.

(Campbell Dep. 68:20-23.)  Campbell was in a great deal of pain and it was difficult for him to

stand.  (*Id*. at 69:2-70:11.)  Once Campbell was standing, either Officer Clark or Officer

Anderkin handcuffed him and walked him back to Parker's residence.  (Clark II Dep. 34:25-

35:3; Campbell Dep. 70:6-22, 71:9-12.)  Campbell was then transported by ambulance to

Middletown Regional hospital, where medical professionals tended to several bite wounds that

ran along Campbell's calf and up onto his thigh.  (Campbell Dep. 73:16-24, 80:13-82:17.)  A nurse and a doctor took x-rays of Campbell's leg, cleaned and stitched the wounds, and trimmed loose tissue and skin.  (*Id*. at 81:21-82:1.)  They then instructed Campbell on how to care for and clean the wounds at home and released him.  (*Id*. at 85:3-25.)  The wounds later became infected and Campbell was admitted to the hospital for three or four days. (*Id*. at 87:12-24.)  It took five to six months for Campbell to heal completely.  (*Id*. at 89:5-15.)

      **C.**     **Gemperline Incident**

On October 11, 2008, approximately one year after the Campbell incident, Officer Clark and Spike were again involved in an incident in which Spike bit someone during the course of a track.  Spike's target on that occasion was Chelsie Gemperline, an 18 year old, 110 lb woman, who was arrested for underage drinking.  (*See* Clark II Dep. 118:18-23.)

On the evening of October 10, 2008, Gemperline and her friend, Sara Osborne, invited people to an informal party at the home of Osborne's neighbors, who were out of town and who had asked Osborne to house sit for them.  (Gemperline Dep. 38:6-41:25.)  About twelve to fifteen people, including Gemperline, Osborne, and Gemperline's brother, Adam, attended the party.  (*Id*. at 42:1-24.)

Officer Clark and Spike were working the midnight shift that night, beginning at 11:00 p.m., October 10, 2008 and ending at 7:00 a.m., October 11, 2008, just as they had been during the Campbell incident.  (Clark II Dep. 109:3-9.)  At approximately 1:30 a.m., Officer Clark was dispatched to 128 Deer Trail Drive, Springboro, Ohio to investigate a report of a loud party at which underage teens were believed to be drinking alcohol.  (Brannon Aff. Ex. G20.)  When he arrived, Officer Clark heard people talking and laughing and saw people on the back deck

drinking and smoking cigarettes.  (Clark II Dep. 110:6-15.)  At that point, Clark was the only officer who had responded to the scene.  (*Id*. at 109:14-25.)

When Officer Clark announced his presence, some of the people retreated back into the house while others stayed on the deck.  (Clark II Dep. 110:11-15.)  Eventually, Officer Clark learned that the homeowners were out of town, that Osborne was house sitting, and that she lacked permission to throw a party.  (*Id*. at 113:3-9.)  While Officer Clark spoke with Osborne and some of the partygoers, others, including Gemperline's brother, fled the residence.  Based on his observations, Officer Clark determined he was dealing with a party involving underage drinking and requested backup.[17]  (*Id*. at 111:5-19, 114:9-115:14.)  Several officers from the SPD and other local police departments, including SPD Sergeant Aaron Zimmaro, responded to the scene.  (Clark Dep. 112-114.)  Officer Clark briefed Sergeant Zimmaro on the events that had transpired and the two briefly discussed deploying Spike to perform a track for one of the individuals who had fled the residence.  (Zimmaro Dep. 39:24-40:8.)  According to Sergeant Zimmaro, Officer Clark did not feel comfortable with performing the track because he was concerned that Spike would bite the individual.  (*Id*. at 40:9-41:1.)

Meanwhile, one of the other responding officers found Gemperline hiding in a closet on the second floor of the house.  (Gemperline Dep. 52:25-55:6, 58:18-59:21.)  The officer escorted Gemperline outside, and Sergeant Zimmaro questioned her about her age, whether or not she had been drinking, and if she knew anything about where her brother might have gone.  (Zimmaro Dep.  46:10-16, 48:3-25.)  Gemperline refused to help the officers locate her brother and initially

---

[17] Osborne let Officer Clark inside the house, where he saw several beer cans and cups. (Clark II Dep. 114:9-115:14.)

denied drinking any alcohol.  (Gemperline Dep. 66:11-23; Zimmaro Dep. 49:18-20.)  During her deposition, Gemperline admitted to drinking two or three beers that night, but she did not believe she was drunk.  (Gemperline Dep. 60:1-22.)  Both Sergeant Zimmaro and Officer Clark testified that Gemperline appeared intoxicated.  (Zimmaro Dep. 46:10-14; Clark II Dep. 118:9-17.)

After questioning her, Sergeant Zimmaro informed Gemperline that she was under arrest, placed her in handcuffs, and placed her in a Warren County Sheriff's Deputy's car.  (Zimmaro Dep. 51:12-58:25.)  Gemperline became belligerent after Sergeant Zimmaro told her she was under arrest.  (*Id*.; Clark II Dep. 116:18-118:17.)  Sergeant Zimmaro and Officer Clark testified that Gemperline was swearing and attempted to kick the officers.  (Zimmaro Dep. 57:11-58:10; Clark II Dep. 117:23-118:8.)  Gemperline admitted during her deposition that she said "fuck you, bitches" to the officers.  (Gemperline Dep. 72:3-14.)

During the brief period after the officers had placed Gemperline in the deputy's cruiser and turned their attention elsewhere, Gemperline was able to slide her right hand out of the handcuffs, lower the window of the car and escape.  She fled down the street and hid in a children's plastic playhouse in the backyard of a house that was six to seven houses away from the location of the party.  Gemperline planned on spending the night in the playhouse because she thought she would get into trouble if she went home.  (Gemperline Dep. 84:8-85:7.)

When Sergeant Zimmaro learned that Gemperline had escaped from the deputy's car, he told Officer Clark to get Spike and look for Gemperline.  Sergeant Zimmaro felt it was important to start the track as quickly as possible because when Gemperline fled, the situation evolved into a felony in progress, and Sergeant Zimmaro believed Gemperline could be a threat to herself or others.  (Zimmaro Dep. 61:11-20.)  During his deposition, he stated that at the time Gemperline

28

fled, he knew only that she was intoxicated, possibly was still handcuffed, that "she was very belligerent, that she was willing to resist officers and that it was unknown what measures she would go to to continue to flee." (*Id*. at 61:11-20, 63:4-18.) He worried that she might injure herself while trying to flee because the terrain in some areas was rough and there was a deep ravine nearby. (*Id*. at 64:24-65:8.) As a result, Sergeant Zimmaro stated, "she needed to be found and she needed to be found soon."[18] (*Id*. at 61:19-20.)

Both Sergeant Zimmaro and Officer Clark testified that they did not intend for Spike to bite Gemperline. (Clark II Dep. 130:14-18; Zimmaro Dep. 72:11-22.) However, Officer Clark also testified that he knew that the track would more likely than not end in Spike biting Gemperline. (Clark II Dep. 129:20-131:8.) Officer Clark also made the following comments, captured in part by his vehicle recording device: "Jeez Louise . . . [unintelligible] this bitch, . . . I've had it," and ". . .she's gonna get a nice rude awakening here in one second or two, . . . it's not gonna feel very good." (Brannon Aff. Ex. G33 at 2.) Officer Clark denied making the first statement, but admitted to the second statement. (Clark II Dep. 194:8-20.)

At Sergeant Zimmaro's request, Officer Clark harnessed Spike, placed him on the same twenty-foot lead as was used during the Campbell track, and deployed him on a "tactical fugitive track." (Clark II Dep. 126:16-24, 141:2-5.) Sergeant Zimmaro and another officer, Deputy

---

[18] Sergeant Zimmaro admitted that there may have been safer methods of searching for Gemperline other than deploying Spike, such as instructing officers to look for her or calling her mother to see if she had returned home, but he did not believe the officers would have had the same success in locating her in a timely manner had they not used Spike. (Zimmaro Dep. 73:23-74:8.) When asked about his thoughts on alternative methods of locating Gemperline, Officer Clark testified that the officers could have done a foot search or called in a helicopter. (Clark II Dep. 127:13-20.) However, for the same reasons as stated by Sergeant Zimmaro, Officer Clark also believed that time was of the essence in locating Gemperline. (*Id*. at 127:24-129:19.)

Apking, accompanied Officer Clark and Spike as they began tracking Gemperline down Deer Trail Drive.  While walking down the street, Sergeant Zimmaro and Deputy Apking noticed an open gate leading into a back yard and suggested they investigate it.  (*Id*. at 146:10-19; Zimmaro Dep. 80:15-81:16.)  However, at that same time, Spike Led Officer Clark into a fenced-in back yard on the opposite side of the street.  (Clark II Dep. 146:24-147:24.)  As they entered the back yard, Officer Clark interpreted Spike's air-scenting behavior as indicating that Spike smelled something on the deck of the house.  (*Id*. at 150:15-151-6.)  Officer Clark shortened Spike's lead to approximately four to five feet and searched the deck, but he did not find anything.  (*Id*. at 151:7-17.)  For a moment, Officer Clark was annoyed with Spike and thought he might just be "goofing off."  (*Id*. at 151:19-21.)  Officer Clark had given up on the search and began to head back toward his car when Spike darted across Officer Clark's path and leapt head-first through the window of a child's playhouse that was located near the gate to the backyard.  (*Id*. at 152:2-23, 156:7-14.)

