IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

CASE NUMBER: 1:08-CV-00737

JUDGE SUSAN J. DLOTT


SAMUEL A. CAMPBELL

AND

CHELSIE GEMPERLINE                    PLAINTIFFS

     vs.

THE CITY OF SPRINGBORO, OHIO, ET AL.    DEFENDANTS


* * * * * * * *

DEPONENT:         KENNETH R. WALLENTINE

DATE:             SEPTEMBER 16, 2013

* * * * * * * *



Tina M. Barlow, CCR

Certified Court Reporter

B  a  r  l  o  w
Raising the Bar
Reporting & Video Services, LLC
620 Washington Street
Covington, Kentucky  41011
(859) 261-8440

# INDEX

Page

Cross-Examination by Mr. Brannon          4


## EXHIBIT INDEX

Plaintiffs' Exhibit One   Report          71
Plaintiffs' Exhibit Two   Correspondence  100

---

The deposition of Kenneth R. Wallentine, taken for the purpose of discovery and/or use as evidence in the within action, pursuant to notice, heretofore taken at the office of Rendigs, Fry, Kiely & Dennis, LLP, 600 Vine Street, Suite 2650, Cincinnati, Ohio, on September 16, 2013, at 9:30 a.m., upon oral examination, and to be used in accordance with the Ohio Rules of Civil Procedure.

\* \* \* \* \* \* \* \*

## APPEARANCES

REPRESENTING THE PLAINTIFFS:
DOUGLAS D. BRANNON, ESQ.


REPRESENTING THE DEFENDANTS:

WILSON G. WEISENFELDER, JR. ESQ.


\* \* \* \* \* \* \* \*

---

KENNETH R. WALLENTINE, called on behalf of the Plaintiffs, after having been first duly sworn, was examined and deposed as follows:

## CROSS-EXAMINATION

BY MR. BRANNON:

Q. Mr. Wallentine, my name is Doug Brannon. I represent the Plaintiffs, Sam Campbell and Chelsie Gemperline in this matter. We were introduced previously. I take it that this is not your first deposition?

A. It's not.

Q. And I'm going to be asking you a series of questions. If for any reason the question is unclear, please state so and I'll be more than happy to restate it. Otherwise, I'll expect that you understand the question and are able to answer it; fair enough?

A. Yes.

Q. And can you please state your full name and address for the record.

A. Sure. Ken Wallentine, W-A-L-L-E-N-T-I-N-E. 5272 South College Drive, Number 200, Murray, M-U-R-R-A-Y, Utah 84123.

Q. And how are you employed?

A. I'm a chief law enforcement officer for

---

the Utah attorney general.

Q. And chief law enforcement officer for the Utah attorney general, please explain that position to me. What does that entail?

A. The office of the attorney general houses the state's investigative division. And I oversee all of the various investigative bureaus within the office of the attorney general.

Q. Okay. And is that to say it's the police department for the police departments? Is that -- how would you characterize that?

A. I wouldn't use that characterization, but one of the roles of the investigative division is to investigate allegations of police misconduct in certain circumstances.

Q. Okay. And give me some examples of what those circumstances would be.

A. It would be common for agents under my supervision to investigate officer-involved shootings, other significant uses of force, allegations of serious misconduct that could rise to the level of criminal culpability by law enforcement officers. Allegations of corruption, again, that would potentially be criminal. And allegations of violations of civil rights that could be

73914236-3f4a-4bc1-802b-d70e3802235a6

1    prosecutable under either state or federal civil
2    rights statutes.
3        Q.   And the purpose of conducting these
4    investigations on behalf of the Utah Department of
5    Justice is what?
6        A.   The office of the attorney general.  The
7    purpose is -- the end goal is to determine whether
8    there is a basis for charging the officers with
9    crimes or not.
10        Q.   It has nothing to do with the evaluation
11    for civil liability purposes, correct?
12        A.   Not correct.
13        Q.   Okay.  Make me understand then.
14        A.   The office of the attorney general,
15    obviously, is counsel to state agencies.  And so if
16    a state-employed law enforcement officer is involved
17    in a critical incident that falls under one of the
18    categories that I've just described, and there is
19    the potential or a reasonable foreseeability of a
20    civil action against the state.  As opposed to one
21    of its political subdivisions, our investigators may
22    be called on to conduct an investigation to assist
23    the attorneys who would defend, or who, in some
24    cases, are defending claims against the state.
25        Q.   Is it ever in support of the plaintiffs,

1    meaning the injured party?
2        A.   In civil rights cases, yes.
3        Q.   And how does that work?
4        A.   The person petitions the office of the
5    attorney general for a civil rights investigation
6    that most typically would happen through their
7    attorneys.
8        Q.   Meaning your office would receive a letter
9    from a plaintiff's attorney stating legally that
10    civil rights violations have occurred by Officer
11    Jones from, pick your town, any town within the
12    state, and you, at that point, investigate that?
13        A.   We could.  It would depend.  If it
14    appeared that the allegations would not lead to
15    criminal charges, we would refer that complaint to a
16    sister agency that investigates law enforcement
17    conduct and alleged misconduct more broadly.
18        Q.   Okay.  So, if it does not contain a
19    criminal element on behalf of the officer, you then
20    refer that investigation elsewhere, if I understand?
21        A.   Very likely we would.
22        Q.   Okay.  And how long have you been at that
23    position?
24        A.   Since 2005.
25        Q.   And have you always been in the chief

1    position, or the position of chief of that agency
2    since 2005?
3        A.   Yes.
4        Q.   Where were you prior to that?
5        A.   Prior to that I served as the
6    investigation bureau chief at the Utah Department of
7    Public Safety Peace Officer Standards and Training
8    Division.
9        Q.   Commonly referred to as POST?
10        A.   Correct.
11        Q.   Okay.  And what did you do there?
12        A.   A moment ago I referred to sending other
13    types of investigations to an allied state agency.
14    And that's the agency to which I referred.  So that
15    position I oversaw the investigation of law
16    enforcement officers, certification and licensing in
17    other words.  Allegations of misconduct that could
18    impact the person's ability to be licensed as a
19    peace officer or corrections officer or a special
20    functions officer within the State of Utah.
21        Q.   Okay.  And can you give me some examples
22    of what would cause an officer to lose his
23    credentials according to POST in the context of an
24    excessive use of force claim?  How would that work
25    within the agency?

1        A.   Well, there are a couple of -- there are a
2    couple of different avenues that that kind of
3    complaint might come to POST.  It might be one
4    referred from the office of the attorney general.
5    It might be -- and probably is fairly commonly a
6    complaint that would be referred from the officer's
7    own employer.  There's a state statute that requires
8    a chief of police or a sheriff or a chief executive
9    of a law enforcement agency to, under penalty of
10    criminal law, report any misconduct, including
11    excessive force, that might impact the officer's
12    certification.  So that's one source.  And another
13    source would be an aggrieved citizen petitioning
14    either the POST, itself, or the council on peace
15    officer standards and training that oversees the
16    operations of POST.
17        Q.   And how long were you there?
18        A.   From some time in 2000 until I left to
19    become chief at the attorney general's office.
20        Q.   2000 to 2005?
21        A.   Yes.
22        Q.   And prior to that, where were you?
23        A.   There's a period around late 1999 to 2000,
24    2001 -- let's see, when I worked both for the
25    Department of Public Safety, POST, as a consultant,

73914236-3f4a-4bc1-802b-d70e380235a6

1 as I was transitioning into a full-time role, and
2 part-time for the Uintah County attorney's office as
3 the chief deputy county attorney.
4         And prior to that transition period, I had
5 worked since 1994 for the Uintah, that's
6 U-I-N-T-A-H, County attorney's office most of that
7 time serving as chief deputy. And I had some other
8 employment during that period, as well.
9     Q. Okay. Let's start with the work that you
10 did for POST as a consultant. What would you
11 consult with them on, or what would they retain you
12 as a consultant for?
13    A. I was working on the curriculum that was
14 presented to peace officers.
15    Q. Okay. And by curriculum, what are we
16 talking about, the training courses, you would
17 prepare course outlines that the instructors would
18 teach off of, or what?
19    A. I prepared some directly, but edited and
20 evaluated other persons' proposed contributions to
21 curriculum.
22    Q. And in what subject areas?
23    A. Fairly broadly across the board, although
24 my particular areas of emphasis were the legal
25 subjects, as well as use of force, subjects related

1 to civil rights. Almost anything that was even
2 tangentially connected to the legal subjects would
3 be under my purview.
4     Q. And what would that include, mainly search
5 and seizure or what? Give me an idea of what's
6 under that gamut.
7     A. Search, seizure, arrest, detention,
8 interview, interrogation, protection of civil
9 rights, use of force, reasonable force, ancillary
10 force tools. That's a pretty good umbrella.
11    Q. Okay. And then when you worked part-time
12 for the Uintah?
13    A. Uintah. It's an Indian tribe.
14    Q. I'll never get that right, so --
15    A. That's all right, most people don't.
16    Q. -- bear with me. All right. Tell me what
17 you did for the attorney's office there.
18    A. As chief deputy I both prosecuted and then
19 assisted in managing the law office.
20    Q. And how large is Uintah?
21    A. Uintah.
22    Q. Uintah.
23    A. It means snow up your crotch, I'm told. I
24 don't know whether that's true or not. Uintah
25 County is a relatively small county in population of

1 perhaps 25,000 people at the time, it's bigger now,
2 and quite large in space. It's the size of Delaware
3 or Rhode Island.
4     Q. A fairly rural area?
5     A. It's a fairly rural area with vast tracts
6 of forest land and oil fields and other mineral
7 deposits.
8     Q. And as far as the criminal element that
9 you are dealing with in this area, not a lot of
10 violent crime I would take it? Or given the
11 population size and the rural nature, not a high
12 drug trafficking, big city type problems? It's --
13 go ahead and describe that for me, if you would.
14    A. I don't recall the year, but there was one
15 year when the county led the nation in number of per
16 capita illegal methamphetamine laboratories. And
17 all of the violent crime associated with that. It
18 was a county of significant violent crime. I
19 mentioned that it was a county of mineral deposits
20 and oil fields. And it was one -- is today one
21 where the population is in constant flux.
22        You will find high school dropouts that
23 are millionaires, because of oil field companies
24 they've started. Come back two years later, and
25 they'll be meth pushers with no appreciable assets

1 to show for their period of financial success. A
2 lot of roughnecks. A lot of oil field people.
3     Q. Okay. And you said -- prior to that, what
4 did you do?
5     A. I spent a couple of years in private
6 practice as an attorney with a firm in Salt Lake
7 City. I spent a couple of years in two different
8 judicial clerkships.
9     Q. And when you were in private practice as
10 an attorney, what years approximately was that?
11    A. '92 to '94.
12    Q. In what areas of law did you practice in,
13 mainly?
14    A. Primarily in employment law and civil
15 rights. With some work in the oil industry, which I
16 suspect wouldn't interest you at all.
17    Q. I'm sure it helped pay the bills.
18    A. Oh, my, that, it did.
19    Q. I think I'm missing a time period gap
20 here, '94 to '99.
21    A. That's when I was at Uintah County.
22    Q. Okay.
23    A. I didn't actually leave Uintah County
24 until 2001 or 2002. As I was transitioning out of
25 the county, one of my friends who was a police chief

73914236-3f4a-4bc1-802b-d70e380235a6

1   was murdered by a drug dealer. There's no one in
2   the area who had ever prosecuted a homicide, let
3   alone a death penalty case. So I remained as a
4   consultant of the county for long enough to
5   prosecute that case to its end, which required
6   almost two years.
7       Q.   Okay.
8       A.   So that's the overlap there.
9       Q.   And prior to your private practice from
10  '92 to '94?
11      A.   I clerked for the chief judge of the Fifth
12  Circuit Court of Appeals in Houston, Texas. Well,
13  the court's in New Orleans, but I was in Houston.
14  Then I clerked for the -- I don't believe he is now,
15  but the presiding judge at the Utah Court of Appeals
16  in Salt Lake City, Utah.
17      Q.   Prior to that?
18      A.   Prior to that I spent three years in law
19  school, and worked part-time. I started law school
20  in '87.
21      Q.   Where did you go to law school at?
22      A.   J. Reuben Clark at Brigham Young
23  University.
24      Q.   Any employment prior to law school?
25      A.   Yes.

1       Q.   Where was that at?
2       A.   Provo City Police Department.
3       Q.   And what years were you with the Provo
4   City Police Department?
5       A.   1982 to 1987, the week I started law
6   school.
7       Q.   And tell me what you did career-wise, as
8   far as the Provo City Police Department. Where you
9   started out as a patrol officer, and tell me about
10  your career, what you did for them.
11      A.   Started as a patrol officer. I spent the
12  majority of my time in patrol and a portion of my
13  time in investigations working burglary and property
14  crimes. Then a brief period of time in special
15  investigations, which was primarily vice and
16  narcotics, or vice and illegal drugs.
17      Q.   Did you ever work as a K9 officer at the
18  Provo City Police Department?
19      A.   I worked as an agitator, not a K9
20  officer.
21      Q.   Tell me what an agitator would do.
22      A.   An agitator is sometimes known by the term
23  of decoy. It's the person who would assist in
24  training the dogs. It would be the person who hides
25  and is typically bitten, or runs and is typically

1   bitten on every case.
2       Q.   So you were the stereotypical guy in the
3   bite suit running away during training sessions?
4       A.   Yes.
5       Q.   Okay. Prior to the Provo City Police
6   Department? Or are we back in high school?
7       A.   Not quite. I worked a brief period as a
8   jailer before -- and dispatcher, and worked in the
9   '70s, late '70s, worked as a security officer at the
10  local medical center complex.
11      Q.   Okay. Now, what I want to go through is
12  your -- with your employment, your experience in
13  working with training, police K9 -- K9 teams through
14  working as a K9 officer. I think that's going to
15  start with the Provo City Police Department,
16  correct?
17      A.   Correct.
18      Q.   Okay.
19      A.   Well, not as a K9 officer, no.
20      Q.   Okay. You have never worked as a K9
21  officer?
22      A.   I have. But not at Provo City Police
23  Department. At Provo all I did was work as a decoy
24  or an agitator.
25      Q.   Okay. And how much time did you spend

1   doing that, and during what years?
2       A.   '82, '83, and that was not a -- that was
3   not by any stretch a full-time assignment. That was
4   an ancillary -- I wouldn't even say duty, because
5   it's something that I did not have to do, wasn't
6   required to do. The dog handler and I became
7   friends. It was an area that interested me.
8       Q.   Okay. And you were the young guy on the
9   police department at that point?
10      A.   Yes.
11      Q.   Good bait?
12      A.   And in sufficient physical condition that
13  I could run from a dog while wearing a heavy suit.
14      Q.   Okay.
15      A.   And didn't mind very much being bitten.
16      Q.   And approximately how often would you
17  engage in helping the K9 officer conduct his
18  training during that period of time?
19      A.   Oh, it would vary, but an average would be
20  monthly. There was a -- Provo City -- well, it
21  still is a relatively small department. I think
22  there's 110, 115 officers. So, as is fairly common
23  to the dog world, there were officers from different
24  agencies who would come together and take turns
25  training.

73914236-3f4a-4bc1-802b-d70e380235a6

1    Q.  And you'd participate in that maybe once a
2  month?
3    A.  Maybe once a month.
4    Q.  Okay.  That takes you through 1987.  Tell
5  me your next job or foray into police K9s then.
6    A.  1994, when I went to Uintah County after
7  being there a brief period of time.  I had
8  maintained my law enforcement license all through
9  law school, and was interested in keeping my law
10  enforcement licensure active.  One of the
11  opportunities that came to me -- well, really the
12  only opportunity that came to me to do that was to
13  become a reserve deputy sheriff with the Uintah
14  County Sheriff's Office.  I did so in 1994.  There
15  were some discussions about expanding the K9 unit
16  there from one dog to two dogs.  And I was afforded
17  the opportunity to go to handler training and
18  ultimately acquire a police service dog.
19    Q.  Okay.  So as a reserve deputy sheriff in
20  Uintah --
21    A.  Uintah.
22    Q.  Uintah.  I told you I'm not going to get
23  that right this whole time.
24    MR. WEISENFELDER:  Can we spell that?
25    THE WITNESS:  U-I-N-T-A-H.

1    MR. WEISENFELDER:  Okay.  Maybe that will
2  help.
3    MR. BRANNON:  Still not going to help.
4  BY MR. BRANNON:
5    Q.  And as far as the time that you spent as a
6  reserve deputy sheriff, how much time would you work
7  on the street patrolling and that sort of thing?
8    A.  Typically -- well, the minimum was 16
9  hours a month.  And many months I worked only the
10  minimum.  Others, particularly during -- there was a
11  time when we had a unique project within the
12  sheriff's office where my time commitment was much
13  greater.
14    Q.  And what was that unique project?
15    A.  The -- Uintah County started, we think the
16  nation's first, if not the first certainly one of
17  the first, drug courts in a rural environment.  The
18  county had a distinctive attribute of being one of
19  the first in the intermountain west to have just a
20  raging methamphetamine problem, and became somewhat
21  of a center for manufacturing methamphetamine in the
22  intermountain west.  Largely due to the oil workers,
23  and the county is surrounded by other large oil
24  working counties in Colorado and Wyoming, two states
25  that it borders.

1    So we started a drug court.  And the drug
2  court was unique in that it, rather than using
3  social workers to monitor drug court participants,
4  we used law enforcement officers.  And we were
5  unique in one other respect, and that is that part
6  of the monitoring, it involved using police service
7  dogs to assist in the inspection of homes, work
8  places and vehicles under the control of persons who
9  were participants in drug court.  So during that
10  period of time --
11    Q.  Meaning under the control of participants
12  that were in drug court, meaning that participants
13  in drug court would --
14    A.  They would sign -- drug court was a
15  diversionary process.  And so they would agree to
16  usually a three-year period of intense supervision
17  coupled with pretty intense participation in
18  twelve-step programs and formal drug treatment, and
19  rigorous testing, urine testing, coupled with
20  inspection of their homes, places of employment and
21  vehicles for the presence of controlled substances.
22    Q.  Okay.
23    A.  So they would sign a -- essentially they
24  would agree to this --
25    Q.  The search.

1    A.  -- fairly onerous search provision in
2  exchange, one would hope, for not ending up with a
3  felony conviction.
4    Q.  And with that, you then did -- took the
5  dog in the homes, did drug searches?
6    A.  Homes, cars, places of business.
7    Q.  Okay.  Tell me about the training that you
8  received, K9 training, where you were trained, how
9  much time you spent training?
10    A.  In the initial training or initial and
11  maintenance training?
12    Q.  The initial training.
13    A.  My initial training was through an entity
14  known as the International Police K9 Conference.
15  It's a group somewhat shrunk now, but back then was
16  a fairly large group based out of Delta, British
17  Columbia and Canada.  That was in 2004, 2005.  I
18  believe that --
19    Q.  Was that where you went to get your dog
20  and you trained with the dog there or --
21    A.  My initial training before I got my dog,
22  yes, although the school, itself, was conducted in
23  Anaheim, California, and I'm trying to remember, I
24  think that it was -- I think that it was actually
25  2005.  It might even have been early 2006 by the

73914236-3f4a-4bc1-802b-d70e3802335a6

1    time I got the dog and then went through additional
2    training with -- paired up with that dog.
3    Q. Okay. So is the International Police K9
4    Conference, was that just a conference in Delta,
5    Canada, Delta, British Columbia, Canada?
6    A. No. It was the basic handler training
7    school. It was actually -- they're headquartered
8    out of Canada, but they would travel to different
9    locations in the United States once a year to do the
10   school, or maybe twice a year. And the one I
11   attended, the basic handler course, was in Anaheim,
12   California at the Anaheim Police Department.
13   Q. Okay. So I'm still up here in Delta,
14   Canada. How much --
15   A. I never went to Canada.
16   Q. You never went to Canada.
17   A. I did, but not for this particular
18   training.
19   Q. Okay.
20   A. They are headquartered out of Canada.
21   They're a bunch of Canadians.
22   Q. Okay. So --
23   A. But they would train in the United States.
24   Q. The first time that you had any formal K9
25   training then was in Anaheim, California?

1    A. Correct, 2004.
2    Q. And who was that with?
3    A. Excuse me, 1994. That -- the entity that
4   put on that training was the International Police K9
5   Conference.
6    Q. That was the entity, and how --
7    A. And it may be called the -- it may have
8   been called the International Police K9 Academy
9   then. I'm not certain.
10   Q. How long were you there in Anaheim,
11   California, and what did this training consist of?
12   A. The first block in Anaheim was six days,
13   then the second block was in another city, was also
14   six days. And it consisted of -- the day would
15   start at 6:00, go roughly until 11:00 at night. The
16   first two blocks had to do with patrol work. Some
17   people would refer to that as handler protection or
18   bite work, building searches, article searches,
19   evidence searches. It would be fair to say
20   non-narcotic training for a police service dog.
21   Q. And when you went to Anaheim, California
22   in 1994, is that when you received your dog?
23   A. No.
24   Q. Okay. So was this just classroom
25   training?

1    A. Classroom and fieldwork.
2    Q. And fieldwork. Would that be a K9 handler
3   was demonstrating the dog to a group of people?
4    A. Or there was another K9 that was there,
5   that dog was actually assigned to someone else in
6   the Uintah County Sheriff's Office that I was with,
7   and I was working with that particular dog.
8    Q. So, you took another dog from your
9   sheriff's office up to Anaheim, California with you?
10   A. I went with the other handler and his dog,
11   yes, and worked with his dog.
12   Q. So were you in an assisting capacity then,
13   is that --
14   A. Training capacity.
15   Q. Training capacity. And what were you
16   training for?
17   A. For the intent and hope that we'd be able
18   to acquire another police service dog for the
19   sheriff's office. And that the sheriff would see
20   that I'd undertaken the training and was qualified
21   and ready to receive a dog, and would receive a dog.
22   Q. Okay. Was that true for the second
23   six-day session as well?
24   A. Yeah.
25   Q. Was this a maintenance training that the

1    other K9 handler went for that you accompanied him
2   on?
3    A. No. His purpose there was primarily to
4   facilitate my training, and also he participated
5   with that group. I think he was -- I don't know,
6   but I believe he was paid as an instructor there.
7    Q. His dog was already trained and, I
8   presume, certified at that time with the state?
9    A. Trained, certified, had been working for
10   some period of time by that point.
11   Q. Okay. When was the next time that you had
12   any K9 experience, interaction, that sort of thing?
13   A. Well, in terms of formal training or
14   interaction?
15   Q. Formal training.
16   A. I would regularly work with -- work with a
17   handler at our sheriff's office. That was the
18   majority focus of what I did for my reserve hours.
19   Q. Let me backtrack, when did you become a K9
20   officer and receive your dog and become certified?
21   A. I believe that was late 2005, and it might
22   have been 2006. I'm sorry. I'm still a decade off.
23   I don't know why that is. Yesterday I wrote 9/15/57
24   on the security logs at the airport.
25   Q. So are we talking 1995 or 1996?

73914236-3f4a-4bc1-802b-d70e380235a6

1    A.  Yes.  We're definitely not talking 1957.
2    Q.  So between that initial course in Anaheim,
3  California, what was the next formal training that
4  you received then?
5    A.  The next formal training, same group,
6  second block.  I am not certain, but I believe that
7  the location then was Ventura County Sheriff's
8  Office.
9    Q.  And that was the second six-day block
10  then?
11    A.  Yes.  I don't recall whether that was
12  later in 2004, or in 2005 -- 1994 and 1995.
13    Q.  Okay.  And was this the same thing where
14  you went with the existing K9 handler as a
15  trainee/assistant --
16    A.  Yes.
17    Q.  -- something like that?
18    A.  A grunt.  A trainee.
19    Q.  Okay.
20    A.  Once again, the new guy, as you put it.
21    Q.  After that second period, when's the next
22  formal -- or tell me what you did at that second
23  six-day period?  What was the training curriculum?
24    A.  Building on the first.  Again, this was
25  only patrol work to the point that I was able to

1  demonstrate my proficiency as a patrol dog handler.
2  That wasn't my initial objective and hope.  I had
3  wanted to follow on and get certified to get a dog
4  and do narcotics work, but that was the first step
5  to take.
6    Q.  Okay.  And as far as this training that
7  you were participating in, would both -- would you
8  be giving the commands to the dog?
9    A.  Yes.
10    Q.  Okay.  As well as the K9 officer whose dog
11  it was?
12    A.  He wasn't -- no, he was in an instructor
13  role.  In that second block, I know he was a paid
14  instructor for them.
15    Q.  Okay.  When is the next time that you
16  received any formal K9 training?
17    A.  It was when I got my dog and we went to
18  New London, Connecticut.  And I believe that was
19  late 2005 -- or excuse me, 1995 or 1996.
20    Q.  And who was the person that you --
21  kennel, kennel or group, that you got this?
22    A.  Same group.  And we bought the dog from
23  this group, The International Police K9 Conference
24  Academy.
25    Q.  Okay.  And so they're breeders of dogs, as

1  well?
2    A.  I don't believe that they breed -- bred
3  dogs then.  I believe that they imported -- I'll do
4  my best, I think it's Schutzhund,
5  S-C-H-U-T-Z-H-U-N-D, titled dogs from Europe and
6  then trained them for police service in the United
7  States.
8    Q.  When they received them were they started
9  dogs --
10    A.  Yes.
11    Q.  -- meaning they already received their
12  basic training overseas, and they were being brought
13  into this country for finishing work and being
14  assigned with officers?
15    A.  Well, I suspect, based on who your K9
16  expert is, that you're familiar with how that
17  process unfolds, in terms of Schutzhund training.
18  So, your term of being started, I understand it to
19  mean that they'd had basic obedience training.  And
20  that -- the skills that police service dogs then
21  will be expected to demonstrate.  And if that's what
22  you mean, then the answer is yes.
23    Q.  Okay.  And was -- tell me about the
24  initial training then that you received in New
25  London, Connecticut.