Gemperline was curled up in the playhouse with her eyes closed.  (Gemperline Dep. 89:7-24.)  When Officer Clark entered the backyard, she heard his radio and the sound of crunching leaves.  (*Id*. at 87:12-88:1.)  She then heard Officer Clark say something to Spike right before he jumped into the playhouse.  (*Id*. at 88:4-22, 92:2-25.)  Spike was able to reach his head far enough through the window of the playhouse to nip Gemperline's chin and bite her right upper thigh.  (Clark II Dep. 156:7-14; Gemperline Dep. 93:5-25.)  Gemperline screamed and grabbed Spike's jaws and tried to pry him off her leg.  (Gemperline Dep. 94:9-16.)  Spike briefly let go of her leg, but then he clamped down again.  (*Id*. at 94:17-23.)  Gemperline continued to struggle with Spike until she either passed out or went into shock.  (*Id*. at 95:2-96:16.)  While

30

Gemperline testified that Spike bit her a few different times, Officer Clark testified that as soon as he heard Gemperline scream, he reached into the playhouse, grabbed Spike by his collar and lifted straight up to cut off Spike's airway.  (Clark II Dep. 156:7-14.)  Officer Clark described that maneuver as a "choke off," and stated that a choke off prevents the dog's head from moving back and forth and cuts off the dog's airway, forcing the dog to release its bite.  (*Id*. at 156:15-25.)  Officer Clark admitted that he did not give Spike a verbal release command prior to performing the choke off.  (*Id*. at 157:7-17.)  He believed it would be more difficult to give a verbal release command and was concerned that Spike would not follow a verbal command if Gemperline was hitting or actively resisting Spike.  (*Id*. at 157:9-25.)

There is conflicting evidence as to what, if any, warnings Officer Clark gave to Gemperline.  Gemperline did not recall hearing officer Clark say anything to her.  (Gemperline Dep. 95:20-22, 96:4-9.)  Officer Clark testified that he could have, but did not shout any warnings when he entered the backyard with Spike.  (Clark II Dep. 159:19-160:8.)  Officer Clark later testified that during the course of pulling Spike off of Gemperline, he gave the command "stand still, hands up, auf."  (*Id*. at 164:10-12.)  He stated that he gives that command every time he performs a choke off and that it is meant as a dual command for both the dog and the person being bitten.  (*Id*. at 164:10-21.)  Another officer, Warren County Sheriff Sergeant Brian Dulle, who had responded to the scene during the track, testified that Officer Clark told him that he gave Gemperline "numerous verbal commands" to which she did not respond, and that in response to her refusal to comply, he utilized Spike.  (Dulle Dep. 17:10-23, 21:23-22:8, 36:22-37:10, 39:4-10.)  Sergeant Dulle also testified that he got the impression that Officer Clark knew that Gemperline was in the playhouse before Spike bit her.  (*Id*. at 37:25-38:4.)

31

When Spike bit Gemperline, she screamed, prompting Sergeant Zimmaro and Deputy Apking to run into the backyard.  (Zimmaro Dep. 83:6-25; Clark II Dep. 161:2-8.)  After Officer Clark pulled Spike off of Gemperline, Deputy Apking flipped over the play house, turned Gemperline on her stomach, and handcuffed her.  (Zimmaro Dep. 85:7-14.)  Sergeant Zimmaro and Deputy Apking carried Gemperline to the street and called for an ambulance.  (*Id*. at 88:5-24.)  When Sergeant Dulle saw Gemperline's leg, he ordered the officers to remove her handcuffs.  (Dulle Dep. 23:14-20.)  Sergeant Dulle was concerned Gemperline might pass out or fall over and wanted to make sure that her hands were free so that she could catch herself.  (*Id*. at 23:18-20.)  According to Sergeant Dulle, Gemperline's leg was bloody and her pants were ripped.  (*Id*. at 23:16-18.)  Gemperline testified that there was a huge gash in the front of her right thigh and that she could see muscle.  (Gemperline Dep. 99:7-8.)  She also had a puncture wound on the side of her leg.  (*Id*. at 98:15-24.)

Eventually, Gemperline was transported by ambulance to Sycamore Hospital, where she was admitted and received treatment for her wounds.  (Gemperline Dep. 102:05-22, 104:20-107:16.)  After a few days, Gemperline was discharged from Sycamore Hospital and admitted to Kettering Medical Center, where she stayed for a week and a half while receiving additional treatment.  (*Id*. at 107:10-108:4.)  During that time period, Gemperline was unable to walk.  (*Id*. at 108:5-15.)  When she was discharged from Kettering, she was given crutches, which she relied on for six months while recovering.  (*Id*. at 108:12-25.)  As a result of her injuries, she now has a permanent deformity in her right thigh.  (*Id*. at 112:20-113:3.)

###### D.     Decommissioning of the Canine Unit

The day after the Gemperline incident, Lieutenant Parker informed Officer Clark that the canine program was being suspended.  (Clark II Dep. 167:20-168:11.)  Chief Kruithoff asked Lieutenant Wheeler to perform an administrative audit of the canine unit.  (Kruithoff Dep. 18:15-19:15; Wheeler Dep. 74:21-75:4, 114:5-15.)  At the conclusion of that audit, Lieutenant Wheeler recommended that Chief Kruithoff retire Spike.  (Wheeler Dep. 115:17-116:23.)  Lieutenant Wheeler felt that although Spike was a good canine, he did not currently meet the needs of the SPD as well as would a different canine.  In early 2009, Chief Kruithoff decided to terminate the canine program.  (Kruithoff Dep. 18:13-18.)  He claims he based his decision in part on the audit and in part on the basis that by that time, the unit had already been off-duty for a number of months.  (*Id*.)  The SPD subsequently terminated Officer Clark on October 9, 2009.  (Clark I Dep. 26:23-25.)

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The nonmoving party must provide more than a scintilla of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  That is, the nonmoving party must present sufficient evidence to permit a reasonable jury to find in that party's favor.  *Id*.

33

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 257.  The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.

The Court carefully reviews "those portions of the submitted evidence designated by" both parties.  *Guarino v. Brookfield Twp. Tr's.*, 980 F.2d 399, 410 (6th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . .").  Although the Court "may consider other materials in the record," Fed. R. Civ. P. 56(c)(3), the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party."  *Guarino*, 980 F.2d at 410.

## III.     ANALYSIS

### A.      Motions to Strike the Affidavits of Plaintiffs' Expert Witnesses

In opposing Defendants' Motions for Summary Judgment, Plaintiffs rely in part on affidavits and reports prepared by two expert witnesses, Kyle K. Heyen and Michael D'Amico, both of whom have extensive experience in law enforcement.  Defendants move to strike the affidavits of those witnesses in whole or in part on several grounds: (1) the witnesses are unqualified to testify about canine policies and procedures in the Defendant's police department and (2) the witnesses' opinions lack proper support in the record and are therefore unreliable;

and (3) in portions of the affidavits the witnesses offer legal conclusions. In reviewing the evidence in this case, it has become apparent to the Court that while Heyen's opinions factor into the Court's analysis of the factual and legal issues presented at summary judgment, D'Amico's do not. Accordingly, Defendants' motion to strike D'Amico's affidavit is moot and the Court need only address Defendants' objections to Heyen's affidavit.

The court evaluates the admissibility of an expert witness's testimony under Federal Rule of Evidence 702, which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. At the outset, the Court must determine whether the expert is proposing to testify to (1) scientific or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). Ordinarily, "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[19] *Id.* at 592-93.

---

[19] In determining whether a theory or technique is scientific knowledge that will assist the trier of fact, the Court must consider the following factors:

> (a) whether the theory or technique can be or has been tested;
> (b) whether the theory has been subjected to peer review and publication;
> (c) the known or potential rate of error; and
> (d) general acceptance within the relevant scientific community.

*Daubert*, 509 U.S. at 594; *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 n.5 (6th

However, *Daubert* does not require that expert testimony be the product of scientific principles and methods when it is derived from the expert's own practical experiences:

> In [*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)], the [Supreme] Court reaffirmed *Daubert's* central holding that a trial judge's "gatekeeper" function applies to all expert testimony, regardless of whether such testimony is based upon scientific, technical, or other specialized knowledge. *Id.* at 141, 147-49[].  With respect to the individual factors enumerated in *Daubert*, the *Kumho* Court held that trial courts may consider such factors when assessing the reliability of all types of expert testimony.  *Id.* at 149-52[]. The Court stressed, however, that "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141[].  In some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." *Id*. at 150[].  "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Id.* at 153[].

*First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 334-35 (6th Cir. 2001).

With regard to expert testimony offered on the matter of police practices, the Sixth Circuit concluded in *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) that a district court erred in finding that a witness was qualified as an expert in the field of "police policies and practices," describing that label as "so broad as to be devoid of meaning."  *Id.* at 1352. However, the Sixth Circuit clarified that position and distinguished *Berry* in *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893 (6th Cir. 2004), where it held that an expert witness may testify about "discrete police-practice issues" so long as the "experts are properly credentialed and their testimony assists the trier of fact." *Id.* at 908.

Applying those standards, the Court finds that Heyen possesses specialized knowledge regarding the training and use of police canines and that his knowledge will assist jurors in

_____

Cir. 2001).