1    A.  At that point, my training transitioned,
2  and when I picked up the dog we started a course of
3  training in substance odor detection, drug dog work.
4    Q.  Was this a dog trained as a drug dog only,
5  or was it known as a dual purpose dog?  Tell me what
6  type of a dog it was.
7    A.  A dual purpose dog.
8    Q.  Okay.  And were you at a kennel or was
9  this an International Police K9 Conference facility?
10    A.  It was the New London Police Department
11  facility.
12    Q.  Okay.  Tell me about how much time you
13  spent in Connecticut then for this program.
14    A.  Six days.
15    Q.  And did the dog come home with you to Utah
16  at that point?
17    A.  Yes.
18    Q.  Okay.  At that time back in 1995, '96, was
19  that the basic training -- did that fulfill the
20  basic training requirements for the State of Utah to
21  become a certified unit?
22    A.  Well, that coupled with taking the exam.
23    Q.  With the state?
24    A.  Yes.
25    Q.  Tell me about the examination process that

73914236-3f4a-4bc1-802b-d70e3802335a6

1  you went through with the State of Utah to become a
2  certified K9 handler.
3      A.  It's -- the examination process was then,
4  and I believe today, is fairly similar to the
5  certification trials or testing that are
6  administered by most K9 organizations, consisting of
7  basic obedience.  One would certify a dog in -- you
8  could certify in both areas, didn't need to, but for
9  the patrol work, basic obedience, article searches,
10  building search and apprehension, call off and
11  retrieval.  A narcotics component then, and I
12  believe now, consisted of, I'd say, five
13  different -- five different exercises involving the
14  odors of four categories or families of controlled
15  substances --
16      Q.  Okay.
17      A.  -- in different settings.
18      Q.  And was your particular dog -- what was
19  his name?
20      A.  Monty.
21      Q.  Monty.  Was Monty certified in both patrol
22  and narcotics with the State of Utah?
23      A.  Yes.
24      Q.  And so he was past the requirements for
25  basic obedience, article searches, building

1  searches, all of those are encompassed over that
2  gamut?
3      A.  Correct.
4      Q.  Okay.
5      A.  And narcotics, the odors.
6      Q.  Okay.  Now, you were still with the
7  reserve sheriff unit, correct?
8      A.  Correct.
9      Q.  How long did you work active duty in --
10  with Monty, how many years?
11      A.  From when I first acquired him, and again,
12  I believe that was '95 or early 1996, until about
13  the time -- about the time that I began working with
14  the Utah Department of Public Safety full-time.  So
15  2000, late 2000, early 2001, and he went to another
16  handler.
17      Q.  Okay.  Went to another handler with the
18  county sheriff's department then?
19      A.  Yes.
20      Q.  And in that 1995 to 2000 time frame, tell
21  me about how many hours you were working,
22  approximately?  You said reserve capacity.  Was
23  that, in that time frame, about 16 hours per month?
24      A.  A minimum of 16 hours per month.  It could
25  fluctuate.  But if it fluctuated, it always

1  fluctuated up.
2      Q.  You were never full-time though?
3      A.  Not as a police officer, no.
4      Q.  Okay.
5      A.  Not during that period of time.
6      Q.  So, in any capacity that you had being a
7  K9 handler, it was part-time -- part-time, correct?
8      A.  As a handler?
9      Q.  Yes.
10      A.  Correct.
11      Q.  Okay.  As far as when you were utilizing
12  that dog, how many bites or how many times did Monty
13  bite a suspect under your handling during that 1995
14  to 2000 time frame?
15      A.  I'd have to go back and peruse his
16  records, but in -- Monty never had a field
17  deployment bite.  He had a number of trial bites,
18  but I don't remember how many.  I would say
19  somewhere in the range of less than a dozen.
20      Q.  Okay.  And when you say field trial bites,
21  would that be training that he was doing, or
22  demonstrations that you'd be conducting with the
23  dog?
24      A.  Outside of training.  No, I'm talking
25  about certification and competition.

1      Q.  Okay.  So a competition field trial?
2      A.  I'm sorry, I used the word trial, which to
3  you may mean something different.  In this context,
4  trial -- I refer to trial as, for example, state
5  certification test, a United States Police K9
6  Association certification test, or one of the other
7  entities of which we would certify that dog as a
8  certification test.
9      Q.  Okay.  And that dog, if I'm understanding
10  you correctly, had about 12 --
11      A.  12 or fewer --
12      Q.  -- field trial bites?
13      A.  Correct.
14      Q.  And I use -- just field trials with bird
15  dogs, because in hunting and that sort of thing,
16  which, you know, a competition where everybody goes
17  out and --
18      A.  Right.  I had bird dogs, that's a somewhat
19  different world.
20      Q.  Okay.  And so these bites would have
21  occurred with any state testing or something of that
22  nature, correct?
23      A.  State or United States Police K9
24  Association, which is not a Utah state-sanctioned
25  organization, or the California Narcotic Detector

73914236-3f4a-4bc1-802b-d70e380235a6

1    Dogs Association.
2        Q.   And these bites would have occurred in a
3    controlled environment then, not in the normal
4    course of patrol work, correct?
5        A.   Somewhat controlled, yes.
6        Q.   But your dog, during the 1995 to 2000 time
7    frame, if I'm understanding you correctly, never bit
8    a suspect?
9        A.   Not under my control, no.
10       Q.   The training -- or let me ask you this,
11   Monty, in the training that you received, was he
12   trained as a bite-and-hold dog or bark-and-hold dog?
13       A.   As I understand the terms, as I use the
14   terms, he was trained as a bite-and-hold dog.
15       Q.   And I'm going to want you to go ahead and
16   tell me what you think those terms mean,
17   bite-and-hold and bark-and-hold.
18       A.   Fair enough.  Let me start with
19   bark-and-hold, because that's perhaps the term that
20   has the most variance.  And I think most people in
21   the K9 world would tell you that's the term that's
22   most loosely applied.  But a bark-and-hold dog,
23   which is also sometimes referred to as a
24   guard-and-bark or a circle-and-bark dog, is one that
25   is trained in the course of a search for a person,

1    most typically a building search, that when -- at
2    the end of the search, that is when the dog believes
3    the dog has located the person that the dog has been
4    sent to locate.  If the person remains still and
5    does not engage in any kind of aggressive move
6    toward the dog, or an attempt to escape, then the
7    dog will bark to signal the presence of that person,
8    but will not engage the person with a bite.  Some
9    dogs, depending on the circumstances, will navigate
10   around, if possible, the person.  Hence, some people
11   use the term circle-and-bark or bark-and-circle.
12       Q.   Okay.  And before you get onto
13   bite-and-hold, let me ask you a few questions with
14   that --
15       A.   Yes, sir.
16       Q.   -- because you sort of qualified your
17   answer with generally in terms of a building search
18   what a bark-and-hold dog is supposed to do.  In
19   terms of doing a track on a lead, what is your
20   understanding of what a bark-and-hold dog is
21   supposed to do?
22       A.   If the dog is tracking on a lead out in
23   the open in the field and locates the person, and
24   the person makes no move to escape, no move that the
25   dog interprets as aggressive, then the dog is

1    trained to, again if possible, circle.  Most dogs
2    are trained to circle, not all.  It depends on who's
3    trained the dog.  And bark to alert the handler and
4    other officers to the presence of that particular
5    person.
6        Q.   Okay.  And let me ask you this, you said
7    building searches.  If the dog is doing a search off
8    lead in an open field, is that bark-and-hold dog
9    supposed to perform the same way, where he barks
10   unless furtive movements are made by the suspect?
11       A.   Yes.  For aggressive movements or
12   movements to escape.
13       Q.   Okay.  And as far as a bark-and-hold dog
14   when we're talking about a search and a track, is
15   there any difference between those two terms if
16   you're conducting a search with a K9 or doing a
17   track with the K9?
18       A.   There could be.  I'm not sure what you
19   mean by a search when I'm -- when I used the term
20   search, I wasn't particularly making a distinction,
21   but there can be a difference between a search and a
22   track.
23       Q.   Okay.  Tell me the difference as you
24   understand it.  Because throughout this case I think
25   that these terms have been used interchangeably.

1    And tell me if you think they're interchangeable, or
2    what the difference may mean.
3        A.   I think that they can be interchangeable
4    if one understands the circumstances.  But a track,
5    when a dog is actually tracking, a dog is following
6    the scent of disturbed, typically vegetation, plant
7    material, particularly in a field.  In an urban
8    environment it can be just a disturbance of the
9    environment, which has a fresh scent transfer.  The
10   person who has moved through the environment and
11   broken the vegetation or brushed up against the
12   vegetation has left fresh scent.  The dog is
13   following that track.  So when you say tracking, the
14   dog is following a defined pathway of disturbed
15   material.  The dog is doing -- I'm sorry, did you
16   ask me to distinguish between search and track --
17       Q.   Between track and search, yeah.
18       A.   Okay.  If the dog is doing a search, that
19   may not necessarily implicate a track.  It may be
20   that you're going into -- you're taking the dog into
21   an area and directing the dog to find any person
22   there, human -- find human scent, or it may be that
23   the dog's been given a scent, or has picked up a
24   scent somewhere else, but is taken into an area
25   where a track is not readily available, and the dog

73914236-3f4a-4bc1-802b-d70e380235a6

1    is asked to search for that person.  And during that
2    search activity there may be a transition from air
3    scenting or a general search behavior to track.  And
4    it may actually transition back, depending on, you
5    know, what happens, for example.
6        Q.  Okay.  You used another term in there
7    that's come up in this case, air scenting.  What is
8    your understanding of that term as it relates to dog
9    behavior?
10       A.  When a dog is air scenting, the dog is
11   transitioned away from tracking.  That is the dog is
12   no longer taking odor in, smelling the ground, the
13   disturbed vegetation, not necessarily just the
14   ground.  It could be vegetative material, bushes and
15   so forth.  And is now sniffing the air to try and
16   find scent molecules to try and find the scent
17   signature of the person the dog is searching for.
18       Q.  Is that something that a dog typically
19   does when it is close to its -- I won't use the term
20   prey, or subject matter that it's looking for?
21       A.  It could be.
22       Q.  Okay.  What, for example, when a dog --
23   you know, you worked as a dog handler, when Monty
24   would be getting air scenting during a search, what
25   would that indicate to you as a handler?

1        A.  It indicated -- well, it would depend.  If
2    he had started on a track and transitioned to air
3    scenting behavior would indicate that he had lost
4    the odor from the track for one reason or another,
5    or that there was some other stimulus that caused
6    him to transition to air scenting.
7        Q.  Doesn't air scenting occur when a dog is
8    on a track and when it gets very close or the odors
9    become very strong the dog begins looking up and air
10   scenting, looking for what it's been tracking?
11       A.  That can be one of the times when the dog
12   moves to an air scenting behavior.
13       Q.  Okay.  And that's part of a handler's
14   responsibility is to be able to read his dog and
15   know what that dog is doing at that time, correct?
16       A.  The handler should be trained and
17   experienced in assessing the behavior of the dog as
18   the dog searches.  And when I say search here, sir,
19   I'm using it in the broad sense for the target of
20   the search.
21       Q.  Sure.  And since we both have some
22   experience with bird dogs, let me put it in the
23   context of bird dogs.  And I'll let you tell me what
24   the equivalent is for K9 handlers.  For example,
25   when my English Setter gets real close to a pheasant

1    he gets real birdy, he gets excited and then locks
2    up on point.  What is the equivalent of getting
3    birdy for a K9?
4        A.  You know, and I've actually heard somebody
5    use that term with a police service dog, saying the
6    dog was getting birdy.  And if he -- I had a
7    chocolate lab.  If you've never had a bird dog you
8    don't know what that term, getting birdy, means.
9    But the equivalent would be to see -- see behavior
10   that some handlers would describe as being in the
11   cone or on scent.  In the cone being fairly common,
12   meaning that the dog is in what is often referred to
13   as a scent cone.  The dog is working toward the
14   source of the odor, the source of the scent of the
15   target of the search.
16       Q.  With a bark-and-hold dog, if there's no
17   furtive movement or gesture made by the suspect, and
18   that dog is properly or acting according to how it's
19   supposed to, as a bark-and-hold dog, it should never
20   engage the suspect, correct?
21       A.  If there's no aggressive move by the
22   suspect --
23       Q.  Correct.
24       A.  -- and no move to escape by the suspect?
25       Q.  Correct.

1        A.  That is correct.
2        Q.  Meaning if the suspect is laying still,
3    sitting still, standing still, all that dog should
4    do is simply bark and possibly circle and bark at
5    the suspect?
6        A.  Correct.
7        Q.  Now, when you were working with Monty in
8    the field from 1995 to 2000, did you have instances
9    in the field where this bark-and-hold process would
10   apply where you sent Monty out on a track or a
11   search or otherwise and he would find a suspect and
12   bark at him?
13       A.  What do you mean by, when I would send him
14   out?
15       Q.  When you would deploy Monty.
16       A.  Monty was trained as a bite-and-hold dog,
17   and so I'm not sure I follow your question.
18       Q.  Okay.  I was assuming a bark-and-hold --
19   maybe that's -- maybe I got off.  I thought he was a
20   bark-and-hold dog.
21       A.  Bite-and-hold.
22       Q.  Okay.  Bite-and -- Monty was a
23   bite-and-hold dog?
24       A.  Correct.
25       Q.  Okay.  So let's talk about, have you ever

73914236-3f4a-4bc1-802b-d70e380235a6

1  worked or been the handler of a bark-and-hold dog?
2      A.  I have supervised persons who have had
3  bark-and-hold dogs, but I have never been their
4  handler.
5      Q.  Okay.
6      A.  Not their, the dog's handler.
7      Q.  The dog's handler.  I understand what
8  you're saying.  So tell me what your definition of a
9  bite-and-hold dog is.
10     A.  A bite-and-hold dog is one that is trained
11 at the end of a search behavior -- and if it's okay
12 with you, when I say search behavior, unless you
13 don't understand, I'd like that just to mean the
14 entire gamut of searching for a person, whether it's
15 a building search, a trailing, a tracking search; is
16 that fair enough?
17     Q.  Okay.  That's fine.
18     A.  A bite-and-hold dog is one that is trained
19 to engage the person at the end of the search
20 behavior with a bite, unless there's an intervening
21 command given by the handler or some intervening
22 circumstance that does not permit a bite to occur.
23     Q.  Okay.  Would you ever use a bite-and-hold
24 dog for a safety search?  Meaning if you were
25 searching for somebody who got lost in the mountains

1  in Utah would you ever send that dog out on a -- or
2  deploy that dog for a search for somebody's safety
3  or welfare with the belief that no criminal activity
4  had occurred?
5      A.  That would not be an uncommon scenario to
6  play out in the area where I work in Utah.
7      Q.  Okay.
8          THE WITNESS:  And when you get to a good
9  point, I'm ready to dispose of that water.
10         MR. BRANNON:  We can take a break right
11 now.  That's fine.
12         THE WITNESS:  I don't want to interrupt
13 your line of questioning.
14         MR. BRANNON:  No.  That's fine.
15         THE WITNESS:  Okay.
16         (OFF THE RECORD)
17 BY MR. BRANNON:
18     Q.  Before we took a break, we were discussing
19 the differences in K9 deployment when conducting a
20 safety or missing persons search as to what a
21 handler would or should do in the event of operating
22 a bite-and-hold dog to prevent it from engaging a
23 suspect when the search is done for safety reasons.
24 I think you were about ready to describe for me what
25 that handler would do or should do under that

1  scenario when conducting a search.
2      A.  Typically, a safety search, as I
3  understand you have described it here, the search
4  would be one that would be done on lead.  And when I
5  say on lead, I think you understand, but just for
6  clarity's sake, there's a lead or a line between the
7  dog's collar, or in some cases harness, and the
8  handler.  And so the handler has that method of
9  control in place.  A safety search typically does
10 not implicate safety concerns for the officer that
11 might come from the suspect.  That is to say the
12 officer is not usually concerned that the suspect is
13 going to pop up with a gun or a club or so forth.
14         When looking for a missing person, missing
15 people are lost, they want to be found, and they're
16 going to cry out for help at the end of -- at the
17 end of the search behavior.  The officer, of course,
18 still has concerns, and I'm not really familiar with
19 your area, but where we're at there are a lot of
20 environmental concerns.  You're out searching for a
21 missing person, this time of year venomous snakes
22 are an issue, certainly the terrain, itself.  So
23 that all of that suggests to the officer that she or
24 he should be keeping the dog closer.
25         Because the officer, at least in most

1  circumstances, doesn't have to be too concerned
2  about the possibility of sudden attack, it allows
3  the officer to -- the latitude to devote more
4  attention to the dog's behavior, which can be
5  helpful in trying to locate the person.
6          Certainly, the handler should be paying
7  enough attention to the dog to make sure the dog's
8  not going off into any areas that could be dangerous
9  to the dog and to the handler, the edge of a cliff
10 or something.
11     Q.  Meaning that the handler should keep the
12 dog pretty tight on the lead, or have a shortened
13 lead in that situation?
14     A.  It could be, depending on the terrain and
15 depending on how the search is unfolding, that
16 certainly could be a consideration.
17     Q.  Meaning if it's dark, a nighttime search,
18 or the terrain is very dense and you're not able to
19 look through it very far.  In that instance would it
20 be prudent then for an officer handling a K9 to
21 shorten the lead to the point where he would know
22 exactly where that dog is and what that dog is doing
23 to recognize the signs and behaviors of the animal?
24     A.  The rougher and more dense the terrain and
25 the less visibility, all of that would suggest a

73914236-3f4a-4bc1-802b-d70e380235a6

1    shorter lead.
2        Q.   And as far as a difference between a
3    search for somebody's safety and a fugitive search,
4    what is the difference between a fugitive search and
5    a safety search and how it's conducted by the K9
6    handler?
7        A.   The primary -- primary distinguishing
8    factor is that in a fugitive search the officer
9    should be concerned about the possibility of ambush,
10   sudden attack, potentially even hazards that the
11   suspect has placed in the path of the officer.  The
12   officer's attention in a fugitive search typically
13   is -- there are much -- there are many more things
14   demanding the officer's attention.  The officer not
15   only has to pay attention to the dog, but has to pay
16   attention to the horizon, the environment
17   immediately around her or him.
18       Q.   What about conducting the handling of the
19   dog, itself?  What's different?  Meaning on lead,
20   off lead, the distance he'll allow the dog to roam
21   from the handler?
22       A.   Depending on the dog's training, it may be
23   more likely that a fugitive search would be
24   conducted off lead.  And distance the dog is allowed
25   to travel away from the handler is going to depend

1    on the dog and the handler's ability to control that
2    dog, as well as the terrain and environment.
3        Q.   Let's talk about -- back to Monty and you
4    back in Utah.  How much maintenance training would
5    you do with Monty back then?
6        A.   Well, we would typically do somewhere in
7    the range of three to four hours a week.
8        Q.   And what would that training consist of,
9    generally?
10       A.   Well, we'd mix it.  As is not uncommon, we
11   would have training once to twice a month with other
12   dogs and other handlers.  But we'd mix it up between
13   patrol work and odor detection work.  If we were
14   doing patrol work, for example, we might go to a
15   high school.  There were a couple of businesses that
16   allowed us to come in and do building searches in
17   their buildings after hours, and do building search
18   training.  We actually might even do narcotics
19   training in those facilities, as well.  One of
20   the -- one of the areas of concern, areas of focus
21   for us, for our sheriff, not surprisingly was drug
22   detection work.  And we would do a lot of training
23   in different vehicles with different quantities of
24   controlled substances hidden in different locations.
25   And occasionally, particularly if we were getting

1    ready for certification, we would -- we'd run
2    through basic obedience and make sure that we
3    weren't going to have any issues with the skills
4    that would be tested in basic certification drills.
5        Q.   And are there any minimum requirements in
6    the State of Utah for maintenance training with the
7    K9?
8        A.   There are not.  By requirements, I assume
9    you mean state requirements?
10       Q.   State requirements, correct.
11       A.   There are not.
12       Q.   Are you aware of any requirements in Ohio
13   for maintenance training for a K9?
14       A.   I'm aware that there are some -- no, I'm
15   not.
16       Q.   Well, tell me what you are aware of, since
17   you opened up that door?
18       A.   Sure.  I'm aware that there are state
19   certification standards in Ohio.  And I haven't
20   looked at those certification standards for some
21   time, so I'm trying to recall.  I don't believe that
22   those certification standards include a prescription
23   as to the hours of in-service training.  I could be
24   wrong.
25       Q.   Do you feel that maintenance training for

1    K9 units, meaning the handler and the dog, is
2    important to maintain that team at professionally
3    performing levels?
4        A.   Yes.
5        Q.   And based upon your knowledge, training
6    and experience, do you have any opinion about how
7    often and with what frequency a K9 unit should
8    engage in maintenance training to stay proficient?
9        A.   I do.
10       Q.   What is that opinion?
11       A.   It can vary according to the mission,
12   according to the dog team.  Some dog teams require
13   more maintenance training, some require less.  Just
14   like some people retain their skill sets better than
15   other people, some dogs do and some dogs don't.  The
16   mission can have a significant impact.
17           For example, I am familiar with and served
18   on a committee with the fellow who is the supervisor
19   over the dogs that work the border in El Paso,
20   Texas.  Those dogs don't do a lot of maintenance
21   training.  I don't know how many hours a week, but
22   it's not very many hours a week, because those dogs
23   are working four to five hours a day with their --
24   an eight-hour shift, four to five hours a day.  They
25   have rest periods.  Working to detect the odors of

73914236-3f4a-4bc1-802b-d70e380235a6

1　controlled substances in hundreds of vehicles as
2　they cross the border checkpoints.
3　　　The dog doesn't know, nobody tells the
4　dog, and the dog can't comprehend that, hey, this is
5　a training exercise involving ten semi trucks, as
6　opposed to, I need you to find the odor control
7　substance in ten semi trucks. So, in that
8　circumstance, for example, if someone were to ask
9　me, you know, what's a reasonable amount of
10　in-service training, I would tell you that it has
11　varied there because of the mission. A generally
12　accepted number within the police service dog world
13　is 16 hours per month. I'm not aware of any -- I'm
14　not aware of any state that mandates a particular
15　number of hours. But my opinion is that that
16　generally accepted number is a pretty good number to
17　rely on.
18　　Q. Okay. And that's accepted, you found,
19　within the law enforcement community for typical
20　patrol service dogs, with drug -- dual purpose dogs
21　and that sort of thing?
22　　A. It's accepted within the community. It's
23　accepted within -- I believe that if you had the
24　representatives of the major K9 organizations here
25　that they would give you a -- I think the same

1　number or pretty similar number.
2　　Q. Okay. In the maintenance training itself,
3　would you agree with me that because a dog's
4　responsiveness to its handler's commands may erode
5　over time, that police dogs need continual training
6　to assure that they will perform responsibly in the
7　field?
8　　A. Yes, generally.
9　　Q. Generally, the maintenance training for a
10　K9 unit within a department, whose responsibility is
11　it to see that that dog receives the appropriate
12　training before it's deployed in the field? Meaning
13　maintenance training or to make sure it's current
14　on -- or performing at professional levels?
15　　A. First line responsibility rests with the
16　handler.
17　　Q. And then after that?
18　　A. Well, that certainly should be something
19　that someone in the supervisory chain should have
20　oversight for, whether that's a chief, sergeant, a
21　major, depending on the structure of the
22　organization and the line of direct report for K9
23　issues.
24　　Q. Okay. And you've reviewed the documents,
25　familiar with the Springboro Police Department, in

1　this particular case, correct?
2　　A. I'm familiar with what I've seen of the
3　department's organization and the documents. I
4　haven't done any research into -- into the
5　department outside of what I've seen in the
6　documents here.
7　　Q. Okay. Meaning in the -- there were two K9
8　policies produced in this case. Are you familiar
9　with both of those documents?
10　　A. I'm aware there were two policies
11　produced, yes.
12　　Q. Okay. There was one that was never
13　officially adopted, the policy that was in existence
14　at the time of both the Campbell and Gemperline
15　bite, correct?
16　　A. Tell me more about which policy you're
17　referring to.
18　　Q. This would be the one printed off of
19　somebody's website, Terry Fleck's website or --
20　　A. Terry Fleck's website?
21　　Q. Terry Fleck's website, yeah.
22　　A. It says at the top, International
23　Association Chiefs of Police?
24　　Q. Correct.
25　　A. Yes. I'm aware of that policy.

1　　Q. Okay. Under that policy, who at
2　Springboro would have been in charge of monitoring
3　the K9 unit to your knowledge?
4　　A. The two parties most involved in that
5　would have been the chief of police, Kruithoff, it's
6　K-R-U-I-T-H-O-F-F. And the officer, Officer Nick
7　Clark.
8　　Q. Okay. So in this particular instance you
9　believe that it was Chief Kruithoff's responsibility
10　then to monitor and supervise Officer Clark directly
11　then?
12　　A. I understood your question as to ask me
13　who is involved in overseeing the unit and the
14　policy, and that would have been Chief Kruithoff and
15　Officer Clark.
16　　Q. Okay. Let me ask you to -- maybe ask you
17　a different question then if you feel that this is a
18　different question. My question to you now is, who
19　at the Springboro Police Department then was in
20　charge of monitoring the performance of Nick Clark
21　and his K9?
22　　A. Other than Nick Clark?
23　　Q. Other than Nick Clark at the Springboro
24　Police Department.
25　　A. The responsibility for monitoring his

73914236-3f4a-4bc1-802b-d70e380235a6

1    performance would have gone up the supervisory
2    chain. So his immediate chain of supervision.
3    Q. Okay. Meaning his shift sergeant, to a
4    lieutenant, to the chief?
5    A. Typically meaning a sergeant, whether they
6    did nominate that person as shift sergeant or not,
7    I'm not sure. I don't recall how they identified
8    it, but typically sergeant, lieutenant and chief.
9    Q. And the person supervising K9 units, would
10   you agree with me that they should have some
11   knowledge in how they operate and how they should be
12   operating, and what professional performance
13   standards should be entailed with the operation of a
14   K9 unit, meaning how they should perform?
15   A. I think it would be optimal for the
16   supervisors to be as knowledgeable as possible in
17   those areas that you've just described.
18   Q. Can we agree that it doesn't make a whole
19   lot of sense to have a supervisor supervising
20   something he doesn't know anything about?
21   A. I think as a general proposition, but
22   that's a pretty broad statement to say that he
23   doesn't know anything about.
24   Q. Meaning for somebody to be supervising a
25   K9 unit they should know something about how that K9

1    unit should operate, or what it's supposed to do;
2    fair statement?
3    A. It would be a fair statement. Certainly,
4    the person supervising certainly should be in a
5    position to ask -- ask probing questions of what the
6    K9 unit is doing to make sure that what the K9 unit
7    is doing is consistent with the mission of the
8    police department.
9    Q. Do you know or do you have an opinion
10   about what the purpose was for the K9 unit of the
11   Springboro Police Department in this matter?
12   A. I believe that -- I believe that I
13   understand the mission of the K9 unit in this
14   particular department to be -- to deploy a dual
15   purpose dog. That is one that was trained both in
16   patrol work and odor detection work.
17   Q. Was the dog in this instance to be
18   deployed as a bark-and-hold dog or a bite-and-hold
19   dog, as you've defined the terms?
20   A. Well, as I've defined the terms, I think
21   that there was some -- I don't think that that was
22   clearly understood universally at all levels in the
23   police department.
24   Q. That's not my question. My question is,
25   was the Springboro Police Department supposed to

1    have a bite-and-hold or a bark-and-hold dog, based
2    upon your review of the records and information that
3    you were provided in this case?
4    A. I believe this dog was trained as a
5    bite-and-hold dog with reference to how it conducted
6    its search behaviors.
7    Q. Okay. And that's your opinion with how it
8    performed in the field, that he performed as a
9    bite-and-hold dog would perform, correct?
10   A. Correct.
11   Q. My question is, based upon the policies
12   and other information that you reviewed in this
13   case, was the Springboro Police Department supposed
14   to have a bite-and-hold trained dog or a
15   bark-and-hold trained dog?
16   A. Are you asking me what the -- when you say
17   police department, who are you referring to?
18   Q. The Springboro Police Department, right.
19   A. But are you referring to --
20   Q. The only one we're dealing with here.
21   A. Right. Are you referring to the chief,
22   are you referring to someone in the chain of
23   command? Tell me --
24   Q. I'm referring in accordance with the
25   policies of the police department that were in place