36

evaluating the issues presented in this case.  The record at summary judgment indicates that

Heyen has extensive experience concerning the training and use of dogs in police work.  (*See*

Heyen Affidavit and Expert Report, Doc. 71-1.)   Heyen was the founder and president of

Detector Dogs International, Inc., a company that selected and trained dogs and their handlers

for all aspects of canine law enforcement from 1988 to 2004.  (Heyen Aff. ¶ 1.)  Heyen has

trained over 500 service dog teams in areas such as tracking and drug detection.  (*Id*.)  He also

has experience evaluating service dog teams based on internationally recognized standards.  (*Id*.)

Heyen also began his career in criminal justice as a patrol officer and canine handler.[20]  (Heyen

Report at 2.)

        In addition to finding that Heyen is qualified as an expert in the area of canine training

and use, the Court also finds that the opinions offered by Heyen, at least to the extent that he

does not reach legal conclusions, are sufficiently supported by the record for the purposes of

summary judgment.  In his expert report, Heyen outlines in detail the evidence upon which he

relied, much of which was submitted by Plaintiffs in opposition to Defendants' motions for

summary judgment.

        To the extent that the Plaintiffs' expert witnesses state opinions that constitute legal

conclusions, the Court will not rely upon those opinions.  However, the fact that portions of

Heyen's affidavit constitute inadmissible legal conclusions does not prevent this Court from

---

        [20] Defendants argue that Heyen must possess expertise concerning Ohio's canine policies and
procedures in order to offer opinions on Defendants' practices.  However, Defendants offer no
support for this contention. Moreover, Defendants' argument is somewhat disingenuous given that
the policies allegedly adopted by Defendants to govern the SPD's canine unit came from an
international association and are not state specific.

considering other aspects of Heyen's affidavit and report.  *See Heflin v. Stewart Cnty., Tenn.,* 958 F.2d 709, 715 (6th Cir. 1992).

**B.    Plaintiffs' Claims**

Plaintiffs assert fourteen causes of action against Defendants City of Springboro, Ohio, City Manager Christine Thompson, Chief of Police Jeffrey Kruithoff, Springboro Police Officer Nick Clark, and Jane or John Does, a number of which are duplicative and/or fail to state a claim. The causes of action, in the order in which they are plead, include:

(1)    Unnecessary, Excessive Use of Force/Cruel and Unusual Punishment, Violation of Civil Rights under 42 U.S.C. § 1983;

(2)    Failure to Protect – Violation of Civil Rights under 42 U.S.C. § 1983;

(3)    Failure to Provide Proper Training and Supervision – Violation of Civil Rights under 42 U.S.C. § 1983;

(4)    Failure to Provide Proper Warning – Violation of Civil Rights under 42 U.S.C. § 1983;

(5)    Failure to Intervene – Violation of Civil Rights under 42 U.S.C. § 1983;

(6)    Personal Injury;

(7)    Policy, Practice, and Custom Claims Against the Defendants – Violation of Civil Rights under 42 U.S.C. § 1983;

(8)    Assault and Battery;

(9)    Failure to Adequately Train and Supervise Its Police Officers, Violation of Civil Rights under 42 U.S.C. § 1983;

(10)   Assault and Battery, Violation of Civil Rights under 42 U.S.C. § 1983;

(11)   Willful and Wanton – No Statutory Immunity, Violation of Civil Rights under  42 U.S.C. § 1983;

(12)   Claim for Respondeat Superior/Failure to Investigate Against City of Springboro, Violation of Civil Rights under  42 U.S.C. § 1983;

(13)   Malicious Prosecution/Abuse of Process – Plaintiff Samuel Campbell Only; and

(14)   Liability Under Ohio Rev. Code §§ 2744 et seq. and 2307.60; Ohio Revised Code § 2903.13[Assault and Battery]; Ohio Revised Code § 2921.45[Interfering with Civil Rights].

Defendants move for summary judgment as to all of Plaintiffs' claims.  Perhaps wisely recognizing that many of their alleged causes of action do not actually state claims, Plaintiffs narrowed the focus of their response to address only the following claims:

(1)     Section 1983 claims for excessive force in violation of the Fourth Amendment of

        the United Stated Constitution against Officer Clark in his individual capacity;

(2)     Section 1983 claims for failure to train and/or supervise against the City of

        Springboro and Chief Kruithoff;

(3)     Ohio law claims for assault and battery against Officer Clark; and

(4)     Plaintiff Campbell's claim for malicious prosecution under Ohio law against

        Officer Clark and Chief Kruithoff.

Plaintiffs explicitly concede summary judgment as to their twelfth cause of action for respondeat

superior liability.  Plaintiffs waive the remainder of their claims by failing to address them.

Specifically, the Court dismisses as either waived or duplicative Plaintiffs' second, fourth

through eighth, eleventh, and fourteenth causes of action.  The Court also dismisses all claims

against City Manager Christine Thompson in her individual capacity[21] and against John and Jane

Doe Defendants.[22]  Finally, the Court construes Plaintiff's third and ninth causes of action as

---

[21] Plaintiffs do not once mention City Manager Thompson in their Response in Opposition to Defendants' Motions for Summary Judgment.

[22] The instant case has been pending for over a year.  The deadline for service of process has long since passed and it has been more than six months since the close of discovery, yet Plaintiffs have made no attempt to amend their complaint to substitute the proper parties for those identified as Doe defendants.  Accordingly, Plaintiffs' claims against the Doe defendants are dismissed.  *See Pruitt v. Lewis*, No. 06-2867, 2007 WL 4293037 (W.D. Tenn. Dec. 6, 2007) (dismissing claims against unnamed defendants where the discovery deadline had passed and the plaintiff failed to use the discovery process to determine the names of the unidentified defendants); *Motley v. Wendy's Old Fashion Hamburgers, Inc.*, 2007 WL 3226973, No. 1:05 CV 2506 (N.D. Ohio Oct. 30, 2007) (dismissing claims against three John Doe defendants where the plaintiffs did "nothing during the more than two years that [the] action [was] pending to identify these John Doe officers, amend their complaint with that identifying information, and then properly serve the identified officers"); *Scott v. City of Dayton*, No. C-3-04-420, 2007 WL 1875642 (S.D. Ohio June 28, 2007).

39

stating a single cause of action for failure to train and supervise against Defendants Springboro and Chief Kruithoff.

### C.    Section 1983 Excessive Force Claims – Officer Clark

As stated above, Plaintiffs Campbell and Gemperline sue Defendant Clark in his individual capacity under 42 U.S.C. § 1983 for excessive use of force in violation of the Fourth Amendment.[23]  Defendant Clark claims that he is entitled to qualified immunity as to that claim because the amount of force utilized against Plaintiffs was reasonable, resulting in no violation of Plaintiffs' constitutional rights, and because even if there is a question of fact as to whether Plaintiffs' rights were violated, Plaintiffs cannot show that those rights were clearly established.

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity provides immunity from suit, not simply a defense to liability.  *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009).  To determine whether qualified immunity

---

[23] In their Second Amended Complaint, Plaintiffs sue Officer Clark in both his individual and official capacities.  Generally, official capacity claims are treated as claims against the government entity employing that official.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) ("A suit against an individual 'in his official capacity' has been held to be essentially a suit directly against the local government unit and can result in that unit's liability to respond to the injured party for his injuries.").  Plaintiffs address the City of Springboro's alleged liability in connection with their claims against the City for failure to provide adequate training and supervision.  To the extent that Plaintiffs intended to raise a separate and independent claim against the City by suing Officer Clark in his Official Capacity that claim is redundant and was not addressed by Plaintiffs in their response brief.

40

attaches, the Court first must ask if the facts alleged, taken in the light most favorable to the plaintiff, show that the government official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008). If there was not a constitutional violation, then there is no need to inquire further about qualified immunity. *Saucier*, 533 U.S. at 201. If there was a constitutional violation, the Court then determines if the specific rights violated were clearly established at the time of the violation. *Id*. at 202; *see also Parsons*, 533 F.3d at 500. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.

## 1.     Violation of Plaintiffs' Fourth Amendment Rights

"[C]laims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In this case, the parties do not dispute that the Plaintiffs were seized within the meaning of the Fourth Amendment. The question for the Court is whether the amount of force used by Officer Clark was objectively reasonable. To answer that question, the Court must determine whether the force used to subdue Plaintiffs was reasonable from the perspective of a prudent officer on the scene. *Greene v. Barber*, 310 F.3d 889, 898-99 (6th Cir. 2002). Because the standard is objective reasonableness, the subjective intent of the officer is immaterial:

41

> [T]he question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 397 (internal citations omitted).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal quotation marks omitted).  Accordingly, courts must consider the totality of the circumstances, "including the severity of the crime at issue, whether the subject pose[d] an immediate threat to the safety of the officers or others, and whether [the subject was] actively resisting or attempting to evade arrest by flight."  *Id*.  Although courts often focus on those three specific factors, the jurisprudence on excessive-force claims has consistently maintained that "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . its proper application requires careful attention to the facts and circumstances of each particular case."  *Id*.