1    at the time of this -- these two incidents involving
2    Plaintiffs Gemperline and Campbell. Was the police
3    department supposed to have a bite-and-hold trained
4    dog or a bark-and-hold trained dog?
5    A. Well, one of the -- one of the challenges
6    here, as I understand your question, is the policy,
7    which was, shall we say, I believe, copied without
8    alteration from -- and I believe the source was
9    Terry Fleck's website, but the International
10   Associate of Chiefs of Police policy that was copied
11   without alteration was a policy that was written to
12   govern the behavior of what IACP defined as a
13   bark-and-hold dog. And that I understand to have
14   been the policy as you identified in effect at the
15   time of these two incidents.
16   Q. Okay. So if I understand your answer
17   then, that policy identified a bark-and-hold dog.
18   Was it then your understanding that this policy was
19   in place or not in place --
20   A. To my --
21   Q. -- during the times of the Campbell and
22   Gemperline bites?
23   A. My understanding from what I reviewed,
24   that this is a policy that when Chief Kruithoff and
25   Officer Clark had a discussion that this is the

73914236-3f4a-4bc1-802b-d70e380235a6

1 policy that the chief agreed that Officer Clark
2 should generally refer to in operating the K9 unit
3 within that department.
4     Q.  Okay.  You've been identified as an expert
5 in police policy and procedure, correct?
6     A.  Yes.  I haven't seen a designation but I'm
7 assuming so.
8     Q.  Okay.  Tell me -- let's start with this.
9 What do you believe that you're an expert in as far
10 as the field of K9 -- K9s go in reference to a
11 police department?
12     A.  I would represent that I have a certain
13 expertise in formulating, designing, maintaining,
14 updating policy with respect to the operation of
15 police service dog units.  I have previously
16 testified and been accepted as an expert on that
17 particular area.  I believe that's one of the
18 purposes that I've been called into this case to
19 talk about.
20     Q.  Okay.  Are you an expert in any other
21 area, besides a policy expert, as it pertains to
22 police K9 units?
23     A.  I've testified with respect to when dogs
24 should be deployed, patrol dogs.  I'm qualified as
25 an expert in those situations and also in the

1 deployment of dogs to search for the odor of
2 controlled substances.
3     Q.  And when you say when dogs should be
4 deployed, is that from a supervisory position as an
5 expert when dogs should be deployed, or is that from
6 a handler position when dogs should be deployed?
7     A.  Well, both.  One would hope that there
8 would not be a disconnect between those two levels
9 of decision making.
10     Q.  Okay.  So you believe that you're an
11 expert in both of those areas?
12     A.  Yes.
13     Q.  Okay.  Are you an expert in training K9s?
14     A.  No.
15     Q.  Or K9 performance in the field, meaning a
16 judge, evaluator, anything like that?
17     A.  I participated in evaluations and
18 certifications, but I don't believe that I would
19 hold myself out as an expert in that area.
20     Q.  Okay.  In the performance of the K9 in the
21 field?
22     A.  In judging the performance, no.
23     Q.  Okay.
24     A.  I've never qualified as a judge.
25     Q.  Okay.  And as a policy expert, as you've

1 described it, you would have some knowledge of when
2 a policy has or has not been adopted by a police
3 department, correct?
4     A.  I would.
5     Q.  And you've reviewed certainly some
6 depositions and other documents that have been
7 provided to you by Mr. Weisenfelder here in
8 reviewing your files.  Do you have an opinion about
9 whether or not the Springboro Police Department had
10 a K9 policy in place at the time of the Gemperline
11 and Campbell bites?
12     A.  I do.
13     Q.  What's that opinion?
14     A.  There was a policy that was in place and
15 not gone through the formal -- I don't know that,
16 but it's my belief that it had not gone through the
17 same formal policy process as other policies in the
18 department.
19     Q.  Okay.  Meaning it was never officially
20 adopted by the Springboro Police Department in this
21 case, correct?
22     MR. WEISENFELDER:  Objection.  Go ahead.
23     A.  I'm not sure what the policy process was
24 for the police department.  If officially adopted
25 simply means the chief approved it, that would be

1 different than adoption meaning that it was
2 necessarily published and put out and made available
3 to the public.  I don't know what officially adopted
4 means for that department.
5     Q.  Okay.  And would you agree with me that
6 typically when a police policy is adopted by a
7 police department it is included in the master book
8 of the department's policies and procedures?
9     A.  Typically, that would be the case.
10     Q.  And that that book would then be
11 disseminated or at the very least made available to
12 all of the officers in the department?
13     A.  Perhaps.
14     Q.  Okay.  Perhaps or should?
15     A.  Perhaps.
16     Q.  If it was not included in a policy and
17 procedures manual that was either made available or
18 disseminated to other law enforcement officers
19 within the department, how then, based upon your
20 knowledge, training and experience, would the other
21 officers on the department have knowledge regarding
22 said policy and procedure?
23     A.  They may not.  It would depend on which
24 officers you're referring to.
25     Q.  Let's talk about the other officers in the

73914236-3f4a-4bc1-802b-d70e380235a6

1    Springboro Police Department in this case.
2        A.   Well, again, I don't know what their -- I
3    don't know what their -- what the department's
4    practice had been with reference to publishing or
5    making available their policy manual.
6        Q.   Are you familiar with any of the Ohio
7    requirements for a police department adapting
8    officially a department policy or procedure?
9        A.   I am not.
10       Q.   When is the use of a police K9 the use of
11   force?
12       A.   Well, that can vary, but the clearest use
13   of force is when the dog actually engages someone
14   with a bite.
15       Q.   Is it a use of force in any other context?
16       A.   It can be.  Some dogs are trained to knock
17   people down.
18       Q.   Is that to say that it's your opinion that
19   a K9 is not a use of force unless it makes physical
20   contact with the suspect?
21       A.   Well, what is and what isn't the use of
22   force is, I suppose, ultimately a question for the
23   court.  But one clear defining perimeter would be
24   whether there is contact that's injurious or
25   intended to be injurious.  When you say contact,

1    sir, I mean, my dog did now pass away, but if my dog
2    were in the room and I called the dog to come to me
3    and he chose to come under the table and brush past
4    your legs, that's contact.  But I wouldn't -- I
5    wouldn't think that any of us here would define that
6    as a use of force.
7        Q.   Okay.  And you've told me that you're an
8    expert in this area, and I'm trying to understand
9    what you believe is a use of K9 force.  And it is --
10   and so far you've described for me instances where
11   the dog has -- makes a physical contact, not
12   necessarily an incident brushing up against, but
13   where the dog engages or intentionally makes contact
14   with a suspect.
15       A.   I want to do my best to answer your
16   question.  I'm not quibbling with you, but if you
17   could add to that in a manner that's injurious or
18   likely to be injurious.  Because, again, the dog can
19   come up and -- I'm thinking of my own experience
20   now, my own dog.  The dog can come up and rub his
21   nose on your knee because he wants you to pay
22   attention to him, much like a child might.  I
23   wouldn't term that as a use of force.  And yet it's
24   not just passing, it's not incidental, it's
25   intentional on the part of the dog.  So, to your

1    answer, I would add the qualification that the
2    contact that's intended to be injurious or apply
3    some force.
4        Q.   Okay.  Is there any other instance where
5    use of a K9 is a real or implied use of force?
6        A.   Yes.
7        Q.   Okay.  What is that?
8        A.   Well, you've now added the word implied
9    use of force.  So, by way of example, I'm thinking
10   of a building search where there's a burglar alarm,
11   for example, that's gone off and officers are
12   called.  They go to an open door of a warehouse and
13   call out into the warehouse, this is the Salt Lake
14   City Police Department.  We know you're here, we
15   have a police service dog, come out or we'll send
16   the dog in and you may be bitten.  And the handler
17   gives the dog the command to speak, and the dog
18   barks.  I think that's -- that could be construed as
19   an implied use of force.
20       Q.   Anything else that you can give me where a
21   K9 would be either a real or implied use of force?
22       A.   Suspect is fleeing and an officer calls
23   the suspect to stop or I'll send the dog.  And those
24   are, I suppose, the most obvious examples that come
25   to mind.

1        Q.   Can a K9 be deadly force?
2        A.   What do you mean by deadly force?
3        Q.   Meaning force that either kills or is
4    capable of killing when it's deployed?
5        A.   Well, yeah.  I think -- I think as
6    illustrated by the United States Supreme Court,
7    that's a -- ultimately a legal question but --
8        Q.   I'm asking you.  You're an expert.  As you
9    stated, in the use of force and K9 force,
10   specifically.
11       A.   Sure.
12       Q.   I'm asking you, not the United States
13   Supreme Court, if a K9 use of force is or can be
14   deadly use of force?
15       A.   There are at least one -- there is at
16   least one incident in which I am aware that a police
17   service dog bite has resulted in death.  So, in that
18   context, in the factual context as opposed to in
19   many, many legal decisions that use of a police
20   service dog is not use of deadly force.  In the way
21   you've asked your question, as you've framed the
22   definition, then the answer is yes.
23       Q.   Do you believe the use of K9 force is
24   deadly force?
25       A.   I do not.

73914236-3f4a-4bc1-802b-d70e380235a6

1    Q.   Where do you believe the use of K9 falls
2  on the use of force continuum?
3    A.   One of the manifold criticisms of a use of
4  force continuum is that there is not a generally
5  accepted and universal continuum in the law
6  enforcement world.  There are many other criticisms
7  as to why agencies ought not to use a use of force
8  continuum, but that's one of them.  One, perhaps,
9  that is most applicable here.  And so the answer is,
10  I don't know, it depends on how an agency defines
11  its own -- if an agency has a use of force
12  continuum.  And if they use it as a policy tool as
13  opposed to merely an exemplary tool or a training
14  tool.  It's really the agency that places that dog
15  in the spectrum somewhere.
16    Q.   Are you familiar whether or not the
17  Springboro Police Department in this case had a use
18  of force policy in effect at the time of the
19  Campbell and Gemperline bites?
20    A.   I believe that they had a use of force
21  policy in effect at that time, yes.
22    Q.   And are you familiar with where the K9 use
23  of force fell within that use of force policy?
24    A.   If I reviewed that, it's not something
25  that I can recall right now.

1    Q.   I'm going to have -- hand you what we've
2  marked as Deposition Exhibit S2, previously.
3    A.   Yes.
4    Q.   Do you recognize that document that I've
5  handed you?
6    A.   I think I've seen the content, but I don't
7  recall seeing a chart form.
8    Q.   Okay.
9    A.   I may have.
10    Q.   Do you know what this document is, or what
11  you recognize it to be?
12    A.   I believe this to be an excerpt from the
13  general policy manual of the Springboro Police
14  Department.
15    Q.   Okay.  And it's titled Section 1.3.1, Use
16  of Force.  And I'll ask you again in reference to
17  this policy, do you know where K9 use of force falls
18  in the use of force continuum as it's presented in
19  this policy of the Springboro Police Department?
20    A.   I do.
21    Q.   And go ahead and tell me.
22    A.   It's put at the midpoint.  It is -- the
23  exemplary action that it's juxtaposed with here is
24  wrestling with an officer or pushing an officer.
25    Q.   Meaning, you put it in that same category

1  with impact weapons, striking structural areas,
2  baton with restraints and K9 use?
3    A.   I didn't put it there, but that's where it
4  appears in this document.
5    Q.   Okay.  And you've been involved in
6  drafting use of force policies and K9 policies,
7  correct?
8    A.   I have.
9    Q.   Is that the same place where you would
10  place the K9 usage as far as use of force goes?
11    A.   No.
12    Q.   Where would you place it?
13    A.   I would never draft a policy that has a
14  use of force continuum in it.
15    Q.   So you would never -- if you were drafting
16  a policy, you would never use a K9 use in the use of
17  force continuum?
18    A.   I would never draft a policy that has a
19  use of force continuum in it.
20    Q.   You don't believe in them?
21    A.   I don't.
22    Q.   Let's go back to some of your training
23  that you've received when you were working as a
24  reserve officer for Utica --
25    A.   I appreciate that you're kind enough to

1  forgive me my decade of being off.  And I will
2  return the favor by --
3    Q.   I'll trade you on that and we'll just quit
4  correcting --
5    A.   All right.
6    Q.   What other formal training did you engage
7  in back then in relation to police K9s outside of
8  your maintenance training?
9    A.   I would typically attend a state-sponsored
10  training refresher course every year that typically
11  would be three days in length.  And I would
12  typically attend at least one, some years two
13  week-long canine refresher training seminars at
14  different locations in the United States.  There was
15  a period of time when the Phoenix Police Department
16  was -- they rebuilt their K9 unit, purchased a
17  number of dogs, I want to say 26, I think, and
18  brought in a number of new handlers.  They
19  contracted with a fellow that I knew to go to
20  Phoenix for somewhere in the neighborhood of three
21  months to supervise this training program.  And so I
22  traveled to Phoenix a couple of times to assist in
23  providing training in that project, and then worked
24  in a similar project in Sacramento, California.  So,
25  in terms of time, typically a minimum of two full

73914236-3f4a-4bc1-802b-d70e380235a6

1    weeks a year in addition to maintenance training,
2    and some years more.
3        Q. Okay. Was that necessary to keep Monty up
4    to professional performing levels to engage in that
5    maintenance training?
6        A. The maintenance training or the training
7    in addition to the maintenance training?
8        Q. All the training I -- let me just --
9        A. I'm sorry. I might have misunderstood
10   your question.
11       Q. Yeah. I'm saying all that training that
12   you did, the maintenance training, the two weeks a
13   year, and this other stuff that you did for the
14   other -- with the other departments, was that
15   necessary to keep Monty performing to professionally
16   accepted levels?
17       A. No.
18       Q. So you feel that you engaged in training
19   that wasn't necessary?
20       A. Some of it I was engaged in because I was
21   paid to go do it, but it wasn't necessary to my
22   responsibilities.
23       Q. Speaking of paid to do it, what have you
24   been paid so far to provide opinions in this case or
25   do review work?

1        A. I don't know. I could -- I'm guessing
2    that my bill hasn't been produced to you.
3        Q. It has not.
4        A. I can look at the next break, if you'd
5    like.
6        Q. Okay. And I've been provided a copy of
7    your report, which we'll go ahead and mark. Let's
8    just mark it Plaintiff's One.
9    (PLAINTIFFS' EXHIBIT ONE WAS MARKED FOR THE RECORD)
10       (OFF THE RECORD)
11   BY MR. BRANNON:
12       Q. You were able to check when we went off
13   the record and I had asked you previously what you
14   have been paid so far for your opinions in review of
15   your work in this case.
16       A. And the answer is $5,800.
17       Q. Okay. And I have provided you with a copy
18   of what's been given to me as your report. Do you
19   recognize that document?
20       A. I do.
21       Q. Is that a true and accurate copy of that
22   document?
23       A. I haven't gone through it word for word,
24   but it appears to be an accurate copy.
25       Q. And that's the report that you issued in

1    this case?
2        A. It is.
3        Q. And it lists several documents that you've
4    reviewed before writing that report. Have you been
5    provided any additional documents since you wrote
6    this report that you also reviewed?
7        A. I have.
8        Q. And what have you been provided
9    additionally?
10       A. Depositions of Nick Clark, Sgt. -- starts
11   with a Z --
12       Q. Zimmaro.
13       A. Zimmaro. Mr. Campbell's girlfriend,
14   Lisa --
15       Q. Lisa is correct. I don't remember the
16   last name either.
17       A. Okay. I think a very short deposition of
18   the girlfriend, Lisa, Chief D'Amico, Mr. Campbell,
19   Ms. Gemperline. I believe that's it with the
20   depositions. And then I've been provided a
21   memorandum decision, a long one, from Judge Dlott,
22   did I pronounce that correctly?
23       Q. Correct.
24       A. And I don't know whether Mr. Weisenfelder
25   provided it to me or whether I saw this in the

1    normal course of my work, but I saw the Sixth
2    Circuit opinion on this case. I believe I did. I'm
3    not certain.
4        Q. Okay.
5        A. And then I'm not sure if you produced
6    subsequent responses to interrogatories, or any
7    subsequent discovery. I may have seen that, as
8    well. If I did, we're talking stuff that happened
9    early in 2010. I'm the guy who's off by ten years
10   here today, so my memory may not be accurate. But
11   if I've seen it, other than the depositions, it's in
12   those two bucket files there today. I brought for
13   you everything that I have outside of the
14   depositions, and what I have prepared, which has
15   been two billings and this report. You have the
16   report and I've told you what's in the billings. So
17   everything else is sitting there on the table with
18   you.
19       Q. Okay. And I noticed when I looked through
20   those files there were not notes or handwritings or
21   otherwise pertaining to these files. Did you not
22   take any notes in going through this, or what?
23       A. I suspect if you looked carefully you -- I
24   typically don't write on the documents, but you
25   might find some highlighting. Occasionally you'll

73914236-3f4a-4bc1-802b-d70e380235a6

1  find a tick mark to the side. You'll find a tick
2  mark to the side that probably indicates that's
3  where I stopped reading one night and picked up the
4  next evening. I don't typically keep notes. What
5  I -- my usual practice is to begin a document in a
6  word processing format. I do it a little bit
7  different nowadays than this. Actually, I do it a
8  fair bit different. But when I was doing this, I
9  would review the materials, think them through, come
10  up with what I thought were the salient opinions. I
11  would write those in a word processing document.
12  And then I would just start a list of things that
13  I -- came to mind from what I'd reviewed that I
14  needed to discuss in the report. And I usually
15  would number that list, and that then became the
16  skeleton word processing file on which I would build
17  my report. And almost always the end product is
18  pretty close to the road map that's begun. We may
19  get to the end and move things around because I
20  think that the flow goes better in terms of temporal
21  progression, but that's how I do things. That's how
22  I did things then.
23      Q. And this report that you provided offers
24  certain opinions. Did the additional materials that
25  you were provided with change any of the opinions

1  that are contained in your report that's before you
2  there?
3      A. It did not.
4      Q. Did you have any additional opinions that
5  you were going to give at trial, or that you
6  formulated that are not contained in the report
7  that's before you?
8      A. I do not.
9      Q. And if you do have any additional opinions
10  that you will be offering for trial prior to trial
11  on any matter related to this case, I would ask that
12  you notify Mr. Weisenfelder and that I be made aware
13  of those opinions; fair enough?
14      A. I'll agree to that.
15      THE WITNESS: And as you're thinking, I'm
16  going to take two minutes. I'll be right back.
17      MR. BRANNON: We'll take a break.
18      (OFF THE RECORD)
19  BY MR. BRANNON:
20      Q. When is the last time that you spoke with
21  Mr. Weisenfelder regarding this case, besides this
22  morning?
23      A. I spent some time with him last --
24  yesterday afternoon when I got into town.
25      Q. Okay. How much time did you spend with

1  him?
2      A. It was -- well, I was in his office for
3  two and a half hours, but my granddaughter in Brazil
4  called to wish me happy birthday. So he was
5  gracious enough to let me spend probably 20 minutes
6  on the phone with her and my son. So maybe two
7  hours, two hours and ten minutes or so.
8      Q. And what documents did you review
9  yesterday in his office?
10      A. I didn't review any documents yesterday.
11      Q. You just had discussions with him?
12      A. I didn't review any documents in his
13  office. I did review Lisa -- I should have looked
14  at her depo last night --
15      Q. Sam Campbell's girlfriend?
16      A. Yes, but with Mr. Weisenfelder I just had
17  a discussion.
18      Q. Okay. Let's get back to your history with
19  the -- with K9s. I believe before we broke last
20  time that you continued in your position as a
21  reserve K9 officer with the --
22      A. Uintah.
23      Q. Thank you. County Sheriff's Office up
24  until 1995 or '94?
25      A. No. From then until approximately 2000 --

1      Q. 2000, 2001, okay.
2      A. I see I've got you messed up on dates now.
3      Q. Since that time what was your next job, or
4  job involving police K9 units in any capacity?
5      A. Not long after I wrapped up the murder
6  trial in Uintah County, and then became a full-time
7  employee of the Utah Department of Public Safety,
8  Peace Officers Standards and Training Division. I
9  was promoted and given a new assignment as bureau
10  chief. And as bureau chief the -- one of the
11  programs that reported directly to me was the Utah
12  post K9 training section. So I held direct first
13  line reporting authority over the police service dog
14  training for Utah, as well as the service dog
15  training for dog teams that were deployed by the
16  Department of Public Safety.
17      Q. Okay. So when you say you supervised
18  them, this Utah post K9 training section was a
19  section underneath you that developed the -- and
20  this may or may not be the correct terminology,
21  policies and procedures for training and developing
22  K9 teams in the State of Utah?
23      A. It would be more accurate to say training
24  and certification.
25      Q. Okay.

73914236-3f4a-4bc1-802b-d70e380235a6

1    A.  Key role of that group was testing and
2  certification in different types of police service
3  dog teams throughout the state.  It's analogous to
4  what you folks call here OPOTA.
5    Q.  And that's to say then that that section
6  then would report to you and give their proposals
7  and recommendations for training and certification
8  standards for the State of Utah.  And then you would
9  either approve or disapprove set policies that they
10  recommended; would that be how that worked?
11    A.  Yes.  But the final -- yes, it would.  But
12  there was one other level of final approval, and
13  that was the council -- the governor appoints a
14  17-member council to oversee the group that hosts.
15  And so council ultimately, on anything that involved
16  testing, certification.  Like the council would have
17  to give its stamp of approval.
18    Q.  They're the governing body that would
19  actually approve the standards?
20    A.  They're the political governance of the
21  organization, yes.
22    Q.  Okay.  And so the main people that were
23  drafting these things was the second -- you
24  designated each section for -- you'd have like a K9
25  section, you'd have a --

1    A.  I had a K9 certification and in-service
2  sections.
3    Q.  Okay.  So two different sections under
4  K9s?
5    A.  No.  I'm sorry.  No, just one -- one
6  section under K9, then the in-service, that was the
7  training -- the group that oversaw training of peace
8  officers for the whole state, unrelated --
9    Q.  Okay.
10    A.  -- radar, you know, intoxilyzer, that sort
11  of stuff.  And then certification was the
12  investigations folks who investigated allegations of
13  misconduct by police officers for purposes of
14  licensing.  K9 is a separate section from those two
15  separate -- and those two sections were separate and
16  distinct.
17    Q.  Okay.  So what direct role did you have
18  with the K9 training sections?
19    A.  I supervised the people who actually
20  worked -- the line workers who worked in those
21  sections.
22    Q.  Okay.  And then you also supervised the
23  same line workers that developed the standards for
24  in-service training --
25    A.  Unrelated to K9 --

1    Q.  Unrelated to K9 --
2    A.  Yes.
3    Q.  Okay.
4    A.  As well as investigations.
5    Q.  So the K9 component to this was just a
6  small part of your overall supervisory role?
7    A.  It was one of three sections that I had
8  direct supervision over.
9    Q.  Okay.  And how long were you in that
10  capacity?
11    A.  Until I became chief at the attorney
12  general's office in spring of 2005.
13    Q.  Okay.  So you never had any direct
14  supervisory role or capacity over K9 units,
15  themselves, am I correct?  Meaning within a police
16  department or a sheriff's office?
17    A.  That's not absolutely correct.  Would you
18  like me to explain?
19    Q.  Yes.  You tell me what your training is as
20  a direct supervisor of K9 units within either a
21  police department, a sheriff's department or
22  something like that.
23    A.  That's probably the shortcut here.  The
24  Department of Public Safety Peace Officers Standards
25  and Training had a section that we've talked about,

1  the supervised training and certification of police
2  dog teams in Utah, generally.  In addition to that,
3  one of the folks in that section also is designated
4  as a handler, and handled, I believe at the time,
5  two dogs.
6    He handled a general purpose, that is a
7  patrol/controlled substance detector dog.  And then
8  he had a dog that was a single purpose explosive
9  detector dog.  And I supervised him as a handler.
10  He would be deployed in the field for, I think,
11  primarily -- I don't know percentages.  The majority
12  of his time was to be deployed in the field as one
13  of the few explosive detector dog handlers that we
14  had in the state, particularly prior to the 2002
15  Winter Olympics.
16    Q.  Okay.  And then the other dog you said was
17  mainly a drug dog?
18    A.  No.  The other dog was a dual purpose dog.
19    Q.  Dual purpose.  Okay.
20    A.  And that supported a mission on the
21  highways of the state.
22    Q.  Okay.  And at that time, how many officers
23  were you supervising besides this one particular K9
24  officer that operated two dogs?
25    A.  I think the highest number at any one

73914236-3f4a-4bc1-802b-d70e380235a6

1  point in that assignment, sworn officers and
2  non-civilian staff, would have been seven.
3      Q.  Okay.  And that was through the Utah
4  attorney general's office?
5      A.  No.
6      Q.  No.  Department of Public Safety?
7      A.  Department of Public Safety, Peace
8  Officers Standards and Training Division.
9      Q.  Okay.  So they operated some officers
10 independently in the field?
11     A.  Yes.
12     Q.  Okay.
13     A.  But a very small -- very small number.
14     Q.  Okay.  They work for special climates like
15 the Olympics or something like that?
16     A.  Well, the K9 team -- the K9 team had a
17 great deal of field assignments, and they primarily
18 related to special events.  The Olympics, Secret
19 Service was coming to town.  It was not uncommon to
20 have the president or vice-president coming to Salt
21 Lake City for some event or another, that sort of
22 thing.  Not a very common occurrence.
23         The other officers had field assignments,
24 but they weren't necessarily related.  During the
25 Olympics they had field assignments that went, gosh,

1  18 hours a day for a long, long time, but they had
2  other duties during other times.
3      Q.  Sure.
4      A.  But these are not -- when you're thinking
5  of police, these aren't guys that are out doing
6  patrol work for the most part, with the exception of
7  the one dog handler.
8      Q.  Okay.  Anything else with the Utah post K9
9  wise?  I'd assume you were the supervisor for the
10 section, or that you oversaw the section that made
11 the recommendations for the changes for the state,
12 and sounds like this one dog team was utilized for
13 special court purposes?
14     A.  Correct.
15     Q.  Anything else K9 related there?
16     A.  Yes.  Although not to a significant
17 degree.
18     Q.  Okay.  And what is that?
19     A.  The governor appointed me a couple of
20 times.  I currently am serving a second term on the
21 Council on Peace Officer Standards and Training.  So
22 I'm on the -- when I refer to the political body
23 that controls the police academy --
24     Q.  POST?
25     A.  POST.  I left and I was an employee, a

1  bureau chief after I left.  Some time after I left I
2  was appointed to the council.  And then I was
3  recently reappointed in January of this year.  So
4  I'm serving a second -- I served a term years
5  before, and now I'm serving a second four-year term.
6  So, you know, I -- ultimately, when the discussion
7  comes up of the police service dog program, rules,
8  regulations, certifications, so forth, ultimately,
9  you know, I have a role approving or not approving,
10 but it's not a very significant role.
11     Q.  And the component of that is K9?
12     A.  It's fairly small.  I think I'm the
13 only -- of the 17 people on the council, I'm the
14 only -- or maybe there's one other person who ever
15 had any K9 experience at all.  So when that comes
16 up, you know, I probably get five minutes to say,
17 hey, guys, I think this is good or I think this is
18 bad, and here's why, one way or the other.  It's a
19 very small role.
20     Q.  Okay.  Any other K9 experience in your
21 career?
22     A.  I currently participate in writing K9
23 policies for approximately 1,400 agencies in the
24 United States.
25     Q.  And when you say for 1,400 agencies, I