Several courts have recognized that attacks by police canines who are improperly deployed by their handlers can constitute an excessive use of force.  *See White v. Harmon*, No. 94-1456, 1995 WL 518865, at *3 (6th Cir. Aug. 31, 1995) (canine handler could be held liable for excessive force where the handler brought a little-trained dog to an arrest scene and failed to prevent the dog from biting the plaintiff, who had already been handcuffed); *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 178 (4th Cir. 1998) (reversing summary judgment as to an excessive force claim where an officer released a police dog into a house to find and bite a

suspect without first calling out a warning); *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1089 (9th Cir. 1998) (affirming denial of summary judgment on an excessive force claim involving a police dog where there was a question of fact as to whether the handler allowed the dog to bite the plaintiff for an unreasonable amount of time before he finally called off the dog); *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1551-52, 1556-57 (11th Cir. 1989) (describing incidents where use of dogs involved excessive force against suspects of minor and nonviolent crimes, and reinstating the plaintiffs' verdict based on unconstitutional city policy of inadequate training on use of dogs); *Marley v. City of Allentown*, 774 F. Supp. 343, 346 (E.D. Pa. 1991) (denying officer's motion for judgment as a matter of law because release of police dog to attack unarmed misdemeanor suspect who "possibly" had stopped fleeing "may be objectively unreasonable").

Though none are dispositive, several cases from the Sixth Circuit shed light on the parameters of appropriate use of police dogs.  In the first case, *Robinette v. Barnes*, 854 F.2d 909 (6th Cir. 1988), the estate of a burglary suspect who was killed after being bitten in the neck by a police dog brought a civil rights action against the canine handler and the police department. The dog that killed the suspect was trained to bite a suspect on the arm and hold the suspect until an officer could secure the suspect.  *Id*. at 911-12.  If the suspect's arm was not available, the dog would bite any part of the suspect that he could reach.  *Id*. at 911.  On the night of the *Robinette* incident, officers responded shortly after midnight to a car dealership where a burglary alarm had been activated.  *Id*.  When the officers arrived, they located a point of entry, a broken glass door, and saw a suspect inside the building looking at them.  *Id*.  The canine handler entered the building with his dog and shouted a warning that he had a police dog and that anyone

inside the building should come out or he would release the dog.  *Id*.  The officer waited about

thirty seconds and repeated the warning.  After another thirty seconds of inaction, he released the

dog.  *Id*.  The dog alerted near a closed door, prompting the officer to call the dog back and to

once again shout a warning.  *Id*.  When no one emerged from behind the door, the officer opened

the door and the dog ran ahead.  *Id*.  A short time later, the officer located the dog in a darkened

area of the dealership.  *Id*.  The dog was holding the plaintiff's neck in his mouth and the

plaintiff, who was lying on the floor with half of his body underneath a car, was not moving.  *Id*.

The officer ordered the dog to release and called an ambulance, but it was too late for the

plaintiff, who was pronounced dead on arrival.  *Id*.

At the time that *Robinette* was decided, it was still unclear whether a plaintiff could bring

an excessive force claim based on the use of non-deadly force.[24]  Accordingly, the main focus of

the Sixth Circuit's inquiry was whether the use of a police dog constitutes deadly force.  With

regard to that question, the Sixth Circuit concluded that "when a properly trained police dog is

used in an appropriate manner to apprehend a felony suspect, the use of the dog does not

constitute deadly force."  *Id*. at 913.  More important to the instant case, however, is the court's

subsequent conclusion that even if it were to have held that the use of a police dog to apprehend

a felon constitutes deadly force, the use of such force was not unreasonable under the

circumstances.  *Id*. at 913.  In holding as such, the court focused on the following facts:

> The facts indicate that Barnes had probable cause to believe that Briggs, a
> suspected felon hidden inside a darkened building in the middle of the night,

---

[24] *Robinette* was decided before the Supreme Court clarified in *Graham* that a claim for
excessive force in violation of the Forth Amendment may lie whether the force used was deadly or
not.  Accordingly, the Sixth Circuit's decision may have been based on the assumption that anything
short of deadly force may be used to apprehend a felon.

threatened his safety and the safety of the other officers present.  As the district court succinctly put it,

> a reasonably competent officer would believe that a nighttime burglary suspect, who, the officers had good reason to believe, knew the building was surrounded, who had been warned . . . that a dog would be used, and who gave every indication of unwillingness to surrender, posed a threat to the safety of the officers.

> Unlike the situation in [*Tennessee v. Garner*, 471 U.S. 1 (1985)], this is not a case where a police officer shot a *fleeing* felon, a criminal suspect who, at least in part because of the fact he was fleeing, posed no threat to the officer. Instead, this is a case where an officer was forced to explore an enclosed unfamiliar area in which he knew a man was hiding. Under the totality of the circumstances, Barnes was justified in using whatever force was necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect.

*Id*. at 913-14.

Six years later, in *Matthews v. Jones*, 35 F.3d 1046 (6th Cir. 1994), the Sixth Circuit addressed another situation in which a suspect had been injured by a police dog and filed a civil rights action.  In *Matthews*, officers deployed a canine to look for the plaintiff after he had been spotted driving recklessly and at fast speeds.  The plaintiff had fled when a police cruiser tried to stop him, and eventually pulled his car over and fled on foot into a wooded area.  *Id*. at 1048.  A canine unit and a helicopter both responded to the scene.  *Id*.  At that point, the officers did not know the extent of the crimes the plaintiff may have committed or whether he was armed.  *Id*. After a failed attempt to locate the plaintiff, the officers called out orders for him to surrender, and when he did not respond, they deployed the canine unit on a track, during which the handler kept the dog on a leash.  *Id*.  The dog eventually stopped near a swampy, heavily wooded area and reacted as though the plaintiff was nearby.  The handler twice ordered the plaintiff to surrender and warned that the dog would be released if he failed to comply.  Receiving no

45

response, the handler then released the dog from the leash.  *Id*.  The dog ran about fifty feet into the woods, stopped and alerted.  When the officer approached, he saw the plaintiff lying on his stomach in the weeds, with his hands underneath his body.  *Id*.  The officer ordered the plaintiff not to move and told him that if he remained still, the dog would be ordered down.  Instead of complying, the plaintiff quickly rose to his knees, prompting the dog to bite him on the arm.  The plaintiff then struggled with the dog, and the dog repositioned his bite.  At that point, the officer ordered the dog to release, and he took the plaintiff into custody.  *Id*.

The Sixth Circuit held that based on those facts, the plaintiff could not state a claim under § 1983 for the use of deadly or excessive force.  *Id*. at 1050.  The court noted that although the officers did not know the extent of the plaintiff's crimes prior to releasing the dog, the plaintiff's "extreme behavior provided cause for the officers to believe that he was involved in activity considerably more nefarious than mere traffic violations," and "a reasonable police officer under these circumstances would have believed that [the plaintiff] posed a threat to the officers' safety as well as the safety of others."  *Id*. at 1051.  Finally, emphasizing the fact that the officer gave repeated verbal warnings prior to releasing the dog and upon locating the plaintiff, warnings which the plaintiff in turn repeatedly ignored, the court held that there was no evidence that "could support a claim that [the dog] was not used in an 'appropriate manner.'"  *Id*. (quoting *Robinette*, 854 F.2d at 913.)

In both *Robinette* and *Matthews*, the Sixth Circuit expressed a "reluctance" to label "unreasonable" the general practice of using police dogs to aid in locating and apprehending suspects.  *See Matthews*, 35 F.3d at 1052; *Robinette*, 854 F.2d at 914.  Nonetheless, the court did not foreclose the possibility that the improper use of a police dog could constitute unreasonable

46

use of force. Indeed, it would seem odd to conclude that a particular type of force is patently

reasonable regardless of the circumstances in which it is applied. And in fact, in *White*, No. 94-

1456, 1995 WL 518865, at *3, decided one year after *Matthews*, the court was faced with a

scenario involving the use of a police dog that the court concluded could support a claim of

unreasonable use of force. In that case, a canine handler requested that two officers, who had

already apprehended and handcuffed a fleeing suspect, hold off on placing the suspect in a police

car until the handler and his dog arrived at the scene. When the canine handler arrived, the

officers yanked the suspect to his feet. At that time, the dog bit the suspect in his right elbow.

The canine handler called the dog off but failed to do so in time to prevent injury to the suspect.

*Id*. at *1. The suspect sued the officers under § 1983, claiming that they violated the Fourth

Amendment's bar against unreasonable seizures by using excessive force, and the district court

denied summary judgment. On appeal, the Sixth Circuit affirmed the denial of summary

judgment on the following grounds:

> Viewing the evidence in the light most favorable to the plaintiff, Clewett [the
> canine handler] requested, for no apparent reason, at least no reason found in the
> record, that other officers postpone taking the plaintiff away so that he could
> bring a little-trained canine to the arrest scene. Clewett, who himself had virtually
> no canine-handling training, then brought the dog, which Clewett knew had bitten
> someone on a previous occasion, into the immediate presence of the handcuffed
> plaintiff the dog was "tracking"; close enough to permit the dog to bite the
> plaintiff. A reasonable officer would understand that those facts constitute an
> objectively unreasonable seizure.

*Id*. at *3.

Examination of those cases reveals a spectrum of police conduct in the deployment of

police dogs ranging from entirely reasonable to entirely unreasonable. Conduct such as occurred

in *Matthews* and *Robinette* falls to one end of that spectrum while conduct such as occurred in

*White* falls to the other end.  As discussed below, although the incidents involving Campbell and Gemperline are located somewhere in between those cases, several factors indicate that the force used in both situations was excessive and objectively unreasonable under the circumstances.