1  don't see how any one man can write 1,400 policies,
2  but go ahead and tell me how that --
3      A.  I don't.  There's another guy who works
4  with me.
5      Q.  Yeah.  How you then participate in it.
6      A.  Let me give you what I think will get to
7  what you need to know in the quickest time.  I work
8  with a company called Lexipol, L-E-X-I-P-O-L.
9  Lexipol is the nation's largest group of risk
10 management consultants and policy providers for law
11 enforcement.  Lexipol provides a policy manual for
12 sheriff's offices, police departments, state police
13 entities, district attorney investigator bureaus,
14 state attorney general investigation bureaus.  I
15 don't know how many of those there are, but we
16 supply K9 policies to about 1,400 of those agencies
17 primarily in the Western United States.  Almost all
18 the agencies in California.  And the overwhelming
19 majority of agencies in Idaho, many in Utah, many,
20 if not most, in Washington, Oregon, a number in
21 Texas, Colorado, Arizona, Illinois.  I'm going to
22 have to stop there.  There are other states, but I
23 have to have documents in front of me.  Within the
24 company there are people with different areas of
25 responsibility.  One of my areas of responsibility

73914236-3f4a-4bc1-802b-d70e3802335a6

1  is the K9 policy.  I share that responsibility with
2  another fellow who has a similar background to me.
3      Q.  Who is the other fellow?
4      A.  Bruce Praet, P-R-A-E-T.
5      Q.  And where is he out of?
6      A.  Sherman Oaks, I believe.
7      Q.  Sherman Oaks?
8      A.  California.
9      Q.  California.  When I looked at your list of
10  qualifications and work in your report that's
11  sitting in front of you, it listed some consulting
12  work for an insurance company, or something of that
13  sort.  Was that for this Lexipol that you mentioned?
14      A.  No.
15      Q.  That was separate?  Okay.  Let's stay on
16  this Lexipol then.  When you say that you draft
17  policies for 1,400 police departments, do you
18  have -- or supply through Lexipol, is it model
19  policy such as the one that Mr. Fleck posted on his
20  website, the model policy for the chief of police?
21      A.  I believe -- my understanding is that a
22  few years back, because of some limitations with the
23  K9 policy and other policies, I believe that the
24  International Association of Police -- Chiefs of
25  Police stopped referring to those policies as model

1  policies.  I don't know what they call them now.
2  But the policies that we provide are -- the typical
3  product that we provide is a manual of best practice
4  policies that spans the gamut of risk areas for law
5  enforcement agencies.  And then with those policies,
6  there are guide sheets provided with questions that
7  an agency works through to determine which
8  components of a policy fit them.  How they fit that
9  particular agency.  So the agency makes some --
10  they're decision driving questions.
11      Q.  Okay.  And this is in a best practices
12  manual that you and Bruce Praet produced for
13  Lexipol?
14      A.  There are a lot of people involved.  I
15  don't know how many, 50 or so involved, but in the
16  K9 area it's primarily those two, myself and Bruce.
17      Q.  Yeah, but I'm just asking you about the
18  K9.
19      A.  Okay.
20      Q.  So, for the K9 component of that --
21      A.  But I don't want you to have the
22  impression that I produced that entire manual,
23  because I really -- I don't.
24      Q.  Okay.
25      A.  A small --

1      Q.  You just have the K9 section in that?
2      A.  I have some others, but that's one of
3  them.
4      Q.  Okay.  So you don't actually write the
5  policies that are adopted by these 1,400 agencies.
6  You provide them through Lexipol where they choose
7  what their best practices are going to be in
8  developing their own policy for their particular
9  department.  Am I correct in stating that?
10      A.  In a gross sense, that's correct.  Many of
11  them find that the best practice fits them
12  perfectly.  Some will use the guide sheet and ask
13  questions and will modify the policy somewhat,
14  typically in a dialogue with those of us responsible
15  for preparing that particular best practice policy.
16      Q.  Okay.  So the best practices policy,
17  that's sort of a model policy?  I know you don't
18  like the term --
19      A.  We avoid that term model for a bunch of
20  reasons, but it is what many people call -- in fact,
21  if you were to ask most of our clients, well, what
22  is it you -- well, we get this model policy manual.
23      Q.  Okay.
24      A.  As I think you --
25      Q.  Industry term.

1      A.  -- as I think you mean it, and as most
2  people in the industry mean it, it's a model policy.
3      Q.  Okay.  I'm going to ask that you produce
4  for me, through Mr. Weisenfelder, your best
5  practices policy, your manual for K9s.  You don't
6  have to give me the whole Lexipol -- Lexipol
7  whatever, but I want what you've developed with
8  Bruce Praet as what you're contributing to Lexipol.
9  I take it you have that in your possession?
10      A.  I actually don't.  You mean here today?
11      Q.  No, not today.
12      A.  No.
13      Q.  But you have it at home somewhere, I'm
14  sure.
15      A.  I do have certain documents.  I'll have to
16  have the discussion with Mr. Weisenfelder as to what
17  is my property to provide to him, as opposed to what
18  is not.  I think for your purposes, I can -- I can
19  provide you with, for example, the Utah Department
20  of Public Safety K9 policy, which is produced by
21  Lexipol.  So I can give you my work product, but it
22  may have someone else's label on it.
23      MR. WEISENFELDER:  And all that I ask is
24  that you follow the request up in a letter to me,
25  so I make sure that we're on the same page as to

73914236-3f4a-4bc1-802b-d70e380235a6

1 what's being requested.
2 Q. Okay. And I just want to make sure that
3 we're clear on what I'm asking. It sounds like
4 there's two things. There's a Utah Department of
5 Safety --
6 A. No. There aren't two things, there are
7 1,400 things. What I can't give you is all 1,400
8 agencies' variations -- iterations --
9 Q. I don't want all 1,400, I want your --
10 A. I can give you what I think you want,
11 which is the core -- the foundational policy.
12 Q. Yeah, and that's it.
13 A. Okay.
14 Q. Your recommended policy with these various
15 questions that agencies ask themselves if they're
16 going to alter the policies.
17 A. I can't provide -- I can't provide the
18 guide sheet to you, because I'm not the guy that
19 writes it, and I don't own the --
20 MR. WEISENFELDER: There may be
21 proprietary interests involved here --
22 A. But I can give you the policy, itself.
23 Q. Okay. And I can refer to that as either
24 the Lexipol manual of best practices?
25 A. Yes. But, again, just that one -- I want

1 to stress there are --
2 Q. For K9 --
3 A. Right. Hundreds of policies in there that
4 I don't really touch.
5 Q. And then the Utah Department of Safety --
6 A. The Utah Department of Public Safety K9
7 policy is one example of an unaltered K9 policy
8 produced by Lexipol.
9 Q. Okay.
10 A. So, if I give you that document, which is
11 a public document because it's now been purchased by
12 the state. And the state can't -- under our state
13 rules, probably the same here, if you ask for it you
14 get it. I mean --
15 MR. WEISENFELDER: General public records
16 request --
17 A. I could make you jump through a bunch of
18 hoops. What I'm telling you is, I won't. What I
19 will do is I will get that document to you. It will
20 then represent to you my work product in
21 collaboration with others.
22 Q. That's the policy --
23 A. Certainly what I think you want is a policy.
24 Q. -- that you developed.
25 A. And that I -- yes.

1 Q. Okay. If I'm understanding, your
2 recommended or your ideal policy is you would create
3 a policy.
4 A. Yes.
5 Q. For K9 usage.
6 A. Ideal is a strong word, but yeah.
7 Recommended is a better word.
8 Q. Okay. What other K9-related experience do
9 you have, either in formulating policy or otherwise,
10 other than what we've discussed already?
11 A. Well, I've spent hours and hours and hours
12 and tedious hours this summer, that could have been
13 better spent on the back of a Harley-Davidson
14 motorcycle, writing a second edition to the K9
15 officer's legal handbook.
16 Q. And that is the book that you authored?
17 A. That's one of the books I've authored.
18 Q. Your prior edition, would that have been
19 current for the time periods of the Campbell and
20 Gemperline bites, meaning the information contained
21 in that book, would that have been the appropriate
22 version to have been in place during those bites?
23 A. May I?
24 Q. Yes.
25 A. Is it listed in here, do you remember?

1 Oh, yes. I couldn't remember when it was published.
2 Yes, it would. Yes.
3 Q. Meaning the book I'm holding up in front
4 of me here?
5 A. Yes.
6 Q. See, you sold one.
7 A. Thank you.
8 Q. To a non-law enforcement officer, which I
9 guess leads into my next question. Your work as an
10 expert witness, how many cases do you review a year,
11 approximately, in your work as a paid expert
12 witness?
13 A. By reviewed do you mean accept, write a
14 report on?
15 Q. Offer an opinion on, either in writing or
16 orally? Meaning, how many times do attorneys pick
17 up the phone, give you a call, or a municipality
18 gives you a call and says, Mr. Wallentine, we've got
19 a case we'd like you to look at and give us an
20 opinion on. Can we send you the file and understand
21 that you're going to charge us for your time and
22 effort in reviewing the matter?
23 A. Certainly it varies, but three to four per
24 year that I actually work through. There are others
25 that I may not agree to work through.

1    Q.   And for how long have you been offering
2  your services as an expert witness?
3    A.   Approximately 13, maybe 14 years.
4    Q.   Okay.  And in reviewing some of the cases
5  that you listed that you've been involved in
6  previously, approximately how many of those have
7  been for the defense or representing the officer in
8  the context of a civil case have you testified for
9  versus the plaintiff, or the injured party or
10  suspect as we refer to it?
11    A.   Of the cases listed here, there is one
12  case where I served as the expert witness for the
13  plaintiff.  Another case where I served as an expert
14  witness testifying against the officer, but
15  representing -- or serving for a co-defendant.
16  That's it.
17    Q.   And in that one case where you were
18  testifying against the officer as an expert, can you
19  give me the basic facts of that case and tell me
20  what it was about and the name of the case?
21    A.   Yes.  There were actually two where I
22  testified against the officer, but in one they were
23  co-defendants.  In the Nielson case versus South
24  Salt Lake City and Burnham, Ms. Nielson was sexually
25  assaulted by a police officer.  She was a juvenile

1  who had been consuming alcohol.  The officer picked
2  her up, took her to his home.  I believe she passed
3  out.  That's what I believe happened.  There was
4  some question as to whether she passed out.
5       And when she became fully conscious of her
6  surroundings, she found the officer was engaged in a
7  sexual act with her.  And he was terminated.  And I
8  testified as to the wrongfulness of his conduct.
9    Q.   Had nothing to do with K9s?
10    A.   It did not.
11    Q.   How about the other case?
12    A.   The other case is Trammell versus
13  Jacksonville Beach City Police Department, and in
14  that case I testified on behalf of Mr. Trammell as
15  the plaintiff in that case.  It was a case where he
16  was bitten in the throat by a police service dog in
17  the course of a track of a suspect.
18    Q.   And in that Trammell case, what were the
19  injuries sustained by the suspect, or Mr. Trammell,
20  I guess?
21    A.   The injuries were fairly significant.
22  He's what a law professor would find as an eggshell
23  plaintiff, or at least he was at the time.
24  Mr. Trammell had had laryngeal cancer.  So he had a
25  compromised esophageal laryngeal tract.  And he was

1  bitten in the front of the neck.  So he was bitten
2  with a crushing and tearing bite to his larynx,
3  which significantly impaired his already impaired
4  larynx and his ability to speak.  I believe there
5  may have been a secondary infection, as well.  I
6  don't recall.
7    Q.   Do you still have a copy of the report
8  that you issued in that case?
9    A.   I don't know if I do or not, because this
10  is -- I think that one has now dropped off the
11  four-year look-back window of Rule 26, so I may not.
12    Q.   Okay.
13    A.   I suspect that --
14    Q.   And I'll tell you what, I'm going to go --
15    A.   I think you can find it.  If I don't have
16  it, I think you can find it on Westlaw, because
17  that's a case that went up to the Eleventh Circuit.
18  2008, I might, I don't know, sir.
19    Q.   I'm going to go ahead and make a request
20  for a copy of that report if you do have it,
21  otherwise I will try and obtain it through other
22  means.
23       MR. WEISENFELDER:  Put that in the
24  letter, too.
25       MR. BRANNON:  I'll put that in the letter

1  with --
2    A.   I can let you know that in fairly short
3  order.  And again, if I don't have it, I'm pretty
4  sure you can find it.
5    Q.   Okay.  Do you know who Wendell Nope is?
6    A.   I do.
7    Q.   Who is Wendell Nope?
8    A.   Wendell Nope is a sergeant with the Utah
9  Department of Public Safety, and he is my former
10  employee.
11    Q.   Okay.
12    A.   And occasional -- someone that still does
13  work for me from time to time.
14    Q.   Okay.  Were you his direct supervisor
15  then?
16    A.   I was.
17    Q.   And where was that at?
18    A.   Utah POST.
19    Q.   Utah POST.  Okay.  And he was the one in
20  charge of the training program there?
21    A.   He was then, and is today.
22    Q.   Okay.  And in your report you stated that
23  you're the author of police academy curriculum use
24  of force in police service dog teams, search-seizure
25  dog teams, that sort of thing.  What's that

73914236-3f4a-4bc1-802b-d70e380235a6

1 referring to, specifically?
2 A. The curriculum that was and I think some
3 of it still is presented at the Utah police academy
4 in the basic handler training courses and in the
5 supervisory courses.
6 Q. Okay. So that was part of the courses
7 that you developed, or that were developed by the
8 training section that you would then approve?
9 A. Yes. I don't want to give you the
10 impression that I created those when I went there.
11 There was a form of that course created prior to my
12 being there, and it went through revision when I was
13 the supervisor.
14 Q. Okay. And when it says you regularly
15 teach POST patrol dog handler courses, you don't
16 teach officers how to utilize their dogs; am I
17 correct in that?
18 A. That's correct.
19 Q. Okay. Yours is mainly -- pertains to
20 search and seizure, legal issues, given your
21 background?
22 A. Search and seizure, the appropriate
23 perimeters for deploying a dog that -- the legal
24 issues and the civil rights issues surrounding
25 police service dog teams.

1 Q. I'm going to hand you -- and these are the
2 originals that I pulled out of your file, just some
3 documents, and most of it is correspondence that
4 looks like between yourself and Mr. Weisenfelder.
5 MR. WEISENFELDER: Are you marking this
6 as Two?
7 MR. BRANNON: Yeah, let's mark that.
8 (PLAINTIFFS' EXHIBIT TWO WAS MARKED FOR THE RECORD)
9 Q. Just for purposes of the record, can you
10 identify that for me and verify that those are
11 records of information that you had contained in
12 your file, and --
13 A. This appears to be a -- I haven't looked
14 at these documents for quite some time, but I
15 believe that they all came from my file.
16 Q. Are you a member of any organization or
17 group, specifically pertaining to any K9 activity or
18 association?
19 A. I am.
20 Q. And which associations or groups are you a
21 part of?
22 A. I'm currently active in the California
23 Narcotic and Explosive Detector Dog Association.
24 Q. And seeing how that's out of state, what
25 is your capacity with them, or are you just a member

1 Q. Okay. So we'd encompass it under the term
2 legal issues, then pertaining to K9 use and
3 deployment?
4 A. I think that's fair.
5 Q. Okay. Which I differentiate from -- let's
6 see if you agree with me on this, from actual
7 training of K9s, K9 activity in the field, meaning
8 how a dog acts, reacts, things of that nature?
9 A. That's fair.
10 Q. Okay. And just so I'm clear, when you
11 were with the sheriff's office and actually had
12 Monty as a dog, he was not -- he was a certified
13 patrol dog, not just a search and rescue dog or
14 something like that, correct?
15 A. He was -- that's true.
16 Q. Okay. Anything else that you do that's
17 related to police K9s?
18 A. Not that I consider to be of great
19 significance or import. I occasionally -- at least
20 once a year I'll go to California and participate in
21 a week-long seminar as an instructor. Occasionally,
22 I'll do others, not often. I don't -- I don't like
23 to travel near as much -- I dislike traveling more
24 today than I did ten years ago, let me put it that
25 way.

1 where you've paid your membership fees this year and
2 you're in the group?
3 A. I do instruction for them. Out of state
4 is true, although it's a bit of a misnomer. It
5 started in California, but the organization's active
6 in six or seven western states. It's a
7 certification organization, primarily.
8 Q. Talking about the training for Spike
9 earlier, you've had an opportunity to review the
10 training records for Spike as part of this case,
11 correct?
12 A. I've seen a number of training records
13 that have been produced to me.
14 Q. Okay. Based upon your review of those
15 records, do you believe that Spike was initially
16 trained as a bark-and-hold dog or a bite-and-hold
17 dog?
18 A. It's my understanding that his training
19 resulted in him being treated as a bite-and-hold
20 dog.
21 Q. Okay. Resulted in him being a
22 bite-and-hold dog. Was that when Spike was
23 initially purchased, in your opinion, or not, or
24 acquired?
25 A. When Spike was initially acquired, he was

73914236-3f4a-4bc1-802b-d70e380235a6

 1  acquired to be what I believe we have all agreed on
 2  for the definition of bark-and-hold or
 3  guard-and-bark dog.
 4      Q.  Okay.  And at some point, it's your belief
 5  then that he was transitioned through training or
 6  otherwise to become a bite-and-hold dog?
 7      A.  In the majority of his deployments, they
 8  were deployments that were more consistent with the
 9  behavior of a bite-and-hold dog.
10      Q.  Okay.  Meaning the -- I'm just asking you
11  based upon your review of the training records.  I
12  just want to make sure we're talking apples to
13  apples here.  When you say when you reviewed his
14  deployment records, these would have been the -- the
15  deployment records would have included the use of
16  force incidents that Officer Clark would have filled
17  out pertaining to when he would have deployed his
18  dog in the field, correct?
19      A.  Correct.
20      Q.  So based upon your review of those
21  deployment records, it led you to believe, based
22  upon your knowledge, training, experience, that
23  Spike was a bite-and-hold dog?
24      A.  In those circumstances that I reviewed, he
25  performed as I would expect a bite-and-hold dog, and

 1  perhaps even a bark-and-hold to behave.
 2      Q.  Why did you believe that he performed as a
 3  bite-and-hold dog?
 4      A.  At the end of the -- at the end of the
 5  trail, so to speak, the persons were bitten.
 6      Q.  Meaning at the end of a track, or when a
 7  suspect was found?
 8      A.  At the end of a search activity.
 9      Q.  Okay.  And that would be consistent with a
10  bite-and-hold dog?
11      A.  Could be consistent with a bark-and-hold
12  dog.
13      Q.  For it to be consistent with a
14  bark-and-hold dog, that would have meant at the end
15  of a track the suspect would have made some type of
16  furtive movement or attempted to escape or attack
17  the officer, or something of that nature, correct?
18      A.  It means that the suspect would have made
19  some kind of movement, some kind of behavior that
20  triggered the dog to engage in a bite.
21      Q.  Okay.  How many deployment incidents did
22  you review for Spike that resulted in a person being
23  bitten?
24      A.  I don't recall.
25      Q.  More than -- there were more than ten

 1  incidents involving Spike that involved biting a
 2  suspect, do you agree with that, in the time that he
 3  was deployed in the field?
 4          MR. WEISENFELDER:  Objection.  Go ahead.
 5      A.  I believe that to be accurate.  Without
 6  going back and looking through the file in some
 7  detail, I couldn't tell you that that's accurate.
 8      Q.  Does that strike you as a high number of
 9  bite incidents involving a K9 in a relatively small
10  department?
11          MR. WEISENFELDER:  Objection.  Go ahead.
12      A.  Well, there are a lot of variables assumed
13  in your question, so, no.
14      Q.  Okay.  Meaning, you operated a K9 for
15  what, five years, roughly, which was a bite-and-hold
16  dog, and had zero suspects bitten with you as the
17  handler of that K9, correct?
18      A.  Correct.
19      Q.  Yet in a smaller time period, Officer
20  Clark had over ten suspects bitten.  That doesn't
21  cause you any concern as somebody who would be
22  reviewing this case file for either an improperly
23  performing dog or improperly performing or trained
24  handler?
25      A.  No.

 1          MR. WEISENFELDER:  Objection.  Go ahead.
 2      Q.  Is that to say that past performance of a
 3  K9 unit is not a good predictor of future
 4  performance?
 5      A.  No.
 6      Q.  It's not?
 7      A.  Well, with all due respect, an English
 8  teacher would not have approved of your question.
 9      Q.  Never did very well in English, so I'll --
10  let me try another one here.
11      A.  It is not to say -- you had a double
12  negative there.  Past performance is often an
13  indicator of future performance.
14      Q.  Okay.  So you would agree with me then
15  that past performance is a good indicator of how a
16  dog or animal will behave in the future,
17  particularly a K9?
18          MR. WEISENFELDER:  Objection.  Go ahead.
19      A.  It can be.
20      Q.  Unless there is some type of intervention
21  for a K9, is it more likely than not that that
22  conduct or activity will continue, will be
23  consistent --
24          MR. WEISENFELDER:  Objection.
25      Q.  -- as it pertains to a K9 unit?

73914236-3f4a-4bc1-802b-d70e3802235a6

1    MR. WEISENFELDER: Objection. Go ahead.
2    A. It's more likely than not that a dog in
3  the same set of circumstances and same stimulant --
4  stimulus will perform consistent with past behavior
5  in future circumstances, if there is no intervening
6  training or you used the word intervention, that's
7  true.
8    Q. Okay. Meaning to put this into context,
9  if a bark-and-hold trained dog, instead of barking
10  at a suspect bites that suspect, let's say three
11  times, one would expect the fourth time that a
12  bark-and-hold dog would have received some type of additional
13  dog would have received some type of additional
14  training or corrective behavior, that it would be
15  more likely than not that that bark-and-hold trained
16  K9 would bite the fourth suspect, correct?
17    MR. WEISENFELDER: Objection. Go ahead.
18    A. Again, I don't know whether there are
19  other, but at least in our world in law enforcement,
20  the kind of circumstances that these service dogs
21  are deployed in, they vary significantly. So if you
22  were to say in your question controlling for all
23  variables, and use the answer that I gave you a
24  minute ago in three prior cases to which you
25  referred to, if all those circumstances were the

1  same and there was no intervening training and no
2  intervening command, and the circumstances were
3  replicated, then, yes, I think the fact that the dog
4  has bitten someone three prior times under identical
5  circumstances, that's an indicator that there's
6  likely going to be a bite again.
7    Q. In your opinion, based upon your
8  knowledge, training and experience, are those traits
9  something that a supervisor should be looking for
10  when monitoring a K9 unit?
11    MR. WEISENFELDER: Objection. Go ahead.
12    A. What traits?
13    Q. Meaning bites occurring with a
14  bark-and-hold dog, consistent bites?
15    A. I think that a supervisor supervising a K9
16  unit or any police unit should be looking at uses of
17  force. I think the answer to that has to be yes.
18    Q. Okay. Meaning that if a bark-and-hold
19  trained dog is consistently biting suspects, that
20  should alert or be a red flag to supervisors of that
21  K9 unit, correct?
22    A. Meaning that every time a dog bites
23  someone, every time someone's struck with a baton,
24  every time someone is sprayed with pepper spray,
25  every time someone receives a current of electricity

1  from an electronic control device, a supervisor
2  should be looking at that incident.
3    Q. Okay. And I'm asking specifically though
4  to K9 units. Are consistent bites from a
5  bark-and-hold -- what's supposed to be a
6  bark-and-hold trained dog, should that be a glaring
7  red flag to a supervisor of a K9 unit?
8    MR. WEISENFELDER: Objection. Go ahead.
9    A. Each one of those bites should be reviewed
10  by the supervisor with great care.
11    Q. And if the supervisor finds that a
12  bark-and-hold dog is consistently biting a suspect
13  without any furtive movements or gestures as we've
14  described it for a bark-and-hold dog, should action
15  be taken by that supervisor or the agency in total
16  to correct that action --
17    MR. WEISENFELDER: Objection. Go ahead.
18    Q. -- in your opinion?
19    A. If a supervisor finds that a dog is biting
20  suspects under circumstances where there is not an
21  appropriate stimulus for the dog to engage in a
22  bite, whether it's one bite or ten, the supervisor
23  should be looking at that and taking some action to
24  remediate.
25    Q. Is the proper action to take that dog out

1  of service until that handler and dog team can
2  demonstrate performance to professionally accepted
3  levels?
4    A. Lots of variables involved, but that
5  certainly could be one within the array of options.
6  That could be one that an agency might take.
7    Q. What are some of the other options that an
8  agency might take in that circumstance?
9    A. It depends on what is determined to be the
10  stimulus, the cause for the bite.
11    Q. Let's say there is no stimulus. That the
12  suspect is just standing there. Besides taking the
13  dog team out of service until some corrective
14  training can occur, what other options are available
15  to that department?
16    A. So as I understand it, your hypothetical
17  is that the dog engages in a bite and there is no --
18  no plausible explanation for the dog's behavior and
19  the bite is inconsistent with the dog's training,
20  then taking the dog out of service certainly is --
21  and providing remediation training certainly is one
22  option. Another option is to conduct further
23  investigation with respect to the handler, bring
24  someone in that's qualified to evaluate the dog and
25  the dog's performance in tandem with the handler,

73914236-3f4a-4bc1-802b-d70e380235a6

1    and tell the department that we think taking the dog
2    out of service is not necessary or we think that
3    taking the dog out of service and providing these
4    particular steps and remedial training is necessary.
5    Let's see, I think your question is to try and give
6    you the realm of possibilities.
7         Another possibility would be taking that
8    dog team or inviting a credentialed assessor to come
9    in and take a look at the dog team and determine
10   whether there was an issue or whether there had
11   simply been an aberration as described in your
12   hypothetical.  There may be others.  Those steps
13   come to mind as I sit here today.
14       Q.  Okay.  So can we agree then that just
15   because a dog team is certified by the state or a
16   state agency, meaning OPOTA here in Ohio or POST out
17   there in Utah, that that does not necessarily mean
18   that that dog team should be deployed in the field?
19       A.  Well, it's certainly a very strong
20   indicator that qualified and credentialed evaluators
21   have made the determination that the dog is
22   appropriate -- the dog team is appropriate to deploy
23   in the field.  But there may be intervening factors
24   that contraindicate that the dog should be deployed
25   in the field.