### a.        Plaintiff Campbell

Defendants argue that the same factors considered by the Sixth Circuit in *Matthews* were present during the track for Campbell.  Specifically, Defendants characterize the search for and apprehension of Campbell as a situation in which "[a] suspect had hidden himself, was suspected of an attempted burglary and vandalism, it was dark, and the officers could be viewed as targets in searching for the suspect."  (Doc. 58 at 15.)  That summary of the situation skews the evidence in Defendants' favor and leaves out important points that distinguish this case from both *Matthews* and *Robinette*.  The Court looks first to the three *Graham* factors: the severity of the crime, the degree to which the subject posed an immediate threat to the safety of the officers or others, and the degree to which the subject was actively resisting or attempting to evade arrest by flight.  Those factors are somewhat entwined.  Like in *Matthews*, the officers in this case did not know the extent of the crimes, if any, that Campbell had committed, or whether he was armed.  The evidence shows that at the time Officers Clark and Anderkin decided to deploy Spike on a track, they had reason to believe that an attempted burglary had occurred and they had been told that the suspect recently had fled the area.  Beyond those factors, however, this case diverges from the factual scenarios presented in *Matthews* and *Robinette*.

For example, there are at least questions of fact as to the degree to which the Campbell posed an immediate threat to the safety of the officers or others.  Officer Clark admitted that he did not believe Parker was in immediate danger and that he was not aware of a specific threat to

anyone on the scene at that time, though he was concerned that Campbell was still in the area.
Of course, it would not be unreasonable for the officers to suspect that a person who they
believed had just attempted to burglarize a residence may be armed.  On the other hand, the fact
that Campbell had left the area suggests that he did not pose a threat to the officers.  *See
Robinette*, 854 F.2d at 914 (noting that "a *fleeing* felon, . . . at least in part because of the fact he
was fleeing, posed no threat to the officer").  Officer Clark did testify that he was concerned that
Campbell may still be in the area because the officers knew that he had only recently left.  But
there is no evidence that he believed Campbell was lying in wait to possibly ambush them.
Instead, the fact that the officers did not express any concern for their own safety while they
were investigating the exterior of Parker's house suggests the opposite.

Additionally, while there is no question that Campbell initially left the scene and then
attempted to hide from the police, Campbell's act of leaving differs at least somewhat from the
*Matthews* plaintiff's act of fleeing by vehicle and foot while actually being chased by the police
after being ordered to stop.  More important, the are genuine issues of fact in this case as to
whether Campbell ever actively resisted the officers.  According to Campbell's version of
events, as Officer Clark approached the area where Campbell was hiding, Officer Clark saw him
lying on the ground with his arms stretched out, and without issuing any warnings or commands,
allowed Spike to march up to Campbell and bite him.  Defendants dispute Campbell's testimony
that Officer Clark saw him, and they fault Campbell for not revealing himself as the officers
approached, claiming that had Campbell announced his presence, he would not have been bit.
However, to the extent that Officer Clark and Campbell did see each other, as Campbell
maintains, there would be no need for Campbell to announce his presence.  Furthermore, there is

49

no evidence that Campbell attempted to run or that he did anything else to try to evade the officers as they approached him.  This case therefore presents a different factual scenario than *Matthews*, where the plaintiff was bitten by the police dog after disregarding the officer's orders and while jumping up as though he were attempting to escape.  *See McGovern v. Vill. of Oak Lawn*, No. 01 C 3772, 2003 WL 139506, at *6 (N.D. Ill. Jan. 17, 2003) (distinguishing *Matthews* on similar grounds).

Furthermore, there are at least three other factors in this case that suggest that the force applied in arresting Campbell was excessive.  First, there is a significant amount of evidence, discussed in detail above, showing that Spike was not undergoing proper maintenance training and that he may not have been performing as expected in the field.

Second, whereas warnings were given at several points in both *Robinette* and *Matthews*, no warnings or orders were given in this case.  Plaintiffs' expert witness, Kyle Heyen, concluded in his written report that Officer Clark violated generally accepted police procedure when he failed to issue a verbal warning after Spike began air scenting. (Heyen Report at 10, 29.) Plaintiffs argue that verbal warnings are necessary in cases such as this in order to give the suspect an opportunity to give himself up without the risk of being bitten.

Defendants argue that warnings in this particular instance were unnecessary for several reasons, all of which are based on a version of the facts that skews in their favor and are therefore unpersuasive at the summary judgment stage.  For example, Defendants argue that any warning could have jeopardized the officers' safety and would have proved futile because Campbell, by his own admission, was hiding from the officers.  That argument assumes that Campbell believed he was still hidden from the officers' view as they approached with Spike.

50

However, as discussed above, Campbell maintains that Officer Clark saw him lying on the ground as the officers approached.  Additionally, with regard to the officers' safety, at least one court has noted that the issuance of verbal warnings when deploying police dogs "would likely diminish the risk of confrontation by increasing the likelihood that a suspect will surrender." *Kuha v. City of Minnetonka*, 365 F.3d 590, 599 (8th Cir. 2003), amended April 27, 2004, abrogated on other grounds by *Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007). Defendants also argue that Campbell did not need a warning because he saw the officers approaching with Spike.  In making that argument Defendants assume, without any evidence to support the assumption, that Campbell knew how Spike would react and knew that there was something he should do in order to avoid being bitten.

Defendants finally argue that Officer Clark did not need to issue any verbal warnings because he kept Spike on a lead during the entire track.  Defendants are correct that this fact distinguishes this case from cases in which courts have found that the failure to give a verbal warning prior to releasing a dog from a leash amounts to excessive force.  *See Vathekan*, 154 F.3d at 178 (reversing summary judgment as to an excessive force claim where an officer released a police dog into a house to find and bite a suspect without first calling out a warning). However, as can be seen from the instant case, a dog can inflict damage even when he is not released, and keeping a dog on a leash or a lead does not guarantee that the handler has sufficient control to always prevent a bite.  Officer Clark admitted during his deposition that he expected that Spike would bite when he located someone during a track and that based on Spike's performance in the field, he believed it was more likely than not that Spike would bite someone

51

while performing a track.  Officer Clark also testified that the only way to prevent such a bite would be for him to either physically restrain Spike or verbally command Spike to stand down.

This Court agrees that warnings may not always be necessary, let alone prudent when tracking a suspect.  However, it would be erroneous to suggest, as Defendants do, that verbal warnings are never a necessary component of the appropriate use of a police dog as long as the dog is kept on a lead.  *See Kuha*, 365 F.3d at 599 (finding that a rational jury could conclude that officers acted unreasonably by failing to give a warning prior to deploying a police dog even though the dog was kept on a lead during the track).  In this case, if they believe Campbell's version of the events, jurors could easily find that Officer Clark acted unreasonably by allowing Spike to get close enough to Campbell to attack him without giving Campbell any orders or any opportunity to surrender, particularly given the fact that Campbell was lying on the ground and was not doing anything approximating active resistance.  *See McGovern*, No. 01 C 3772, 2003 WL 139506, at *7 (denying summary judgment as to the plaintiff's excessive force claim where there was a genuine issue of fact regarding whether a canine officer, upon locating the suspect, gave any warning prior to instructing a police dog to engage the suspect).  Moreover, even if jurors do not believe Campbell's account, there would remain a question of fact, based on Heyen's testimony, as to whether Officer Clark's failure to give a warning once Spike began air scenting was unreasonable.

The final factor suggesting the force applied against Campbell was excessive is the duration of the attack.  There is evidence suggesting that Officer Clark allowed Spike to continue to bite Campbell for an extended period of time, up to forty-five seconds.  Officer Clark claims that he allowed Spike to continue to bite Campbell during that period of time because Campbell

was struggling, kicking Spike, and would not comply with orders to put his hands up. Campbell maintains that he did not kick Spike and that the only orders Officer Clark gave were to Spike. At the very least, there is a question of fact as to whether it was reasonable for Officer Clark to allow Spike to bite Campbell for up to forty-five seconds before ordering Spike to stand down. *See Watkins*, 145 F.3d at 1089 (finding that the plaintiff set forth sufficient facts for the purposes of summary judgment to show that the duration and extent of force applied in effecting his arrest amounted to an unreasonable use of force where officers allowed a police dog to continue to bite a suspect for ten to fifteen seconds, allegedly because the suspect would not comply with orders to show his hands). Even if they believe Officer Clark's testimony that he did not immediately order Spike to stand down because Campbell would not comply with orders to put his hands up, jurors could still find that Officer Clark's actions were unreasonable. *See Kopf v. Wing*, 942 F.2d 265, 268 (4th Cir. 1991) (noting that "[w]e believe that a jury could find it objectively unreasonable to require someone to put his hands up and calmly surrender while a police dog bites his scrotum").

### b. Plaintiff Gemperline

Applying the same analysis to Gemperline's claim, the Court finds similar questions of fact with regard to the question of whether excessive force was used during her arrest. The amount of force used on Gemperline was extreme, resulting in permanent disfiguration. This Court balances that intrusion into Gemperline's Fourth Amendment rights against the countervailing governmental interests, beginning with the three *Graham* factors.