1        Q.  And one of those contraindicating factors
2    would be if the supervisor were to determine that a
3    dog isn't operating to professionally performing
4    levels; would that be fair to say?
5        A.  That's certainly within the realm of
6    possibilities, yes.
7        Q.  Can we agree then that the state
8    certification for a K9 team, either through OPOTA or
9    POST or otherwise, that's the minimum accepted level
10   of performance to deploy a dog in that particular
11   state?
12           MR. WEISENFELDER:  Objection.  Go ahead.
13       A.  I don't know that that's accurate.  It may
14   be -- that may be true, but I don't know that that's
15   accurate.
16       Q.  Okay.  And you're the expert.  If it's not
17   accurate, please correct me and tell me what would
18   not be accurate about that statement.
19       A.  Well, broadly speaking, there are many
20   states, and you mentioned a couple of them, where
21   certification by the state is not absolutely
22   mandatory for the dog to be deployed on the street.
23   In fact, it's a relatively small minority of states
24   that have any state standards at all.  So to say
25   that that's the minimum standard may not -- in my

1    opinion, would not be accurate.
2         If you were in a state, for example, that
3    had no state standards, does that mean that -- the
4    way you posed your hypothetical, it would suggest
5    that the dog need meet no criteria before deploying
6    on the street, and I just could not accept that as
7    being appropriate.
8        Q.  Okay.  Well, let me -- perhaps it was a
9    poor question on my part.  And let me be more
10   specific since this is an Ohio case and dealing with
11   the Ohio standards through OPOTA.  Would you agree
12   with me that the state certification is the minimum
13   performance standard that a K9 team must meet before
14   being deployed in the State of Ohio?
15           MR. WEISENFELDER:  Objection.  Go ahead.
16       A.  I would agree that the dog must be -- if
17   the dog is certified to OPOTA standards, that the
18   dog must meet those standards at the time of the
19   certification.  My understanding of the
20   administrative code or administrative procedures
21   here, I can't remember what it's called, is that
22   it's not required by the state for that dog to
23   maintain that certification beyond the initial
24   certifying period.
25       Q.  Meaning the certification here in Ohio

1    would be issued for, let's say, an initial period of
2    two years.  Is it your understanding then that that
3    dog team would not have to be recertified
4    subsequently to that first two-year period?
5        A.  My understanding is that recertification
6    is not mandatory here.  I may be mistaken, but
7    that's my understanding.
8        Q.  Okay.  And regardless, those minimum
9    standards set forth by OPOTA here in Ohio doesn't
10   necessarily mean that each individual department
11   should deploy that team in the field, correct?
12           MR. WEISENFELDER:  Objection.  Go ahead.
13       Q.  Just because they passed that class with
14   OPOTA doesn't mean that they should deploy them in
15   the field, correct?
16       A.  Not necessarily.
17       Q.  Okay.  Would you agree with me that it is
18   then up to each department who has that K9 unit
19   handler team to determine whether or not their dog
20   is suitable for deployment in the fields -- in the
21   field based upon their particular agency's needs?
22       A.  I would agree that the primary
23   responsibility for determining whether the dog is
24   suitable for deployment in the field rests with the
25   department.

73914236-3f4a-4bc1-802b-d70e380235a6

1    Q.   And they make that decision based upon the
2  policies and procedures that they have in place,
3  correct?
4    A.   That would be one factor.
5    Q.   What are the other factors?
6    A.   It may be factors entirely unrelated to
7  the policies.  Such as dogs can get sick, dogs can
8  develop disease, dogs can develop disabilities that
9  may -- there may not be anything in the policy about
10  that.  The dog in my home -- one of the dog teams in
11  my hometown, for example, right now is suffering
12  from hip dysplasia.  And some folks are out trying
13  to raise money for a corrective medical procedure.
14  That dog should not be out on the street until
15  medical veterinary officials clear him to return to
16  the street.  That may not be discussed in policy.
17  Dogs can get colds, actually, dogs can get a
18  flu-like illness.  Handlers don't always recognize
19  that.  One would hope that they do, but a dog that
20  has a cold is often a dog that is not particularly
21  effective at search for the odors in controlled
22  substances, or the odors of people in hiding.  So
23  that may be a circumstance.
24    It may be that the handler is sick, or it
25  may be that the handler has worked -- I don't know

1  about Ohio, but at my agency we have requirements
2  about the maximum number of hours an officer can
3  work in any, I think it's a week period.
4  Recognizing that people diminish -- people's
5  performance diminishes with a number of hours.  Or
6  it could be other factors, but not every factor is
7  going to be discussed in the policy manual.
8    Q.   Can we agree that one of the factors that
9  would weigh against deploying a K9 team in the field
10  would be repetitive complaints from a handler
11  stating that he needed more training, or he wasn't
12  getting enough training for his K9 unit?
13    A.   That certainly should be something that an
14  agency would be taking a very careful look at.
15    Q.   Meaning if that was ignored by an agency,
16  that's something that should not be ignored by an
17  agency?
18    A.   I'm not sure what you mean by ignored.
19    Q.   Ignored or disregarded?
20    A.   Yeah --
21    Q.   Blown off?
22    A.   I don't -- yeah, and I don't know exactly
23  what that means, but it certainly -- certainly an
24  agency should be attentive to a handler raising
25  concerns about the training time available to the

1  handler.
2    Q.   Meaning that's another one of those, as
3  I've described it, a red flag item, that's a warning
4  to supervisors?
5    MR. WEISENFELDER:  Objection.  Go ahead.
6    A.   It could be, but it also could be that
7  you've got a handler who doesn't like to work on the
8  street and likes to have training time in controlled
9  environments, or enjoys -- being one handler who
10  wanted to go to training more frequently because he
11  had a romantic interest in one of the other dog
12  handlers.  There could be other reasons.  It didn't
13  work out so well.
14    Q.   One thing I didn't ask you about was your
15  work as a consultant to the Utah Risk Management and
16  Mutual Association.
17    A.   URMA.
18    Q.   And is that Utah's largest insurer of
19  police departments?
20    A.   It was then, and I believe it still is
21  today.
22    Q.   What do you do for them?
23    A.   There are times when their adjusters will
24  call to discuss a case that may have resulted in
25  litigation.  And we can have a discussion about

1  whether the case should be settled or whether
2  litigation should be defended.  There are times that
3  they will actually hire me to be the expert in cases
4  that they -- where they undertake the defense.  And
5  occasionally they'll hire me to do training.  It's
6  more frequent though that their principal adjuster
7  will call and say, look, I need to review a case
8  with you and let's talk about whether this was one
9  that we ought to fight or ought to just write a
10  check.
11    Q.   Okay.  And in regards to this particular
12  case, have you had discussions with anybody about,
13  as you've described it, whether or not you should
14  fight or just write a check?
15    A.   No.
16    Q.   You've had zero discussions with
17  Mr. Weisenfelder or any other adjuster regarding
18  whether or not this case should be settled, or why
19  it's continuing in litigation?
20    MR. WEISENFELDER:  Objection.
21    A.   I don't -- if this case is -- I'm not even
22  sure that there is an insurance company involved
23  here, so I -- I certainly haven't had any discussion
24  with any insurance adjuster here.  And that's
25  something I typically would not do, other than for

73914236-3f4a-4bc1-802b-d70e380235a6

1  the folks that hired me to do it.  In this case, I
2  certainly have talked to Mr. Weisenfelder about what
3  I think the defensible strengths are and how
4  different issues are best addressed.
5      Q.  So you've --
6      A.  I've not told anyone to write a check, nor
7  has anyone asked me.  I'll tell you to write me a
8  check when we're done.
9      Q.  If we can, let's go to your report.  I
10 want to go through, and if anybody needs to take a
11 break we can.
12     MR. WEISENFELDER:  How much longer do you
13 think?
14     MR. BRANNON:  I'm going to ask him some
15 questions about his report and some of the opinions
16 in there, so let me just take a quick five minutes.
17     (OFF THE RECORD)
18 BY MR. BRANNON:
19     Q.  I told you we were going to talk about
20 your report.  I'm going to shift a little bit and
21 ask you some questions.  And this is out of your
22 book.  I wanted to know what your understanding of
23 the term positive control means, when pertaining to
24 a K9 on a lead?  What is positive control?
25     A.  A handler has control over the volitional

1  behavior of the dog.
2      Q.  Okay.  And you used a word in there to
3  describe the control.  Is that to say that the
4  handler with positive control can control what the
5  dog will and will not do?
6      A.  Generally speaking, yes.
7      Q.  Okay.  And would you agree with me that
8  handler control is essential in stopping a dog
9  before a bite occurs?
10     A.  Yes.  And I just -- I don't know that this
11 matters to you, but the answers in a narcotics
12 detection case would be somewhat different, but in
13 this context, yes.
14     Q.  Okay.  And I understand in a narcotics
15 context, which this is not, you know, it's sometimes
16 necessary to give the dog a little bit more free
17 rein to sniff out contraband.
18     A.  That's correct.  But when you say control
19 over what the dog does or doesn't do in a narcotics
20 context, you're looking for different changes in
21 behavior so you don't want to control; for example,
22 the dog maybe tried to get under a car,
23 scratching -- going up on a car which may scratch
24 the car that you may later have to pay for.
25     Q.  Okay.

1      A.  Those answers could differ slightly in a
2  narcotics context.
3      Q.  Okay.  I would like your answers then
4  to -- let's just focus on the facts dealing with
5  this case were -- we call that a patrol context?
6      A.  Yes.  And that's what I understood that
7  you were asking.  I just wanted to be clear.
8      Q.  And that was, in fact, what I was asking.
9  So that being said, any change to your answers --
10     A.  No.
11     Q.  -- knowing all my questions were patrol
12 context specific?
13     A.  No.
14     Q.  And would you agree that in a patrol
15 context that a K9 officer should be in control of
16 his dog at all times?
17     A.  Generally speaking, yes.
18     Q.  And that where a patrol officer is not in
19 control of his K9, that he's not the one making the
20 use of force decisions any longer?
21     A.  I'm sorry.  I don't -- I'm not sure I
22 heard that correctly.
23     Q.  Yeah, meaning that where a K9 officer does
24 not control, or cannot or does not have control of
25 his dog in a patrol context, that that officer is

1  then no longer making any decisions regarding use of
2  force?
3      A.  The officer is not making certain
4  decisions regarding use of force.  I don't know that
5  it's accurate to say the officer is making no
6  decisions.
7      Q.  Okay.  And then define that a little bit
8  further for me since you discuss that topic area in
9  your book.
10     A.  If a handler does not have positive
11 control over the dog, if the handler is not
12 directing the dog's behavior, and the handler is
13 not, I think you said, paying attention to the dog
14 and the dog runs off and the handler doesn't see
15 what the dog is doing, then obviously the handler is
16 not engaging in the decision process with respect to
17 the dog.
18     A contrary wise example might be a dog
19 behaving in an autonomic fashion.  For example, I
20 can think of one case where at a rodeo dance an
21 intoxicated rodeo queen dressed in her fine attire
22 in a large crowd with a lot of drinking folks and a
23 lot of noise and a big loud country western band
24 walked up to a service dog handler and the service
25 dog handler was paying attention to many things that

73914236-3f4a-4bc1-802b-d70e380235a6

1  were demanding his attention as a police officer and
2  didn't see this somewhat loopy rodeo queen reach
3  down to pet his dog.  The dog and the woman -- do
4  you have a dog?  You do, you have setters, right?
5      Q.  Yeah.
6      A.  The woman came in with an open hand from
7  above into the dog's face to pet the dog.  Most any
8  dog, particularly a trained police service dog is
9  going to interpret that as an aggressive move, and
10  it resulted in a torn satin blouse.  So, in that
11  case, the officer wasn't making a use of force
12  decision with respect to the dog, because the
13  officer wasn't paying attention to the dog.
14      Q.  Should the officer be making all of the
15  use of force decisions in the context of a K9 with
16  what his dog will or will not do regarding the use
17  of force?  Meaning that's not something that's
18  typically left up for the dog to decide?
19      A.  At some point.  There may be context in
20  which -- there may be context in which the handler
21  makes the decision to remove himself from that
22  decision-making process or decision making
23  opportunity.  For example, I gave you earlier the
24  example of a building search at a warehouse where
25  the handler gives a warning -- this is the Salt Lake

1  City Police Department -- we know you're in there.
2  We have a police service dog, make yourself known or
3  we'll send the dog in, you may be bitten.  At that
4  point the dog may be sent in.  Because of the
5  warehouse, it may not be advisable for officers to
6  go in and search the warehouse.  It just may not be
7  a safe situation until it's been at least
8  preliminarily cleared by the dog.
9          The dog goes in, finds the suspect hiding.
10  In this particular case I'm thinking about it was
11  actually in a stack of suitcases of beer, large beer
12  packs, and the suspect tried to scramble up and
13  knocked a beer case down onto the dog's body
14  somewhere, and the dog jumped up and bit the person.
15  The handler, I guess wasn't involved in the use of
16  force decision right at that moment, but it was
17  still an appropriate deployment of the dog.
18      Q.  Okay.  Let's take that then and go to your
19  opinions that you offer in your report, and it looks
20  like, and if I'm not mistaken, that no opinions are
21  offered in the first seven pages of your report.
22      A.  I think that's correct.  That's just the
23  rules stuff about prior cases and so forth.
24      Q.  Yeah, your prior cases and your history.
25      A.  History and all that.

1      Q.  And it looks like we get to Page 8 --
2      A.  8 --
3      Q.  -- number 9(a) is the first opinion that
4  you offer, the use of police service dog Spike to
5  track and attempt to locate Chelsie Gemperline after
6  she escaped from custody was reasonable and
7  comported with generally accepted police service dog
8  standards.
9      A.  Yes.
10      Q.  And what is your basis for making that
11  opinion?
12      A.  Well, the situation with Gemperline arises
13  really from a couple of different, if you will,
14  reasons for deploying the police service dog in this
15  case to track her and try and find her.  So dealing
16  with them separately, first you have the issue of
17  her criminality and escape.  She was arrested for a
18  relatively minor charge.  I don't remember the -- it
19  was like a minor -- in Utah we call it a minor in
20  possession, I don't know what you call it here, but
21  it was an alcohol violation.  Fairly minor,
22  run-of-the-mill, misdemeanor charge that is soon
23  compounded by her act of escape from custody which,
24  at least in my home state, and I believe in Ohio as
25  well, then elevated her status to that of being a

1  felony offender.
2          So one has to take that into
3  consideration, her criminality and her escape.  And
4  then put on it the additional factors that at the
5  time she escaped the officers -- I believe that she
6  was, and the officers believed that she was still
7  wearing handcuffs.  Now, whether she had slipped
8  them to the front by then or not, I don't know.  I
9  don't know that anybody does know that.  I don't
10  know that she even ever said that or recalls it.
11  Nonetheless, the officers have assumed custody and
12  responsibility for this young woman.  She's in
13  handcuffs.  She's physically impaired.  She's got,
14  one must assume based on the behavior as described
15  and then that I think is bolstered by her later
16  blood alcohol reading, one must assume that she's
17  somewhat impaired, including her mobility is
18  impaired by being handcuffed.
19          And she's escaped into an area that at
20  least one of the other people in this group had gone
21  into a pond to hide.  I don't know about this area,
22  but anecdotally I'm aware of at least one other
23  person who, when fleeing from police going into a
24  pond and ultimately drowned.  I mean, it happens.
25      Q.  Not in this state, correct?  This is

73914236-3f4a-4bc1-802b-d70e380235a6

1  you're talking --
2      A.  If it's happened in this state, then I
3  don't know about it.  But whether the officers knew
4  that something like that had happened before or not,
5  certainly it was foreseeable to them that she could
6  fall into or go into the pond, that she could -- I
7  think we all agree, and I think she agreed that she
8  was intoxicated to some degree.  You know, if she
9  had seen the movie with Daniel Day-Lewis, The Last
10  of the Mohicans, or read the book by James Fenimore
11  Cooper and gone into a pond thinking that she could
12  pluck up a cattail or a reed and breathe under the
13  water, she may have formed that thought in her mind
14  but been too drunk to do it.
15      Now, granted, I don't know what was in her
16  mind.  I don't know what the officers were thinking
17  other than the fact that they knew there was a pond
18  there that posed a danger, a physical danger to her.
19  An additional danger was the nature of the terrain.
20  I haven't been to this location, I've never been to
21  Springboro, that I know of.  I may have ridden
22  through it on my Harley when I came through here a
23  couple years ago, but I don't think so.
24      But in any event, I did look at the
25  territory on a mapping program on the Internet and

1  confirmed for my own mind that there are some ups
2  and downs, gullies and ravines, places that she
3  could fall.  Again, the officers believed that she
4  was handcuffed.  She has no way to reach out and
5  effectively break her fall if she should fall.
6  She's at significant risk of hitting her head.  All
7  of that adds up to what I think Sgt. Zimmaro,
8  whether it was at the scene or later said look, this
9  is a young lady who we needed to find, and that's
10  clearly true.
11      So then we take a look at, well, what are
12  the options available to us to find her effectively
13  before she gets away, before she gets to a point
14  that she could hurt herself?  How can we quickly and
15  effectively get her back into our custody?  And one
16  of the alternatives that was available to them was
17  to use this police service dog they had there at the
18  scene that was trained in tracking to go out and
19  find, or do his best to find Chelsie Gemperline.
20      Q.  Any other basis for that opinion, other
21  than what you've already explained?
22      A.  Let me just take a look here.  I don't
23  know that I want to add to that, but -- no.
24      Q.  One of the things in your basis that you
25  touched upon was that this track was initiated for

1  the safety of Ms. Gemperline; is that a fair
2  statement?
3      A.  It's a fair statement to say that was one
4  of the considerations, yes.  I didn't mean to imply
5  that was the only reason.
6      Q.  Okay.  Is it your belief or your opinion
7  that this was a track for her safety or to track
8  down a dangerous fugitive?
9          MR. WEISENFELDER:  Objection as to the
10  form.  Go ahead.
11      A.  I don't think I would ever characterize
12  her as a dangerous fugitive.  Strike that.  I
13  wouldn't characterize what she did here as saying
14  that she's a dangerous fugitive.
15      Q.  Meaning within the context of the
16  incident, itself, the underage drinking party, kids
17  scattering from a residence, that's a typical
18  reaction that you'd encounter if you were busting up
19  an underage party, correct?
20      A.  Been there, done that.  And she's not --
21  based on the behavior they described, I mean, it's
22  certainly -- I've been assaulted at such parties.  I
23  mean, I've been assaulted by teenagers who didn't
24  want to be arrested.  One that I remember didn't
25  want to be arrested for much the same reason she

1  didn't want to be arrested.  This particular kid had
2  priors and knew that the judge was going to take
3  those priors into consideration.  But I -- based on
4  what I read, I didn't see Chelsie Gemperline as
5  posing a significant threat of assaulting the
6  officers as they searched for her.  So when you say
7  dangerous fugitive, that's what's coming to my mind.
8      Q.  Okay.  And would this have been more a
9  track for her safety due to her intoxication and
10  possibly being handcuffed in that instance, then?
11      A.  I don't know that I would say it was more
12  or less, but it certainly was a significant reason
13  for using the dog to go out and find her.
14      Q.  And with your statement, you say the use
15  of a police service dog to track and attempt to
16  locate, meaning you're opining that their decision
17  to actually deploy the dog in this instance is, in
18  your opinion, is that that was okay for them to do,
19  correct?
20      A.  That's correct.
21      Q.  Okay.  It's not saying anything about the
22  dog's performance in the field, meaning just the
23  decision to deploy the dog was what you've opined as
24  acceptable?
25      A.  I think I understand your question, and

1   the answer is yes.
2     Q.  Okay.  Do you believe that both the
3   Gemperline case and the Campbell case, that both of
4   those were successful uses of a police K9?
5     A.  What do you mean by successful?
6     Q.  That they fulfilled the goals and
7   objectives at the point of deployment?
8     A.  Well, in both cases the individuals that
9   they sought were found.
10    Q.  And are those the results that you would
11  expect when deploying a K9, based upon your
12  knowledge, training and experience?
13    A.  Depends on the circumstance to say that --
14    Q.  I'm talking in these particular cases.
15    A.  Sure.
16    Q.  Were these the -- as a supervisor, or
17  someone in a supervisory role, knowing that you
18  aren't necessarily an expert in handling and
19  controlling of K9s, but as a supervisor, knowing
20  that the decision to deploy Spike in this instance
21  to locate Chelsie Gemperline as you opine was a --
22  you believed a good decision.  Was the result
23  obtained what you would have expected in this case?
24      MR. WEISENFELDER:  Objection as to the
25  form.  Go ahead.

1     A.  I would have expected the dog team to
2  locate -- I mean, optimally it's not what I would
3  have hoped for, but it's certainly within the realm
4  of what I would have expected to happen.
5    Q.  Is this to say that you expected
6  Ms. Gemperline to be located but not bitten?
7    A.  Well, I would have -- that certainly would
8  be one hope.  Another hope would be that
9  Ms. Gemperline would have made herself known.
10    Q.  Would you agree with the proposition that
11  most people in the general public have no idea what
12  K9s are supposed to do, or what they do do when
13  they're deployed in a -- in the field?
14    A.  I don't know.  I don't know, that's not --
15  I'm not sure.
16    Q.  Okay.  Meaning should average John Q.
17  Public know what a K9 service dog is supposed to do,
18  or what they're supposed to do in response to an
19  interaction with a K9 service dog?
20      MR. WEISENFELDER:  Objection.  Go ahead.
21    A.  I think that's the same question that I
22  didn't know the answer to.  I don't know what the --
23  I know I was raised around dogs, my family has a
24  heritage of law enforcement going back a long ways.
25  A couple kids that are cops.  I've lived in cop

1   world.  I'm not sure that I know what John Q.
2  Citizen or Jane Q. Citizen would know about what a
3  dog is going to do.  I also grew up around -- I
4  mean, I do not remember a time there was not a --
5  when I was a kid, I do not remember a time that
6  there was not a dog, usually a German Shepherd
7  bigger than me, around.
8    Q.  That would not be typical for most people,
9  correct?
10    A.  Probably not.  I mean, yeah, most
11  people -- I don't remember a time there wasn't a
12  horse that didn't tower over me, too.  I don't --
13  yeah, probably that's -- my experience is probably
14  not typical.
15    Q.  And most people, whether or not they have
16  experience with a house pet dog, most people do not
17  have any experience at all with police K9s,
18  correct?
19    A.  Fair enough.
20    Q.  And if they don't have any experience with
21  police K9s, how would they otherwise know what a
22  police K9 is supposed to do, what they're supposed
23  to do, or otherwise when encountering a police K9?
24      MR. WEISENFELDER:  Objection.
25    A.  Didn't every kid in the '80s and '90s

1  watch Rin Tin Tin?
2    Q.  So they were supposed to have watched TV
3  and gained knowledge from the television, in your
4  opinion, about it?
5    A.  I don't know that I'm opining on that.
6  I'm just telling you that I don't know what other
7  people might think.
8    Q.  So when you make the statement that
9  Chelsie Gemperline should have done something,
10  there's no basis for that opinion that she was --
11  had the knowledge or capacity to know how to act or
12  react to a police K9, correct?
13      MR. WEISENFELDER:  Objection.
14    A.  I think that's correct, but I also want
15  you to understand that my answer was predicated only
16  on the presence of a dog.  I would have hoped that
17  she would have made herself known when she realized
18  that officers were not going to just, you know,
19  leave her out there.  That they were actively
20  looking for her.  That she would have been like her
21  friend who sponsored the party, and despite being I
22  think underage and drinking herself, cooperated with
23  the police.  It didn't turn out that way.
24    Q.  Based upon your knowledge, training and
25  experience as a police officer, when a suspect is

73914236-3f4a-4bc1-802b-d70e380235a6

1  encountered, isn't the suspect supposed to do
2  nothing unless ordered by the police officer to do
3  something?  Meaning a suspect ideally makes no
4  furtive gestures or sudden movements, they just
5  stand there, sit there or otherwise wait for
6  direction from an officer, correct, when being
7  encountered?
8      A.  I don't know that I've ever seen a
9  situation unfold like that.  I mean, the typical
10  situation unfolds in the gross sense in the pattern
11  of an officer recognizing that there's a suspect,
12  and the officer immediately giving some commands,
13  and the suspect either responding or not responding
14  to those commands.
15      Q.  Meaning, as an officer that's approaching
16  or walking up to somebody, that person can either
17  stand there or sit there and continue to be
18  approached, or the alternative reaction is for that
19  suspect to flee, correct?
20      A.  That's one alternative.
21      Q.  Okay.  What are the other alternatives?
22      A.  The suspect might, I think you said was
23  sitting, the suspect might leap up and launch an
24  attack against the officer, an assault against the
25  officer.