There is no question that Gemperline attempted to evade arrest by sneaking out of a patrol car window and then running from the scene. Undisputed evidence also shows that the

53

officers were concerned that Gemperline posed a threat to herself and to others because Gemperline had been drinking, appeared intoxicated, and had been belligerent when the officers initially attempted to arrest her. Nonetheless, the crime for which she was initially arrested, underage drinking, was not severe, and there is no evidence to suggest that she was ever armed. The officers found no weapons on her when they first arrested her outside of the party, though Defendants point out that they had no way of knowing whether she had armed herself after fleeing from the patrol car. The *Graham* factors, therefore, tip the scales only very slightly in Defendants' favor.

However, just as with Campbell's situation, there are additional factors suggesting that the force used in apprehending Gemperline was excessive. Again, as discussed above, there is ample evidence that Spike was not undergoing regular training and had not undergone any training within a month of the incident – evidence that calls into question the general decision to deploy Spike in the field.

The second factor is Officer Clark's failure to give any verbal warnings, particularly at the point when Spike led him into the backyard where Gemperline was hiding and began air scenting. Officer Clark testified that air scenting behavior can indicate that a suspect is close by. Plaintiff's expert, Kyle Heyen, concluded in his report that verbal warnings should have been given at the point when Spike started air scenting. (Heyen Report at 10, 29.) Heyen also expresses skepticism regarding Officer Clark's statements that he did not know that Gemperline was hiding in the playhouse, noting that "[a] playhouse in the backyard of a residence with little other cover becomes an obvious point of interest, especially if a trained dog is 'air scenting' that a suspect is near." (*Id.* at 30.)

54

Defendants attempt to paint Spike's attack on Gemperline as an accident that Gemperline could have prevented by announcing her presence when she heard Officer Clark walk into the backyard.  In making that argument, Defendants assume without any supporting evidence that Gemperline knew what could befall her if she did not announce her presence.  Officer Clark was the only person in that scenario who knew what Spike was capable of doing.  Even assuming Officer Clark had no idea Gemperline was hiding in the play house, there is evidence indicating that he deployed Spike with the expectation that Spike would bite upon locating Gemperline and that he knew or should have known from Spike's air scenting behavior that Gemperline may have been hiding somewhere nearby.  A reasonable jury could find that Officer Clark's failure to issue verbal warnings at that point and to give Gemperline an opportunity to reveal herself was unreasonable.

Finally, there are questions of fact regarding the amount of time during which Spike was permitted to bite Gemperline after first locating her in the playhouse and regarding the method that Officer Clark used to stop the attack.  Officer Clark maintains that he performed a choke off maneuver on Spike as soon as he heard Gemperline scream.  However, Gemperline testified that Spike was permitted to bite her several different times and that she struggled with the dog until she passed out, suggesting that Spike was not pulled off of Gemperline as quickly as Defendants allege.  Gemperline, relying largely on Heyen's report, questions why Officer Clark never attempted to call Spike off with a verbal command and argues that performing the choke off may have worsened the physical injuries caused by Spike.  Heyen writes the following regarding the use of a choke off maneuver in this instance:

a) a choke off takes longer to perform than a verbal release, if the dog is performing to professionally accepted standards, b) a choke off increases the

55

potential of significant damage (bone, musculature, nerves) and inflicting extreme pain to the person being bitten when performed on the street and, c) other on scene law enforcement personnel ran from the side of the house across the street to the back yard and then to the playhouse and Spike was still biting Ms. Gemperline.  It would have taken several seconds for Sgt. Zimmaro and Dep. Apking to have run that distance and still observe Spike biting Ms. Gemperline. It would have been much faster to immediately give verbal commands to Spike to release the bite (disengage) and Defendant Clark's failure to do so was contradictory to professionally accepted guidelines, the training he received during handler school and subjected Ms. Gemperline to untold pain and greatly enhanced the chance of serious and permanent injury to Ms. Gemperline.

. . . A purpose of a choke off in training situations is to increase the bite pressure of a dog and to condition the dog to stay on the bite.  On the street a "choke off" should only be done when a patrol dog will not release the bite with a) a verbal command or b) a leash correction or c) combinations of a & b.  And once evidence of this failure to execute such a critical task is documented, the administration should immediately remove the dog from service until an evaluation by a trained professional has been performed to evaluate the suitability of the dog for service.

(Heyen Report at 33-34.)  There is evidence suggesting that the real reason Officer Clark chose to perform a choke off was that Spike did not always respond to Officer Clark's verbal commands as consistently as he should have responded.  During his deposition, Officer Clark admitted that Spike did not always cease biting subjects when ordered to stand down during training sessions and sometimes bit subjects when he was supposed to stay back and bark. (Clark I Dep. 182:2-186:11.)  Heyen also indicated that his review of the training records led him to believe that Spike frequently failed to disengage from a bite during training, and that as a result Officer Clark or other unknown trainers began using a pinch collar or electronic shock collar ("e-collar") in order to gain better control over Spike during training sessions.  (*Id*. at 20.) Officer Clark testified that Spike wore an e-collar when deployed in the field, including during tracks, from the time that he was first certified for duty to sometime in 2007 when the e-collar

56

stopped working.  (Clark I Dep. 165:5-168:22.)  The above evidence suggests that Officer Clark did not have as much control over Spike as Defendants allege.

Essentially, when the facts are viewed in a light most favorable to Gemperline, the evidence in this case demonstrates the following: Defendant Clark deployed a police dog known for biting subjects during tracks to locate a 110 pound intoxicated eighteen year old who had evaded arrest for underage consumption of alcohol, despite knowing that the dog had not regularly undergone required maintenance training and was not always responding properly to verbal commands.  Furthermore, when the dog began air scenting, Officer Clark failed to issue any verbal warning to give Gemperline an opportunity to surrender, although he either knew or should have known that she was nearby and possibly hiding in a playhouse in the area near where the dog air scented.  Finally, when the dog engaged Gemperline, Officer Clark chose to physically pull Spike off of Gemperline rather than issuing a verbal command, thereby unnecessarily extending the duration and increasing the force of the bite.  Under that scenario, a reasonable jury could find that the amount of force used in apprehending Gemperline was excessive.

### 2.    Violation of Clearly Established Right

"[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent."  *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008).  In determining whether a right is clearly established, the Supreme Court has held, the crucial inquiry must "be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  There is a clear Constitutional prohibition

57

against the use of excessive force in effecting an arrest.  *Graham*, 490 U .S. at 394.  However, the test of "clearly established law" cannot be applied at that level of generality.  *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  Instead, the right at issue "must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id*. at 640.

The particularized inquiry does not require Plaintiffs to demonstrate that "the very action in question has previously been held unlawful" in order to defeat Officer Clark's claim of qualified immunity.  *Id*.; *see also Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007) ("The mere fact that a court has not held the particular action in question unlawful is insufficient to create immunity."; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  Accordingly,

> The Supreme Court has refused to require that a plaintiff demonstrate the existence of a "fundamentally similar" or "materially similar" case.  There can be "notable factual distinctions between the precedents relied on . . . so long as the prior decisions g[i]ve reasonable warning that the conduct then at issue violated constitutional rights."  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."

*Champion*, 380 F.3d at 902 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002)) (internal citations omitted).

To demonstrate that Officer Clark unreasonably violated a clearly established right, "the Plaintiffs must therefore show the prior articulation of a prohibition against the type of excess force exerted here."  *Id*.  In evaluating the contours of the right, the Court "'look[s] first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits.'"  *Sallier v. Brooks*, 343 F.3d 868, 878 (6th Cir. 2003) (quoting *Buckner v. Kilgore*, 36 F.3d 536, 539 (6th Cir. 1994)).  "[A]n action's

58

unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). In other words, "[t]he Court can consider more than merely the factual context of a prior case: the general reasoning that a court employs also may suffice for purposes of putting the defendant on notice that his conduct is clearly unconstitutional." *St. John v. Hickey*, 411 F.3d 762, 774 (6th Cir. 2005) (internal quotation marks omitted).

The issue here is whether the boundaries of the Fourth Amendment right against excessive force were clearly established in the context of police dog use at the time of Plaintiffs' arrests in 2007 and 2008. *See Smith v. City of Auburn*, No. C04-1829RSM, 2006 WL 1419376, at *6 (W.D. Wash. May 19, 2006). There is not an abundance of case law addressing the use of police dogs to effectuate seizures. That does not mean, however, that there was no clearly established law that would indicate to Officer Clark that the deployment of Spike under the circumstances and in the manner as occurred in the Campbell and Gemperline situations was unreasonable. As discussed above, Sixth Circuit decisions demonstrate that there is a continuum of permissible versus impermissible use when it comes to police dogs. On the permissible end of that spectrum are cases wherein officers deploy properly trained police dogs to locate individuals who were believed to be involved in nefarious criminal activity, who may have been armed and dangerous, and who failed to surrender or respond in any manner after officers gave several warnings. *See Robinette*, 854 F.2d at 909; *Matthews*, 35 F.3d at 1064. On the other end of that spectrum lies a case in which a canine officer allowed a little-trained police dog to get close enough to a subject of a track to bite the subject despite the fact that the subject had already been subdued and placed in handcuffs. *See White*, No. 94-1456, 1995 WL 518865, at *3.

59

Cases from other circuits help to further flesh out the continuum.  As early as 1998, in a case in which officers allowed a police dog to continue to bite the plaintiff for ten to fifteen seconds and did not call the dog off until the plaintiff complied with orders to show his hands, the Ninth Circuit recognized that "it was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation."  *Watkins*, 145 F.3d at 1093.