1      Q.  Okay.  So we have basically three
2  different scenarios when a suspect's approached.
3  They'll either stand there, sit there and wait to be
4  approached or told what to do by the officer,
5  correct?  They will possibly flee, or the other
6  alternative is that they get combative and attack
7  the officer.
8      A.  Can we agree that there may be a lot of
9  subsets within those three categories?
10      Q.  We can agree that there would be, but
11  those are probably the three most often encountered
12  scenarios?
13      A.  Sure.  If you want to say that those are
14  the most common scenarios, and a general description
15  of them, I think that's true.
16      Q.  And with those being the common scenarios,
17  ideally, the officer most encounters is the suspect
18  that just stays there, sits there and is approached
19  until told to do otherwise by the officer?
20      A.  In the context of someone who's fled from
21  the police, that would not be the most common
22  response, no.
23      Q.  Okay.  What would be the most common
24  response then?
25      A.  The most common response would be for the

1  person to, if they chose to not flee again, so we've
2  ruled that one out by taking this particular track.
3  The most common response would be for that person to
4  verbalize and, you know, they've fled.  They're
5  probably aroused emotionally.  It's pretty typical
6  to see that emotional arousal manifest itself in
7  being -- in vocalizing, verbalizing their
8  displeasure at being caught or going to jail, or
9  whatever the consequence is that they believe is
10  going to happen.  The consequence that motivated
11  them to flee from the police in the first place.
12      Q.  In this instance, there were other means
13  in which to locate or find Ms. Gemperline, correct?
14      A.  Were there?
15      Q.  Other than using a K9 unit?
16      A.  Well, such as?
17      Q.  Meaning they could have done a foot search
18  for her.
19      A.  Given the number of officers and the other
20  people who were in custody available, I don't know
21  that a foot search would have been particularly
22  effective in this area.  Also factoring in the
23  terrain, time of night.
24      Q.  They had identified who this person was,
25  correct?  They knew her identity at the time when

1  she fled out of the cruiser?
2      A.  I think there was some indication of who
3  she was.
4      Q.  Okay.  They could have gone looking for
5  her at her residence, her acquaintances, correct?
6      A.  That certainly would have been a
7  possibility.
8      Q.  What is the next opinion that you offer
9  after Page 8 then?
10      A.  Well, on Page 10, I don't know that you've
11  discussed my opinion that I believe that the
12  officers had a duty to try and find Ms. Gemperline
13  and prevent further injury, or prevent injury to
14  her.  I don't know if you meant to include that in
15  your earlier discussion.
16      Q.  Yes.  You tell me which are the opinions
17  that you're offering because it's -- as I read it,
18  you know, the 9(a) was an opinion.
19      A.  Right.
20      Q.  And if you're telling me your next opinion
21  is on Page 10, tell me what that opinion is that
22  you're offering?
23      A.  Well, I believe my answer included, but
24  I'm not sure that you specifically asked before that
25  the officers had a duty, and I think here I used the

1 term obligation. Yes. An obligation to use all
2 reasonable means to find Ms. Gemperline and prevent
3 her from injuring herself because of her impairment.
4 Q. Okay. Meaning that that duty arose out of
5 an interest in Ms. Gemperline's safety, correct?
6 A. They'd taken her -- they had taken her
7 into custody. They had assumed custody and assumed
8 responsibility of her.
9 Q. And based upon that they had an obligation
10 then to ensure her safety after taking her into
11 custody?
12 A. I believe so.
13 Q. What is the next opinion that you offer?
14 A. You'll go to Page 5, at the end of Page
15 5 -- or excuse me, paragraph 5, Page 11.
16 Q. Okay.
17 A. At the end of Page 11, paragraph 5,
18 there's some bold -- is it bolded in yours?
19 Q. Yes.
20 A. Yeah. You're right there.
21 Q. It says --
22 A. That the use of force -- use of force
23 policy is consistent with generally accepted police
24 service dog practices.
25 Q. Okay. And can you explain that opinion to

1 me? It looks like it means that the police
2 department policy, which we had marked previously as
3 S2, that you believed that that was consistent with
4 generally accepted police service dog practices?
5 A. And policies, yes.
6 Q. And policies. Meaning, that that policy
7 is consistent with other police agencies' policies?
8 A. It was at the time. Again, my
9 understanding is that the International Association
10 of Chiefs of Police has changed that policy, but at
11 the time that these facts arose, I believe that was
12 the IACP, and I think they called it model K9 policy
13 that was in effect at the time.
14 Q. Okay. And you're aware that there was
15 some dispute as to whether or not that policy was in
16 effect or not in effect at that time?
17 A. Right.
18 Q. But if it was in effect, you think it was
19 a consistent policy with what was in place during
20 that time period?
21 A. Generally, yes.
22 Q. What was changed in that policy to your
23 knowledge?
24 A. I don't recall what was changed. I know
25 that there was some -- I recall being in a meeting

1 of the legal officers section of the International
2 Association of Chiefs of Police, which I'm a member.
3 I don't remember whether it was in Denver or in
4 San Diego, but several years ago I remember being in
5 a meeting where there were a number of issues
6 raised, and -- about some policies, and one of the
7 issues that I recall being raised with that policy
8 was an issue that I think that's actually come up in
9 this case. And that is, that the policy as written
10 seems to be very focused on one general area of
11 police service dog use, and that is deployment of a
12 dog to search a building for a fleeing suspect or a
13 fugitive suspect. And so I know that -- it's not
14 anything I had responsibility for, but I know there
15 was some discussion of expanding the scope of that
16 policy, and providing some additional language to
17 deal with other circumstances. Whether that
18 happened or not, I do not know.
19 Q. Okay. We discussed previously a little
20 bit, and you touched upon the fact that you wouldn't
21 classify Ms. Gemperline as a, I think the term we
22 used was dangerous fugitive, is that --
23 A. That was your term, yes.
24 Q. Okay.
25 A. And I agreed --

1 Q. Would you --
2 A. I don't think -- as I understand dangerous
3 fugitive, I would not have classified her that
4 evening as a dangerous fugitive.
5 Q. You would agree then that she was not a
6 real threat to the safety of the officers --
7 MR. WEISENFELDER: Objection.
8 Q. -- meaning she was a drunk 18-year-old
9 female that probably weighed about 110 pounds
10 soaking wet, a petite small girl.
11 MR. WEISENFELDER: Objection. Go ahead.
12 A. Okay. I agree that she was petite. I
13 agree that she was impaired. I agreed that -- and I
14 don't think you said this, but I didn't see any
15 reports of any behavior to suggest that she was a
16 physical threat. But as the father of a very, very
17 tough cop who is a blond female about that size,
18 I'll tell you, she can be a serious threat, and is a
19 dang good street cop and good street fighter. So
20 that -- the fact that she's small and she's young,
21 that alone does not make her a threat. But I didn't
22 see any -- in the record, I didn't see any behavior
23 from her that's particularly threatening. She was
24 mouthy, but gosh, I've dealt with mouthy --
25 Q. Every other drunk person you've pulled

73914236-3f4a-4bc1-802b-d70e380235a6

1    over in your career, probably, right?
2        A. Yeah. I mean, you just -- you just kind
3    of let that go.
4        Q. And you'd agree that this particular girl,
5    I'm sure, did not have the training that that little
6    darling of a daughter of yours had that has enabled
7    her to --
8        A. Probably not.
9        Q. -- kick somebody.
10       A. Probably not.
11       Q. And --
12       A. My daughter grew up taking bites from
13   police service dogs.
14       Q. And you would agree with me then that her
15   ability to -- Ms. Gemperline to, I think you stated
16   in your report, and I'm just going to quote, summon
17   confederates to assist her in assaulting the
18   officers, that that would be an unlikely scenario in
19   this instance?
20       A. I think it's --
21           MR. WEISENFELDER: Objection. Go ahead.
22       A. I think it's certainly a possibility. How
23   likely it was, I don't know. I mean, it becomes
24   more likely when you consider that I don't think any
25   of the officers knew how many people had run away

1    from that party, or what they -- their mental state
2    was, or what their gender and size was. I think
3    it's fair to -- for the cops seem to assume that if
4    there are a bunch of young women there at the party
5    that there were a bunch of young men there, as well,
6    that fled. So, I don't know how -- I don't know
7    that I can tell you how likely -- I can't quantify
8    how likely it was that she could summon
9    confederates, but I do think that that was a real
10   possibility.
11       Q. Anything's possible, correct?
12       A. Anything is possible.
13       Q. Any suspect could flee and later show back
14   up with a Tommy gun, right?
15       A. Sure.
16       Q. It's possible. But in all probability
17   it's highly unlikely that any suspect could get
18   their hands on a Tommy gun, correct, in the context
19   of fleeing from a police officer?
20       A. I don't know your culture and your
21   environment here. In my neck of the woods, probably
22   not a Tommy gun, but I'd be surprised if there were
23   many people in Utah that couldn't fairly quickly put
24   their hands on a gun, or Colorado or Idaho. I don't
25   know. But I think that it's -- officers don't get

1    the luxury of foreknowledge, they just don't.
2        Q. I understand that. But we can agree
3    though that her summoning confederates to assist in
4    launching an attack on the Springboro police
5    officers that were on the scene was a remote
6    possibility, correct?
7            MR. WEISENFELDER: Objection.
8        A. I wouldn't agree that it was remote. I'll
9    agree that it wasn't very likely. And I'll agree
10   that the officers didn't know that one way or the
11   other.
12       Q. What is the next opinion that you're
13   offering in this matter?
14       A. Paragraph 6, the bold language at the end,
15   using the police service dog to track Ms. Gemperline
16   was generally consistent with police practices.
17       Q. What is your basis for that opinion?
18       A. She had -- Ms. Gemperline had, in fact,
19   been in custody. She had escaped from custody,
20   albeit she didn't escape from a jail, I understand
21   that, but she had escaped from custody and presented
22   a danger to herself, and potentially to others. She
23   had committed what I understand and been informed to
24   be a felony crime in the State of Ohio. And she was
25   actively trying to avoid efforts to take her into a

1    place of confinement and further her detention.
2        Q. And if I'm understanding your explanation
3    correctly, that was the decision to track
4    Gemperline, correct?
5        A. Yes.
6        Q. Okay. Not the performance of the dog,
7    itself, correct?
8        A. Correct.
9        Q. What is the next opinion that you -- let
10   me go back. Is there any other basis for that
11   opinion that you're offering, other than what you've
12   just described?
13       A. Other than what I've stated, no.
14       Q. Okay. Let's go to the next opinion then.
15       A. Paragraph 8 on Page 13 that Spike was kept
16   on a lead. Here, we talk about a 15-foot lead,
17   which is my understanding, believed it was used to
18   track Gemperline.
19       Q. And is your basis of this then the
20   Department General Order 1.3.4 that you cite there?
21       A. That, and what I understand police
22   practices with respect to K9s to be, generally.
23   There are a lot of different options for tracking.
24   I mean, you can actually have like a 50-foot lead in
25   some circumstances. A 15-foot, a 12 to 15-foot lead

73914236-3f4a-4bc1-802b-d70e380235a6

1   is not unusual, and actually in this case, although
2   the lead was 15 feet, that wasn't the actual lead
3   distance because, at least according to testimony,
4   Officer Clark had picked up some of the slack,
5   choked down on -- moved down on the lead, so to
6   speak.
7       Q.  Okay.  Any other basis?
8       A.  No.
9       Q.  Would you agree with the statement that if
10  a handler has control of his dog on a short lead
11  that there should be little possibility of an
12  unintended bite?
13      A.  Did you say little or low --
14      Q.  If a handler has control of his dog on a
15  short lead, there should be little possibility of an
16  unintended bite?
17      A.  I think that's generally true.
18      Q.  So, if I'm understanding this opinion
19  correctly that it was -- to the extent that there
20  was a policy in place, that it complied with the
21  policy that he was conducting the track with the dog
22  on the lead?
23      A.  Correct.
24      Q.  And what you're telling me additionally is
25  that based upon my question, this lead should have

1   allowed the handler to exert more control over this
2   K9, correct --
3           MR. WEISENFELDER:  Objection.
4       Q.  -- in this incidence?
5           MR. WEISENFELDER:  Objection.  Go ahead.
6       A.  As a general proposition, the shorter the
7   lead the more control, as a general proposition.
8       Q.  And in this instance, does it defer from
9   the general proposition?
10      A.  I don't believe so.
11      Q.  What's the next opinion that you offer in
12  your report, or that you're offering in this case?
13      A.  The next broad opinion is right below
14  that, subparagraph, I think it says B.  Anyway it's
15  on Page 13, and the caption is B, that the bite on
16  Ms. Gemperline was an unintended bite, and
17  unanticipated, and that the officer limited the bite
18  exposure.
19      Q.  What's your basis for that opinion?
20      A.  I don't -- the testimony of Officer Clark,
21  as well as the circumstances of the track, lead me
22  to believe that Officer Clark did not anticipate
23  that Ms. Gemperline was in the playhouse in the
24  backyard of the residence where she was at.  That he
25  actually had walked by the playhouse, and as I

1   looked at the pictures of the playhouse, I certainly
2   agree that it didn't seem to be a likely hiding
3   place.  I don't think that he believed that
4   Ms. Gemperline was hiding in the playhouse.
5           Moreover, based on the behavior of Spike,
6   the behavior that Officer Clark observed immediately
7   prior to the incident in which Ms. Gemperline was
8   bitten, the dog, Spike, had pulled Officer Clark in
9   the direction of a deck that suggested to Officer
10  Clark -- he actually believed that Spike was trying
11  to communicate to him that there was a person hiding
12  somewhere on the deck.  And as I recall, I think
13  Officer Clark actually went toward -- I think he
14  actually went -- yeah, he did, went and searched the
15  area of the deck, lit it up, illuminated it.  He
16  didn't see anyone, and at that point I believe,
17  again, based on the testimony that Officer Clark,
18  thought the track was over.  He thought that they
19  had not been successful and was going to return to
20  his car.  And so it was a surprise to him when Spike
21  made a sudden movement and jumped through the
22  playhouse.
23      Q.  Any other basis for that opinion?
24      A.  I don't recall specifically what I wrote
25  about this in my report, but I would not expect that

1   Officer Clark and Spike had ever trained in an
2   environment with a child's playhouse, so this is
3   something that would be new to Spike and new to
4   Officer Clark, and I don't think that he anticipated
5   that Spike would jump up and go through the -- I
6   mean, you've seen the pictures, it's a pretty
7   small -- pretty small opening.  It's a window of the
8   window opening of the playhouse.
9       Q.  Any other basis for your opinion?
10      A.  No.  I believe that's it.
11      Q.  Okay.  And in conducting dog training, all
12  of the scenarios in the training gamut aren't
13  necessarily what's encountered out in the field,
14  correct?
15      A.  That's correct.
16      Q.  Meaning you will train a dog to enter a
17  door, enter other structures, home -- whether it be
18  a home, a business, a chicken house or otherwise,
19  these dogs are trained to go in wherever they're
20  commanded and trained to go into, correct?
21      A.  Yes.  That's correct.
22      Q.  They don't have to receive training in a
23  specific structure to perform properly, correct?
24      A.  In a general sense.  I mean, there may be
25  types of structures that are so unique or access to

73914236-3f4a-4bc1-802b-d70e380235a6

1  structures that are unique and different that
2  present a real obstacle in the field to a dog that
3  the dog hasn't been trained.
4      Q.  Meaning just because a dog encounters a
5  suspect in a plastic child's playhouse, doesn't mean
6  that it should perform any differently than when it
7  encounters a suspect in a wooden shed in somebody's
8  backyard, correct?
9          MR. WEISENFELDER:  Objection.
10     A.  Once the dog is in the shed and the
11  playhouse, that may be correct.  It depends on the
12  size of the shed and what's inside the shed, and the
13  ability of the dog to maneuver in the shed and so
14  forth.
15     Q.  And is it your understanding, and do you
16  agree with me, that this particular backyard where
17  Ms. Gemperline was found was a fenced-in backyard?
18     A.  After the fact I've seen pictures that
19  show at least part of it was fenced with a fairly
20  open wire fence.
21     Q.  Would you agree with me that Officer Clark
22  should have issued verbal warnings to Ms. Gemperline
23  if he had known or thought that she was hiding in
24  this plastic playhouse prior to allowing Spike to
25  engage her, or deploying Spike?

1      A.  If he had known that she was in there, he
2  should have given her commands and an opportunity to
3  surrender.
4      Q.  Do you agree that performing a choke off
5  maneuver increases the bite pressure that a dog
6  exerts against a suspect?
7      A.  I believe that it certainly can.  There's
8  some variables there, but I believe that it can.
9      Q.  Do you agree with me that a verbal command
10  to a K9 is the quickest way to have a dog disengage
11  a bite?
12     A.  Under ideal circumstances, yes.
13     Q.  Meaning you give it a command verbally and
14  it releases immediately, correct?  That's what it's
15  supposed to do?
16     A.  Under, again, with the qualification under
17  ideal circumstances, yes.
18     Q.  It's much quicker than performing a choke
19  off maneuver, correct?
20     A.  It can be.
21     Q.  It should be?
22     A.  It should be if the conditions allow it to
23  be so.
24     Q.  What conditions wouldn't allow it to be
25  so?

1      A.  Typically, when a dog is given a verbal
2  command, out or to release, that the dog actually
3  releases from the bite and then often goes into a
4  sitting-and-barking or even can be commanded to go
5  into down position.  If the dog is in an
6  environment, and that's how the dog is trained, and
7  that's pretty common.  The dog's in an environment
8  where that's impossible, and in fact the dog can't
9  get any real purchase on the ground for balance and
10  you give a dog a command to out, to release, that
11  may be confusing to the dog.  And the dog's not able
12  then to release in the fashion which it's been
13  trained to do.
14     Q.  And if a -- in this particular instance,
15  if Spike had just had his head inside the playhouse
16  and not his whole body, there's no reason why he
17  could not have released and backed out as you've
18  described, correct, with a verbal command?
19     A.  I don't know.
20     Q.  Meaning there would be nothing physically
21  preventing the dog from doing so, based upon the
22  pictures that you've seen of the scene in the
23  backyard, correct?
24     A.  I don't know.
25     Q.  One of the things that I noticed that you

1  did not address in your report were the comments of
2  Officer Clark that he made prior to deploying Spike
3  to find Ms. Gemperline.  Are you familiar with those
4  comments?
5      A.  I think I know what you're talking about,
6  but I would prefer that you tell me what you --
7  which comments specifically you're talking about.
8      Q.  I'm talking about specifically where
9  Officer Clark can be heard prior to deploying Spike
10  to track Ms. Gemperline something to the effect of
11  this bitch, I've had it, she's going to get a nice
12  rude awakening here in a minute or two.  It's not
13  going to feel very good.
14     A.  I've heard that on the recording.
15     Q.  And --
16     A.  I think I've read it.  Well, I know I've
17  read it somewhere.
18     Q.  And you would agree with me that that
19  would indicate, or tend to indicate that Officer
20  Clark intentionally allowed his dog to engage with
21  Ms. Gemperline?
22         MR. WEISENFELDER:  Objection.  Go ahead.
23     A.  I don't know what was in his mind, and why
24  he said what he said.
25     Q.  I didn't ask you what was in his mind.  I

73914236-3f4a-4bc1-802b-d70e3802335a6

1  asked you if you would agree that that would tend to
2  indicate that Spike -- or that Officer Clark
3  intended for Spike to bite and engage
4  Ms. Gemperline?
5       MR. WEISENFELDER: Objection. I think he
6  answered that he didn't know what was in
7  Clark's mind.
8       Q. If it's a factor from his evaluation of
9  the circumstances that that would indicate that yes,
10 it was intentional?
11      MR. WEISENFELDER: Objection. Go ahead.
12      Q. I'm not asking you what's in Clark's mind.
13 You, as an evaluator.
14      A. Well, but you really are because as an
15 evaluator I have to figure out what is he -- what is
16 he thinking. And, in fact, I recently disciplined a
17 employee, a veteran with more years of service than
18 me in my -- I said to him, what were you thinking
19 when you made this comment. Because that's
20 important, what was he thinking.
21      Q. And you just said, what was he thinking,
22 have you ever spoken with Nick Clark?
23      A. I have not.
24      Q. Okay. So what was he thinking when he
25 made that comment, since that is what you're

1  considering?
2       A. I don't know --
3       MR. WEISENFELDER: Objection.
4       THE WITNESS: I'm sorry.
5       MR. WEISENFELDER: Go ahead.
6       A. I don't know what he was thinking.
7       Q. But you would not agree with me that it
8  would tend to indicate that the bite was
9  intentional?
10      A. I would agree that certainly it raises a
11 question as to why he would say something like that.
12      Q. Does it cause you to question the results
13 that occurred as a result of the deployment of the
14 K9 unit in this particular circumstance?
15      A. I think that my reaction when I heard the
16 record, or read it, and I don't remember whether I
17 heard it first or read it first, but I think my
18 reaction was much the same, what were you thinking.
19 It's not the type of comment that, you know, one
20 would hope to hear come from one of -- I'm a chief.
21 I would not expect one of my staff of men or women
22 who work for me to say something like that. But in
23 my career I said stupid things. I probably said
24 some stupid things here today that when I'm reading
25 the transcript I'll regret. That happens. I don't

1  know what he was thinking, so I have to -- I can't
2  tell you. I just can't tell you.
3       Q. Is that to say that that comment would not
4  be reflective of a professional K9 handler?
5       MR. WEISENFELDER: Objection.
6       A. I generally find no reason for a police
7  officer, or other people for that matter, to engage
8  in profane language. And I don't know what was
9  added here. I suppose if Officer Clark thought that
10 his statement would be heard and cause fear and
11 prompt to surrender, that might be one thing, but I
12 don't know. I'm not sure that I can really
13 speculate on what he was thinking. I don't know and
14 I can't guess.
15      Q. And you've listened to this tape,
16 Ms. Gemperline had fled. She was nowhere in the
17 immediate vicinity where she would have heard this
18 statement by Officer Clark, correct?
19      MR. WEISENFELDER: Objection.
20      A. I think in hindsight, I know that she was
21 far enough away that she probably didn't hear. I
22 don't know what he knew or thought at the time.
23      Q. This wasn't, in your opinion, issued as a
24 verbal warning to Ms. Gemperline about the possible
25 use of a K9 being deployed against her, are you?

1       A. If it was, it's not the form of a warning
2  which I prescribe in the training that I present.
3       Q. So it's an improper warning at the very
4  best, is that fair to say?
5       A. It's not appropriate language, sir.
6       Q. And, in fact, it was a threat of harm,
7  wasn't it?
8       A. Well, I suppose that's subjective. But
9  again, it's not the language I would want to use.
10      Q. I understand it's not the language you'd
11 want to use, but it's the language that was used,
12 and you're the one evaluating the case, correct?
13      A. Yes.
14      Q. So because that is the language that was
15 used, and you're the one evaluating the case,
16 wouldn't that not indicate to you a threat of
17 physical harm?
18      A. That's -- as you sit here and pose that
19 hypothetical to me, it's certainly, I think, one way
20 that one could interpret that statement. I didn't,
21 and I don't.
22      Q. Okay. So you don't believe that that was
23 a threat of harm directed towards Ms. Gemperline,
24 that statement of she's going to get a nice rude
25 awakening here in a minute or two. It's not going

73914236-3f4a-4bc1-802b-d70e380235a6

1   to feel very good.
2     A.  I don't see that as an explicit threat.
3   What he had in his mind when he said it I just do
4   not know.
5     Q.  You would agree with me that according to
6   the account of the encounter by Officer Clark, at
7   least his version of the events that occurred that
8   he's testified to in his deposition and that he
9   wrote in his report, that Ms. Gemperline at no time
10   made any furtive movement or flight or anything that
11   would have triggered a bark-and-hold dog to bite
12   her, correct?
13     A.  I didn't see any indication of that in his
14   report or his testimony.
15     Q.  Okay.  Meaning that if Spike had been a
16   properly trained bark-and-hold dog, in all
17   likelihood, Ms. Gemperline would not have been
18   bitten given her reaction to the presence of the K9
19   unit?
20     MR. WEISENFELDER:  Objection.  Go ahead.
21     A.  I don't know that to be the case.
22     Q.  Well, when you spoke about what a properly
23   performing bark-and-hold K9 unit, how they're
24   supposed to perform, correct?
25     A.  Yes.

1     Q.  And you told me earlier that that dog is
2   supposed to bark at or circle-and-bark a suspect
3   unless some type of furtive movement is made,
4   correct?
5     A.  Under ideal circumstances, that's true.
6     Q.  And Ms. Gemperline didn't make in this
7   instance any furtive movement, correct?
8     MR. WEISENFELDER:  Objection.  Go ahead.
9     A.  I believe that it's true that Officer
10   Clark has not testified that she did, or written in
11   his report that she did.
12     Q.  And nobody else has testified that she
13   made any furtive movement, correct?  Or provided any
14   evidence to the contrary to that?
15     A.  No.  Not that I recall.
16     Q.  And based upon that, if there was a
17   properly performing bark-and-hold K9 unit there,
18   that she would not have been bitten and just been
19   barked at, correct?
20     A.  I don't know that to be the case.
21     Q.  In all probability, wouldn't that have
22   been what occurred?
23     MR. WEISENFELDER:  Objection.  Go ahead.
24     Q.  Based upon your knowledge, training and
25   experience, and your review of this case?

1     A.  I don't think so.
2     Q.  You think that a bark-and-hold K9 would
3   have engaged Ms. Gemperline in this circumstance
4   then?
5     A.  I think that's very possible.
6     Q.  Despite the fact that she made no movement
7   or other furtive gesture?
8     MR. WEISENFELDER:  Objection.
9     Q.  Correct?
10     A.  I don't know that she didn't make a
11   movement.
12     Q.  You're presuming that she possibly made
13   some type of movement that would have triggered the
14   dog to attack, correct?
15     A.  I think that's a possibility.
16     Q.  But it's not a probability, is it?
17     A.  Well, whether it's a probability or not
18   calls for me to speculate on what she did.  And I
19   don't know but I think it's fairly -- I think it's
20   fairly likely that she did engage in some movement
21   that triggered the dog's behavior.  I don't know
22   that.
23     Q.  And you're saying about this speculation,
24   well, you're speculating as to what Officer Clark
25   said when you say that you didn't think he intended

1   Spike to engage Ms. Gemperline, correct?
2     A.  That's my opinion.
3     Q.  Okay.  And you're speculating that because
4   you don't know what was in Officer Clark's head,
5   correct?
6     A.  I do not know what he was thinking.
7     Q.  But based upon the facts that you do know
8   from all of the information that you've been
9   provided by Mr. Weisenfelder and your review of the
10   documents and the records, not one of them, nor can
11   you point to any one of them, indicate that Mr. --
12   Ms. Gemperline ever made any movement whatsoever
13   that would have triggered that dog to attack her had
14   it been a bark-and-hold trained dog acting as it's
15   supposed to?
16     MR. WEISENFELDER:  Objection.  Asked and
17   answered.  Go ahead.
18     A.  All the documents that have been provided
19   to me, the only -- my belief is the only person who
20   saw inside of that playhouse was Ms. Gemperline.
21   And she has not testified that she made any
22   movements.
23     Q.  What is the next opinion that you're
24   offering?  Strike that.  Let's go back and talk
25   about one more thing while we're on the unintended

73914236-3f4a-4bc1-802b-d70e380235a6

1  nature, as you opined.  Are you familiar with Sgt.
2  Dulle in this matter?
3      A.  Yes.
4      Q.  Are you aware that Sgt. Dulle's report
5  indicated that after this bite incident occurred
6  that Officer Clark had a conversation with Sgt.
7  Dulle regarding the bite?
8      A.  I don't remember the timing, but I know
9  that there was a conversation at some point.
10     Q.  Okay.  And are you aware that it was Sgt.
11 Dulle's impression, and it was conveyed to him
12 according to his report and his testimony that
13 Officer Clark knew where Ms. Gemperline was prior to
14 allowing Spike to engage her?
15     A.  I don't -- can you pull his deposition
16 out, because I don't recall exactly what he said
17 with respect to that.
18         MR. BRANNON:  Can we get a copy of this
19 real quick?
20         MR. WEISENFELDER:  Not real quick.
21     Q.  Okay.  I'm going to hand you what's been
22 previously marked as Defendants' G25, and I'm going
23 to let you review that document.
24     A.  Okay.
25     Q.  Are you familiar with that memorandum from

1  Sgt. Dulle?
2      A.  I have seen it before, yes.
3      Q.  And would you agree with me that it
4  indicates that Officer Clark told Sgt. Dulle that he
5  was aware of Gemperline's presence before releasing
6  Spike to bite her?
7          MR. WEISENFELDER:  Objection.  Go ahead.
8      A.  That's what Sgt. Dulle recounts as his
9  recollection in that report.
10     Q.  And based upon that report, wouldn't you
11 agree with me that that is a factor weighing in
12 favor of indicating that it was Officer Clark's
13 intent to have Spike engage Ms. Campbell, or
14 Ms. Gemperline, rather?
15         MR. WEISENFELDER:  Objection.  Go ahead.
16     A.  I think that's certainly something that
17 Officer Clark and Sgt. Dulle are going to have to
18 explain, their conversation.
19     Q.  You would agree with me that Sgt. Dulle
20 has no interest in the outcome of this case either
21 way, correct?
22     A.  I don't know.
23     Q.  Wouldn't that indicate that it was Officer
24 Clark's intent to have Spike engage Ms. Gemperline
25 in a bite?