Also in 1998, on a somewhat broader level, the Fourth Circuit held that "[a]n attack by an unreasonably deployed police dog in the course of a seizure is a Fourth Amendment excessive force violation."  *Vathekan*, 154 F.3d at 178.  In the same case, the Fourth Circuit found that "it was clearly established in 1995 that it is objectively unreasonable for a police officer to fail to give a verbal warning before releasing a police dog to seize someone."  *Id*. at 175.  The *Vathekan* court relied in large part on earlier precedent set in *Kopf*, 942 F.2d at 267-68, where the Fourth Circuit held that where the evidence viewed in a light most favorable to the plaintiff showed that officers had released a dog without warning to apprehend two suspects who were cornered in a narrow passageway.  In both *Vathekan* and *Kopf*, the police dogs were actually released from their leads.  In 2003, the Eighth Circuit found that deploying a police dog without a verbal warning can violate the Fourth Amendment even where the dog is kept on a lead.  *Kuha*, 365 F.3d at 599.

Based on the precedent discussed above, Officer Clark had reason to know that the conduct he engaged in while apprehending and arresting Plaintiffs was unlawful.  Officer Clark deployed Spike with knowledge that Spike had not undergone necessary maintenance training on a regular basis and had a high propensity for biting subjects during tracks.  Further, in both

cases, Officer Clark never issued any verbal warnings or commands though there is evidence showing that he knew or should have known that the plaintiffs were hiding close by and in fact knew or should have known the precise location in which each was hiding.  Finally, in both cases, there are questions of fact as to whether Officer Clark allowed Spike to bite Plaintiffs for an unreasonable and unnecessary amount of time, particularly where neither Plaintiff showed signs of active resistance other than attempting to prevent Spike from further biting them.  Under the circumstances, Officer Clark should have known that his conduct violated the clearly established rights of the Plaintiffs to be free from the unreasonable and improper deployment of a police dog in the course of their apprehensions and arrests.

This Court recognizes that in a recent case that is somewhat analogous to the Gemperline incident, the Fourth Circuit granted qualified immunity to the defendant canine officer.  *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 358 (4th Cir. 2010).  In that case, an officer deployed a police dog on a fifteen-foot lead to track a teenage boy who had been drinking, had wandered off into the night, and who was believed to be in need of medical assistance.  *Id*. at 352-53.  The dog tracked into a yard and went into a bush and out of the view of the officer.  After the lead went slack, the officer realized that the dog had located the boy and was biting the boy's leg.  The officer decided to physically pull the dog away from the boy rather than verbally call the dog off because the boy was struggling and the officer feared that if he performed a verbal call off the dog would release and then bite the boy in the face.  *Id*. at 353.  The boy's father filed suit, alleging that the canine officer used excessive force in seizing the boy.  The district court declined to grant the canine officer qualified immunity and the officer appealed.  The Fourth

Circuit reversed, finding that although there were questions of fact as to whether excessive force was used, the officer was entitled to qualified immunity.  *Id*. at 356-359.

In addressing the issue of qualified immunity, the Fourth Circuit focused first on *Kopf* and *Vathekan*, finding that those cases were not sufficiently similar to provide prior notice to the officer that his conduct violated clearly established law.  The court found that those cases signaled only that the failure to give a warning prior to releasing a dog is objectively unreasonable, and the court distinguished *Melgar* on the basis that "[t]here is a vast difference between an officer releasing a dog off a leash knowing with a good degree of certainty that it will find and bite its target and an officer exercising substantial control over a leashed animal with the expectation of being able to prevent any injury."  *Id*. at 359.  The court also rejected the plaintiff's contention that the officer acted in a professionally incompetent manner by deciding to deploy a police dog to locate a missing juvenile with knowledge that the dog was trained to bite upon locating a suspect.

In deciding the qualified immunity issue, the Fourth Circuit did not consider *Kuha*, *Watkins*, or any of the Sixth Circuit precedent discussed above.  With due consideration to the *Melgar* court's conclusion, this Court believes that the case law discussed above warrants a different conclusion in this case, particularly given the questions of fact that exist regarding the adequacy of Spike's training, the ability of Officer Clark to effectively control Spike during tracks even while Spike was on a lead, and the fact that Officer Clark knew that when he deployed Spike on a track, the likely result would be a bite.  Accordingly, the Court denies Officer Clark's motion for summary judgment as to Plaintiffs' § 1983 excessive force claims.

**D.**  **Section 1983 Failure to Train and/or Supervise Claims – City of Springboro and Chief Kruithoff**

62

In addition to pursuing claims against Officer Clark, Plaintiffs also seek to hold the City of Springboro and Chief Kruithoff liable under § 1983 for violations of their Fourth Amendment Rights.  Plaintiffs originally sued Chief Kruithoff in his official and individual capacities.  It is not clear from Plaintiffs' Response in Opposition to Defendants' Motions for Summary Judgment if Plaintiffs intend to pursue both types of claims.  Accordingly, the Court considers both herein.  To the extent that Plaintiffs sue Chief Kruithoff in his official capacity, his claims against the Chief are essentially claims against the City and will be analyzed as such.[25]  *See Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989) ("A suit against an individual 'in his official capacity' has been held to be essentially a suit directly against the local government unit and can result in that unit's liability to respond to the injured party for his injuries.").

### 1.    Municipal Liability – City of Springboro

The Sixth Circuit has described the circumstances under which a government entity may be held liable under § 1983 as follows:

> Section 1983 does not permit a plaintiff to sue a local government entity on the theory of respondeat superior.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978).  A plaintiff may only hold a local government entity liable under § 1983 for the entity's own wrongdoing.  *Id.*  A local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights.  *Id.*  A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers.  *Id.*

---

[25]  The same holds true for Plaintiffs' official capacity claims against City Manager Christine Thompson.

*Gregory v. City of Louisville*, 444 F.3d 725, 752-53 (6th Cir. 2006).  In this case, Plaintiffs allege that the City of Springboro acted with deliberate indifference by failing to ensure adequate supervision and training.

The systematic failure to train or supervise police officers adequately can amount to a custom or policy justifying city liability "when the failure . . . amounts to 'deliberate indifference' on behalf of the city toward its inhabitants."  *Id.* at 753 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Leach*, 891 F.2d at 1247-48; *Kammeyer v. City of Sharonville, Ohio*,  No. 1:01-CV-00649, 2006 WL 1133241, at *11 (S.D. Ohio Apr. 27, 2006). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997).  The Supreme Court explained this standard in the context of a failure to train claim in *Harris*:

> The issue . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."  It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Harris*, 489 U.S. at 390 (footnotes omitted).   "To establish deliberate indifference, a plaintiff must demonstrate either that a municipality or local government (1) failed 'to provide adequate training [or supervision] in light of foreseeable consequences that could result from the lack of instruction [or supervision];' or (2) failed 'to act in response to repeated complaints of

64

constitutional violations by its officers.'" *Rodriguez v. City of Cleveland*, 619 F. Supp. 2d 461, 482 (N.D. Ohio 2009) (quoting *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)); *see also Leach*, 891 F.2d at 1247-48.

The evidence related to the training and supervision of the SPD's canine unit is described in detail above. That evidence, when viewed in a light most favorable to Plaintiffs, at the very least creates a question of fact as to whether the need for more adequate supervision and training was so obvious and the likelihood that the inadequacy would result in the violation of constitutional rights was so great as to amount to deliberate indifference to Plaintiffs' rights. First and foremost, the evidence shows that Spike was not subject to continual and regular maintenance training although such training was necessary to prevent the deterioration of Spike's performance and responsiveness to Officer Clark's commands. Officer Clark repeatedly complained about the lack of time afforded to him for training, but no formal action was taken to rectify the situation. As a result, Spike had not undergone any maintenance training for more than a month prior to both the Campbell and Gemperline incidents, despite recommendations of approximately sixteen hours of maintenance training per month.

The evidence indicates that Officer Clark's inability to keep up with Spike's maintenance training resulted from a systematic lack of supervision and training throughout the upper levels of the police department. For example, the SPD never developed any clear guidelines for the operation of the canine unit. There are questions of fact as to whether the SPD actually adopted a formal canine policy prior to 2008. The policy that defendants claim was in force – an IACP model policy that Officer Clark obtained from internet –  was never disseminated amongst the staff and was not placed in all of the policy manuals. To the extent that Officer Clark's

65

supervisors were aware of the policy, it provided only vague guidelines for training and certification.  For example, the IACP Policy does not actually set out specific training requirements.  Rather, it simply states that training requirements must be met.  Neither Chief Kruithoff nor anyone else in the SPD ever set forth any written guidelines for the amount and type of training that the SPD would require its canine unit to complete.  A policy stating that training requirements must be met is meaningless unless it also states what those requirements are.

In addition to failing to establish a clear written policy, Chief Kruithoff never assigned anyone one with specific knowledge or training regarding the operation of the SPD's canine unit to supervise the unit.  Instead, when it came to his duties as a canine handler, Officer Clark was essentially left to monitor himself.  He was under the general supervision of Lieutenants Wheeler and Parker and a number of rotating sergeants.  However, none of those supervisors received adequate training in the operation of a canine unit such that they would be capable of effectively supervising the unit.  Accordingly, although they allegedly were in charge of monitoring the canine unit's certification and training, they expressed a lack of knowledge as to what type of certification and training was required.  Perhaps as a result of their lack of knowledge, Officer Clark's supervisors allowed him and Spike to continue working for several months after their state certification had lapsed and failed to take any formal action to address Officer Clark's repeated complaints that he was unable to find time to perform necessary maintenance training with Spike.