1          MR. WEISENFELDER:  Objection.
2      A.  If that recollection is accurate, that's
3  certainly something to consider in that analysis.
4      Q.  If that recollection is accurate, would
5  that change your opinion regarding whether or not
6  Officer Clark intended Spike to bite Ms. Campbell?
7          MR. WEISENFELDER:  Objection.
8      Q.  Or Ms. Gemperline, rather.
9      A.  If I knew that to be absolutely accurate,
10 that would certainly be something that I think I
11 would give some further consideration to.  But I'm
12 relying more on the reported behavior of the dog, as
13 well as the other information available to me.
14     Q.  And that was the information that was
15 provided by Officer Clark, correct?
16     A.  Correct.
17     Q.  And no other source, other than Officer
18 Clark, correct?
19     A.  Correct.
20     Q.  Now, let's go to your next opinion that
21 you're offering in this case?
22     A.  What page are we on?
23     Q.  The last one we did was on Page 13.
24     A.  So 15, subparagraph -- well, let me back
25 up just to make sure.  Yeah, Page 15, subparagraph

1  (b)(3), the decision to physically remove the dog
2  from the bite.
3      Q.  Is this your bold --
4      A.  Yes.
5      Q.  -- line here?
6      A.  Yeah.  We've talked about it, but I'm not
7  sure that I --
8      Q.  Where it says based upon the circumstances
9  presented by Gemperline's hiding place, and the
10 actions available to Officer Clark, Officer Clark
11 made a reasonable decision to perform a choke off to
12 end the bite, correct?
13     A.  Correct.
14     Q.  You're not a dog handling expert, are you?
15 I think we've established that already.
16     A.  I don't think that I would agree with
17 that, but --
18     Q.  Are you holding yourself out as a dog
19 handling expert then?
20     A.  I have been qualified as an expert dog
21 handler, not trainer.
22     Q.  Okay.  And where have you been qualified
23 as an expert dog handler before?
24     A.  I'd have to -- I don't have my updated CV
25 here for you, but one of the cases that we talked

73914236-3f4a-4bc1-802b-d70e380235a6

1   about this morning, the Trammell case as well as
2   another case we didn't talk about, Swofford versus
3   Eslinger, a case we didn't talk about, United States
4   versus Ludwig, and there have been others.
5       Q.  Okay.  Because when I asked you earlier
6   about what you thought you were an expert in as it
7   pertained to police K9s, you did not mention an
8   expert in dog handling, correct?
9       A.  I don't recall that I didn't.  I may not
10  have.
11      Q.  Okay.
12      A.  I think at the time your questioning was
13  focusing on training, and that's what I was keying
14  in on.
15      Q.  Okay.  And just so that we're more clear
16  on what your testimony is, it's your testimony that
17  you are holding yourself out as an expert in the
18  area of dog handling?
19      A.  Correct.
20      Q.  And your experience as a dog handler was
21  limited to working as a reserve deputy for a period
22  of approximately five years, correct?
23      A.  As an actual handler?
24      Q.  As an actual handler.
25      A.  And not in any other roles, correct.

1       Q.  Okay.  And we discussed all of your other
2   roles pertaining to dog work, correct?
3       A.  Yes.
4       Q.  We didn't leave any of those out, correct?
5       A.  I don't think so.
6       Q.  Okay.  And most of that other work, that
7   was in developing policies and procedures, correct?
8       A.  Much of it.
9       Q.  Okay.  So you feel that your five years
10  working as a part-time sheriff's deputy as a K9
11  handler qualifies you as an expert dog handler, or
12  an expert in the field of dog handling?  That's a
13  question.
14      A.  Oh, was that a question?
15      Q.  That's a question.
16      A.  Coupled with all of my other experience
17  related to K9, yes.
18      Q.  Okay.  But your other experience with K9
19  isn't actual experience with the dog, itself, it's
20  with policies and procedures in the administrative
21  aspects of managing a K9 unit, correct?
22      A.  No, not entirely.
23      Q.  Well, tell me what actual experience you
24  have in handling and training police K9s outside of
25  your experience with being a sheriff's -- a

1   part-time sheriff's deputy.
2       A.  We talked about my experience in working
3   as an agitator and a decoy, which I did prior to
4   becoming a handler done on a number of other
5   occasions subsequent to that.  My work in training
6   handlers, primarily in the field of drug detector
7   dogs.
8       Q.  And where have you actually trained people
9   in training drug detector dogs?
10      A.  Part of the work that I did in Phoenix.
11      Q.  Okay.  And how much time did you spend in
12  Phoenix doing that?
13      A.  A week or so.
14      Q.  Okay.  So there's one week.
15      A.  A number of other seminars.  I've done
16  seminars in --
17      Q.  And let's differentiate seminars between
18  seminars and actual time with dogs.
19      A.  Okay.  Seminars where I've actually spent
20  time with the dogs and the handlers --
21      Q.  Yeah.
22      A.  -- in the field working?  You tax my
23  memory here, but Santa Clara, California.
24      Q.  For whom and how long?
25      A.  That was a conference facilitated by the

1   Santa Clara County Sheriff's Office, and I believe
2   the San Jose Police Department may have
3   participated, and it was a weeklong seminar.
4       Q.  When you say a weeklong seminar, was that
5   in the field training working with K9s or not?
6       A.  The majority of the time was spent in the
7   field working with K9s.
8       Q.  Okay.  What other time --
9       A.  Portsmouth, New Hampshire.
10      Q.  What specifically in Portsmouth, New
11  Hampshire?
12      A.  The conference facilitated by the
13  Portsmouth -- I believe it was the Portsmouth Police
14  Department.
15      Q.  And how long was that, and what did you
16  do?
17      A.  A week.  And worked training primarily
18  narcotic detector dogs.
19      Q.  Okay.
20      A.  Lake County, Florida, which is the -- I
21  think the town was Kissimmee.  That, too, was a week
22  or maybe it was four days, I don't recall.  Again,
23  same kind of work, working and training narcotic
24  detector dogs and, obviously, and their handlers.
25  Boulder, Colorado, again, a weeklong training, again

73914236-3f4a-4bc1-802b-d70e380235a6

1  focusing on narcotic detector dogs.
2     Q.  What group?
3     A.  I can't remember whether that was the
4  sheriff's -- I think that was a joint thing with the
5  sheriff's office and then one of the national K9
6  groups, and I don't recall which ones.
7     Q.  Okay.  Any others?
8     A.  Yes.  There's one near Milwaukee.  I think
9  it's the Waukesha, W-A-U-K-E-S-H-A, County Sheriff's
10  Office.  And one of the municipal police departments
11  there, I don't remember which one.  That was a
12  six-day conference.  And I worked both with patrol
13  dogs and detector dogs at that particular
14  conference.
15     Q.  Any others?
16     A.  Yes.
17     Q.  How many --
18     A.  Harris County -- Harris County Sheriff's
19  Office in Houston, Texas, six-day conference.  And
20  the time there was spent about half patrol dogs and
21  half narcotic detector dogs, or 40 and 60 percent.
22  The Iowa Department of Public Safety in Des Moines,
23  Iowa, and that, I believe, was only three days, and
24  that was exclusively working with narcotic detector
25  dogs.

1     Q.  Any others?
2     A.  I think so.  I'm trying to remember.  I
3  didn't come -- it's not something I was prepared to
4  talk about.
5     Q.  Is it safe to say that you've had probably
6  no more than 15 additional one-week courses in
7  training dogs, actual dog work outside of what you
8  did with the reserve and the sheriff's department?
9     A.  And outside of agitation work?
10     Q.  Yeah, and outside being the --
11     A.  You're talking dog time only?  Yeah, I
12  think 15 weeks is probably a fair --
13     Q.  Okay.
14     A.  It might be a little low, but it's
15  probably a fair number.
16     Q.  Okay.  And that had to do mainly with
17  narcotics dogs?
18     A.  Majority of time with narcotic detector
19  dogs.
20     Q.  Okay.  I think you listed maybe three,
21  possibly four that were not --
22     A.  Correct.
23     Q.  -- narcotics.
24     A.  Okay.
25     Q.  Or that were at least dual.

1     A.  Dual time, yeah.
2     Q.  Okay.  And you believe that that qualifies
3  you to be an expert in dog handling?
4     A.  Again, coupled with my other experience,
5  yes.
6     Q.  Is there any other basis that you could
7  offer me as to your opinion that Officer Clark made
8  a reasonable decision to perform a choke off to end
9  the bite, other than the possible physical
10  restraints or lack of space pertaining to the
11  situation involving Ms. Gemperline?
12     A.  No.
13     Q.  Would you agree with me that it would have
14  been prudent for Officer Clark to at least attempt a
15  verbal call off before engaging in a choke off
16  maneuver?
17     A.  I believe that it would have been prudent
18  for him to give a verbal call off at the time
19  contemporaneous.  And, in fact, I think one of the
20  witnesses said that he did with lifting the dog off
21  of the bite physically.
22     Q.  And so you believe based upon your review
23  of the material that Officer Clark was both
24  performing a choke off and giving a release command
25  to Spike at the time he was performing the choke off

1  procedure?
2     A.  I believe that Clark said he did not give
3  any commands, if I remember correctly, but one of
4  the other witnesses said that he did and it just --
5  it would be second nature for a handler to do that.
6  I don't know, but I believe probably commands were
7  given.
8     Q.  Any other opinions, or let's -- any other
9  basis --
10     A.  Basis for that, no.
11     Q.  Let's move on to your next opinion.
12        MR. WEISENFELDER:  You need a break?
13        THE WITNESS:  I don't know.  How long you
14  going to go?
15        MR. BRANNON:  It seems to keep going
16  endless here, but we can take a break.
17        MR. WEISENFELDER:  Well, you have -- it's
18  2:30 now.
19        MR. BRANNON:  We're at least on Page 15
20  of the report.
21        MR. WEISENFELDER:  We kind of need to get
22  him out of here by about 4:00.
23            (OFF THE RECORD)
24  BY MR. BRANNON:
25     Q.  Your next opinion then.

73914236-3f4a-4bc1-802b-d70e380235a6

1      A.   The next category there is C.  Officer
2  Clark was exercising reasonable caution and properly
3  handling Spike at the time Ms. Gemperline received
4  an unanticipated bite, and that's really a
5  cumulative summary of what we've talked about thus
6  far.
7      Q.   So, do you have any other basis other than
8  what you've already stated that he was properly
9  handling the police service dog Spike at that time
10 that she was bitten?
11     A.   Just to -- no, just to sum up, he thought,
12 based on Spike's behavior that Spike was pulling him
13 toward the deck.  He really believed he was going
14 toward the deck.  He had actually taken steps,
15 shortened down or maybe choke isn't the right word,
16 but take up the slack on the lead so the 15-foot
17 lead was actually much, much shorter.  He believed
18 that based on the testimony that the search exercise
19 was over, and he was going back to his -- back to
20 his car to put Spike up at the time that Spike
21 suddenly lurched and went into the window.  So I
22 think that that's -- I think I've testified to all
23 that already, and that's really the basis there.
24     Q.   Okay.  Any other basis than that?
25     A.   Not other than what I've mentioned

1  already.
2      Q.   And, again, that's a handling opinion,
3  correct?
4      A.   Yes.
5      Q.   What's the next opinion that you are
6  offering here?
7      A.   Well, we transitioned to -- the report
8  transitions to the other situation, Mr. Campbell.
9      Q.   Okay.
10     A.   Page 16.  There's a general statement
11 there followed by some subparagraphs with other
12 opinions that the use of Spike to track and try and
13 find Mr. Campbell after the incident at Lisa
14 Parker's house.  I remember Lisa Parker's house was
15 a reasonable use of a police service dog.
16     Q.   Okay.  So, your opinion, and I'm just
17 going to read it verbatim here, is that the use of
18 the police service dog Spike to track and attempt to
19 locate Sam Campbell after he allegedly committed a
20 violent felony crime was reasonable and comported
21 with generally accepted police service dog
22 standards.  So if I'm understanding what you're
23 opining here, it's your opining that the decision
24 to utilize Spike on a track had a basis, had a
25 reasonable basis to it?

1      A.   That's correct.
2      Q.   And what was that basis?
3      A.   The officers were responding to a
4  situation where a neighbor reported that there was
5  some kind of a domestic disturbance.  When Officer
6  Clark and Officer Anderkin -- Anderkin arrived at
7  Ms. Parker's home.  They saw extrinsic evidence that
8  suggested to them that there had been some violent
9  action that it appeared to them that the screen door
10 in front had been kicked in and damaged.
11     They spoke with the neighbor, Ken Simpson,
12 who told them that there had been some kind of
13 incident a couple of weeks before, and that
14 Ms. Parker had related to him that the man with whom
15 she'd had the incident had made death threats
16 against them -- excuse me, against her on a prior
17 occasion.
18     They weren't able to speak with
19 Ms. Parker.  She was -- I think they later figured
20 out she was intoxicated and basically passed out.
21 They knew that the man, who at that point I don't
22 think they'd identified as Samuel Campbell, had fled
23 the area upon hearing sirens.  So based on that they
24 believe that what happened was that they are
25 responding to a situation where there is at least an

1  attempted, if not actual burglary.  That the person
2  who committed the burglary was potentially a person
3  with whom Ms. Parker had had a dispute a couple of
4  weeks before, that the person was at least
5  potentially the person who had allegedly made some
6  kind of death threat against Ms. Parker on a prior
7  occasion.  And that the person had fled from police
8  upon hearing the police response.
9      Q.   Any other basis for that opinion?
10     A.   No.
11     Q.   Can we agree that in the Campbell incident
12 that no violent felony had, in fact, been committed?
13     MR. WEISENFELDER:  Objection.
14     A.   I believe that the hindsight showed that
15 that was, in fact, the case, at least not that night
16 at that place.
17     Q.   Yeah, and that's what I'm --
18     A.   That's what you meant, right.
19     Q.   That's the only place we're talking about
20 right now.
21     A.   Right.  We don't -- I don't know what
22 happened between Campbell and his girlfriend on
23 prior occasions.
24     Q.   Okay.  And --
25     A.   Nor is it relevant.

73914236-3f4a-4bc1-802b-d70e380235a6

1    Q.  And that the information that was provided
2 by Ken Simpson was some type of a domestic dispute,
3 correct?
4    A.  Some type of a domestic dispute, and that
5 the man he believed to have been involved had made
6 death threats against Ms. Parker.
7    Q.  And that the information -- you would
8 agree with me that the information relayed by the
9 dispatcher to the officers in your review of the
10 tapes, that it also indicated some type of a
11 domestic dispute, correct?
12    A.  That is correct.
13    Q.  Okay.  And that it was Officer Clark or
14 Officer Anderkin or both that jumped to the
15 conclusion of this breaking and entering or
16 burglary, correct?
17    A.  I don't know that I'd say that they jumped
18 to the conclusion.  I think they looked at the
19 circumstances before them and thought that that was
20 one explanation of what was happening.
21    Q.  And they're the only ones -- in fact,
22 Officer Clark was the only one that made the
23 conclusion that -- or the assumption that a possible
24 burglary had taken place at that time, correct?
25        MR. WEISENFELDER:  Objection.

1    A.  I don't recall what Officer Anderkin had
2 to say, so I'm not sure that's true.
3    Q.  Okay.  Regardless, it came from the
4 officers, correct?
5    A.  The belief that there was a potential
6 burglary that occurred came from the officers?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Would you agree that the officers in the
10 officers' investigation of the incident, that it
11 would have been prudent for Officer Clark and
12 Officer Anderkin to make contact with Lisa Parker
13 prior to deploying the K9?
14    A.  I think they tried to do just that.
15    Q.  Wouldn't you agree that the safety and
16 welfare of Lisa Parker would have been more
17 important than pursuing the fleeing suspect with the
18 police K9?
19    A.  Well, I think that her safety and welfare
20 certainly was one of their legitimate concerns.  I
21 think that's probably why they called Holly -- and
22 I've forgotten her last name, the landlord to get a
23 key once they were unsuccessful in rousing
24 Ms. Parker.
25    Q.  And my question was in the priority of the

1 two, based upon your knowledge, training and
2 experience in investigating police officers' actions
3 and conduct, wouldn't it be more important to ensure
4 the safety and welfare of an individual that they
5 believed was possibly compromised rather than pursue
6 a fleeing suspect with the use of K9?
7    A.  Well, I don't know.  That's a judgment
8 call that they made based on their observation of
9 Ms. Parker.  They could see where she was at.
10    Q.  What's the next opinion that you're
11 offering in this matter?
12    A.  Well, I think if you go to paragraph 4 on
13 Page 18, I think we've just finished discussing
14 that, a decision to pursue Campbell.  Do you see
15 that in bold, paragraph 4?
16    Q.  Okay.  And let me read what you wrote
17 here.  The decision to pursue Campbell was a
18 reasonable choice.  They knew that he had committed
19 a serious crime.  That he was actively escaping and
20 that he posed a threat to Parker having allegedly
21 threatened to kill her, according to a presumably
22 reliable named citizen informant.  Let me ask you
23 about that statement.  How did Officers Clark and
24 Anderkin know that the fleeing suspect had committed
25 a serious crime?

1    A.  Based on the evidence before them they
2 believed that at the very least an attempted
3 burglary had been committed.
4    Q.  So that's not a true statement?  They
5 believed that he may have committed a serious crime,
6 but they didn't know that he had committed a serious
7 crime, correct?
8    A.  That -- I'll accept that.
9    Q.  Okay.  So, at best, they suspected that he
10 may have committed a serious crime, they didn't know
11 that any serious crime had been committed, or even a
12 crime at all, correct?
13    A.  They didn't have any absolute certainty,
14 they just evaluated the evidence before them.
15    Q.  And if no crime had been committed,
16 nobody's escaping, correct?
17        MR. WEISENFELDER:  Objection.
18    A.  I'm not -- I think that's a debatable
19 legal proposition.
20    Q.  You're an attorney.
21    A.  I'm not here to testify about what the law
22 is in Ohio.  That gets me into trouble with judges.
23    Q.  From a context of a police officer -- in
24 the context of being a police officer you can
25 certainly understand it, a person has to commit a

73914236-3f4a-4bc1-802b-d70e3802335a6

1  crime before they can escape from the scene of a
2  crime, correct?
3       MR. WEISENFELDER: Objection.
4  Argumentative now. Go ahead and answer.
5       A. I think that -- I'm not sure how the law
6  works in Ohio, but if this situation had played out
7  in Utah and the -- Mr. Campbell -- if this were to
8  play out in Utah, Mr. Campbell could potentially,
9  even though a crime may ultimately have been
10 determined not to be committed, or even though a
11 prosecutor in the exercise of her discretion may not
12 have decided to file charges for an attempted
13 burglary, or even a disorderly conduct, or a breach
14 of the peace or criminal mischief being the property
15 damage, even if the prosecutor hadn't decided to
16 file charges, at least in the system with which I am
17 familiar, Mr. Campbell still could have been
18 convicted of obstructing justice. In that he knew
19 that he was the subject of a police investigation
20 and took steps to conceal himself from the police.
21 So I don't -- you know, I think you could -- your
22 question actually is pretty darn nifty for a law
23 school hypothetical. But I don't know that I can
24 answer it for you here any better than that.
25      Q. Well, escape is a much different criminal

1  charge than obstructing justice, correct?
2       A. Probably under Ohio statutes it is.
3       Q. And if under Ohio statutes I can represent
4  to you under a hypothetical that escape is a felony
5  charge and obstructing justice is a misdemeanor
6  charge, and that can have a bearing on whether or
7  not a police K9 should be deployed, correct?
8       A. It could.
9       Q. And if it was only a misdemeanor
10 obstructing justice offense, that would weigh
11 against deploying a police K9 to track a suspect,
12 correct?
13      A. If that's the only crime that the officers
14 believe to have been committed, that certainly would
15 be an important factor.
16      Q. Okay. And in your analysis as you've gone
17 through this, knowing that an escape has not
18 occurred but at most an obstructing justice offense
19 may have occurred, it would indicate that the police
20 K9 in this instance should not have been deployed,
21 correct?
22      MR. WEISENFELDER: Objection. That's not
23 his testimony. Go ahead and answer.
24      A. Okay. That question has a number of
25 problems. First off, I don't know whether an escape

1  under Ohio law had been committed. I don't know
2  whether obstructing justice under Ohio law had been
3  committed. And my testimony has to do with what
4  crime the officers believed to have been -- to have
5  been committed based on what they say before them at
6  the time.
7       THE WITNESS: And with that, having
8  finished my answer to the question, how about we
9  take five?
10      MR. BRANNON: I've got a few more
11 follow-up with you, then I'll give you a break.
12      THE WITNESS: Okay.
13      Q. Would you agree with me that Officer
14 Clark, being a peace officer, should have been
15 familiar with the differences between escape and an
16 obstructing justice charge?
17      MR. WEISENFELDER: Objection. Go ahead.
18      A. I presume that those are crimes about
19 which Ohio peace officers are trained.
20      Q. And he should know, or should have known
21 at the time whether or not one was a serious felony
22 or one was a misdemeanor, correct?
23      A. Again, I believe those are crimes about
24 which he should have been trained.
25      Q. You also stated in this opinion that,

1  referring to Mr. Campbell, that he posed a threat to
2  Parker, meaning the girlfriend, correct?
3       A. Correct.
4       Q. After the officers arrived on the scene,
5  what threat did Mr. Campbell pose to Lisa Parker, if
6  any?
7       A. They didn't know. He certainly posed a
8  threat if he was armed of engaging them and her at a
9  distance. They didn't know whether he was armed or
10 not, he was unsearched. They didn't know if --
11 whether he would return if they weren't able to
12 locate him. They didn't know what was in his mind.
13 They knew only the information that had been
14 communicated to them.
15      Q. And they would get that information most
16 likely from talking with Lisa Parker, herself,
17 correct?
18      A. And from Ken Simpson and from the
19 extrinsic evidence that they observed.
20      Q. Okay. So really, there was -- after the
21 officers arrived, is it fair to say that there was
22 no real threat to Lisa Parker at that time?
23      MR. WEISENFELDER: Objection. Go ahead.
24      A. No. It's not fair to say that.
25      Q. Okay. You believe that there was a

73914236-3f4a-4bc1-802b-d70e380235a6

1  serious and legitimate threat to Lisa Parker after
2  the officers arrived on scene?
3      A.  Well, you've asked me a question at one
4  far end of the spectrum and now you're asking a
5  question at the other far end of the spectrum, and
6  neither one of them are accurate.
7      Q.  Well, I'm just asking you to answer the
8  question that was asked.
9      A.  I believe that, just as I told you a
10  minute ago, there certainly still remained a threat
11  of serious harm to the officers and to Lisa Parker.
12      Q.  Okay.  And my question was at the time
13  that the officers, or after the officers arrived on
14  scene at Lisa Parker's residence, it's your
15  testimony that you believe it was reasonable to
16  presume that there was a serious and legitimate
17  threat to Lisa Parker's health and safety?
18      A.  Yes.
19      Q.  You've also classified Ken Simpson as a
20  reliable citizen informant, correct?
21      A.  Yes.
22      Q.  Why do you find him to be a reliable
23  citizen informant?
24      A.  The information that the officers had
25  before them at the time didn't give any indication

1  that he wasn't reliable.  And officers are trained,
2  and we hear at the police academy that not only our
3  common sense, but courts tell us that we presume
4  that people who don't seem to have an interest in
5  the outcome are reliable.  He gave them face-to-face
6  information.  They knew who he was.  If he had an
7  interest in Lisa Parker, that wasn't evident to
8  them.  It's not evident to me now.
9      Q.  Would you agree with the proposition that
10  reliable citizens or witnesses will participate in
11  the legal process?
12      A.  One would hope.  They don't always,
13  sometimes they're pretty reliable in reporting
14  information and then when they start to consider the
15  import of going to court, entering a world that's
16  foreign to them sometimes they become less -- less
17  forthcoming, become reticent to be involved.  I
18  don't know.
19      MR. BRANNON:  We can go ahead and take
20  that break now if you'd like.
21      (OFF THE RECORD)
22  BY MR. BRANNON:
23      Q.  What is the next opinion in here that
24  you're offering?
25      A.  Okay.  I'm not sure if we had -- had we

1  talked about using -- Page 19 at the top there in
2  bold, using Spike to track Mr. Campbell was
3  consistent with generally accepted police practices,
4  reasonable method of tracking a fleeing felon.
5      Q.  Okay.  And that again makes the
6  presumption that a felony had occurred, correct?
7      A.  Correct.  Well, makes the presumption that
8  the officers had a reasonable basis to believe that
9  a felony had occurred.
10      Q.  Okay.  And what else is your basis for
11  that?
12      A.  Nothing beyond what we discussed in the
13  last few minutes.
14      Q.  Okay.  What's the next opinion that you're
15  offering in this case?
16      A.  The next paragraph immediately below that
17  dealing with warning, the area in bold.  This was a
18  situation in which a warning would have been
19  tactically inadvisable and ineffective because there
20  was no contained and controlled perimeter around the
21  wooded area or neighborhood.  And because the
22  officers did not know whether Mr. Campbell was
23  armed, and did not know his intentions other than
24  his intentions to do harm to Parker.
25      Q.  Okay.  And we can say at this point that

1  Mr. Campbell had no intentions to do harm to
2  Ms. Parker, correct?
3      A.  That seems to be the evidence at this
4  point.
5      Q.  And his only intention was to return her
6  car keys, correct?
7      A.  That seems --
8      MR. WEISENFELDER:  Objection.  Go ahead.
9      A.  That seems to be what the evidence would
10  point to at this point.
11      Q.  Okay.  Can we agree that if Officer Clark
12  had seen Campbell prior to Spike engaging him that
13  he should have issued a verbal warning to Campbell
14  prior to deploying the police K9 on him?
15      A.  As a general proposition, yes.
16      Q.  Okay.  Meaning in reading your report
17  you've accepted Officer Clark's version of the
18  events that occurred in this case, correct?
19      A.  I believe Officer Clark did not see
20  Mr. Campbell before Spike engaged Mr. Campbell.
21      Q.  And you're also aware of Mr. Campbell's
22  testimony that him and Officer Clark, that their
23  eyes met.  Officer Clark recognized Campbell laying
24  face down on the ground with his head up looking at
25  him, correct?  That ring a bell with you?

73914236-3f4a-4bc1-802b-d70e380235a6

1    A. That he recognized him by name or just saw
2 him as a person?
3    Q. Saw him as a person.
4    A. I recall that testimony, yes.
5    Q. Okay. And if, in fact, under that same
6 scenario you take Mr. Campbell's version of the
7 events as he has testified in his deposition, that a
8 verbal -- that Clark should have issued a verbal
9 warning to Campbell prior to allowing his K9 to
10 engage Campbell?
11    MR. WEISENFELDER: Objection as to form
12 in terms of allowing. Go ahead and answer the
13 question.
14    A. My answer remains the same. Injecting
15 specifics or the abstract here, and the answer is
16 generally yes, their circumstances were that it's
17 not feasible in the circumstances where it's not
18 advisable.
19    Q. Okay. And I'm talking about specifically
20 in the circumstance as purported to have occurred by
21 the Plaintiff, in this instance, Mr. Campbell. His
22 testimony was that their eyes met, that Officer
23 Clark saw or recognized him as a suspect laying face
24 down on the ground. In that instance, Officer Clark
25 should have issued verbal warnings to Officer (sic.)