The SPD never put into place any formal system for monitoring the canine unit.  Officer Clark filled out use of force reports when Spike bit someone and those reports were reviewed by

66

his supervisors.  However, given their lack of understanding of how Spike was supposed to be performing in the field, it is questionable whether they were able to conduct meaningful reviews of the incidents.  Additionally, there is no evidence that the supervising officers received any training or instruction regarding the use of a police dog as a use of force.  Furthermore, despite starting a canine unit, the SPD never amended its use of force policy to address canine use.  In fact, Officer Clark testified that in early 2006, Lieutenant Wheeler asked him where the use of a canine should be included in the SPD's use of force policy and Officer Clark advised him that he did not believe it should be included in the policy at all.  (Clark I Dep. 51:2-56:10.)

Indeed, the Court finds that when the evidence is viewed in a light most favorable to Plaintiffs, this is not simply a case in which the training could have been better or a case in which a sound training program was administered negligently.  This is a case in which, aside from the initial training that Officer Clark and Spike undertook prior to Spike's certification, there was a complete, across the board absence of training and supervision with regard to the canine unit. Under such circumstances, the inadequate training and supervision may be fairly said to represent the policy of the city.  Accordingly, the Court cannot at this point conclude as a matter of law that the City of Springboro could not be held liable for violations of Plaintiff's constitutional rights.

### 2.    Supervisory Liability – Chief Kruithoff

Plaintiffs also seek to hold Chief Kruithoff individually liable due to his supervisory role. Plaintiffs argue that, like the City, Chief Kruithoff acted with deliberate indifference to the rights and safety of Plaintiffs by failing to supervise the SPD's canine unit and ensure proper training.

Defendants argue that Chief Kruithoff did not act with deliberate indifference to Plaintiffs' rights and that he is entitled to qualified immunity as to any claim of individual liability.

Just as a governmental unit may not be held liable under § 1983 based on a theory of respondeat superior liability, respondeat superior also is not a proper basis for supervisory liability. *See Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009); *McQueen v. Beecher Cmty. Schools*, 433 F.3d 460, 470 (6th Cir. 2006). To hold an individual supervisor liable "under a failure-to-train theory, the [plaintiff] must point to a specific action of [the] supervisor to defeat a qualified immunity claim." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008). "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)). "At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (quoting *Hays*, 668 F.2d at 874).

There is no allegation in this case that Chief Kruithoff either encouraged the specific incidents of misconduct or in some other way directly participated in them. Instead Plaintiffs seek to hold Chief Kruithoff liable for establishing a policy and custom of training and supervision that was so inadequate as to inevitably result in the violation of Plaintiffs' rights. One way of showing knowing acquiescence is to show that a supervisor knew of a pattern of constitutional violations and failed to address the problem. In the absence of evidence of a pattern of past misconduct that would suggest knowing acquiescence on the part of a

supervisor,[26] the Sixth Circuit has held that  "a supervisory official . . . may be held liable only

where there is essentially a complete failure to train the police force, or training that is so

reckless or grossly negligent that future police misconduct is almost inevitable."  *Hays*, 668 F.2d

at 874 (6th Cir. 1982); *see also Clark v. Kentucky*, 229 F. Supp. 2d 718, 724 (E.D. Ky. 2002)

(refusing to dismiss a claim of supervisory liability based on failure to train where there was a

possibility that the plaintiff could prove that there was either a complete failure to train the

officers, or training that was so reckless or grossly negligent that future misconduct was almost

inevitable).  "Only in such circumstances can it be said that a supervisor's liability rests upon

active unconstitutional behavior, as opposed to a mere failure to act."  *Ontha v. Rutherford Cnty.,*

*Tenn.*, 222 F. App'x 498, 504 (6th Cir. 2007) (internal quotation marks omitted).

As discussed above, there is evidence in this case that in establishing the SPD's canine

unit, Chief Kruithoff took few if any steps to ensure that the unit functioned in accordance with

the law.  He chose to essentially abdicate any duty he may have had to set policies governing the

operation of the unit and to provide training for the officers who were supposedly charged with

supervising the unit.  Plaintiffs set forth sufficient evidence from which a jury could conclude

that the supervision and training in this case were so lacking that the resultant violations of

Plaintiffs' Fourth Amendment rights was almost a foregone conclusion.  *See A.M. v. Lexerne*

*Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (holding that individual defendants

---

[26] While there may be evidence of a pattern of Fourth Amendment violations that occurred
prior to the Campbell and Gemperline incidents, Plaintiffs have not fleshed that evidence out at this
stage.  Although Plaintiffs failed to show a pattern of past *constitutional violations*, they do present
evidence – notably the annual canine usage reports that Officer Clark prepared for Chief Kruithoff
– that Chief Kruithoff knew or had reason to know that an increasing percentage of Spike's tracks
were ending in bites in 2007 and that Officer Clark was concerned Spike's training was not up to
par.

69

who are policymakers may be subject to supervisory liability under § 1983 if it is shown that such defendants, with deliberate indifference to consequences, established and maintained policy, practice, or custom which directly caused constitutional harm).   Questions of fact therefore preclude this Court from granting Chief Kruithoff qualified immunity at this time.

### E.      Ohio Law Claims for Assault and Battery

Having addressed Plaintiffs' federal constitutional claims, the Court turns next to Plaintiffs' claims against Officer Clark for assault and battery under Ohio law.  An officer may be held liable for assault and battery where the officer used unreasonable force in the course of an arrest.  *See D'Agastino v. City of Warren*, 75 F. App'x 990, 995 (6th Cir. 2003) ("If an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery" under Ohio law.); *Knox v. Hetrick*, No. 91102, 2009 WL 792357, at *8 (Ohio App. 8 Dist. Mar. 26, 2009).  This Court has already determined that Plaintiffs raise genuine issues of material fact as to whether Officer Clark used excessive force in arresting them.

Officer Clark asserts that he nevertheless is entitled to immunity under Ohio Rev. Code § 2744.03, which provides immunity to employees of political subdivisions of Ohio except in certain limited circumstances.  One exception applies where the employee's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).  The Ohio Supreme Court has held that "the issue of wanton misconduct is normally a jury question."  *Fabrey v. McDonald Vill. Police Dept.*, 70 Ohio St. 3d 351, 356, 639 N.E.2d 31 (1994).  In light of all of the evidence discussed above in the context of Plaintiffs'

excessive force claims, the Court finds that a reasonable jury could conclude that Officer Clark acted with a malicious purpose, or in a wanton or reckless manner.

###     F.      Ohio Law Claims for Malicious Prosecution

Plaintiff Campbell also asserts claims under Ohio law for malicious prosecution against Officer Clark and Chief Kruithoff.   While Campbell was recovering from the wounds he sustained during his arrest, Officer Anderkin filed criminal charges against Campbell for burglary and vandalism.  (Clark Dep. 51:9-13; Anderkin Dep. 39:19-25.)  Although criminal charges were filed, Campbell was never indicted on those charges.  (Campbell Dep. 79:19-25.)

To succeed on a claim of malicious criminal prosecution under Ohio law, a plaintiff must show three elements: (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused.  *Logsdon v. Hains*, 492 F.3d 334 (6th Cir. 2007).  In this case, there is no evidence that Officer Clark or Chief Kruithoff were in any way involved in the decision to pursue an indictment of Campbell.  When asked during his deposition who made the decision to charge Campbell with burglary and vandalism, Officer Anderkin testified that he could not remember exactly who decided on those charges. (Anderkin Dep. 39:11-18.)  He also testified that he ultimately had sole discretion to file or to drop the charges.  (Anderkin Dep. 58:1-19; *see also* Clark II Dep. 51:9-16.)  Officer Clark maintains that he provided no input into the charging decision and had no conversations with Officer Anderkin about what crimes would be charged.  (Clark II Dep. 51:14-20.)  As Plaintiff fails to set forth any evidence showing that Officer Clark or Chief Kruithoff played any role in the decision to file criminal charges, the Court grants summary judgment to Defendants with regard to Plaintiff's malicious prosecution claim.

71

IV.     **CONCLUSION**

For the reasons stated above, the Court **DENIES as moot** Defendants' Motion to Strike the Affidavit of Plaintiffs' Expert, Michael D'Amico (Doc. 74), and the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Strike the Affidavit of Plaintiffs' Expert, Kyle K. Heyen (Doc. 75).  Finally, the Court **GRANTS in part** and **DENIES in part** Defendants' Motions for Summary Judgment.  (Docs. 58, 59.)   The Court **DENIES** summary judgment as to Plaintiffs' claims against Officer Clark for excessive force in violation of the Fourth Amendment, brought under 42 U.S.C. § 1983, and for assault and battery under Ohio law.  The Court also **DENIES** summary judgment as to Plaintiffs' § 1983 claims for failure to train and/or supervise against the City of Springboro and Chief Kruithoff.  The Court **GRANTS** summary judgment to Defendants as to all remaining claims.

IT IS SO ORDERED.


_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court