1 Campbell prior to utilizing or deploying his police
2 dog to engage Mr. Campbell, correct?
3    A. If I can add some things to that version
4 of events then I can answer, correct. Otherwise,
5 I'd have to say no.
6    Q. I'm not going to tell you how to answer.
7 I'll let you explain your answer.
8    A. Okay.
9    Q. I've let you explain all day today, so I
10 don't think I've jumped on you too bad.
11    A. No. No. One of the circumstances that
12 would make a warning ineffective or inadvisable
13 would be the distance. If, for example, the
14 distance where -- I can see you clearly here and I
15 recognize you, so let's assume that I do. At this
16 distance I may be startled and there may not be
17 time, and it may not be effective to give a warning
18 before my dog sees you, and in effect, the dog may
19 see you right at the same moment as I've seen you.
20 So a warning isn't going to do anybody any good. I
21 don't know precisely what distance at which
22 Mr. Campbell asserts he was at when he saw Officer
23 Clark. And I don't -- just to maybe add a bit of a
24 correction to your assumption. I don't know that
25 Mr. Campbell isn't accurate. I do accept Officer

1 Clark's version here in this particular factual
2 conundrum, that he didn't see Mr. Campbell.
3 Mr. Campbell may have seen him. And Mr. Campbell
4 may have the belief in his mind that Officer
5 Clark -- Officer Clark saw him. I don't know that
6 for certain.
7    Q. Let me ask a little different question
8 then along the same lines. If Officer Clark saw
9 Campbell prior to Spike engaging Campbell, should he
10 have issued warnings, verbal warnings, to Campbell?
11    A. Again, there's some factors -- generally,
12 yes, but there's some factors that would make that
13 impractical and inadvisable, distance being one of
14 them. Officer Campbell's perception -- or excuse
15 me. You did it a minute ago, did you catch that?
16 You called Mr. Campbell Officer --
17    Q. Yeah.
18    A. Officer Clark's perception of
19 Mr. Campbell's body posture. Mr. Campbell was
20 laying down in a way that it appeared that he had a
21 weapon at the ready. I can see that the warning may
22 not have been advisable and effective. There may be
23 other circumstances.
24    Q. You would agree with me that just because
25 a track or a search for a suspect in the context of

1 a police K9 occurs in an open field, that the fact
2 that it occurs in an open field as opposed to a
3 closed building does not prohibit an officer from
4 issuing verbal warnings to suspects about the use of
5 possible K9 deployment or K9 force?
6    A. I agree.
7    Q. What is the next opinion that you're
8 offering in this case?
9    A. Paragraph (e), Page 19, the force used to
10 apprehend Samuel Campbell was reasonable and
11 comported with generally accepted police practices.
12    Q. And what is your basis for that opinion?
13    A. In addition to what we've talked about
14 before, at this point I would note that the officers
15 didn't know who was out there. They didn't know
16 that this was Samuel Campbell. They didn't know
17 that there was some prior history, other than the
18 allegation from Mr. Simpson that there had been an
19 incident a couple weeks before, and other than the
20 allegation from Mr. Simpson that potentially
21 Mr. Campbell was a person who allegedly had made
22 death threats against Lisa Parker. So basically,
23 the officers had someone who fled from them, they
24 didn't know why. And he was unsearched, meaning
25 that they didn't know whether he was armed. They

73914236-3f4a-4bc1-802b-d70e3802335a6

1  didn't know what his intent was, and they could
2  certainly reach some conclusions based on their
3  perception that the banging that Mr. Simpson had
4  reported resulted in damage to the door, and their
5  perception the door had been kicked in.
6      Q.  Any other basis for that statement?
7      A.  No.  Not -- I mean, other than what we've
8  discussed already, no.
9      Q.  You would agree with me that the -- a
10 prolonged bite is one example of excessive use of K9
11 force, correct?
12     MR. WEISENFELDER:  Objection.  Go ahead.
13     A.  The duration of the bite is a significant
14 factor to take into consideration when assessing
15 propriety of use of force from a police service dog.
16     Q.  And generally, the longer a dog is engaged
17 in a bite, the more harm, physically, it does to the
18 suspect, correct?
19     MR. WEISENFELDER:  Objection.  Go ahead.
20     A.  As a general rule, that's true.
21     Q.  And at this particular case, are you
22 familiar with how many stitches it took to sew up
23 Mr. Campbell?
24     A.  I read that once.  The number doesn't come
25 to mind today.

1      Q.  60 to 70, I believe.
2      A.  Quite a few.
3      Q.  Would that indicate to you a long duration
4  in which the dog was engaged on a suspect?
5      A.  Not necessarily.
6      Q.  Is 60 to 70, when I told you that number
7  you said that's quite a few.  Is that more than what
8  is normally -- what it normally takes to stitch up a
9  suspect after a police K9 engages a suspect, in your
10 experience?
11     MR. WEISENFELDER:  Objection, but go
12 ahead.
13     A.  It depends.  It depends on a number of
14 factors.  I'm not the really smart one in my family,
15 there are five smarter than me who went to med
16 school, including a couple of surgeons and four that
17 are nurses.  To look at me you don't see a scar on
18 my face, although I've had a significant injury to
19 my face.  Part of that was that there were a lot of
20 stitches that were made, very tiny and very
21 carefully.  So number of stitches, I have learned,
22 can be a factor of the patience and skill and the
23 style of a surgeon.  So the number is significant,
24 but there are extraneous factors that impact that.
25     There are other factors that impact the

1  number of stitches.  And the most significant factor
2  is probably, and I am not a medical guy, not by any
3  stretch, but it's probably the length and the
4  breadth of the wound channel, I think.
5      Q.  Okay.  So you think the -- how about the
6  coverage area for a bite, meaning if a bite occurs,
7  or the numerosity of bites rather, let me ask you
8  like that.  Does the numerosity of bites indicate to
9  you how long a dog is engaged on a suspect?
10     A.  No, it's a factor.  It doesn't make me --
11 I can't clock and give you a timeline from the
12 numerosity.
13     Q.  Okay.  Not to say that -- but in all
14 likelihood, the higher the number of puncture wounds
15 or bites from a dog's jaws on a suspect, the longer
16 that that dog was engaged on the suspect?
17     A.  That's generally true.  There are some
18 dogs that engage in what's known -- what are called
19 typewriter bites.  And so you can see a lot of
20 typewriter bites in a fairly brief period of time.
21 That is a dog that engages in the undesirable, at
22 least from the law enforcement officer's
23 perspective, and desirable behavior of (imitating).
24 How do you transcribe that?
25     Q.  Continuous chewing?

1      A.  Not chewing, just tapping, in and out, in
2  and out.  And so you can see -- I've only seen it
3  once, but you can see a lot of punctures in a very
4  short period of time.
5      Q.  Was there any indication in your review of
6  Spike's records that he was a typewriter biter as
7  you've described it?
8      A.  No.
9      Q.  In your opinion that you've just offered,
10 you again set forth the scenario of Mr. Campbell
11 fleeing the scene to arm himself or return with
12 confederates to mount an attack.  You would agree
13 with me that that was a remote possibility in this
14 particular circumstance?
15     MR. WEISENFELDER:  Objection.
16     A.  I don't know that it was remote.  I think
17 that it's less likely that he was -- particularly if
18 it was -- in a domestic situation one would tend to
19 see fewer times that someone would return with
20 confederates.  That's more consistent with gang
21 activity, with an area where there's a group of
22 people to begin with that dispersed in the different
23 areas of the neighborhood.  I don't think that it's
24 all remote though that he would go into an area and
25 retrieve a weapon.  Whether it's one he knew to be

73914236-3f4a-4bc1-802b-d70e380235a6

1   located someplace, or an improvised weapon or a
2   weapon of opportunity.  I don't think that it's
3   all -- at all a remote possibility for the officers
4   to consider.
5      Q.  Okay.  When referring to the summoning
6   confederates here in relation to Campbell, can we
7   say that that possibility is more remote in the
8   instance of Campbell's incident, as opposed to
9   Gemperline in light of the fact that Campbell was
10  the only other possible suspect, there were no
11  groups of people?
12     A.  Perhaps.  It's a little different
13  situation in that the police don't know who Campbell
14  is yet, but they know -- they have reason to believe
15  at least that he's been at that home before, based
16  on Mr. Simpson's statements.  They don't know --
17  they don't have any sense of how far away he lives.
18  They don't really know what his purpose in going
19  there was.  They just know there was some kind of
20  disturbance, and based on what they see before them
21  they think there's some kind of an attempted
22  burglary, so -- different -- it's kind of apples and
23  kumquats.
24     Q.  What's the next opinion that you're
25  offering in this case?

1      A.  If you go to Page 20, paragraph 2, about
2   halfway down.
3      Q.  Is this where it gets bold again?
4      A.  Yes.  It was reasonable and consistent
5   with generally accepted police practices to use
6   Spike to track and apprehend Mr. Campbell because
7   the officers had the disadvantage of tracking
8   through dark woods with abundant hiding places.  It
9   would not have been reasonable for them to provide a
10  warning announcement that would pinpoint both their
11  location and intention to apprehend Mr. Campbell.
12     Q.  And what's your basis for that opinion?
13     A.  Well, based on photographs, and again
14  looking at satellite images of the area, it appeared
15  that there was a fairly -- a fairly wide open -- I
16  don't know if I put the distance or amount of --
17  amount of space.  I didn't, but a fairly wide open
18  area with not only a significant wooded area, but
19  other residences and outbuildings and plenty of
20  hiding locations.  As well as plenty of -- you have
21  outbuildings and garages, you also tend to have
22  plenty of places where there are weapons of
23  opportunity, shovels, axes, picks, pitchforks, so
24  forth.
25     Q.  And if I'm understanding this opinion

1   correctly, you're both offering a policy opinion and
2   a handling opinion, correct?
3      A.  Well, I hadn't conceptualized it that way,
4   but I think that's fair.
5      Q.  Can you not mean it to be a handling
6   opinion?
7      A.  I didn't -- I didn't really think about it
8   in terms of a broad policy statement actually.
9      Q.  Is it a board policy statement as opposed
10  to an opinion on K9 handling?
11     A.  It's certainly a broad policy statement to
12  say that there are circumstances when a warning is
13  not tactically advisable.  And one of those
14  circumstances is when you're about to track into a
15  wooded area with plenty of hiding places and
16  ancillary buildings -- excuse me, outbuildings, and
17  no defined established perimeter.
18     Q.  Then explain to me, if you would, the
19  handling portion of this opinion.
20     A.  Well, the officers were the one -- the
21  officer, the handler here, Officer Clark was the one
22  who was responsible to survey the scene to make the
23  assessment of whether a warning made sense in a
24  circumstance presented to him or not.  That's a
25  decision he made as a handler, as a police officer.

1      Q.  Any other component to the handling
2   portion of that opinion?
3      A.  I don't believe so.
4      Q.  What's the next opinion that you're
5   offering in this case?
6      A.  Page 21 at the top, Officer Clark
7   reasonably and properly limited the force applied to
8   Campbell.
9      Q.  And what's your basis for that opinion?
10     A.  As soon as the -- as soon as Mr. Campbell
11  ceased his resistance, as soon as he stopped
12  fighting, stopped struggling with Officer Anderkin
13  and Officer Campbell, and stopped kicking at Spike,
14  Officer Clark gave a release command.  And as soon
15  as the release command was given, Spike released
16  from the bite.
17     Q.  And in this instance, Spike was able to
18  follow and obey a verbal release command, correct?
19     A.  He was.
20     Q.  So this wasn't an incident where the dog
21  kept engaging in a bite because he wouldn't respond
22  to a command?  Officer Clark had complete control
23  over how long Spike continued to engage the suspect
24  based upon the response of this dog, correct?
25     A.  I think the facts show that Officer Clark

73914236-3f4a-4bc1-802b-d70e380235a6

Page 202

1    had control of the dog with respect to giving the
2    dog a release command and having the dog instantly
3    obey.  I don't --
4        Q.   Meaning at any time Officer Clark, upon
5    his own choosing, could have shortened the duration
6    of the bite by giving a release command earlier
7    after the dog had engaged, correct?
8        A.   I believe that to be possible based on the
9    fact that the dog obeyed promptly.
10       Q.   In fact, probable since the dog obeyed
11   promptly, correct?
12       A.   That would be fair.
13       Q.   So there's no question in this case that
14   Officer Clark was applying the use of force to
15   Campbell, correct?
16           MR. WEISENFELDER:  Objection.  Go ahead.
17       A.   I'm not -- you mean that Officer Clark
18   wasn't touching Mr. Campbell?
19       Q.   Meaning Officer Clark, as the handler, was
20   in control of his K9.  He was able to, as we
21   discussed earlier when we were talking about
22   handlers, and let me put it in this context.  That
23   you recall our prior conversation that if the
24   handler is not in control, then the handler is not
25   the one making the use of force decisions, correct?

Page 203

1        A.   Correct.
2        Q.   And in this case, Officer Clark was in
3    control of his K9, correct?
4        A.   Yes.  I understood your question to
5    suggest that Officer Clark never touched
6    Mr. Campbell.
7        Q.   I don't think anybody is alleging that
8    Officer Clark ever touched Mr. Campbell.
9        A.   Okay.  I may have misunderstood where you
10   were going.  Okay.
11       Q.   My question is, and I wanted to see if you
12   agreed with me.  That it was not the dog that was
13   determining the use of force in this instance, but
14   it was Officer -- I said Campbell -- Officer Clark
15   in this instance that was determining how much force
16   to exert on Mr. Campbell, knowing that the dog was
17   properly responding to verbal commands?
18       A.   Officer Clark certainly was the one here
19   who made the determination of when to give the
20   release command, and Spike complied with that
21   release command.
22       Q.   And based upon that, it's fair to say that
23   Officer Clark was in control of the use of force
24   being exerted against Mr. Campbell, correct?
25       A.   He was as in control as a handler could

Page 204

1    be.  There were other factors with respect to the
2    use of force.
3        Q.   Any other basis for you opinion that we
4    haven't discussed yet?
5        A.   Not other than what we mentioned here.
6        Q.   What is the next opinion that you're
7    offering in this case?
8        A.   Page 21, letter F, the training provided
9    for Spike's maintenance, generally accepted police
10   service dog training standards.
11       Q.   Okay.  And what is your basis for that
12   statement?
13       A.   Both testimony from Officer Clark that he
14   did regular maintenance training, as well as the
15   training records that I have reviewed in this case.
16   And the fact that at least prior to these occasions,
17   albeit there had been a gap, at least prior to these
18   occasions, that Spike and Officer Clark had been
19   able to perform at a sufficient level of proficiency
20   to achieve police service dog team certification
21   from the -- I don't know that I even remember what
22   OPOTA stands for, Ohio Peace Officer Training
23   Commission.
24       Q.   So, your basis for this statement, if I'm
25   understanding you correctly, is that Spike had met

Page 205

1    the minimum standards for OPOTA certification in the
2    State of Ohio?
3        A.   He had met those minimum certification
4    standards.  He had also been certified by a private
5    certification group, I believe North American Police
6    Working Dog Association.  And also I'm relying on
7    the testimony of Officer Clark, as well as training
8    records.
9        Q.   Anything else that you're relying upon?
10       A.   No.
11       Q.   Do you agree that Officer Clark admitted
12   during his deposition that Spike was not current in
13   his training at the times the Campbell and
14   Gemperline bites occurred?
15       A.   I agree that he talked about -- he did,
16   yes, talk about some weeks, and I don't remember
17   exactly what the time frame was, but he did talk
18   about weeks where he had not accomplished his
19   regular maintenance training period.
20       Q.   And just so we're clear on this, is your
21   opinion that both the maintenance training
22   requirements were met and the OPOTA certification
23   requirements were met, or just the OPOTA
24   certification requirements?
25       A.   The OPOTA certification requirements, and

1  generally he met the in-service training
2  requirements, but they clearly are, as shown in the
3  record, and the training records, there are some
4  lapses.
5      Q.  And I think you indicated that those
6  lapses caused you some concern as to whether or not
7  this dog was performing to professionally acceptable
8  levels --
9          MR. WEISENFELDER:  Objection.
10     Q.  -- correct?
11         MR. WEISENFELDER:  Objection.  Go ahead.
12     A.  I didn't -- I did not say that.  It caused
13  me concern.
14     Q.  Well, what did it cause you concern about?
15     A.  It caused me concern that Officer Clark
16  may not have been adequately and accurately
17  recording the full scope of the in-service training
18  that he was doing, the maintenance training that he
19  was doing on a regular basis.  And as we discussed
20  earlier this morning, one factor that a supervisor
21  should be looking at is whether a handler is making
22  statements, such as I need more time to be made
23  available to me to do training.
24     Q.  And that's a factor that weighs against or
25  that causes some concern, at least from a

1  supervisory position, that that dog may not be
2  operating to professional standards, correct?
3          MR. WEISENFELDER:  Objection.
4      A.  It's one of the factors a supervisor
5  should look at.  Certainly, you know, you can have,
6  as I gave the example of the border patrol dogs, you
7  can have dogs that aren't getting four hours of
8  formal training in a week, but are still performing
9  quite -- quite well.
10     Q.  And that's because those dogs are actively
11  engaging in the work that they do, correct?
12     A.  That's one of the reasons.
13     Q.  Now, this particular K9 unit, in the
14  context of Springboro, Ohio, which is a relatively
15  affluent community with low crime, would you agree
16  with that characterization of Springboro as you've
17  read it in the depositions?
18     A.  I've seen that written in several places.
19     Q.  Okay.  You would have --
20     A.  I've never been there.  I don't know
21  anything about the town.
22     Q.  You wouldn't dispute those demographics,
23  though?
24     A.  I have no reason to.
25     Q.  And you would agree with me in that

1  context that, you know, it's an entirely different
2  situation than as you've described these border dogs
3  where maintenance training is going to be necessary
4  because they aren't daily in and out engaging in
5  dual purpose work?
6      A.  I think that's a strong consideration, but
7  it also doesn't -- it doesn't take into
8  consideration one other variable, and that is the
9  dedication of the particular handler and the team.
10  You know, you can have a handler that's very
11  motivated.  Handlers, like other people, other
12  police officers, their motivations may rise and
13  fall.  You can have a handler that's very motivated,
14  who is getting that dog out a couple hours every
15  night, or an hour every night to do training with a
16  handler, potentially training with another officer,
17  who is doing a great job of keeping the training up,
18  but is not doing such a great job of documenting and
19  recording the training.
20     Q.  Officer Clark or anybody else never
21  testified that there was training that he did that
22  he didn't document, correct?
23         MR. WEISENFELDER:  Objection.
24     Q.  There's no indication of that in this set
25  of facts that you've been given, or the case

1  materials that you've reviewed?
2      A.  I don't recall that.
3      Q.  You don't recall that or you would agree
4  with me that that scenario that you've listed where
5  he's doing training but he's just not recording it
6  is something that's at play in this case?
7      A.  I'm sorry, I don't remember.  I don't
8  agree with you.  I have in my mind the notion that
9  Officer Clark was doing some maintenance training
10  that I didn't see reflected in the training records,
11  but I'm not -- I'm not certain of what it is that
12  pops that into my mind.
13     Q.  Would you agree with me that the training
14  records completed by Officer Clark in this instance
15  could have been done better, meaning more
16  information, more detail about what he was doing
17  with this particular dog?
18     A.  Yes.  I think there's a time they got
19  better.  In fact, there was a time they shifted to a
20  computer program.  It made accurate recordkeeping a
21  lot easier.  Cops like easy.
22     Q.  Were you able to determine from your
23  review of the training records at what point Spike
24  was transitioned from a bark-and-hold dog to a
25  bite-and-hold dog?

73914236-3f4a-4bc1-802b-d70e3802335a6

1    A.  No.
2    Q.  You just believe that he was eventually
3  trained or transformed into a bite-and-hold dog
4  based upon the results you were reviewing in the
5  deployment reports, correct?
6    A.  Well, I think what I told you earlier and
7  what I say now is the end of the searching behavior,
8  the circumstances I reviewed he performed as I would
9  expect a bite-and-hold dog to perform.
10   Q.  What is the next opinion that you're
11 offering?
12   A.  Page 22.
13   Q.  Okay.  And what is that opinion?
14   A.  At the top of the page, the Springboro
15 Police Department properly supervised Officer Clark
16 in the incidents involving Chelsie Gemperline and
17 Samuel Campbell, and just continuing that paragraph.
18 The policy and practice is consistent with generally
19 accepted police practices providing an adequate
20 supervisory review for use of force for
21 administrative purposes.
22   Q.  Who do you believe at the Springboro
23 Police Department -- or strike that.  Tell me the
24 basis of that opinion.
25   A.  Each time -- and when we're talking about

1  use of force here today, I'm assuming that you want
2  me only to talk about the use of force involving the
3  police service dog Spike.
4    Q.  I want you to talk about what you're
5  opining about --
6    A.  Okay.  And that's it.
7    Q.  -- anything that you're offering an
8  opinion on.
9    A.  Right.  And that's it.  I'm not offering
10 an opinion about batons or tasers or anything else.
11 Each time there was a bite that occurred in the
12 course of police service by police service dog
13 Spike, there was a use of force report that was
14 completed that was reviewed by a supervisor and
15 ultimately was part of -- became part of the annual
16 public report.  The practice -- well, I'll stop
17 there.  That's the basis for my opinion, was that
18 there was a use of force reporting system in place
19 that apparently was carried out in the case of each
20 bite.
21   Q.  Okay.  Any other basis for that opinion?
22   A.  The way the use of force report was
23 handled, that is that it went up the chain of
24 command and was reviewed at multiple levels for
25 whether the use of force was consistent with the

1  agency's policies, practices with the law, and
2  essentially whether it was an appropriate use of
3  force.
4    Q.  Okay.  So, if I'm understanding your
5  statement correctly, you're stating that the
6  Springboro Police Department properly supervised
7  Officer Clark in the incidents involving Chelsie
8  Gemperline and Samuel Campbell because a report was
9  generated after the incidents and went up the chain
10 of command?
11   A.  Generated and reviewed, and that's
12 indicative -- and the policy requires that.  That's
13 indicative that the agency is supervising the use of
14 force generally within the agency.
15   Q.  Okay.  And this is the agency supervising
16 the use of force.  You're not opining that the
17 sergeants, the lieutenants and Kruitoff in this
18 case, regarding their supervision of Officer Clark,
19 other than the reports that you mentioned, correct?
20   A.  Well they're the ones reviewing the
21 reports.  I mean, they're human, if you want to say
22 agency that they're the folks carrying out the duty,
23 but if you're talking about supervision beyond these
24 incidents, I'm not giving an opinion, no.
25   Q.  Okay.  And that pertains to his not

1  offering any opinion regarding his supervision and
2  the field supervision for training or anything of
3  that nature, correct?
4    A.  I'm not.
5    Q.  Okay.  Any other opinions that you're
6  offering?
7    A.  I believe you've covered it.
8        MR. BRANNON:  Give me a minute.  I'm
9  pretty close to done.
10       (OFF THE RECORD)
11 BY MR. BRANNON:
12   Q.  In your review of the records pertaining
13 to Spike, the dog, did you find him to be
14 particularly weak or strong in any certain areas?
15       MR. WEISENFELDER:  Objection.  Go ahead.
16   A.  I'm not sure what you mean by weak or
17 strong.
18   Q.  Meaning was he really good at drug
19 detection as opposed to patrol work?  Was he an --
20 you know, an aggressive dog when it came to barking
21 at suspects, was he --
22   A.  I don't --
23   Q.  Did you form any --
24   A.  I didn't look at the -- I didn't look at
25 the records with an intent to opine on that, so, you

73914236-3f4a-4bc1-802b-d70e380235a6

1 know, I guess I could go back, but I -- it's not
2 something that strikes me here as I sit today that
3 he was weak and strong in any particular area.
4   Q.  Okay.  You're not offering any opinions
5 on --
6   A.  I'm not.  I suppose I did in one sense
7 when I told you I didn't think that he made the
8 mistake of typewriter bites, but, you know, other
9 than that, I really hadn't thought about it.
10   Q.  As far as the K9 usage of Spike, you keep
11 referencing these border patrol dogs.  From your
12 review of the records, was there any indication that
13 Spike was getting so much use in the field that it
14 wasn't necessary for him to engage in maintenance
15 training?
16   A.  No.
17   Q.  So that's to state that in all likelihood
18 Spike should have been engaging in maintenance
19 training, in addition to his OPOTA certification
20 training, correct?
21   A.  Yes.
22   Q.  For maintenance training to occur on a
23 regular basis, I think that you said was it eight
24 hours a week, sixteen hours a week?
25   A.  The generally accepted best practice

1 number that I believe to be appropriate is sixteen
2 hours a month.  And that's the number one would hear
3 most often endorsed by the National K9 Association,
4 and regional, with which I'm familiar for that
5 matter.
6   Q.  And how is that sixteen hours a month
7 generally done?  Is it, you know, you spend four
8 hours a week for four weeks?
9   A.  Sure.  And every -- you know, every month
10 is different.  Some months have five weeks, some
11 months have four, and recognizing that special
12 events and just vacation and other incidents may
13 throw in an off week.  I think that it's best, and I
14 believe that most folks will tell you that it's best
15 to try and accomplish that in blocks of four hours a
16 week.  I'm aware of agencies that try and do it
17 differently.  They try and do it two hours, a couple
18 a week, two hours twice a week.
19     In California it's not uncommon to see an
20 agency that will do one eight-hour training day
21 every two to three weeks.  It just kind of depends
22 on what works for the agency and what works for the
23 trainers involved.
24   Q.  In your review of the materials pertaining
25 to the K9 team of Detective Clark -- or Officer

1 Clark, Spike, is it fair to say that anybody from
2 the sergeant or a lieutenant or otherwise was void
3 of any involvement with the basic and in-service
4 training requirements for Spike in the City of
5 Springboro Police Department?
6   A.  I'm sorry.  I'm not quite sure I
7 understand what you're asking me.
8   Q.  I'm asking you if, as it pertains to the
9 basic in-service training requirements regarding the
10 Clark/Spike K9 team, if the sergeants to lieutenant
11 operations commanders, none of them were involved
12 with any -- any of that in this particular instance,
13 correct?
14   A.  Based on what I've seen, I believe that to
15 be the case.
16   Q.  Okay.  And in the case of Mr. Campbell,
17 Officer Clark never got approval from any supervisor
18 prior to deploying K9 Spike, correct?
19   A.  That's correct.
20   Q.  And that's against the policy that
21 Springboro had in place at the time, correct?
22   A.  You're referring to the policy --
23   Q.  That may or may not have been adopted.
24   A.  -- that may or may not have been
25 officially adopted?

1   Q.  Yeah.
2   A.  One could certainly interpret it that
3 way.
4     MR. BRANNON:  I don't have anything else
5 for you.  I'll let you go catch that plane.
6           (Witness excused)
7 (The deposition ended at approximately 3:50 p.m.)
8
9
10
11
12 _____   _____
13 Kenneth R. Wallentine        Date
14
15
16
17
18
19
20
21
22
23
24
25

73914236-3f4a-4bc1-802b-d70e380235a6

```
 1                    )
 2   STATE OF OHIO       )
 3                    )
 4
 5        I, Tina M. Barlow, Notary Public for the
 6   State of Ohio, do hereby certify:
 7        That the witness named in the deposition, prior
 8   to being examined, was by me, first duly sworn;
 9        That said deposition was taken before me at the
10   time and place therein set forth and was taken down
11   by me in shorthand and thereafter transcribed into
12   typewriting under my direction and supervision;
13        That said deposition is a true record of the
14   testimony given by the witness and of all objections
15   made at the time of the examination.
16        I further certify that I am neither counsel for
17   nor related to any party to said action, nor in any
18   way interested in the outcome thereof.
19        IN WITNESS WHEREOF I have subscribed my name
20   and affixed my seal this 23rd day of September,
21   2013.
22
23
             TINA M. BARLOW
24           Notary Public
             State at Large
25           My Commission expires: 5/16/14
```

73914236-3f4a-4bc1-802b-d70e380235a6